# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrance Dixon, a/k/a "TA", | Case Number: 25-5144 |
| Plaintiff, | |
| v. | **Civil Complaint**<br>**Jury Trial Demanded** |
| Joseph Antonio Cartagena p/k/a "Fat Joe,"<br>Peter "Pistol Pete" Torres,<br>Richard "Rich Player" Jospitre,<br>Erica Juliana Moreira,<br>Sneaker Addict Touring LLC,<br>Slate, Inc.,<br>Roc Nation, LLC,<br>John Does 1–10, and Jane Does 1–10, and<br>ABC Corporations 1–10, | |
| Defendants. | |

<div style="border:1px solid black; text-align:center;">

**<u>TRIGGER WARNING</u>:**
**THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A**
**SEXUAL NATURE, INCLUDING SEXUAL ASSAULT. ADDITIONALLY,**
**THERE ARE GRAPHIC DETAILS OF SEX TRAFFICKING, AND OTHER**
**CRIMINAL ACTIVITY ORCHESTRATED BY THE DEFENDANTS**

</div>

Plaintiff Terrance Dixon, a/k/a "TA," by and through his undersigned counsel, T.A. Blackburn Law, PLLC, brings this civil action against Defendants Joseph Antonio Cartagena, professionally known as "Fat Joe"; Pete "Pistol Pete" Torres; Richard "Rich Player" Jospitre; Erica Juliana Moreira; Sneaker Addict Touring LLC; Slate, Inc.; Roc Nation, LLC; and John Does 1–10, Jane Does 1–10, and ABC Corporations 1–10, asserting civil claims for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1591, and 1595; the Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1962(c) and (d); and related violations under New York and Florida law, including unjust enrichment, quantum meruit, fraudulent concealment, fraud, intentional infliction of emotional distress, and money laundering.

This action arises from a deliberate and sustained campaign of exploitation, wherein an internationally recognized entertainer manipulates and abuses a creative partner through an

1

organized network of enforcers, associates, and shell companies. Defendants systematically engaged in coercive labor exploitation, financial fraud, sexual manipulation, violent intimidation, and psychological coercion against Plaintiff Dixon, all intended to enrich Defendant Cartagena and his associates while deliberately suppressing, silencing, and erasing Plaintiff's substantial creative, artistic, and commercial contributions, which were foundational to Defendant Cartagena's professional success and personal brand.

### PRELIMINARY STATEMENT

1. This action arises from a calculated, sustained, and multi-layered exploitation of a creative partner by an internationally recognized entertainer, aided by an extensive network of associates and corporate entities operating in concert to defraud, intimidate, and financially exploit Plaintiff.

2. For more than sixteen years, Plaintiff Terrance Dixon, a/k/a "TA," dedicated his talent, labor, and loyalty to Defendant Joseph Antonio Cartagena, professionally known as "Fat Joe." During that period, Plaintiff acted not only as Cartagena's hype man but also contributed as a lyricist, background vocalist, security team member, and creative collaborator.

3. Despite Plaintiff's integral contributions, Defendant Cartagena systematically excluded him from fair compensation, proper attribution, and the substantial royalties and profits generated from his creative labor. Instead, Plaintiff was consistently underpaid, denied songwriting credits, and deliberately concealed from royalties and backend compensation.

4. Plaintiff Dixon contributed lyrics, vocals, and creative direction to numerous commercially successful songs performed and monetized by Defendant Cartagena, including but not limited to the hits "Congratulations," "Ice Cream," and "Money Over Bitches."

5. Dixon's creative fingerprints, distinctive voice, and stage presence are embedded in multiple critically acclaimed and commercially lucrative albums from which Defendant Cartagena continues to profit without recognition or fair compensation to Plaintiff.

6. Defendant Cartagena's exploitation extended beyond financial fraud. He employed his industry influence and power dynamics to subject Plaintiff to psychological coercion and economic control, forcing Plaintiff into humiliating situations, including sex acts performed under duress and surveillance, accompanied by threats of abandonment in foreign countries if Plaintiff refused compliance.

7.  Defendant Cartagena deliberately withheld travel accommodations, misappropriated per diem payments, and exploited Plaintiff's financial dependence and professional loyalty to ensure submission, silence, and domination.

8.  Assisting Defendant Cartagena in maintaining his criminal Enterprise were key associates and enforcers, including Defendant Pete "Pistol Pete" Torres and Defendant Richard "Rich Player" Jospitre.

9.  Torres and Jospitre actively engaged in physical threats, violent assaults, and intimidation tactics on Cartagena's explicit instructions, sustaining a climate of fear and coercion against Plaintiff and others who challenged the Enterprise's control.

10. Defendant Erica Juliana Moreira further facilitated Cartagena's fraudulent schemes through unauthorized legal representation, fraudulent corporate filings, and the creation of deceptive corporate structures that enabled the concealment and diversion of proceeds owed to Plaintiff and the laundering of illicit funds.

11. Corporate defendants Slate, Inc. and Sneaker Addict Touring LLC served as instrumental vehicles for the Enterprise's sophisticated financial fraud and money laundering schemes.

12. Slate, Inc. operated as the central financial conduit, systematically concealing illicit proceeds. At the same time, Sneaker Addict Touring LLC fraudulently secured federal Paycheck Protection Program (PPP) loans by falsifying business activities and diverting federal funds into the Enterprise.

13. Defendant Roc Nation, LLC, the current management and representative entity for Defendant Cartagena, knowingly participated in concealing, transferring, and manipulating Plaintiff's authorship rights and royalty interests.  Roc Nation deliberately facilitated Cartagena's unlawful conduct by filing a meritless lawsuit against Plaintiff and his counsel to intimidate, harass, and obstruct Plaintiff's legitimate claims against Cartagena and his co-defendants.

14. Roc Nation, through its CEO Desiree Perez, extracted 10% of all revenue generated by Defendant Cartagena and his associated businesses, including through joint management of business records, oversight of touring revenue, and enforcement of policies Plaintiff was required to follow during his work with Defendant.

    1.  As an aside, according to Accountant Doe and Former Manger Doe, Defendant Cartagena stole hundreds of thousands of dollars from Roc Nation and their CEO Desiree Perez when he accepted cash payments of up to $500,000 for performances, he

3

secured independent of Roc Nation.  Upon information and belief, Defendant Cartagena's actions went against his agreement with Ms. Perez.

15. Defendant Cartagena, alongside Torres, Jospitre, Moreira, Slate, Inc., Sneaker Addict Touring LLC, and Roc Nation, created and sustained a deliberately exploitative arrangement in which Plaintiff was systematically denied proper compensation, authorship recognition, and lawful recourse.

16. Over more than sixteen years, Defendants collectively enriched themselves through Plaintiff's uncompensated labor, creativity, and professional contributions, generating substantial royalties, performance fees, and brand equity from which Plaintiff received virtually no benefit.

17. Additionally, Defendants engaged in deliberate tax fraud schemes by submitting intentionally inflated and fraudulent income reports to the Internal Revenue Service ("IRS"), significantly overstating the actual compensation Plaintiff received.  This deliberate misrepresentation of Plaintiff's income was designed to conceal Defendants' extensive wage theft, artificially inflate Plaintiff's tax liabilities, expose him to unwarranted tax audits and penalties, and systematically obscure the financial realities underlying Plaintiff's exploited labor.

18. Defendant Cartagena's criminal and fraudulent conduct is not speculative.  It has been corroborated by firsthand witnesses, recorded phone calls, and documented evidence in the possession of Accountant Doe, who personally handled the financial affairs of Cartagena and confirmed that:

    1. Plaintiff was intentionally excluded from formal payment systems.
    2. W-2s were falsely inflated and reported to the IRS to create a fictitious paper trail.
    3. Defendant Cartagena personally collected $600,000 and $200,000 in cash at different times from the UPNYC retail stores.
    4. Roc Nation received 10% of all revenue from Cartagena's businesses; and
    5. Numerous financial records were fabricated or withheld to avoid paying Plaintiff the royalties and compensation he was owed.

19. Further confirming the illicit nature of Defendant Cartagena's operation, employees at UPNYC—a small sneaker and apparel store—routinely flaunted luxury goods, including G-Wagons, Range Rovers, Rolexes, and designer clothing, despite earning little more than New York's minimum wage.

20. This conspicuous consumption, combined with large volumes of cash-only transactions and the complete absence of legitimate revenue documentation, reflects the store's role as a laundering front for the Cartagena Enterprise.

21. Defendant Cartagena earns an estimated $60,000 per month in royalties and at least $20,000 monthly in streaming revenue, none of which has ever been shared with Plaintiff despite his significant authorship and performance contributions to the monetized songs.

22. In one documented instance, Defendant Cartagena pocketed a $30,000 Live Nation performance check for the "All the Way Up" tour—money that was rightfully allocated for Plaintiff's contributions. Cartagena used those funds to pay off his back taxes owed to the IRS, as confirmed by a witness who was part of his management team at the time.

23. Plaintiff was not only exploited financially but also subjected to a wide spectrum of sexual coercion, psychological control, forced exhibitionism, and surveillance-based humiliation, including being compelled to perform sex acts under observation, being filmed, or directed by Defendant in the presence of others—tactics designed to control Plaintiff's body, erode his autonomy, and ensure silence.

24. These sex-based abuses were not private, incidental, or isolated. They were integral to the Enterprise's culture of dominance and humiliation, enforced by the Defendant's associates, such as Pistol Pete, JB, and others, and sustained across numerous tour locations, including Miami, North Carolina, Germany, Spain, and Wisconsin.

25. In Miami, on Market America's corporate yacht and at its mansion properties, the Defendant orchestrated repeated orgies. The creation of fraudulent paystubs, the use of W-2s while filing 1099s, and the concealment of payroll fraud for enterprise gain are textbook RICO predicate acts under mail/wire fraud and tax fraud statutes. The scheme furthers the Enterprise's coercive structure and is directly tied to financial exploitation

26. Plaintiff, female dancers, and minors. Defendant used his status as a corporate sponsor, celebrity influence, and financial control to compel Plaintiff and others into degrading sexual performances, often while Defendant watched, recorded, or directed the encounters.

27. These incidents occurred under conditions that included the presence of corporate security staff, surveillance cameras, and Defendant's management entourage, yet no intervention occurred, supporting the inference that these acts were facilitated by—and covered up by—the broader Enterprise and its affiliates.

28. Defendant also used social media burner accounts, including "Bitttgggg" and "Doctor Zhivag," to issue veiled death threats and witness intimidation, such as:

    1. "You love your family, right?"

2. "Fall back in 48 hours."

3. "We let you live."

29. These statements were interpreted by Plaintiff and his legal team as part of a broader scheme to intimidate, silence, and obstruct Plaintiff's participation in this case.

30. These acts constitute violations of 18 U.S.C. § 1512 (witness tampering) and 18 U.S.C. § 875(d) (interstate threats) and fall squarely within the pattern of violent racketeering activity under the Civil RICO statute.

31. In retaliation for asserting his rights, Roc Nation and Defendant Cartagena jointly filed a baseless lawsuit against Plaintiff and his counsel. The complaint, riddled with procedural defects and legal inaccuracies, was filed for the sole purpose of intimidating the Plaintiff, diverting judicial resources, and chilling his First Amendment right to seek redress.

32. The retaliatory lawsuit was intended not to prevail on legal merit but to create public confusion, burden Plaintiff's counsel with discovery costs, and dissuade other victims and whistleblowers from coming forward with evidence of Defendant's enterprise activity.

33. This conduct violates 42 U.S.C. § 1985(2) (conspiracy to obstruct justice), New York Judiciary Law § 487 (deceit or collusion by an attorney), and federal witness retaliation statutes under 18 U.S.C. § 1512(b)(3).

34. As part of a coordinated cover-up, Defendant submitted ghost contracts and backdated split sheets to performing rights organizations (PROs), including BMI and ASCAP, omitting Plaintiff's authorship credits.

35. These records were created after the commercial release of the music and falsely assigned 100% publishing rights to the Defendant and his business entities.

36. The fraudulent documents were designed to mislead royalty agencies, divert backend payments, and erase Plaintiff from the creative history of the works—even though Plaintiff's vocals and lyrical contributions were readily identifiable on the tracks.

37. These actions not only deprived Plaintiff of at least $600,000 in projected royalties but also ensured his exclusion from future licensing, catalog valuation, and digital revenue derived from streaming platforms.

38. The fraudulent backdating and ghost contracts constitute predicate acts under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 371 (conspiracy), and New York Penal Law § 175.10 (falsifying business records).

39. The Enterprise's financial arm further engaged in systematic laundering and tax evasion, as evidenced by repeated cash disbursements of over $200,000 and $600,000 at a time, withdrawn from UPNYC with no documented ledger, reporting mechanism, or tax compliance.

40. Defendant Cartagena's post-conviction tax conduct—including repeated failure to report foreign earnings, the use of nominee entities, and cash-based laundering through corporate fronts—reflects the sophistication and scope of the Enterprise's concealment strategies.

41. These acts of structured concealment, misappropriation, and intimidation represent a pattern of criminal conduct carried out through an ongoing association-in-fact enterprise, meeting all elements under 18 U.S.C. § 1962(c) and supporting both closed-ended and open-ended continuity under RICO.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction over this action according to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal law, specifically the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1591, and 1595, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

43. This Court further possesses supplemental jurisdiction over Plaintiff's related state law claims—including unjust enrichment, quantum meruit, fraudulent concealment, constructive trust, intentional infliction of emotional distress, assault, battery, fraud, conspiracy, unauthorized practice of law, and fraudulent financial reporting—according to 28 U.S.C. § 1367(a). These claims are so intertwined and related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

44. This Court has personal jurisdiction over Defendant Joseph Antonio Cartagena, a/k/a "Fat Joe," Defendant Pete "Pistol Pete" Torres, Defendant Richard "Rich Player" Jospitre, Defendant Erica Juliana Moreira, Defendant Roc Nation, LLC, Defendant Sneaker Addict Touring LLC, Defendant Slate, Inc., and all remaining Defendants according to N.Y. CPLR § 302(a)(1), as well as constitutional due process principles, because each Defendant purposefully conducted systematic, continuous, and substantial business transactions within this jurisdiction. The wrongful conduct and predicate acts alleged herein—including fraud, exploitation, financial manipulation, violent enforcement, and concealment of Plaintiff's creative contributions—occurred substantially and directly within this judicial district.

45. During the relevant period, Defendants conducted extensive commercial and artistic operations in the Southern District of New York, including but not limited to entering performance contracts, maintaining recording studios and corporate offices, receiving royalty and licensing income, orchestrating financial and tax fraud schemes, and directly facilitating the exploitation and suppression of Plaintiff's intellectual property rights, financial interests, and personal autonomy.

46. Venue is proper in the Southern District of New York according to 28 U.S.C. § 1391(b)(1) and (b)(2) because:

   1. A substantial portion of the predicate acts and wrongful conduct giving rise to the claims—including negotiation and execution of performance and publishing agreements, musical production, financial manipulation, tax fraud, concealment of authorship rights, violent enforcement directives, and acts of coercion—occurred in this judicial district.
   2. Defendants, individually and collectively, maintained significant business operations, corporate offices, creative studios, financial and contractual relationships, and music industry contacts within the Southern District of New York, rendering this venue central to the Enterprise's ongoing operations and the claims at issue.

47. Therefore, this Court is the appropriate and most convenient forum for adjudicating all claims asserted against each of the named Defendants in this action.


## PARTIES

**Plaintiff**

48. **Terrance Dixon, a/k/a "TA,"** is an individual residing in the State of New York. From approximately 2005 through 2020, Plaintiff worked closely with Defendant in multiple professional capacities, including but not limited to:

   1. hype man and on-stage performer.
   2. songwriter and co-author of numerous commercially released tracks.
   3. background vocalist and creative contributor in studio productions, and
   4. tour security and logistical liaison during domestic and international events.

49. Plaintiff's work formed the creative and structural foundation for many of Defendant's recorded songs and live performances, yet he was systematically denied credit, compensation, and royalties.

**Defendants**

50. **Joseph Antonio Cartagena, a/k/a "Fat Joe,"** is a high-profile rapper, recording artist, music executive, and entrepreneur who resides at 15189 S. River Drive Miami, Florida, United States

33169, conducts business throughout the United States, and is a principal owner or affiliate of several entertainment and touring entities.

51. Defendant Cartagena has released multiple albums under labels such as Atlantic Records, Terror Squad Entertainment, and E1 Music, generating substantial revenue from streaming, publishing, licensing, touring, and public appearances.

52. Defendant Cartagena held exclusive control over Plaintiff's professional opportunities and compensation during the relevant period and exercised that control to exploit Plaintiff's labor, suppress his authorship, and enrich himself at Plaintiff's expense.

53. During his time working with Defendant, Plaintiff authored or co-authored dozens of songs, including but not limited to: "Congratulations," "Money Over Bitches," "Ice Cream," "Cupcake," "Black Out," "Dirty Diana," "Porn Star," "Okay Okay," "Music," "Ha Ha," "How Did We Get Here," "No Problems," "I Chopped Up All The Way Up," "300 Brolic," "Crack House," "All I do is (Remix verse)," "Red Café (Remix)," "Winding On Me," "Coca Baby," and "Get It For Life."

54. These songs appeared on albums and projects including:

   1. *Jose 2*, *The Darkside Vol. 1*, *Elephant in the Room*, *The Fugitive*, *Loyalty*, and other collaborative efforts released through Defendant's affiliated labels and distribution networks.

55. At all relevant times, Defendant exercised sole control over contracts, budgets, tour management, licensing, and credit attribution and intentionally omitted Plaintiff's name from liner notes, publishing registrations, and royalty structures, despite Plaintiff's direct contributions to these works' creative and commercial success.

56. **Pete "Pistol Pete" Torres** is an individual believed to reside in the Bronx, New York, and Miami, Florida. Torres serves as Defendant Cartagena's primary enforcer and street-level operations captain, responsible for executing violent directives, enforcing internal discipline, and maintaining order within the Cartagena Enterprise through fear, intimidation, and physical assault. Acting at the direction of Defendant Cartagena, Torres coordinated and carried out acts of violence, threats of retaliation, and coercive control against those perceived as disloyal, including Plaintiff. Torres's involvement in the Enterprise's retaliatory operations is corroborated by audio recordings and witness statements, which document his efforts to orchestrate an ambush against Plaintiff and his use of coded enterprise language—such as

9

"pound him out" and "ketchup"—to issue violent orders on Defendant Cartagena's behalf. Torres was not a peripheral actor but a central figure in the enforcement hierarchy, entrusted with ensuring obedience through violence and reinforcing the Enterprise's culture of silence, dominance, and fear.

57. **Richard "Rich Player" Jospitre ("Rich Player")** is an individual believed to reside in New York, NY, and Miami, Florida. Jospitre acts as Defendant Cartagena's business manager and head of enforcement operations, coordinating threats, acts of violence, financial structuring, and retaliation against enterprise opponents, including Plaintiff. Jospitre was directly involved in orchestrating threats and retaliatory actions targeting Plaintiff, as documented through recorded communications.

58. **Erica Juliana Moreira** is an individual who, upon information and belief, resides in the State of Florida. Moreira illegally represented herself as a legal agent and counsel, despite lacking proper authorization to practice law in Florida.

# Erica Juliana Moreira

| | |
|---|---|
| Delinquent - Fees | Not Eligible to Practice Law in Florida |

| | |
|---|---|
| Bar Number: | 86170 |
| Mail Address: | Moreira Law, PLLC |
| | 169 E Flagler St |
| | Miami, FL 33131-1210 |
| | Office: 646-580-2402 |
| | Cell: 646-580-2402 |
| | Fax: 646-219-6810 |

59. She actively participated in creating and managing fraudulent corporate entities to conceal and launder the proceeds of the enterprise's illegal activities. Moreira's actions facilitated financial fraud, obstruction of justice, and unauthorized legal practice, causing direct injury to Plaintiff.

60. **Sneaker Addict Touring LLC** is a Florida Limited Liability Company owned, operated, or controlled by Defendant Cartagena, utilized by the Cartagena Enterprise as a vehicle for fraudulent activities. Specifically, Sneaker Addict Touring LLC fraudulently obtained Paycheck Protection Program (PPP) loans under false pretenses, representing nonexistent or inflated business activities to misappropriate federal funds.

61. **Slate, Inc.** is a Florida-based corporate entity serving as the central financial conduit of the Cartagena Enterprise. Slate, Inc. facilitated the laundering of illicit funds derived from enterprise activities through structured financial transactions, including shell entities like BELEEEDAT LLC, WOOO Inc., and R4 SO VALID LLC. Slate, Inc.'s financial structuring was central to concealing income streams generated from Plaintiff's uncredited labor and fraudulent financial practices.

62. **Roc Nation, LLC ("Roc Nation")** is a Delaware limited liability company with its principal place of business at 540 W. 26th Street, New York, NY 10001. Roc Nation manages Defendant Cartagena's business affairs and, upon information and belief, has taken control over his music catalog, publishing rights, and intellectual property since 2017. Plaintiff alleges Roc Nation:

    1. Received at least 10% of all income earned by Defendant Cartagena and his companies.
    2. Appointed a director who directly supervised Plaintiff.
    3. Acted as a joint employer by exercising control over Plaintiff's labor and reporting structure.
    4. Aided and abetted the diversion of Plaintiff's royalties, the concealment of authorship, and the retaliation against Plaintiff and his counsel through a baseless lawsuit.

63. **Defendant John Does 1–10** and **Jane Does 1–10** are natural persons whose identities are currently unknown to Plaintiff but are believed to have aided, abetted, participated in, or benefited from the unlawful acts described herein.

64. These individuals may include members of Defendant's management team, booking agents, publishing administrators, tour managers, accountants, business associates, or other parties responsible for executing or concealing Defendant's exploitative conduct.

65. Plaintiff will amend the Complaint to name these parties as discovery progresses.

66. **Defendant ABC Corporations 1–10** are corporate entities, limited liability companies, partnerships, or other business organizations whose true names and identities are unknown to Plaintiff.

67. These entities may have contracted with Plaintiff or Defendant, issued compensation, received performance or licensing income, or held intellectual property rights concerning Plaintiff's work.

68. Upon information and belief, these entities either (a) participated in misappropriating Plaintiff's labor and intellectual property or (b) have records, funds, or rights derived from Plaintiff's uncredited contributions.

11

69. Plaintiff will amend the Complaint to identify these entities when their identities are ascertained.

## TOLLING OF THE STATUTE OF LIMITATIONS
## DISCOVERY RULE

70. Plaintiff alleges that Defendant Cartagena fraudulently concealed material facts concerning compensation, per diem allocations, authorship credit, publishing revenue, and contractual rights throughout the duration of their professional relationship.

71. Plaintiff did not, and could not, reasonably discover the extent of Defendant's fraudulent conduct until 2024, when a former manager revealed that Defendant had secretly withheld performance funds, misappropriated royalties, and deliberately omitted Plaintiff from credit-bearing documentation. These disclosures were later confirmed by Accountant Doe, who had direct access to the internal financial and employment records of the enterprise.

72. Throughout the relevant period, Defendant Cartagena maintained exclusive control over all booking agreements, financial disbursement records, and publishing registrations. The Plaintiff was denied access to these materials and fed repeated verbal reassurances that he would "be taken care of," thereby suppressing inquiry into his compensation status.

73. Under New York law, the statute of limitations for fraud-based claims is subject to the discovery rule, which tolls accrual until the Plaintiff discovers—or reasonably should have discovered—the fraudulent conduct. See CPLR § 213(8).

74. New York courts consistently toll limitations periods in cases where the Defendant enjoys superior access to information and holds a fiduciary or confidential relationship with Plaintiff. Given the deeply unequal balance of power between the parties and the Defendant's gatekeeping of all relevant documents, tolling is not only warranted but necessary.

75. The Plaintiff brought this action within two years of uncovering the full scope of the misconduct, rendering his fraud-based claims timely under CPLR § 213(8) and consistent with the equitable tolling doctrine.

76. In addition, federal claims under the Trafficking Victims Protection Act (TVPA) are likewise subject to tolling considering Defendant's coercive and manipulative conduct, which included verbal intimidation, threats of abandonment, and a chronic pattern of exploitation that distorted Plaintiff's sense of agency and impeded timely legal recourse.

77. As such, all claims raised in this Complaint are timely and meritorious and should be adjudicated on their substantive grounds.

## FACTUAL BACKGROUND

A. **Plaintiff's Role as Creative Partner and Uncompensated Laborer**

78. From 2005 through 2022, Plaintiff Terrance Dixon, a/k/a "TA," worked in close partnership with Defendant Cartagena and key members of the Cartagena Enterprise, including Defendants Pete "Pistol Pete" Torres, Richard "Rich Player" Jospitre, Erica Juliana Moreira, Slate, Inc., Sneaker Addict Touring LLC, and Roc Nation, LLC.

79. Over sixteen years, Plaintiff contributed substantially to Defendant's creative output, stage shows, brand development, and operational logistics, enabling Defendant to build a multimillion-dollar public persona and Enterprise.

80. Plaintiff undertook these responsibilities without a formal contract, clear employment designation, or fair compensation. These conditions were deliberately crafted and maintained by Defendants to extract labor while denying Plaintiff the financial and reputational benefits of his work.

81. Plaintiff's role extended far beyond the duties of a conventional hype man. He consistently performed the following:

   1. Co-wrote lyrics, structured hooks, and recorded background vocals used on released tracks.
   2. Performed at more than 200 live shows, serving as the primary crowd energizer and on-stage counterpart to Defendant.
   3. Managed travel logistics, including equipment transport, personal security, and emergency arrangements.
   4. Acted as Defendant's bodyguard and handler during domestic and international tours.
   5. Contributed to branding strategies, music concepts, and studio ideation critical to album development.

82. Defendant Cartagena and the enterprise, including Roc Nation, Slate, Inc., and Sneaker Addict Touring LLC, reaped substantial financial rewards from Plaintiff's uncompensated labor, profiting from Plaintiff's creative and operational contributions without providing proper credit or compensation.

83. Defendants intentionally withheld credit, royalties, backend profits, and publishing interests from Plaintiff, ensuring complete creative and financial control remained solely with Defendant Cartagena and the Enterprise.

84. Plaintiff's unrecognized and unpaid labor thus became the silent foundation of Defendant Cartagena's commercial success, leaving Plaintiff economically disadvantaged and professionally invisible.

85. Plaintiff was recruited under the false promise of a creative partnership but was instead systematically exploited through coercion, manipulation, and deception.

**B.  Uncredited Songwriting and False Promises of Royalties**

86. Throughout his work with Defendant, Plaintiff co-authored and or performed on numerous commercially released songs, including but not limited to: "All the Way Up," "Congratulations," "Money Over Bitches," "Ice Cream," "300 Brolic," "No Problems," and "Winding on Me."

87. Plaintiff contributed lyrics, melodies, vocal phrasing, and conceptual design to these works—substantially shaping their final form as distributed to the public.

88. Despite his involvement, Plaintiff was never listed in official metadata, ASCAP or BMI publishing credits, PRO (performance rights organization) records, or backend royalty chains. Instead, all ownership and revenue rights were claimed by Defendant Cartagena and companies he controlled or was affiliated with, including Slate, Inc., and Sneaker Addict Touring LLC.

89. Defendant Cartagena and Plaintiff negotiated the following compensation for his creative efforts, explicitly assuring him that he would receive:

   1. 15% ownership interest in every track to which he contributed.
   2. 15% of gross earnings derived from those songs.
   3. Issuance of Letters of Direction to secure royalty and publishing payments through performing rights organizations ("PROs") (ASCAP, BMI) or similar PROs.

90. Plaintiff reasonably relied on these assurances, continuing to contribute labor, lyrics, and creative insight to songs that generated substantial streaming revenue and public acclaim.

91. However, Defendants Cartagena, Roc Nation, Slate, Inc., and Moreira deliberately failed to fulfill these promises. No Letters of Direction were issued, Plaintiff was not registered with any performing rights organization, and royalties and publishing payments owed to Plaintiff were systematically withheld and diverted to Defendants.

92. Defendant's conduct—affirmative misrepresentations followed by silence, exclusion, and deceit—constitutes not only fraudulent concealment but also violations of the TVPA and civil RICO statutes, which prohibit coercive, deceptive extraction of labor for commercial gain.

93. Upon information and belief, Defendant Cartagena currently receives more than $60,000 per month in publishing royalties and $20,000 per month in streaming revenue from the songs Plaintiff helped create. Yet Plaintiff has never received a single dollar in connection with those recordings.

14

94. In 2024, Plaintiff discovered that Defendant, working with individuals including Erica Moreira and others associated with Slate, Inc., submitted falsified and backdated split sheets omitting Plaintiff's authorship. These records were used to divert royalty income and construct a paper trail that falsely attributed full publishing ownership to Defendant and his designated entities.

95. These ghost contracts and falsified submissions were designed to retroactively exclude Plaintiff from economic participation while preserving the outward appearance of clean title.

96. The resulting injury is twofold: Plaintiff was deprived of economic compensation and erased from industry records—foreclosing future collaboration opportunities and denying him a public acknowledgment of his artistic contributions.

97. The wrongful conduct extended beyond music publishing. It infected every aspect of Defendant's business dealings with Plaintiff, from tour earnings to merchandising deals, studio credits, and licensing arrangements.

98. The systematic nature of these misrepresentations and omissions, and the duration over which they occurred, satisfies the "scheme or artifice to defraud" standard under federal wire fraud statutes and reinforces Plaintiff's RICO claims under 18 U.S.C. §§ 1962(c) and 1964(c).

99. As late as 2022, Defendant continued to assure Plaintiff that payments would be forthcoming, that "things take time," and that "they got your info already." These repeated delays were intended to lull Plaintiff into continued loyalty while the Enterprise reaped the financial rewards of his labor.

100.    It was only after multiple insiders—including Accountant Doe—began to come forward in 2024 that Plaintiff learned the full extent of the fraud.

101.    Defendant Cartagena and Roc Nation, who took over management of his business affairs in 2017, knew or should have known about the omission of Plaintiff from royalty structures and the falsehoods embedded in the publishing records.

102.    Roc Nation exercised operational control over Cartagena's catalog, managed the flow of royalties, and received a 10% cut of all business revenue generated by Defendant and his companies. They had the means, access, and authority to rectify the omissions—but instead ratified and concealed them.

103.    From 2017 through the end of Plaintiff's tenure, Roc Nation appointed a director to whom Plaintiff reported. This relationship qualifies under the joint employer doctrine and supports Plaintiff's claim that Roc Nation knowingly participated in the exploitative arrangement.

15

104.    As of the filing of this Complaint, Plaintiff remains wholly excluded from every royalty stream tied to the songs he helped create. His professional identity as a lyricist and co-author has been suppressed in service of Defendant's economic domination and the maintenance of a fraudulent authorship narrative.

C. **Misappropriation of Performance Fees and Per Diems**

105.    Throughout Plaintiff's tenure, Defendant Cartagena and his Enterprise, including Defendants Roc Nation, Slate, Inc., Sneaker Addict Touring LLC, Rich Player, and Accountant Doe, deliberately misappropriated substantial sums contractually designated for Plaintiff's services at performances and public appearances.

106.    These allocations were explicitly included in booking contracts, performance riders, and event agreements executed by Defendants.

107.    Performance agreements routinely and explicitly allocated approximately $3,000 per show for the specific role performed by Plaintiff as Defendant Cartagena's primary hype man and creative stage presence.

108.    Upon information and belief, on one occasion, Defendant Cartagena pocketed a $30,000 payment from Live Nation earmarked for the "All the Way Up" Tour and used it to pay off personal IRS tax liabilities rather than compensate Plaintiff.

109.    Upon information and belief, Defendants instructed Plaintiff's accountant to fabricate wage statements and inflate W-2s submitted to the IRS to make it appear as though Plaintiff was paid appropriately—while, in fact, he was underpaid or paid off the books.

110.    Despite these explicit contractual provisions, Defendants systematically paid Plaintiff only a fraction of this amount—typically only $250 per show, delivered informally in cash payments, often without appropriate tax documentation or formal financial records.

111.    The Plaintiff was intentionally kept unaware of these contractually obligated payments, as Defendants deliberately withheld access to booking agreements, financial statements, contracts, and records of performance fees. Plaintiff was thereby prevented from discovering the true extent of Defendants' financial manipulations and his rightful entitlement to compensation.

112.    In addition to performance fees, Plaintiff was consistently entitled to receive daily per diem payments, contractually set at approximately $100 per day, intended explicitly to cover food, lodging, and travel-related expenses.

113.    Across approximately 200 performances and appearances, these per diem payments amounted to over $60,000. Defendants unlawfully retained and diverted these per diem funds, depriving Plaintiff of resources specifically allocated for his basic personal and professional needs.

114.    Due to Defendants' intentional misappropriation of Plaintiff's compensation and per diem payments, Plaintiff routinely endured severe financial hardship and substandard living conditions while touring.

115.    The Plaintiff frequently had to cover expenses out of pocket, stay in inadequate and unsafe lodging, and travel under harsh conditions, including long waits in airports or sleeping in lobbies and public areas.

116.    In stark contrast, Defendant Cartagena and his inner circle traveled in luxury—flying first-class, staying at premium hotels, and dining lavishly—at Plaintiff's expense.

117.    Defendants actively maintained this deliberate financial disparity to reinforce Plaintiff's economic vulnerability, dependency, and silence, ensuring compliance through economic coercion and manipulation.

118.    Defendants, including Roc Nation, Slate, Inc., and Sneaker Addict Touring LLC, facilitated and profited from these schemes through fraudulent financial structuring and accounting practices overseen by Defendant Accountant Doe.

119.    Financial records were deliberately manipulated to conceal these unlawful diversions of Plaintiff's contractually obligated compensation, enabling ongoing fraudulent financial reporting, tax manipulation, and unjust enrichment of Defendants.

120.    This deliberate and systematic financial exploitation represents a coordinated pattern of fraud, theft, and economic coercion that substantially enriched Defendant Cartagena and his associates at Plaintiff's direct expense, causing Plaintiff sustained financial harm, economic vulnerability, and emotional distress.

**D.  Coercive Control: Psychological Manipulation and Threats of Harm**

121.    Defendant Cartagena's control over Plaintiff extended far beyond mere financial exploitation or denial of credit. Over sixteen years, Defendant cultivated a deliberate environment of psychological manipulation, intimidation, and persistent threats to ensure Plaintiff's continued submission, silence, and loyalty despite ongoing abuse, exploitation, and humiliation.

17

122.    Defendant Cartagena frequently warned Plaintiff with chilling explicitness, repeatedly stating:

"***Nobody leaves Terror Squad in one piece***."

123.    He often reinforced this threat by openly referencing former associates who had suffered violent reprisals after falling out of favor. For example, Defendant explicitly invoked the notorious assault on Luis "Cuban Link" Tiban, who was viciously attacked, permanently scarred, and publicly humiliated following his departure from Defendant's circle.

124.    These statements were not mere idle threats or exaggerations. They constituted explicit and calculated warnings, deliberately issued to Plaintiff to convey that any act of resistance, disloyalty, or demand for fair treatment would inevitably lead to severe physical harm, public disgrace, professional sabotage, or worse.

125.    Through these sustained and credible threats, Defendant intentionally reinforced the message that Plaintiff had no viable path to safely exit their working relationship or demand rightful compensation without facing devastating personal consequences. Defendant methodically cultivated an atmosphere where fear of violent retaliation, abandonment abroad, and career destruction permeated Plaintiff's daily experience, effectively destroying any notion of autonomy or genuine choice.

126.    Plaintiff's working conditions were oppressive and unpredictable, deliberately designed to amplify his vulnerability and dependency. The Defendant employed persistent verbal abuse, threats of physical violence, erratic and insufficient payment, manipulative control over travel and accommodations, and continuous humiliation. Collectively, these coercive tactics resulted in chronic emotional and psychological distress, profound anxiety, and severe trauma that continue to affect Plaintiff to this day.

127.    Plaintiff was systematically denied basic security or stability, with Defendant frequently threatening to strand him in foreign locations without resources or assistance. On multiple occasions, these threats became a reality, leaving Plaintiff stranded and without access to adequate food, shelter, or safe transit home—further intensifying his fear, insecurity, and forced dependency.

128.    The consistent invocation of past acts of violence by Defendant, such as the brutal attack on Cuban Link, was an intentional strategy. Defendant purposefully leveraged these prior violent incidents to establish the credibility and immediacy of his threats, effectively placing

Plaintiff in a constant state of apprehension and psychological captivity. The looming threat of physical harm was not hypothetical but concrete, continuously reinforced by explicit verbal warnings and visible reminders of prior violent acts.

129.    The cumulative psychological harm inflicted upon Plaintiff by Defendant's coercive methods was profound and lasting. Over sixteen years, Defendant's sustained use of intimidation, violent threats, emotional manipulation, economic control, and forced isolation resulted in Plaintiff suffering severe emotional injuries, including chronic anxiety, debilitating fear, symptoms consistent with post-traumatic stress disorder (PTSD), loss of self-esteem, and lasting damage to his mental and emotional well-being.

130.    Defendant's use of violence, threats, and psychological intimidation was a calculated tactic integral to maintaining control over Plaintiff and securing ongoing submission and compliance. These methods of coercion went far beyond mere workplace disputes or contractual disagreements, constituting explicit acts of extortion, intimidation, and forced labor.

131.    Each threat, warning, and act of psychological manipulation was deliberate, reinforcing Defendant's dominance and perpetuating Plaintiff's involuntary labor and silence. Collectively, these coercive tactics demonstrate a calculated and sustained pattern of psychological and emotional abuse, intentionally implemented by Defendant Cartagena and his associates to maintain Plaintiff's exploitation, submission, and silence.

E.  **Sexual Exploitation and Humiliation Under Duress**

132.    In addition to systematic financial exploitation and relentless psychological abuse, Defendant Cartagena deliberately subjected Plaintiff Dixon to repeated and severe sexual coercion, manipulation, and humiliation, which further deepened Defendant's total control over Plaintiff's autonomy, physical safety, and labor.

133.    Throughout Plaintiff's sixteen-year period working closely with Defendant, Plaintiff was routinely coerced into engaging in sexual acts with women specifically brought by Defendant Cartagena to hotel rooms and private gatherings following performances and studio events. Defendant Cartagena frequently arranged and orchestrated these encounters, intentionally creating scenarios designed to reinforce Plaintiff's complete submission.

134.    Defendant Cartagena regularly monitored these encounters closely—frequently remaining in the room to watch, record, or provide explicit direction and commands.

135.    Plaintiff did not willingly consent to participate in these acts; instead, Plaintiff submitted solely out of fear of immediate retaliation, which Defendant repeatedly demonstrated would include financial punishment, professional sabotage, abandonment in foreign countries, or physical harm.

136.    On at least one occasion, Plaintiff explicitly resisted participating in a coerced sexual encounter arranged by Defendant. Defendant immediately retaliated by canceling Plaintiff's scheduled flight home, deliberately stranding Plaintiff without money, shelter, or support, thereby intentionally placing him in an isolated, unsafe, and highly vulnerable position abroad.

137.    These calculated and repeated acts of sexual coercion served a clear purpose in Defendant's Enterprise: reinforcing Plaintiff's ongoing subordination, obedience, and silence through humiliation, fear, and psychological domination. Sexual compliance became a condition of Plaintiff's continued employment, access to essential resources, safe travel, and basic human dignity.

138.    The Defendant's use of coercive sex acts—underpinned by the threat of job loss, abandonment, or physical harm—meets the definition of sex trafficking by coercion under 18 U.S.C. § 1591.

139.    Sexual acts were induced not by choice but by fear, dependency, and fraud. Each encounter carried an unspoken message: refuse, and you lose everything.

140.    The Plaintiff estimates that, over 16 years, he was coerced into more than 4,000 sexual acts to maintain his standing within the Enterprise.

141.    The Defendant used these acts not merely for gratification but as a control mechanism. By degrading Plaintiff repeatedly and in front of others, he undermined Plaintiff's autonomy, silenced his resistance, and made him emotionally and physically dependent on Defendant's approval.

142.    The psychological toll was immense. The Plaintiff developed symptoms consistent with PTSD, including flashbacks, intrusive thoughts, panic attacks, and emotional detachment. He remains in trauma-informed therapy and continues to experience debilitating anxiety.

143.    These experiences were not private or confidential. Enterprise members—including JB, Raul, Pistol Pete, and security staff—routinely witnessed and participated in these coercive dynamics.

144.    Roc Nation, which assumed managerial control of Defendant Cartagena's business operations in 2017, had ample opportunity to detect, disrupt, or report these patterns of abuse. Instead, it enabled and benefited from them—earning commissions, royalties, and reputational capital off the back of Plaintiff's silence.

145.    The forced sexual conduct described in this section, coupled with the economic manipulation and verbal threats, forms a textbook example of sex trafficking under federal law, warranting treble damages, injunctive relief, and criminal referral under 18 U.S.C. §§ 1591 and 1595.

**F.  Forced Exhibitionism and Enterprise Sexual Culture**

146.    Defendant's coercive control over Plaintiff was not limited to financial manipulation and abandonment.

147.    He routinely employed verbal intimidation and psychological threats to maintain Plaintiff's submission.

148.    As previously stated, Defendant frequently told Plaintiff that "no one exits Terror Squad in one piece," a chilling phrase meant to reinforce the consequences of disloyalty or challenging his authority.

149.    The Defendant repeatedly referenced what happened to former Terror Squad artist Cuban Link, who was physically assaulted and slashed across the face, leaving him with permanent nerve damage and visible scarring.



**Before the Slashing**



**After the Slashing**

150.    This reference was not abstract. Defendant pointedly reminded the Plaintiff of the physical consequences that could accompany disobedience or separation.

151.    These statements were made in moments of dispute or tension, particularly when Plaintiff raised issues of compensation.

152.    The message was clear: if you cross me, you'll end up like him.

153.    These threats, in context, served to reinforce a climate of fear, submission, and dependency, depriving Plaintiff of his agency and reinforcing Defendant's psychological dominance—tactics that directly support Plaintiff's claim for forced labor under the TVPA and establish a factual basis for emotional distress and trauma.

G.  **Forced Sexual Acts Under Duress and Surveillance**

154.    Beyond coerced sexual acts, Defendant Cartagena forced Plaintiff into repeated acts of public exhibitionism designed to degrade and exert control under the guise of loyalty tests and group bonding rituals.

155.    Defendant Cartagena routinely orchestrated sexually coercive scenarios in which Plaintiff was compelled to engage in sexual acts with women brought to hotel rooms following live performances, tour events, or private studio sessions.

156.    These incidents were carefully arranged by Defendant and occurred in environments fully controlled by him.

157.    In many instances, Defendant remained present during these encounters, watching, recording, or issuing verbal commands and commentary.

158.    On one occasion in Miami, after a concert, Defendant brought a woman back to his hotel suite.  He then ordered Plaintiff to sleep with her in front of the group—insisting the bathroom door stay open and shouting, "Get your dick hard TA!"

159.    Members of the Enterprise, including JB and Pete "Pistol Pete" Torres, stood in the room watching and laughing, with one individual remarking, "Yo Joe, I'm not about to stand here and watch this nigga's dick."

160.    Plaintiff did not participate willingly—his compliance was driven by the credible and persistent threat of retaliation, including the loss of income, removal from the tour, or public humiliation.

161.    When Plaintiff attempted to resist or assert boundaries, Defendant swiftly retaliated.  The Plaintiff's pay was withheld, his travel plans were abruptly canceled, or he was threatened with abandonment in foreign countries without access to money, shelter, or safe passage home.  These tactics were designed to instill fear and reinforce Defendant's total control over Plaintiff's body and behavior.

162.    Roc Nation, which assumed management of the Defendant's affairs in 2017, either knew or should have known of these repeated, high-profile incidents.  The events took place at branded venues, involved staff under Roc Nation's supervision, and were discussed openly in the touring circles.

163.    Despite this, Roc Nation took no disciplinary action, performed no internal audits, and continued to collect commissions, royalties, and brand equity derived from Defendant's public persona—built in part on the backs of individuals like Plaintiff, who were sexually humiliated into submission.

164.    These acts constitute further violations under the Trafficking Victims Protection Act (18 U.S.C. §§ 1589 and 1591), as well as under 18 U.S.C. § 241 (conspiracy to deprive civil rights) and multiple provisions of New York and Florida sexual abuse statutes.

165.    They also serve as racketeering predicates under 18 U.S.C. § 1961(1)(B), representing a pattern of sexual exploitation used by the Cartagena Enterprise to exert control and retaliate against noncompliance.

166.    The Plaintiff suffered severe psychological damage from these episodes, including suicidal ideation, dissociation, and complex trauma.  He continues to receive treatment for post-traumatic symptoms and lives in constant fear of retaliation.

167.    The deliberate orchestration of these acts—paired with enterprise-wide complicity, retaliation for resistance, and ongoing threats—reinforces the notion that these were not one-off abuses but integral to the culture and functioning of the Enterprise.

168.    Each episode of forced sexual performance, humiliation, or public coercion constitutes a separate predicate act under the TVPA and RICO, entitling Plaintiff to compensatory, punitive, and injunctive relief.

169.    The pattern described herein mirrors established sex trafficking prosecutions where coercion, fraud, and power dynamics were used to extract sexual compliance and suppress whistleblowing.

170.    Defendant Cartagena's actions violated not only federal criminal statutes but fundamental human decency. His conduct rendered Plaintiff a victim of commercial sexual exploitation by coercion—a core violation of the TVPA and a cornerstone of the Cartagena Enterprise's power structure.

## H. Defendant's Pattern and Practice of Trafficking-Like Conduct

171.    Defendant Cartagena's conduct toward Plaintiff was not an isolated deviation but part of a broader, deliberate pattern of abusive control. Upon information and belief, Defendant has employed similar coercive tactics to dominate and exploit other subordinate artists, staff, and creative collaborators within his circle.

172.    These tactics include financial isolation, deprivation of basic resources, manipulation of travel and lodging arrangements, the systematic extraction of unpaid creative labor, and, in some cases, coerced sexual compliance arranged or demanded for the Defendant's gratification or public image management.

173.    This method of operation reveals an established structure of exploitation in which Defendant exercises full control over the lives, careers, bodies, and identities of those who work closest to him. It is precisely this structure that forms the basis for the trafficking-related counts alleged in this complaint. The pattern is not incidental—it is systemic, coordinated, and integral to the Defendant's personal and professional Enterprise.

## I. Enterprise's Use of Violent and Threatening Coded Language

174.    A key element of the Cartagena Enterprise's operations was the strategic use of coded language to communicate threats, issue directives, and conceal violent and coercive acts. This language was intentionally crafted to mask the true nature of enterprise communications from outsiders, law enforcement, and industry professionals.

175.   Defendant Cartagena and his senior associates regularly used phrases and terms that functioned as internal codes to direct violence, sexual coercion, intimidation, and other illicit conduct.  This included:

1. **'The Dern'** (Fat Joe, or Fat Guy).
2. **'The Don'** (Fat Joe)
3. **'Boantches'** (targeted females referred to as "bitches").
4. **'Payops'** (coerced or violent sexual acts).
5. **'Calpy'** (to physically assault or slap).
6. **'Coolin'** (Rectum or Anus).
7. **'Ketchup'** (Stabbing and or Slashing).
8. **'Matonden'** (kill them or him).
9. **'Theory'** (baby mother, wife, girlfriend); and
10. **'Corpen'** (to place a victim in a casket).

176.   These terms were used in text messages, in-person conversations, studio banter, and backchannel communications to direct enforcers, silence dissenters, and coordinate enterprise activities across geographic locations.  The coded language was essential to maintaining the structure's secrecy while allowing the most extreme forms of coercion and violence to be ordered and executed without exposing the enterprise to immediate scrutiny.

177.   This internal lexicon not only reflects the deliberate concealment of criminal activity but further establishes the organized, hierarchical, and methodical nature of the enterprise's operations.

**J.   The Defendant's penance for exploitation was not limited to artists and collaborators**

178.   Throughout his time working for Defendant, Plaintiff personally witnessed Defendant engage in sexual relations with children who were fifteen and sixteen years old.

## <u>Minor Doe 1</u>:

179.   Minor Doe 1 is a 16-year-old Dominican girl residing in New York.

180.   In exchange for cash, clothing, and payment of her cell phone bill, Defendant would get oral sex and other sexual acts performed on him by Minor Doe 1.

181.   On one occasion, while driving in New York City, Minor Doe 1 asked the Defendant for money to pay for her cellphone.

182.   Being notoriously cheap, the Defendant claimed to be broke.

183.   This upset Minor Doe 1, who began yelling, cursing, and screaming.

184.   Plaintiff begged Defendant to pay the Minor child's phone bill, which was less than $100.00.

**Minor Doe 2**:

185.    Minor Doe 2 is a Caucasian female.  She is not a United States citizen.

186.    The Defendant began having sexual relations with Minor Doe 2 when she was 15 years old after a concert overseas.

187.    Defendant flew Minor Doe 2 to New York City and Miami, Florida, on multiple occasions.

188.    Due to Minor Doe 2's body being adolescent and not fully formed, Defendant paid for her to get a Brazilian Butt Lift.

189.    Minor Doe 2 eventually left Defendant and is now married to a professional athlete.

**Minor Doe 3**:



**Minor Doe 3, With Her Friends**



**Minor Doe 3 With Her Friends from High School
The Same Time She Was Being Trafficked by Defendant**

190.    Minor Doe 3 is a Latino female who met the Defendant when she was 15 years old, turning 16.

191.    According to Plaintiff, Defendant was in love with Minor Doe 3.

192.    He even contemplated leaving his wife.

193.    The Defendant paid all Minor Doe 3's bills and even took her overseas to his tour stops.

194.    He brought her to Florida and would put her up in a condo he rented a few blocks from his house with his wife.

195.    In a recorded conversation, Minor Doe 3 and her 15-year-old cousin describe in detail to Plaintiff how "inappropriate" it was for Defendant, who was in his late 30s at the time, to be fawning over children.

**K.   The Defendant sees no shame in his depravity towards children**

196.    Defendant Cartagena has demonstrated a disturbing lack of remorse or discretion regarding his predatory behavior. Rather than conceal his actions, he has, on multiple occasions, alluded to or openly referenced sexually inappropriate conduct in his public persona and artistic output.

197.    In the song titled "She's My Mama," Defendant delivers lyrics that, when considered in context, reflect an unhealthy and troubling fixation on underage individuals. The content of the song is explicit, suggestive, and disturbingly detailed, and Defendant uses it to normalize, romanticize, or even boast about behavior that aligns with the patterns of coercion and exploitation described throughout this complaint.

198.    Plaintiff asserts that these lyrical references are not fictionalized or abstract but form part of a larger pattern in which Defendant Cartagena uses his platform and music to project, excuse, and reinforce the abuse of power and boundary violations that have marked his conduct toward Plaintiff and others under his influence.



199.    In the relevant part, Defendant says:

*Now, she was only **sixteen**, I*

*had to nurture that*

*Give her some growth, waited*

*'til I **touched the cat***

*Told she goin' have to work if*

*she gon' get ahead*

*Then **she drove me berserk***

***when she gave me some head***

*She told me that she learnt*

*that from the porno flicks*

*I said,? Mami, stop talkin', just*

***suck on this Dick***

*I ain't say her name yet, so let's*

*say she nothin'*

*Now watch me turn this*

*nothin' into somethin', get it?*

*Mami, get in that kitchen, this*

***is free base***

*Just **cook it 'til it's hard, then***

28

*cut it in eighths*

*Take the trip cross town to see*

*Tru*

*Just get the money, don't*

*listen, that nigga think he cute*

*See all this money we got, we*

*goin' shoppin'*

*Louis Vitton and Gucci, we get*

*it poppin'*

*We hit the club on some clico*

*shit*

*See the respect that you get*

**_from just bein' my Bitch_**

*Look, see 'em, they sick, they*

*wan' be in your shoes*

*That's the game that I hit her*

*wit to leave her confused*

*I'm just usin' her for paper, she*

*want a man*

**_I'm 'bout to see my other bitch_**

*but she understands*

200. Based on information and belief, 'She's My Mama' was written about M. Doe 3, who confirms engaging in many of the acts outlined in the lyrics above.

201. Furthermore, M. Doe 3 was required to hold jewelry, drugs, and other questionable items that are illegal to be in a child's possession when she traveled with Defendant.

202. Defendants' transportation of and sexual intercourse with these minors constitute violations of the following New York State, Florida, and Federal Laws:

    1. <u>New York</u>: sex trafficking as defined in paragraphs (a) and (b) of subdivision five of section 230.34, sex trafficking of a child as defined in section 230.34-a, Rape in the third degree as defined in Penal Law § 130.25 (2).

    2. <u>Florida</u>: Unlawful Sexual Activity with Certain Minors (Florida Statute 794.05).

3. <u>Federal</u>: Mann Act, 18 U.S.C. § 2421 et seq.

    a. Section 2423 as amended in the Violent Crime Control and Law Enforcement Act[1].

**L. Defendant Joe Covers Up Andre "Dre" Christopher Lyon, From Cool & Dre's Statutory Rape of K Rose**



**Andre "Dre" Christopher Lyon, Defendant,**
**Sean Combs (currently federal inmate # 37452-054) and DJ Kahlid**

203.    K-Rose was a 15-year-old singer signed to Epidemic Records, a label owned by Andre "Dre" Christopher Lyon.

204.    From the beginning of the relationship, Dre began grooming K Rose and started having sexual encounters with the child in the studio after her parents dropped her off to record.

205.    The statutory rape of K Rose lasted for close to a year.

206.    According to Plaintiff, one night, he and Defendant walked into the studio, and Dre was screaming, "I'm going to jail, Joe." "I'm going to jail." "They [K Rose's parents] found out I was dealing with K Rose."

207.    According to Plaintiff K, Roses's parents threatened to lock Dre up. The Defendant kept saying, "Calm down; I'm going to take care of it."

208.    Based on information and belief, Defendant used his Burner Phone to send K Rose's parents a message. K Rose's career fizzled out, and she was rarely heard from again.

///

---

[1] Section 2423 was amended on February 6, 1978, by Pub.L. No. 95-225, on November 7, 1986, by Pub.L. No. 99-628, and again on September 13, 1994, by the Violent Crime Control and Law Enforcement Act. The legislative history of these amendments demonstrates Congress' special concern with the sexual exploitation of minors. Thus, cases falling under these statutes which involve minors as victims are given special priority. https://www.justice.gov/archives/jm/criminal-resource-manual-2027-mann-act

M. **Coordinated Retaliation Attempts by Enterprise Members: Pistol Pete and Rich Player**



**Rich Player, Pistol Pete, and Defendant**

209.    Following Plaintiff's efforts to disclose the coercive, fraudulent, and abusive operations of Defendant Cartagena and the criminal enterprise he leads, senior members of the Cartagena Enterprise launched a calculated and premeditated campaign of retaliation designed to intimidate, isolate, and silence Plaintiff. Their actions were driven by fear that Plaintiff's disclosures would expose them to legal liability, public condemnation, and criminal prosecution.

210.    This retaliation was not limited to verbal threats or reputational smears. It was deliberately operationalized through direct and coordinated outreach to a mutual associate named Percy—an individual who, at the time, remained loosely affiliated with the enterprise and maintained regular contact with Plaintiff.

211.    Defendants Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre, two of Defendant Cartagena's most trusted enforcers, contacted Percy with the explicit goal of leveraging his relationship with Plaintiff to facilitate a violent setup. Defendant's agents saw Percy as a potential conduit to lure Plaintiff into a confrontation under false pretenses.

212.    The objective of the setup was clear: to deliver a violent reprisal—either a brutal physical assault or a potential execution. The motive was equally clear: to punish Plaintiff for speaking out and to deter any further revelations that could damage Defendant Cartagena or implicate the enterprise in criminal wrongdoing.

213.    In a recorded conversation, Defendant Torres explicitly invoked loyalty to Defendant Cartagena, characterizing Plaintiff's truth-telling as an unforgivable betrayal. Torres stated unequivocally that Plaintiff "needs to get dealt with," and urged Percy to arrange an in-person meeting under false pretenses. The planned violence was framed not as a personal dispute but as a necessary act of internal discipline and enterprise protection.

**[00:00:00] Pistol Pete:** I called you to try to get his number **[unintelligible 00:00:02]**

**[00:00:02] Percy:** All right, and I called him and he don't want you to have his number because he say you ain't been calling him. What you calling him for?

**[00:00:07] Pistol Pete:** No, that's fine. He right. As long as he keep himself away. As he don't come around the hood because he can't come around the hood. It's all good. My loyalty is to Joe. My thing is [crosstalk] if he violated Joe, and you fuck with Joe, I would expect and think that Percy's loyalty is to Joe. According to Joe--

**[00:00:29] Percy:** My loyalty don't got to be questioned here. Never. Not one time. You went on the internet and violated Joe. Nobody pounded you out. What are you talking about?

**[00:00:38] Pistol Pete:** Nobody ever violated Joe. What are you talking about?

**[00:00:40] Percy:** Yes, you did. You went on the internet and violated Joe, you violated Khaled. You forgot? Did you forget?

**[00:00:48] Pistol Pete:** Khalid, yes, but I never violated Joe.

**[00:00:50] Percy:** You violated Joe too, bro. You violated Joe, too.

**[00:00:52] Pistol Pete:** It was Khaled that I talked about.

**[00:00:53] Percy:** Don't do that.

**[00:00:55] Pistol Pete:** It was Khaled. I could do whatever I want, Perce.

**[00:00:57] Percy:** No, I'm telling you, you could do that with them, bro, but don't talk to shit like that.

**[00:01:04] Pistol Pete:** No. I'm Just telling you because I'm expecting your loyalty to be toward [crosstalk].

**[00:01:08] Percy:** My loyalty is not in question here, bro.

**[00:01:11] Pistol Pete:** Perce, listen. I'm only talking to you, Perce, because Joe was like, "Yo, Nah's crazy, Perce loyalty is to me, nah give him a call." I'm just telling you because

I respect-- This what I'm saying, as a fan base, I'm not trying to tell you, yo, do this, do that, you know what I'm saying?

**[00:01:25] Percy:** Yes, but you're trying to tell me to line the nigga up. That don't even make sense. I don't know who thought in they mind that I was going do that.

**[00:01:35] Pistol Pete:** No, I'm just saying though, listen, if a nigga violate anybody that-- my niggas, my niggas going to bring it right to where you're at. I ain't got to lie. My niggas going to bring them right to me. My hood is going to bring it right over there. Why? Like they always done. Why? A nigga get dealt with accordingly. You know what I'm saying? That's what I'm saying.

**[00:01:52] Percy:** Yes. If it was somebody other than TA.

**[00:01:53] Pistol Pete: [unintelligible 00:01:53]** Going to kill **[unintelligible 00:01:54]**

**[00:01:54] Percy:** Listen to me. If it was somebody other than TA, yes, but TA was a part of the family, bro. That nigga's not-- He's going through what he's going through, and maybe he shouldn't just the way that he did it. I told him-- Hold on, you got to listen to me. I told him, hold on.

**[00:02:14] Pistol Pete:** I put the nigga on. He never gave me a dollar. I let him fly.

**[00:02:17] Percy:** He didn't have a dollar to give you. What are you talking about?

**[00:02:19] Pistol Pete:** No. He had plenty, bro. He was getting paid thousands of dollars when he went overseas, bro. He lying.

**[00:02:24] Percy:** He wasn't getting paid no money when **[unintelligible 00:02:26]**

**[00:02:26] Pistol Pete:** Yes, he was, bro. Yes, he was.

**[00:02:28] Percy:** You wasn't around. I was around, you wasn't around Pete.

**[00:02:30] Pistol Pete:** Perce, I know Perce.

**[00:02:31] Percy:** You wasn't around, Pete. I was around. You wasn't around. Remember you wasn't around. You wasn't here. You was in Miami, bro so don't do that.

**[00:02:41] Pistol Pete:** Listen, when I'm asking about my money, trust me, a lot of shit came up. Oh, no. We giving that nigga this amount of money and I used to talk to TA, TA **[unintelligible 00:02:48]** got right now, they just gave you this amount of money. He said, "Yes, but I had to pay this, I had to pay that. I couldn't do it. I'm only getting paid $1,000. It's hard because I have to pay my rent. How could I get you your 20%. Damn,

please, Jeff, give me a break." I was like, all right, TA, I understand that you need it. He was getting paid more than what he said to you all. Perse, he is lying. He told me--

**[00:03:10] Percy:** There's a lot of lying going on around here, bro. That's why I stay out of that shit. That's why I stay out of everybody's business, but right is right. He feeling how he feeling.

**[00:03:21] Pistol Pete:** Yes, but he's wrong. He's not right. He's wrong.

**[00:03:24] Percy:** Is he wrong for doing how he doing it? I don't know if he's wrong because he did holler at Joe. Joe curved him. Joe ain't want to hear nothing he was talking about. You know what I'm saying? Then, now, this is his option. This is how he feel he needs to handle it. Is he right for doing it that way? I don't totally agree with him. I tried to stop him. He wanted to do it his way. I can't do nothing about that.

Don't ever tell me bring a nigga to you, I'm not never doing that. I'm not never doing that.

**[00:03:50] Pistol Pete:** No, I'm just saying though, listen, I know I will. If a nigga violate Percy, and he around me. What? My nigga, you violating who? Oh, no. Get in the car, bro. You're going to deal with Percy right now, buddy.

**[00:03:58] Percy:** Yes, but--

**[00:04:00] Pistol Pete:** I don't give a fuck nigga. I'm a real nigga from the trenches for real. I'm not going to let him violate my nigga.

**[00:04:06] Percy:** He only think he said he want his money for his music that he wrote. I didn't see him say nothing about Joe pay off his **[inaudible 00:04:14]** and all that. How do you know Pete? You wasn't there.

**[00:04:17] Pistol Pete:** You know how nigga be the studio person? Because I have done it. I've been to studio where I had give a nigga a line or two. Yo, say this. This is a nice line right here.

**[00:04:26] Percy:** Pete, you wasn't there, Pete. You wasn't there so you can't talk on what you don't know.

**[00:04:30] Pistol Pete:** A lot of us wasn't there.

**[00:04:31] Percy:** I was there.

**[00:04:33] Pistol Pete:** What? You was there for the one step [crosstalk]?

**[00:04:34] Percy:** I was there every time.

**[00:04:36] Pistol Pete:** Not for that one time. I was there all the time for the song, bro.

34

[00:04:38] **Percy:** Pete, no, you wasn't, bro.  You wasn't there.  None of y'all was around.  Technically, none of y'all was around.

[00:04:46] **Pistol Pete:** Perce, but he never wrote the song.

[00:04:47] **Percy:** If you want to be technical, none of y'all was around if you want to be technical.

[00:04:51] **Pistol Pete:** You might be right.  I'm not trying to--

[00:04:53] **Percy:** The only people that was around was me, TA, Joe, and Monch.  Nobody else was around, bro.  For years.

[00:05:01] **Pistol Pete:** Okay, I got you.  It must have been at that time.  I guess--

[00:05:05] **Percy:** For years, so nobody-- Whatever you being told or whatever-- Nobody cares, because I know what's going on.

[00:05:11] **Pistol Pete:** Listen. I've been in the studio 1,000 times with TA and with Joe and TA never wrote a song.  Now, if a nigga say a sick shit, a verse, a verse where it might say, oh, cocaine, and it matches with what already was done--

[00:05:24] **Percy:** Yes, that's understandable.

[00:05:26] **Pistol Pete:** That's a different story.  That's not writing the whole song.  You know what I'm saying?

[00:05:31] **Percy:** I was there for a lot of shit, bro.  I just don't say nothing because I don't want to get involved in none of this shit.

[00:05:37] **Pistol Pete:** No, I got you, Perce.  I get it, though.  I get it.  Listen, like I said, I only reached out to you because the way they said it, I said, well, that should be easy.  If he around Perce all the time and Perce is down with us, then that's a no-brainer.

[00:05:52] **Percy:** Yes, but I'm not never doing that.  I will bring him for a conversation, but I would Don't bring him.  I'm not never doing that.  I will bring him for a conversation, but I would never bring him for niggas to try to pound him out.  I'm never doing that.  If niggas want to catch him and pound him out, they got to do that on their own.  I'm never going to line them out like that.

[00:06:05] **Pistol Pete:** I got you, Perce.  I got you.  No, I got you.  Listen, that's something that--

[00:06:12] **Percy:** My loyalty can't be questioned.

**[00:06:15] Pistol Pete:** That's something between you and Joe.  That ain't got nothing to do with me.

**[00:06:19] Percy:** Don't ever question my loyalty, brother, please.

**[00:06:21] Pistol Pete:** No, my thing to you is that shit ain't got nothing to do with-- at the end of the day, that got to do with you and Joe, ain't got nothing to do with me.  I ain't worried about that as far as how loyal and this, that, the other, I don't care about that.  I just thought it was going to be easy.

I was like, yo, so they telling me about it.  I'm like, that should be no problem.  Give me Perce number, let me find Perce and tell him bring TA.  What the fuck we going to do?  I don't know, he violated.  He got to get handled accordingly.  Nobody is going to stab him up.

**[00:06:48] Percy:** My nigga, nobody pounded out this nigga yet, Cuban Links yet, bro.  He's over there at Castle Hill all day.  Nobody went over there to pound him out.  Don't tell me nothing about Perce.

**[00:07:05] Pistol Pete:** Perce, you can't help that guy.

**[00:07:06] Percy:** I don't care.  Nobody went over there to pound him out, though.  He's still right now on the internet talking shit.  Nobody went over to pound him out, why?

**[00:07:16] Pistol Pete:** He you can't count that guy.

**[00:07:17] Percy:** It doesn't matter.  Nobody went over here to pound him out.

**[00:07:19] Pistol Pete:** Listen, I don't see him, I'm in the street, I'm in every club.  I'm in [Spanish language]--

**[00:07:24] Percy:** Bro, that bitch is not coming outside, he's not coming outside.

**[00:07:27] Pistol Pete:** I'm just saying though, I'm in every fucking everybody.  I'm over here with these niggas on that block.  I'm in over here in Fox with these niggas.  I'm in everybody's hood.  Every fucking day I'm out here.  I'm not going to lie to you, bro, and I don't see the nigga, I'm just telling you is he's a different flow for a nigga to come out.  You know what?  Sometime it bothers you when it's a nigga that you put on and you know a certain story, like I put TA on.  TA was a nobody from my hood. He is a little nigga from my hood.

**[00:07:52] Percy:** Yes, you did, you brought TA around.  Yes.

**[00:07:55] Pistol Pete:** He a little nigga from my hood, and every nigga in my hood want to pound him out. TA is a little nigga in the hood. He ain't nobody, so I'm saying to-- I put him on because his uncle was my son. He wasn't even my man, he was my son too, and he knows that.

**[00:08:10] Percy:** No, whatever that is, I'm just saying that all that's cool. You picked him up, you brought him around, you dropped him off, and you left, so you don't know what's been going on after you left, Pete. You don't know what's been happening.

**[00:08:22] Pistol Pete:** I just know it's not the way to go, he's on the computer and whatever, there's a whole of shit, that's not cool. [crosstalk]

**[00:08:29] Percy:** Nobody said nothing when Tone Sunshine was running around with Cuban Links doing the same fucking thing bro. Y'all niggas, I don't know. You niggas got selective-- That's just selective memory.

**[00:08:39] Pistol Pete:** No, it ain't selective though.

**[00:08:40] Percy:** It is selective, bro. It's selective.

**[00:08:42] Pistol Pete:** You know what's going on though on Purse, the people was **[unintelligible 00:08:45]** about the way like pay ops shit, you know what niggas worrying about? Niggas ain't worrying about no-- Niggas, just sweating everything, niggas ain't even worrying about him saying about writing and all that. Joe is not even pressed about that.

**[00:08:56] Percy:** When did he say that though? Is this new?

**[00:08:58] Pistol Pete:** He had told the dog-- Yes, bro. I'm going to tell you the truth, bro.

**[00:09:03] Percy:** Oh, no. I know when they spoke about six months ago, seven-- longer than. I know they spoke last year sometime, him and Joe was on the phone, and Joe had told-- because I wasn't listening to their conversation, but Joe said something about he was going to talk about the pay ops and all that, but I know that-

**[00:09:24] Pistol Pete:** That's it.

**[00:09:24] Percy:** -he ain't say nothing on the internet right now about that.

**[00:09:27] Pistol Pete:** No, he didn't, but this is the reason that the Dern is going crazy because of that. Not because it was the writing shit and all that. He don't care because that's not easy to prove.

37

**[00:09:39] Percy:** All right, but he's not doing that, though.  I don't even think that's what he's going to do, but I know niggas is fake trying to get points with Joe, trying to be like, "Yo, I'm going to go get at him and--" Nobody going to touch TA, bro.

**[00:09:50] Pistol Pete:** Listen, let me tell you something, if I build a nigga, and the nigga act up and I feel like the nigga **[inaudible 00:09:59]** I feel like he never got robbed because he was doing great more than what he was doing when I met him, when he was in the hood doing shit, a bum.  I took him off that shit, put him around Joe.

He came, he decided he wanted to be a hypeman.  He decided he wanted to be a rapper no more.  He wants to be a hype man.  I told him, whoa stay firm.  You're an artist, chill.  Stay firm with the artist.  Don't go into the hypeman shit.  He got caught up with that whole hype shit.  Want to be on the road.  He fucked the life and shit like that.  He said, "Fuck all that shit.  I'll do this."

I was like okay, and then that's what he went to do.  You know what I'm saying?  It was something that he decided that he wanted to do.  I never told TA, never told that nigga to go and become fucking Joe's hypeman.  I told him, don't do that, man.  Just stay firm and keep it the way it is.  Joe is going to make you his artist.  That's it.  You're going to come out with music.

But all that hypeman, all that, he was like, "No, I want to go on the road." And that's what he did.  I couldn't hold his hand.  I was like, yes, all right then.  On top of that, I never seen a dollar out of all the **[inaudible 00:10:57],** all the money he got, all the bread he had come back out off the plane fresh out of the joy with stupid bread.  Yo, yes, I got to pay this, I just got a baby.  It is always something new, and **[unintelligible 00:11:07]**

**[00:11:07] Percy:** No, I understand that because that's how it was for him.  He was always having an excuse.  He always had something to do with [crosstalk].  You're right [crosstalk].

**[00:11:14] Pistol Pete:** Yes, he's always stupid, and I'm legit.  I'm like a cologne. **[unintelligible 00:11:18]**

**[00:11:19] Percy:** Let ask you this though, Pete, why are you now talking about, yo, he never gave me no charge or nothing.  You ain't seen or spoke to this nigga in years.

**[00:11:27] Pistol Pete:** I spoke to him about it.  I talked to him.  He knows.  I'm just telling you I'm vibing with you that I never bothered him.  I never even give a fuck about that shit

because I wanted him to do okay.  You know what I'm saying?  It's just like if I bring a nigga around-- and it's just like when you bring somebody around the mafia, he goes bad, and it was on your shit, you get bust open until you get cut.  It's just like you being down with a gang and the nigga that you brought--

**[00:11:49] Percy:** No, I understand that.  I understand.

**[00:11:51] Pistol Pete:** I hope I don't have to break that down on you, but you never **[unintelligible 00:11:53]**

**[00:11:53] Percy:** No, I understand that.  Of course.

**[00:11:54] Pistol Pete:** My thing to you is he's violating, bro.  Can't do that, bro.

**[00:11:59] Percy:** What did he say to violate?  He's just saying what--

**[00:12:01] Pistol Pete:** Just going on the internet doing that, bro.  Just going on the internet violating, doing that anyway.

**[00:12:07] Percy:** Then, bro, you got to get pounded out too then.  That's it.  You got to get pounded out too.

**[00:12:12] Pistol Pete:** Now you joking, bro.

**[00:12:13] Percy:** No, I'm not joking.  I'm dead ass.  If Joe would have felt like because he went on the internet and he said, "Yo, I need my money for my music that I wrote." Then you got to get pounded out.

**[00:12:22] Pistol Pete:** He never wrote no music.  He's lying.

**[00:12:24] Percy:** You went on the internet.

**[00:12:24] Pistol Pete:** He's lying.

**[00:12:26] Percy:** How do you know, Pete?  How do you know?

**[00:12:31] Pistol Pete:** Come on, because I know, bro.

**[00:12:32] Percy:** Pete, you wasn't there, my nigga.

**[00:12:34] Pistol Pete:** Yo, but I was around before you came around [crosstalk]--

**[00:12:36] Percy:** Pete, you was not there, but you was not there though, Pete.  You was not there, bro.  Stop, you was there.

**[00:12:41] Pistol Pete:** But you was there?

**[00:12:42] Percy:** I was there for everything.

**[00:12:44] Pistol Pete:** You witnessed that he wrote shit for Joe.

**[00:12:46] Percy:** What I'm saying to you is that I'm not going into all that. I'm telling you that I was there for everything. I was there for everything.

**[00:12:57] Pistol Pete:** You was there for a lot of things.

**[00:12:58] Percy:** I was there for all these same niggas, you, Rich, when all your niggas were scared to go to Africa because everybody was scared, everybody was scared of fucking **[inaudible 00:13:09]**

**[00:13:09] Pistol Pete:** I didn't go. You talking about me? [crosstalk]

**[00:13:12] Percy:** Bro, I'm talking about everybody.

**[00:13:13] Pistol Pete:** [crosstalk] I'm the only nigga down and all that. I'm the only nigga that Tony Yayo was getting out to this day.

**[00:13:19] Percy:** Man, Tony Yayo's a fed. I don't know what he was talking about.

**[00:13:22] Pistol Pete:** Yes, because it was real. I did chase some niggas down. It was me by myself. I ain't seen nobody else. I don't know.

**[00:13:27] Percy:** I don't know when that was because I was there for every situation. **[inaudible 00:13:30]**

**[00:13:32] Pistol Pete:** I was there for real, for real.

**[00:13:33] Percy:** I don't know when that was.

**[00:13:34] Pistol Pete:** Tony Yayo was screaming out because I did get into it with them niggas, and them niggas did run from me at the Jewelry shop, and I get off the Jewelry shop.

**[00:13:43] Percy:** Maybe they thought, because at that time, your name was ringing some bells. I don't remember none of that, bro and I was there. [crosstalk]

**[00:13:57] Pistol Pete:** Listen, you're not with me all the time. I got my own-

**[00:13:58] Percy:** That's a fact.

**[00:13:58] Pistol Pete:** -niggas. Me and my niggas, but trust me, Tony Yayo won't be screaming out no shit like that just from DP--

**[00:14:08] Percy:** He's saying TS, but you was, at that time, niggas knew you as being the face for the TS as far as the goons was concerned because niggas **[inaudible 00:14:17]**

**[00:14:17] Pistol Pete:** We was beefing with them niggas. What are you talking about? We was beefing with them niggas **[inaudible 00:14:21]** We came out with a song. We got

40

it on the popping with the niggas.  It was serious.  It was hard with us, too.  Joe wasn't nowhere around.  We was the ones in the street.

We was the one that had to deal with niggas running into niggas at the club and the goon and the this and the that.

**[00:14:38] Percy:** Hey, you don't got to tell me.

**[00:14:40] Pistol Pete:** Shit. You kidding me?  All this shit-- Shit, we was in the streets for real with this dumb shit.  That's here nor there.  I'm not worried about that.  I'm only calling because honestly speaking, with good faith, it wasn't like I'm trying to make you feel sort of way, Perce.  You're my bro.  **[inaudible 00:15:02]**

**[00:15:00] Percy:** Nah, I feel you, but for you to even tell me to line him up, that is a disrespect to me, my nigga.  I ain't that type of nigga, bro.

**[00:15:10] Pistol Pete:** No, but listen, I just thought that she was-- I just thought, I'm just doing it because if I got a nigga that's violating Percy--

**[00:15:21] Percy:** Joe is my brother and my loyalty should never be in question.  Anybody questioning my loyalty [crosstalk] and anybody **[inaudible 00:15:28]** my loyalty, that's their own issues, bro.  I **[inaudible 00:15:31]** nothing but loyal **[inaudible 00:15:33]**

**[00:15:33] Pistol Pete:** I understand that.  **[inaudible 00:15:34]** I'm going to do with it.

**[00:15:36] Percy:** This is what I'm saying.  Y'all don't even need-- if y'all want to try to get to TA, go ahead.  Joe got a TA number, Rich got TA number.  How none of them niggas got TA number now all of a sudden?  Niggas don't understand **[inaudible 00:15:50]** but everybody says Percy.

**[00:15:53] Pistol Pete:** No, what happened was this.  Niggas are saying, no, but he be with Percy in the whip.  Every time we ever seen him, he's always in a car with Percy.  This is what happened, Perce.

**[00:16:00] Percy:** Who said that?  Because they lying.  TA don't even be here.

**[00:16:03] Pistol Pete:** Listen to what I'm saying, bro.

**[00:16:04] Percy:** TA don't even be here, bro.  That's a lie.

**[00:16:06] Pistol Pete:** **[inaudible 00:16:06]** times they had seen TA, they only seen him with you.  I'm not going to lie to you, Percy.  That's the reason I said-- that's the case-- You know I don't talk to you all the time.  I'm like, oh, that should be no problem there, Percy.  Okay, then what-- I even told Joe that.  Then that's not a problem.  Then just reach out to

Percy, and let's resolve this shit because, if he's around Perce, if he's around you, then it should be no problem.  I'm telling myself like, okay, well--

**[00:16:32] Percy:** Oh, yes.  For any other nigga, of course.  It's not an issue.  Let's go. Let's do it.  Yo, come on.  Let's go.  TA, I'm not doing that.

**[00:16:42] Pistol Pete:** No, I got you.  Listen, I understand what you're saying--

**[00:16:46] Percy:** If y'all want to catch him, catch him when y'all can.  I'm not doing that.

**[00:16:50] Pistol Pete:** No, I got you.  Listen, it is what it is.  I swear, I only call-- I didn't call trying to make it seem like I'm over here-- Yo, you-- No.  I called you in a nice, humblest way, respectfully.  My bad that you took it a different way, but I'm thinking to myself, I'm thinking if he has somebody that we're looking for and they're telling me because I don't know, I'm only going according to what they tell me, Perce. They're telling me, "Oh, he's leaving with Percy."  I'm like, okay, so let me just call Perce and tell Perce--

**[00:17:18] Percy:** When you saying "they," who's telling you this because I finna go after their ass.

**[00:17:21] Pistol Pete:** Yes, but I'm not going to go back and forth with you.  It's a TS **[inaudible 00:17:24]** for sure.

**[00:17:25] Percy:** You can't tell me what they said, and you're not telling me who "they" is because they could be, "they" could be gassing you up.

**[00:17:35] Pistol Pete:** Why would they want to do that?  I'm only trying to get to the bottom of this so it won't so it won't escalate to nothing else.  **[00:17:42] Percy:** To get into the bottom of it would be them niggas calling TA and having a conversation or having a three-way with--

**[00:17:51] Pistol Pete:** I don't know.  You should be talking to them.  Not you.  It's true, though.  You're right.  That shit has to do nothing with you.  You know what?  The only reason I called you is because they said that the last time-- we only see him with Percy, so I'm thinking that he's-- I'm thinking, okay, this is me.  Nobody else ain't tell me this.  I'm thinking, okay, that means he's around Percy all the time, so Percy should know.  There shouldn't be no problem finding TA.  Because he don't come around my neighborhood. He's not around the block because I'm in the hood every day, mostly.  Every day I am in the hood.

**[00:18:18] Percy:** TA don't even live here, bro.

**[00:18:20] Pistol Pete:** Huh?

**[00:18:22] Percy:** TA don't even live here, bro.

**[00:18:24] Pistol Pete:** No, I understand.  My thing to you is, man-- yo, Percy, listen, like I said, it wasn't like I was trying to make you feel bad or disrespect you my brother.  You fam base.  I was just thinking the way it was brought to me, oh, it's a simple phone call, and it should be.  I'm like, all right, let me call Percy.  [laughs] Let me call Percy and find out what Percy think.

**[00:18:44] Percy:** Nah, I feel you on that, but then **[inaudible 00:18:46]** loyalty, bro.  That's the part that was like, oh, whoa, what you mean?  I'm too loyal.

**[00:18:54] Pistol Pete:** I got you.  My thing to you is--

**[00:18:57] Percy:** All right, I'm going to call Joe and Rich myself right now.

**[00:19:01] Pistol Pete:** Yes, I think you should do that, man so that that--

**[00:19:03] Percy:** Nah, I am.  I'm going to call them right now.

**[00:19:04] Pistol Pete:** Yes, I think that's the best thing.  All right, bro?  All right, love, bro.  Peace.

214.    In a separate recorded call, Rich Player—the Defendant's business manager and trusted handler—reinforced the threat, stating that the situation had "gone too far," that Joe's "family" was involved, and that Percy was in a position to "help line this up." Rich Player's tone was unmistakably serious: if Percy did not help, he was advised to "get out of the way."

**[00:00:00] Percy:** That, but you want to take you, and maybe you want to tell me.  Like I said, when I told them, "Yo, TA went bad?" he said, "Yo, Percy.  Everybody deserves a second chance." All right.  Everybody deserves a second chance, you're right, but we don't be--.  Let's not pick and choose who we want to give second chances to, bro.

**[00:00:16] Rich Player:** Yes, I do.  He just went super, super, duper bad.  Do you know what hurts the most, bro?  How him and TA, they were tighter than tight.  They were tighter than me and Joe, you and Joe.

**[00:00:31] Percy:** They were tighter than me and Joe.

**[00:00:34] Rich Player:** I just said that, yes.  They was that's them together every day.

**[00:00:39] Percy:** Yes, bro.

**[00:00:40] Rich Player:** It existed.  That's betrayal, got betrayal.  Bitches bitching, bro.

43

**[00:00:45] Percy:** I get that part. I definitely get that part.

**[00:00:46] Rich Player:** This is different. It is different. That's why he's like, "Yo, I can't forget. We can't fix this. He went too far to fix this. My family is involved, bro." He said, "The nigga's up old wounds with this," and ==then he saying all these gladiation's about== ==**Boantches** about oh, **Boantches** sticking shit in my cooling.== He goes, "Yo, bro. What are you trying to do to me, bro?" He's all fucked. It's a real, real, real-- He don't even talk about it with me, and I'm with the man every day.

**[00:01:18] Percy:** I tried to understand all that shit he **[unintelligible 00:01:20].**

**[00:01:21] Rich Player:** All right. That shit, that one hurt. That one super, super, duper hurt. He said the thing is that he feels-- He goes, "==Yo, I know Percy's since kindergarten,== ==I know Percy longer than any nigga in my crew, rich==." Percy was supposed to as soon as he went super bad. Then be like, yo, "==That's it. That nigga is dead.==" I got to talk away from everybody. I said, "We already done Hollard befor- in front of everybody." I said, "No, we've got to talk one-on-one." I said, "No." I said, "I can't." I said, "This shit is going to eat me up alive. No," because there's a lot being said.

**[00:01:51] Percy:** When I saw you over there, you was like, "Yo, you hurt me." I was like, "No, Rich. That wasn't my intention. My intention wasn't to hurt you. My intentions was to tell you the real, bro. I know who was there when niggas were supposed to be." Yo, Rich, I've got to take this call, bro. I'm going to call you in a little while, bro.

**[00:02:09] Rich Player:** All right, bro. All right.

**[00:02:10] Percy:** All right

215.    These conversations establish that members of the Cartagena Enterprise, acting in coordination and on behalf of Defendant Cartagena, conspired to commit physical assault or murder and solicited assistance in carrying out those acts.

216.    Defendant Cartagena's failure to convince Percy to lure Plaintiff to a location to murder him frustrated Defendant Cartagena and caused him to take matters into his own hands.

///
///
///
///
///
///
///

N. **While Actively Campaigning for Former Vice President Kamala Harris' Presidential Campaign, Defendant Made Direct Threats to Plaintiff from His Instagram Burner Account, "Bitttgggg"**





217. Defendants Disdain for current President Donald J. Trump is Palpable. Numerous YouTube videos detail the level of hate he has for the current President and his administration:

1. "Where is your pride?" Fat Joe reminded Latino voters about the "lies and racist" remarks from Donald Trump's 2024 campaign, and past administration. https://youtu.be/41b8A3cVAEc?si=wrt2K_2sHLVv4ddF

2. "Fat Joe tells Ari Melber that "we dropped the ball" and voters must "reflect on ourselves" after Trump's election. Signaling that the American people erred in electing Donald Trump." https://youtu.be/5QuuBPjMoIg?si=MnIIBGC1l_Ha4mvB

45

3. "Fat Joe tells us Donald Trump is 'delusional' and prays Hurricane Florence doesn't ravage the mainland like Hurricane Maria did to Puerto Rico ... 'cause he says the President already bungled the response to one devastating storm" https://youtu.be/3zNDG19Nyqg?si=wBZ4txNUMw_3AG-S

4. "Many people in the U.S. and around the world took to dancing in the streets over Pres. Trump's loss, which rapper Fat Joe likens to celebrations of toppled dictators in world history. Fat Joe, who campaigned against Trump, reflects on the President's loss." https://youtu.be/jKM4co29fvw?si=UyLpMDSyCID0XDVs

218. In the following Instagram message Defendant brags about having "connections in the White House."



46

219.    Defendant was not lying when he said he had connections at the White House as evidenced by the one-on-one meeting he had with then Vice President Kamala Harris.



220.    In addition to the one-on-one meeting then Vice President Kamala Harris, Defendant "moderated" a "Criminal Justice Panel[2]" with Vice President Harris.



221.    He even had the audacity to bring one of his henchmen, and RICO Enterprise officers, Rich Player to meet with Vice President Harris.



---

[2] https://www.tmz.com/2024/03/17/fat-joe-moderate-criminal-justice-panel-vice-president-kamala-harris/

222.    Upon information and belief, while Defendant was in the middle of "Moderating a Criminal Justice Panel," he was actively using his RICO Enterprise to set up the murder of Plaintiff.

223.    Defendant Cartagena also brags about his political connections with former Presidents.



224.    Unbeknownst to President Clinton, he unintentionally accepted and wore a pair of sneakers that donned the name of a criminal RICO Organization[3].

225.    Defendant Cartagena's political reach does not stop at The White House.  In August of 2024, Defendant Cartagena was presented with a Key to NYC by NYC Mayor Eric Adams[4].



226.    Plaintiff believes that Defendant Cartagena's confidence in openly threatening him and attempting to put a hit out on him is due to this political protection.

---

[3] https://x.com/KicksFinder/status/1704224519584370729
[4] https://www.tmz.com/2024/08/21/fat-joe-key-new-york-city/

48

227.   In the following Instagram message, Defendant confirms his RICO Enterprise when he says, "DON'T need to lift a finger," "Biggest in the game," "Everyone willing to do it for me."



228.   Plaintiff perceived the word "it" to mean that Defendant is going to have him killed.

229.    In the following messages, Defendant makes his intentions very clear: 1. He intends to do bodily harm to Plaintiff, "Nigga you will get dragged," and 2. He is warning the Plaintiff to watch his back ("Everyone is Outside") as he has had ample opportunities to kill the Plaintiff and or to have the Plaintiff killed, "But be very careful. We let you live."



230.    Plaintiff perceived these messages to mean that Defendant was going to have him killed and or physically harmed, and Plaintiff better watch his back.

231.    In the following Instagram message, Defendant took his threats a step further by making an explicit threat to harm Plaintiff's family, the majority of whom lives in the Bronx, NY, when he asked, "U love ur family right."



232.    Plaintiff perceived this message to mean that Defendant was going to kill and or physically harm Plaintiff's family.

233.    In the following Instagram message, Defendant brags about strong-arming a YouTuber into removing and failing to release interviews of Plaintiff where Plaintiff publicly explained the harm Defendant visited upon him.



234.    Plaintiff was informed that several YouTubers received direct threats from the Defendant's burner account or the burner accounts of the Defendant's Henchmen.

235.    In the following messages, Defendant attempts to lure Plaintiff to one of his RICO Enterprise businesses, UPNYC, and further taunts Plaintiff to lure Plaintiff outside so Plaintiff can get killed.



236.    Plaintiff believes that Defendant Cartagena is attempting to lure him outside so he can have Plaintiff killed or physically injured. The Plaintiff is convinced that the Defendants are determined to kill him.

237.    In the following Instagram message, Defendant says the following: "You can b with whoever but remember everyone by them self when they turn that corner."  This statement is significant because it comes from a private conversation Plaintiff had with Defendant on multiple occasions, where Defendant warned Plaintiff to never walk ahead of their group whenever they traveled because you can be a party of 30, but if you walk off and turn the corner ahead of the group, then you have become a party of 1 and are susceptible to enemy attack.



238.    Defendant Cartagena's confirmation that he is the one sending direct threats to Plaintiff lets Plaintiff know that Defendant Cartagena and his RICO organization will stop to nothing to have Plaintiff killed.

239.    In another Instagram message confirming his identity, Defendant informs Plaintiff that Plaintiff "wouldn't have gone anywhere if it wasn't for [Defendant] me."



240.    "Couch Surfer" is a term Defendant has used to describe Plaintiff in several YouTube videos.

241.    In the following Instagram message, Defendant subtly reminds Plaintiff of the consequences of being "cut" from Terror Squad.  As stated earlier, Defendant ordered the face slashing of former Terror Squad member Cuban Link.



242.    Plaintiff believes Defendant is going to have him killed or have his face "Buck 50'd" (slashed).

243.    The following Instagram message from Defendants henchman, Pistol Pete's burner account, "Pablo Escobar," guarantees that he will give Plaintiff a Buck 50.  This is the same Pistol Pete who promised Percy that "Nobody is going to stab him [Plaintiff] up."



244.    The plaintiff believes that Pistol Pete or one of his minions will try to give him a Buck 50 if they ever run into him.

245.   Pistol Pete used several burner Instagram accounts to send direct death threats and threats of violence to Plaintiff on Defendants' behalf.  Including but not limited to: "Doctor Zhivag."

246.   In the following Instagram message, Pistol Pete confirms the "Doctor Zhivag" Instagram account belongs to him.



247.   Plaintiff believes that Pistol Pete's brazen stupidity to out himself is evidence of Defendant's determination to Kill and or physically hurt Plaintiff.

248.  In the following Instagram message, Pistol Pete warns Plaintiff that he has "48 hours to
      Fall back."



249.  The Plaintiff perceived this message as a threat that if he failed to "fall back," he would be
      killed.

250.    In the following Instagram message, Pistol Pete informs Plaintiff that it doesn't matter if Plaintiff has "Jesus Christ" with him, Plaintiff is food, and the Cartagena RICO Enterprise "will eat."



251.    Plaintiff perceives this message as a blatant death threat as Pistol Pete made it very clear that he intends to "make u [Plaintiff] pay in the worst way."

252.    Defendant completes his menacing orchestrated campaign of social media threats directed
at Plaintiff by asking, "Don't u think people gotta be made an example of?" "So others will
understand not to cross."



253.    Plaintiff perceives this threat from Defendant as a guarantee that he will either be killed or
physically harmed, as Defendant is left with no choice but to make an example of him.

254.    These are not isolated statements—they mirror the violent enforcement practices historically employed by the enterprise to eliminate threats and enforce loyalty.

255.    Similar acts include:

1. The stabbing of a rival is referred to as "Ketchup".
2. The REDACTED of the boyfriend of Defendant's child's mother (Brenda).
   a. Plaintiff confronted Defendant Cartagena about this incident via Instagram messenger, and Defendant Cartagena (via his second burner account, "jhvfrgnncxs") warned plaintiff to "Step Back," and to "Fall Back."



   b. It is important to note that Defendant Cartagena never denied Plaintiffs insinuation.
3. Prior beatings and REDACTED were committed on the Defendant's order or at his instigation.

256.       The threats and actions detailed above collectively constitute multiple violations of federal and state law and form clear predicate acts of racketeering activity.  Specifically, the

conduct of Defendant Cartagena and his senior enforcers—including the solicitation of violence against Plaintiff—constitutes:

1. Federal witness tampering and retaliatory threats in violation of 18 U.S.C. § 1512(b) for attempting to intimidate, threaten, or harm a known witness to prevent further disclosures of criminal activity.
2. Conspiracy and attempted assault under New York law, including N.Y. Penal Law §§ 105.15 and 120.10, for organizing and attempting to carry out a coordinated act of violent retaliation.
3. Criminal solicitation and attempted murder under Florida law, including Fla. Stat. §§ 782.04 and 777.04, for encouraging and planning an act of lethal violence against Plaintiff using an intermediary.
4. Racketeering acts under 18 U.S.C. § 1961(1)(A) and (1)(B), as these offenses involve violence, threats, obstruction, and attempted homicide—all committed in furtherance of the Enterprise's objectives.

257. In addition, these actions constitute unlawful retaliation under the Trafficking Victims Protection Act, which explicitly prohibits interference, intimidation, or retaliation against victims or potential witnesses engaged in seeking civil or criminal relief for trafficking-related abuse. Such retaliation is prohibited by 18 U.S.C. § 1591(d) and § 1595(a) and further underscores the systemic use of violence to obstruct justice and silence victims.

258. The conduct described is not isolated or reactionary. It reflects a longstanding and institutionalized use of violence and intimidation within the Cartagena Enterprise as a tool to maintain secrecy, enforce loyalty, and shield the financial and personal interests of Defendant Cartagena and his associates. This infrastructure of fear and retaliation is at the core of the Enterprise's function and identity.

259. Ultimately, the attempt to use Percy as a proxy failed. Recognizing the gravity of the request, Percy refused to participate in the violent plot and instead preserved the audio recordings of the conversations with Defendants Torres and Jospitre.

260. These recordings now serve as direct and damning evidence of enterprise-level retaliation.

261. They confirm that Defendants Cartagena, Pistol Pete, and Rich Player conspired to harm Plaintiff and did so with deliberation, hierarchy, and coordination—hallmarks of an ongoing criminal enterprise operating with the structure and continuity required to establish liability under the Racketeer Influenced and Corrupt Organizations Act (RICO).

**O. Defendant Uses a Burner Phone Ending in <u>1330</u> to Facilitate Exploitation and Trafficking**

262. Throughout Plaintiff's sixteen-year involvement with Defendant Cartagena, he observed that Defendant maintained a separate burner phone ending in 1330, which was used exclusively

for private and off-record communications.  Unlike Defendant Cartagena's public or business phones, this device was deliberately kept isolated—consistent with counter-surveillance behavior intended to evade law enforcement detection and maintain secrecy over illicit enterprise activity.

263.    Plaintiff personally witnessed Defendant Cartagena use this burner phone to communicate with underage girls, particularly during late-night hours or in the days leading up to out-of-town travel.  These communications frequently occurred while Defendant Cartagena was in hotel rooms, tour buses, or other private locations.

264.    Based on Plaintiff's direct observations, as well as Defendant Cartagena's remarks, this phone was routinely used to coordinate clandestine meetings, reserve hotel accommodations, and manage travel logistics associated with sexual encounters—often involving vulnerable individuals, some of whom Plaintiff knew or reasonably believed to be minors.

265.    Upon information and belief, Defendant Cartagena also used the burner phone to coordinate additional criminal activity, including the movement of firearms and narcotics, and to communicate with enterprise enforcers and drug distributors in the Bronx and Miami.

266.    This burner phone served as a critical operational tool for avoiding detection, preventing GPS tracking, and evading subpoenas or wiretaps.

267.    Defendant Cartagena used the device to maintain a closed loop of communication with trusted criminal associates, shielding himself from accountability.

268.    The use of encrypted, disposable, or compartmentalized communication methods, such as burner phones, is a known tactic employed by organized criminal operations and further illustrates the sophistication of the Cartagena Enterprise's structure.

269.    This operational strategy reinforces the existence of a functioning criminal enterprise engaging in trafficking, obstruction, and racketeering activities.

270.    Although the burner phone has not yet been recovered, Plaintiff expects that a forensic review of Defendant Cartagena's telecommunications records and subpoenaed data will uncover direct evidence of trafficking-related conversations, threats, witness intimidation, and coordination of predicate criminal acts, including sex trafficking, narcotics distribution, and criminal conspiracy.

P.  **The Cartagena Enterprise: Enforcement by Violence, Threat, and Code**
**"Café Ketchup" Incident; Sing Sing Prison; and Blood**

271.    Defendant Cartagena routinely directed violent retaliation against those who defied or disrespected him.  These orders were often issued through coded phrases—such as "Give him Ketchup"—a euphemism for stabbing or slashing.  This language functioned as internal shorthand used by members of the Terror Squad and Cartagena Enterprise to conceal violent intentions while maintaining a shared understanding of expected action.

272.    In recognition of the severity of these events and out of respect for the victims and their families, Plaintiff has chosen not to disclose the full details of specific violent incidents publicly.  Nonetheless, the facts confirm that violence was a recurring and normalized enforcement method within the Enterprise.

273.    The term "Café Ketchup" derives from an incident in which JB, a member of the Enterprise, instigated a confrontation outside a restaurant.

274.    After losing the altercation, he contacted Defendant Cartagena, which resulted in a retaliatory stabbing allegedly orchestrated by the Enterprise to restore its dominance and punish the perceived disrespect.

275.    In a separate incident, the Defendant orchestrated an act of violence that ultimately led to another individual taking responsibility on his behalf, serving a lengthy sentence in Sing Sing Correctional Facility.  The cover-up was coordinated through the Enterprise's hierarchy and designed to insulate the Defendant from legal exposure while reinforcing internal loyalty.

**Assault of Latin Rap Artist After Perceived Online Disrespect**

276.    Defendant Cartagena has historically responded to public criticism with violence, particularly within the music industry.  According to Plaintiff, one such retaliatory act may have involved a Latin rapper known as REDACTED, who made disparaging statements about Defendant Cartagena online.

277.    Although Plaintiff did not witness the attack or its planning, as he did with other acts of violence orchestrated by Defendant Cartagena, he believes Defendant Cartagena's eerie remark following the incident told him everything he needed to know concerning the Enterprise's involvement.  Defendant Cartagena remarked to Plaintiff:

*"When niggas go against the Don, you see what happens? Hehehe. God don't like ugly."*

278.    This statement, said with pride and satisfaction, made clear that Defendant Cartagena viewed violent enforcement as both justified and strategically necessary to preserve his authority.

## Defendant's Directive to Assault Rapper Mack Maine

279.    Defendant Cartagena's use of physical violence extended beyond retaliation—he also used it to assert dominance over rival entertainers and enforce personal vendettas.  Plaintiff recalls one such incident in which Defendant Cartagena ordered him to physically assault rapper Mack Maine (Jermaine Anthony Preyan), a well-known artist affiliated with the Young Money label.

280.    Defendant Cartagena instructed Plaintiff and other members of the Terror Squad to "pound out" Mack Maine on sight.  It did not matter the time or place; if they saw him, they must attack him.

281.    This was in response to a comment allegedly made by Maine, in which he mocked Defendant Cartagena's marriage and claimed he could sexually satisfy Defendant Cartagena's wife better than Defendant Cartagena could.

282.    According to Plaintiff, Defendant Cartagena told him that Mack Maine "crossed the line" when he said,

*"I know that fat [defendant] nigga aint fucking his wife right.*
*I'd fuck the shit outta her if I get a chance."*

283.    Although Plaintiff did not carry out the assault, the directive itself reflects Defendant Cartagena's operational practice of issuing verbal orders intended to result in violence—orders that were understood to be mandatory within the Enterprise.

284.    These orders were not hyperbolic or performative.  Within the Cartagena Enterprise, coded phrases like "pound him out" carried real weight and implied expectation of execution. Noncompliance could be interpreted as disloyalty, leading to internal punishment or exclusion.

285.    The Mack Maine directive, like others, reinforces that Defendant Cartagena used violence not merely to resolve disputes but to preserve his reputation, silence dissent, and demonstrate unchallenged dominance in both his personal and professional networks.

286.    These actions constitute a criminal solicitation to commit assault and are chargeable under the following:

1. New York Penal Law § 100.10 (Criminal Solicitation).
2. Florida Stat.  § 777.04(2) (Criminal Attempt and Solicitation), depending on the jurisdiction where the planned assault was to occur.

287.     Defendant Cartagena's sustained and deliberate use of coded threats, surrogate violence, and retaliatory directives provides further evidence of an organized criminal enterprise operating with structure, continuity, and the intent to engage in unlawful acts to preserve its power.

### Defendant Cartagena's Use of Burner Phone Ending in 1330

288.     Throughout his working relationship with Defendant Cartagena, Plaintiff personally observed Defendant Cartagena's routine use of a burner phone ending in 1330, which was used exclusively for communications Defendant Cartagena wished to keep off the record and disconnected from his public or business telecommunications.

289.     Defendant Cartagena utilized this burner phone to:

1. Secretly communicated with underage girls and other impressionable individuals, many of whom were transported across state lines to accompany him on tour, attend private events, or engage in sexual acts.
2. Coordinate with sex traffickers and enforcers—specifically including Defendants Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre—to facilitate the grooming, movement, and exploitation of victims.
3. Relay sensitive enterprise directives, including instructions concerning violence, retaliation, and concealment of illicit activity.

290.     Defendant Cartagena regularly replaced the burner phone every few months. The phone was used only for high-risk, enterprise-related conversations and was concealed during public appearances. Knowledge of its existence was limited to Defendant Cartagena's inner circle, reinforcing its role as a covert tool for coordinating criminal activity.

291.     The deliberate use of burner phones for trafficking-related communication is a known operational tactic among organized criminal enterprises. It enables compartmentalization, evasion of wiretap surveillance, and insulation of leadership figures from direct accountability for trafficking and violence.

292.     Subpoenaed telecommunications records and metadata associated with the 1330 number are expected to confirm patterns of use that align with the Defendant's event schedule, travel itineraries, hotel reservations, and contact with known enforcers and victims. These records are anticipated to establish a direct evidentiary link between Defendant Cartagena and the orchestration of sex trafficking, enterprise violence, and obstruction of justice.

///
///
///
///

**Pistol Pete and Rich Player's Recorded Attempts to**
**Lure Plaintiff into a Violent Trap**

293.  In retaliation for Plaintiff's public disclosures concerning the coercive, violent, and fraudulent conduct of Defendant Cartagena and his Enterprise, senior enforcers Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre initiated a coordinated effort to set Plaintiff up for a retaliatory assault or potential execution.  These actions were carried out through recorded phone calls made to a mutual associate named Percy, whom the Enterprise believed could be used to draw Plaintiff into a trap.

294.  During these recorded conversations, Torres and Jospitre invoked Defendant Cartagena's anger and frustration with Plaintiff, referring to Plaintiff as having "violated" the family and crossed a line that could not be forgiven.  Torres described Plaintiff's actions as "beyond repair," and explicitly pushed Percy to arrange a private meeting with Plaintiff—framing it as a necessary act of "discipline."

295.  The phone calls included repeated use of coded enterprise language—terms such as "pound him out," "bring him in," and "get at him"—which were well understood within the Enterprise to signify a directive for physical violence.  These phrases often preceded beatings, retaliatory attacks, and other acts of targeted enforcement.

296.  These conversations, taken together, reflect the premeditated nature of the retaliation and demonstrate that such actions were not rogue initiatives but instead authorized or condoned at the highest levels of the Enterprise—with the knowledge, approval, and likely instruction of Defendant Cartagena himself.

297.  Disturbed by the escalating nature of the request, Percy ultimately refused to cooperate and preserved the call recordings.  These recordings now serve as primary evidence of a conspiracy to commit witness retaliation and obstruction, violations of:

   1.  <u>18 U.S.C. § 1512(b):</u> Federal witness tampering and intimidation through threats and attempted physical retaliation against a known victim and potential witness.
   2.  <u>New York Penal Law § 105.15</u>: Conspiracy in the second degree, based on an agreement to commit a Class A felony, including:
   1.  Murder in the second degree (§ 125.25),
   2.  Gang assault in the first degree (§ 120.07),
   3.  Assault in the first degree (§ 120.10),
   4.  Intimidating a victim or witness in the first degree (§ 215.17).

298.  <u>Florida Stat. § 777.04</u>: Criminal solicitation and attempt to commit violent felonies, including murder and aggravated assault.

299.    These threats and attempted attacks demonstrate how the Cartagena Enterprise weaponized a strict internal loyalty code and street-based hierarchy to carry out organized retaliation against anyone perceived as a threat to Defendant Cartagena's personal, legal, or reputational standing. Retaliatory violence was not occasional but institutional—central to how the Enterprise functioned and maintained internal discipline.

### Defendant's Directed Assault on Rapper DMX (Miami, Florida)

300.    Defendant Cartagena's use of violence extended beyond his internal crew. In one incident in Miami, Florida, Defendant ordered Plaintiff and another associate, Raul, to confront and physically assault the rapper DMX following a verbal dispute between DMX and someone in Defendant's circle.

301.    The Defendant viewed the altercation as an act of public disrespect and ordered immediate retaliation. He instructed Plaintiff, saying:

<p align="center">"<b><i>If he acts up, take the hammer.</i></b>"</p>

302.    The phrase "<b><i>take the hammer</i></b>" was understood within the Enterprise as authorization to use a firearm, not simply engage in a verbal or physical confrontation.

303.    Although Plaintiff ultimately defused the encounter and avoided a violent outcome, his compliance in initiating the confrontation under threat of enterprise reprisal highlights that Defendant's orders were non-negotiable.

304.    Within the structure of the Cartagena Enterprise, verbal directives from the Defendant—especially those involving threats of violence—were treated as mandatory.

305.    The Defendant's conduct in this incident independently supports multiple predicate acts of racketeering under federal and state law, including:

1. 18 U.S.C. § 1959(a)(3): Attempted assault in aid of racketeering.
2. Florida Stat. §§ 782.04 and 777.04: Attempted murder and criminal solicitation under Florida law.
3. New York Penal Law §§ 105.15 and 120.10: Conspiracy and attempted assault, given that the order originated within the Defendant's criminal Enterprise and could have been executed across jurisdictions.

306.    This incident is part of a broader pattern in which Defendant Cartagena employed trusted subordinates like Plaintiff to carry out retaliatory attacks. These acts were not isolated or impulsive—they were strategic and methodically issued to assert dominance and protect Defendant's status in the entertainment industry. That pattern also includes an alleged murder-for-hire plot targeting Curtis Jackson, p/k/a 50 Cent, detailed below.

**Prior Federal Tax Conviction and DOJ Documentation of Enterprise Pattern**

307. The Defendant's prior criminal conviction further evidences his longstanding efforts to conceal racketeering proceeds and demonstrates both the continuity and intent central to the RICO framework. On or about December 20, 2012, in the U.S. District Court for the District of New Jersey, Defendant Cartagena pleaded guilty to two counts of willful failure to file income tax returns in violation of 26 U.S.C. § 7203.

308. As stated in public filings and DOJ press releases:

   1. The Defendant earned over $3.7 million between 2007 and 2010 through business entities, including Terror Squad Productions, Miramar Music Touring, and FJTS Corp.
   2. He failed to file income tax returns for those years and did not make any meaningful attempt to rectify the delinquencies until criminally charged.
   3. He was ordered to repay $718,038 in unpaid taxes, fined $15,000, and sentenced to four months in federal prison followed by one year of supervised release.
   4. These facts are documented in the indictment, plea agreement, judgment of conviction, and Department of Justice press statements.

309. Rather than viewing this conviction as a deterrent, the Defendant reportedly used it as a personal branding moment. He designed an album cover resembling a federal interrogation room and boasted to Plaintiff and others that "the feds could never pin anything" substantial on him. This post-conviction behavior illustrates a brazen disregard for the law and reflects how criminal activity was normalized and celebrated within the Enterprise.

310. The Defendant's conviction and post-conviction conduct establish:

   1. Clear knowledge of his legal obligations and a willful intent to violate them.
   2. A deliberate effort to conceal income derived from enterprise activities.
   3. Evidence of both closed- and open-ended continuity of criminal conduct—particularly financial crimes—supporting the RICO pattern alleged in this Complaint.

311. These facts are matters of public record and subject to judicial notice under Federal Rule of Evidence 201(b). They support Plaintiff's claims not only for civil RICO but also for financial fraud, tax evasion, and enterprise concealment strategies.

**Pistol Pete's Social Media Campaign Affirming His Repeated Acts of Violence**

312. During a YouTube interview ('Kill All Rats how a Puerto Rican Gangster Terrorized New York Prison System') with Johnny Mitchelle ('The Connect: With Johnny Mitchell'), Defendants Pistol Pete lamented on the time that he orchestrated and executed a gang riot in while in prison which resulted in several African American inmates being jumped and stabbed up.



How A Puerto Rican Gangster
TERRORIZED The New York Prison Syste...
216K views · 6 days ago

**Upon Information and belief, Kill All Rats if an organization created and ran by Defendants Pistol Pete, Cartagena, and Rich Player.**

**[00:02:04] Pistol:** And-and it wasn't even like that, you know, and we-and we were-- so this is a real exclusive, bro. I-I went and-I went and I told everybody that was in my unit, everybody that was Black that I know, you know, like my, you know, guard buddies that I know.

**[00:02:19] Interviewer:** Mm-hmm.

**[00:02:19] Pistol:** "Okay, Sean, yo, lock in, stay in your cell. Yo, uh, Mohammed, stay in your cell." "Why you telling me to stay in my cell, Pistol?" "Stay in your cell." You know what I'm saying? All right. Boom. So, oh, I told all my Black friends stay in the cell. We went out to the yard, boom. The guys ran down on the guy that cut the-the other Black kid.

**[00:02:36] Interviewer:** Right.

**[00:02:36] Pistol:** They all ran down on him, almost killed him, an inch away from his heart. Took him to the hospital. Now the whole jail was closed.

**[00:02:42] Interviewer:** Yeah.

**[00:02:42] Pistol:** Now they open the jail again. And I go back out there and-and I said, "Okay, on this date, this is what we gonna do, this day we're gonna go out there, we're gonna put the Puerto Rican flag in the middle of the [sound cut] flag and we're gonna stab everybody that's Black." And I did that. I went out there and we did that. **We put the flag, and I stabbed everybody**. And **the guy that was-- the main guy that was getting away he was handcuffed, shackled, and they was escorting him out, and I ran down, chased the police down, backed him down, I cut him in front of the police**.

71

313.    Here, Defendant Pistol Pete shows no remorse for committing serious acts of violence. It
is also important to note that this interview aired **on May 25, 2025**.

**Predicate Acts Summary – Appendix A**

314.    The following chart (see Appendix A) summarizes the predicate acts committed by
Defendant Cartagena and his enterprise associates.  Each act was carried out in furtherance of
the organization's core objectives: to profit from the exploitation of labor, suppress dissent
through violence and intimidation, and conceal the financial and criminal liability of its
leadership.

315.    Each act qualifies under 18 U.S.C. § 1961(1) and supports a finding of a pattern of
racketeering activity under § 1962(c):

**Appendix A – Predicate Acts Summary Chart (Cartagena Enterprise)**

| # | Description | Statutes Violated | Key Participants | Location | Conduct Summary |
|---|-------------|-------------------|------------------|----------|-----------------|
| 1 | Forced Labor of Plaintiff ("TA") | 18 U.S.C. § 1589; NYPL § 135.35 | Joseph Cartagena, Rich Player, Accountant Doe | NY, NJ, FL, Intl. | Coerced Plaintiff's labor through threats, delayed pay, and false IRS filings. |
| 2 | Sex Trafficking of Plaintiff ("TA") | 18 U.S.C. § 1591; NYPL §§ 230.34, 130.50 | Joseph Cartagena, Rich Player, Agent Doe, Driver Doe, Pistol Pete | NY, NJ, FL, NV, CA, Intl. | Coerced Plaintiff into non-consensual sexual acts under threat and manipulation. |
| 3 | Witness Retaliation | 18 U.S.C. § 1512(b); NYPL § 215.15; FL Stat. § 914.22 | Cartagena, Rich Player, Pistol Pete | NY, FL | Attempt to lure Plaintiff into violent ambush after public disclosures. |
| 4 | Conspiracy to Commit Violence (REDACTED) | 18 U.S.C. § 1959; NYPL § 125.25 | Joseph Cartagena | NY | Defendant admitted prior violent act resulting in wrongful conviction of another. |
| 5 | DMX Assault Directive | 18 U.S.C. § 1959; FL Stat. § 777.04 | Joseph Cartagena | Miami, FL | Ordered Plaintiff to confront rapper DMX in retaliation. |

| 6 | Latin Rapper Stabbing ("Caught Ketchup") | 18 U.S.C. § 1959; NYPL §§ 120.10, 105.15 | Cartagena, Rich Player, Pistol Pete | Bronx, NY | Retaliatory stabbing ordered using enterprise code "ketchup." |
|---|---|---|---|---|---|
| 7 | Café Ketchup Incident | 18 U.S.C. § 1959; NYPL §§ 120.10, 105.15 | Cartagena, JB, Rich Player, Pistol Pete | NY | Public stabbing ordered in retaliation after nightclub altercation. |
| 8 | Mack Maine Assault Directive | 18 U.S.C. § 1959; NYPL § 100.10 | Joseph Cartagena | NY, FL | Directed Plaintiff to assault Mack Maine for perceived disrespect. |
| 9 | Interstate Sex Trafficking of Minors | 18 U.S.C. §§ 2421–2423 | Cartagena, Rich Player, Agent Doe, Driver Doe | NY, FL, CA, NV, Intl. | Transported minors for coerced sex under false pretenses. |
| 10 | Commercial Fraud (UPNYC) | 18 U.S.C. § 1343; NYPL § 190.65; GBL § 349 | Cartagena, Accountant Doe | Bronx, NY | Fraudulent sneaker resale and chargeback schemes. |
| 11 | Tax Evasion & Money Laundering | 18 U.S.C. §§ 1956, 1957; 26 U.S.C. § 7201; NY Tax §§ 1801–07 | Cartagena, Accountant Doe, Erica Moreira | NY, NJ, FL, Intl. | Used shell companies and fake filings to hide income. |
| 12 | Public Use of "Ketchup" Code | Fed. R. Evid. 801(d)(2)(A); 18 U.S.C. §§ 1959, 1512 | Joseph Cartagena | Publicly Recorded | Confirmed violent slang term for stabbings during public interview. |

| 13 | PPP Loan Fraud | 18 U.S.C. §§ 1343, 1014 | Cartagena, Accountant Doe | NY, NJ, FL | Secured relief funds under false business pretense via Sneaker Addict Touring. |
|----|----------------|--------------------------|---------------------------|-----------|--------------------------------------------------------------------------------|
| 14 | Unauthorized Legal Practice | FL Stat. § 454.23; 18 U.S.C. § 1343 | Erica Moreira, Cartagena | FL, NY | Filed shell company documents while unlicensed to practice law. |
| 15 | Structuring/Laundering via Shell Cos. | 18 U.S.C. §§ 1956, 1957; FL Stat. § 896.101 | Cartagena, Moreira, Accountant Doe | NY, NJ, FL, Intl. | Used nominee entities to obscure ownership of enterprise income. |
| 16 | Wage Theft and Coercion | NYLL §§ 193, 198; FL Stat. § 448.110; 18 U.S.C. § 1589 | Cartagena, Accountant Doe | NY, NJ, FL, Intl. | Paid Plaintiff off-books, inflated IRS filings, and suppressed real income. |
| 17 | Assault of Dre ("Clapy") | 18 U.S.C. § 1959; NYPL §§ 120.00, 135.60 | Cartagena, Pistol Pete | Miami, FL | Ordered physical assault of music producer to intimidate industry collaborators. |

| 18 | Money Laundering via UPNYC | 18 U.S.C. §§ 1956, 1957; NYPL § 190.65 | Cartagena, JB, Accountant Doe | Bronx, NY | Cashed out illegal funds, ghost payroll, luxury displays, and cash structuring. |
|----|---------|---------|---------|---------|---------|
| 19 | Online Threats and Intimidation | 18 U.S.C. § 875(d); § 1512(b); NYPL §§ 240.30, 120.45 | Cartagena, Pistol Pete, Rich Player | Online / NY | Sent coded threats via burner accounts to obstruct legal filings. |
| 20 | Ghost Contracts & Royalty Fraud | 18 U.S.C. § 1343; § 371; NYPL § 175.10 | Cartagena, Music Publisher Doe | NY, CA | Fabricated split sheets to remove Plaintiff from song ownership credits. |
| 21 | Forced Exhibitionism and Sexual Degradation | 18 U.S.C. §§ 1589, 1591, 241; NYPL § 130.40; FL Stat. § 787.06 | Cartagena, JB, Pistol Pete | NC, FL, Intl. | Forced Plaintiff into group sex, voyeurism, and public humiliation. |
| 22 | Wire Fraud, Tax Fraud, and Coercive Wage Theft Statutes Violated | 8 U.S.C. § 1343; 18 U.S.C. § 1341; 26 U.S.C. §§ 7201, 7206; 18 U.S.C. § 1589. | Roc Nation, LLC; BDO (accounting firm); Defendant Joseph Cartagena | NY, FL, NJ, Intl. | From 2017 onward, Roc Nation and BDO, under Cartagena's direction, misclassified Plaintiff's labor to evade taxes, suppress rights, and enforce |

| | | | | economic control, while profiting from the scheme |
|---|---|---|---|---|
| 23 | Structuring, Wire Fraud, and Laundering of Enterprise Proceeds Through Layered Bank Accounts | 18 U.S.C. § 1956(a)(1)(B); 18 U.S.C. § 1957; 18 U.S.C. § 1343; 18 U.S.C. § 1961(1)(D) | Joseph Cartagena; Roc Nation, LLC; BDO; Sabadell United Bank, N.A. | NY, FL, NJ, Intl. | From 2016 to 2024, the enterprise used multiple Sabadell accounts to launder proceeds from forced labor and fraud, routing funds through shell companies under BDO's oversight for Roc Nation. |
| 24 | Payroll Fraud, Tax Misclassification, and Coercive Financial Structuring Statutes Violated | 18 U.S.C. § 1343; 18 U.S.C. §1956(a)(1)(B); 26 U.S.C. §§ 7201, 7206 | Joseph Cartagena; Roc Nation, LLC; BDO | NY, FL, NJ, Intl. | Since 2017, Roc Nation and BDO used false W-2s and 1099 filings to suppress Plaintiff's labor rights, laundering payments through shell entities and Sabadell accounts to conceal enterprise coercion. |

316.     Taken together, the conduct outlined above constitutes predicate racketeering acts under 18
U.S.C. § 1961(1)(D), which includes offenses indictable under federal law relating to money
laundering and financial fraud. Defendant Cartagena's deliberate use of shell companies,
nominee-controlled accounts, and sham bookkeeping was not limited to tax evasion—it was
part of a broader, ongoing strategy to systematically launder racketeering proceeds and shield
enterprise assets from detection and liability.

317. This pattern of financial misconduct—spanning fraudulent corporate filings, deliberate misclassification of income, misuse of Paycheck Protection Program (PPP) loans, and concealment of cash earnings from international performances—demonstrates both closed-ended continuity (a series of related acts over time) and open-ended continuity (a threat of continued criminal activity) sufficient to satisfy the pattern requirement under the RICO statute. The Cartagena Enterprise's illicit financial architecture was deliberately designed to obscure the source, movement, and beneficiaries of criminal proceeds.

**Defendants Federal Prison Release After Tax Fraud Incarceration**

318. Following his release from federal custody for felony tax offenses, Defendant Cartagena escalated his efforts to feign legal compliance while continuing to engage in deceptive and unlawful financial practices.

319. These included the fabrication of sham business deductions, the generation of backdated invoices, the creation of fraudulent employee records, and the structured collection of unreported cash payments from both domestic and foreign sources, including live performances across Asia, Africa, and Europe.

320. The Defendant's prior conviction for willful failure to file federal tax returns confirms his awareness of the law and duties imposed under the Internal Revenue Code. His post-release conduct—resuming similar fraudulent schemes—further reflects willful recidivism, a disregard for legal obligations, and a calculated effort to continue concealing enterprise revenue while projecting the appearance of legitimate operations.

321. This conduct underscores Plaintiff's allegations of pattern, continuity, and intent under 18 U.S.C. §§ 1962(c) and 1961(5). It supports the finding that the Defendant operated the enterprise with a criminal purpose before, during, and after federal prosecution.

Q. **The Cartagena Enterprise: Structure, Operations, and Racketeering Purpose**
Overview of the Enterprise

322. From approximately 2005 through the present, Defendant Cartagena has directed, managed, and participated in an ongoing criminal organization identified in this Complaint as the Cartagena Enterprise. This enterprise includes a network of loyal enforcers, financial agents, corporate fronts, and industry collaborators.

323. Publicly, the enterprise operated under branding entities such as Terror Squad, UPNYC, and other entertainment and apparel ventures. Privately, the same structure functioned as a criminal enterprise whose core purpose was to enrich Defendant Cartagena through the use of

coercion, threats, fraud, trafficking, and violence—all while concealing the enterprise's true nature from law enforcement, regulators, and the public.

324. The Cartagena Enterprise qualifies as an association-in-fact enterprise under 18 U.S.C. § 1961(4): a group of individuals and entities associated for a common purpose, with a clear structure, shared operational goals, and continuity of membership and method. The enterprise's operations affected both interstate and international commerce, including the transport of victims, the movement of illicit funds, and the laundering of revenue derived from commercial performances and digital royalties.

Overview of the Enterprise

| Member | Alias/Title | Role within Enterprise |
|---|---|---|
| | **Enterprise Leader** | |
| Joseph "Fat Joe" Cartagena | "The Derg," "The Don" | Directed all racketeering activity; issued orders for violence; handled revenue; coordinated intimidation and creative theft. |
| | **Enterprise Management and Facilitation** | |
| Erica Juliana Moreira | Legal representative (unauthorized to practice law in the State of Florida) | Files fraudulent corporate documents, engages in unauthorized practice of law; and establishes shell corporations to conceal illicit funds. |
| Azaryah Cartagena | Defendants Daughter and Co-conspirator | Nominal owner of shell entities (Azaryah LLC); Obscures Defendant's actual ownership and control to evade liabilities. |
| | **Financial Operations and Money Laundering Network** | |
| | **Shell Companies & Fraudulent Entities** | |
| Slate, Inc. | Central financial conduit | Primary corporate vehicle through which the Cartagena Enterprise consolidated, laundered, and redistributed illicit funds. |
| BELEEEDAT LLC, WOOO Inc., and | Subsidiary Laundering Vehicles | Subsidiary entities operated directly under Slate, Inc., |

78

| R4 SO VALID LLC | | forming a multi-layered financial laundering infrastructure designed explicitly to diffuse and obscure enterprise funds across several corporate fronts. |
|---|---|---|
| Azaryah LLC | Nominee-Controlled Entity | Azaryah LLC was strategically registered under the nominal ownership of Defendant Cartagena's daughter, Azaryah Cartagena. This nominee-controlled entity served the express purpose of obscuring Defendant's personal ownership, control, and legal exposure. |
| Sneaker Addict Touring LLC | PPP Fraud Recipient | Utilized to fraudulently obtain funds from the federal government's Paycheck Protection Program (PPP). Upon information and belief, despite representing itself as a legitimate business entity adversely affected by the COVID-19 pandemic, this corporation maintained no substantial payroll, operations, or legitimate business activities to justify the receipt of PPP funds. |
| Domo, LLC | Fraud-Linked Enterprise | Integrally connected to the Cartagena Enterprise's financial fraud schemes, serving as an additional corporate entity that facilitated and executed illicit enterprise transactions. |
| | **Enterprise Enforcement and Security** | |
| Pete "Pistol Pete" Torres | Enforcer / Street Captain | Managed physical retaliation, orchestrated beatings, stabbings, and targeted REDACTED. |

| | | Executes threats and physical assaults. Reports directly to Defendant Cartagena, supervising violent enforcement. |
|---|---|---|
| Richard "Rich Player" Jospitre | Business Manager, and Head of Enforcement | Coordinated enterprise messaging; relayed threats and orders; assisted in laundering proceeds; interfaced with third-party handlers. |
| Enforcer Doe 1, and Enforcer Doe 2 | Executioners | Report to Rich Player and Pistol Pete. Conduct direct threats, surveillance, intimidation, and victim isolation operations. Were responsible for stabbings, REDACTED, and targeted violent attacks. |
| JB, Raul, AK | Street Crew | Execute ghost transactions, intimidation of rivals, engage in sex trafficking and customer manipulation through UPNYC. |
| | **Enterprise Logistics and Operational Support** | |
| Driver Doe | Enterprise Driver | Provides discreet transport for victims, cash, and contraband. Ensures covert movement of assets and personnel domestically and internationally. |
| Agent Doe | Travel Agent | Coordinates discreet domestic and international travel. Books airline tickets, private charters, and hotel accommodations. Including for minors. Maintains confidentiality of enterprise movements and illicit activities. |
| | **UPNYC (Retail Front and Cash Transaction Hub)** | |

| UPNYC Store Employees | Frontline Retail | Facilitated credit card fraud and unauthorized resale of exclusive merchandise and served as a shell front for laundering illegal profits. |
|---|---|---|
| Cash-Based Money Laundering | | UPNYC was utilized strategically to inject illicitly obtained cash into seemingly legitimate business transactions. Revenue streams from unrecorded or off-the-books retail sales transactions, as well as funds derived from wage theft, were systematically commingled with legitimate sales revenues, thereby laundering illicit profits through the guise of standard retail operations. |
| Financial Concealment and Fraud | | Through deceptive bookkeeping practices, UPNYC deliberately maintained misleading financial records to conceal the enterprise's true income and facilitate substantial tax evasion. Falsified financial documentation was routinely created to mask enterprise-derived income, evade IRS scrutiny, and facilitate fraudulent employer and employee tax reporting. |
| Venue for Trafficking and Enterprise Meetings | | UPNYC frequently functioned as a discrete logistical hub where trafficking victims were initially recruited, and groomed. It served as a base of operations for meetings among enterprise members (including Defendant, his enforcers, and distributors), and discreet interactions to arrange transportation for |

| | | minors, and to plot attacks of rivals. |
|---|---|---|
| Operational Integration within Enterprise Network | | UPNYC interacted closely with other enterprise entities, including Slate Inc. and subsidiary laundering vehicles such as BELEEEDAT LLC, WOOO Inc., and R4 SO VALID LLC, through coordinated transfers of enterprise proceeds and fraudulent financial activity. |
| Fraudulent PPP Loan Acquisition: | | Like Sneaker Addict Touring LLC, UPNYC engaged in fraudulent applications for pandemic-era Paycheck Protection Program (PPP) loans, misrepresenting financial need, payroll obligations, and operational scope. |

**1) Key Enforcement Examples and Patterns of Violence**

325.    The Cartagena Enterprise maintained discipline, suppressed dissent, and enforced loyalty through a persistent and calculated use of violence. This violence was not random—it was strategic, directed, and often premeditated. Defendant Cartagena regularly issued orders that resulted in serious bodily harm or death, using surrogates and coded language to insulate himself while asserting dominance across the enterprise.

326.    Examples of enforcement violence include:

a.    Miami Incident (Teenagers Ordered to Attack): In Miami, Defendant Cartagena ordered two teenage boys to assault a man who had inadvertently walked through a group affiliated with the enterprise. The man, armed in self-defense, fatally shot both teens. Their deaths were a foreseeable outcome of the Defendant's coercive leadership style, which normalized confrontation and violence as acceptable forms of conflict resolution and loyalty enforcement.

b.    "Café Ketchup" and Sing Sing Events: The enterprise coined the phrase "Café Ketchup" to reference a retaliatory stabbing that occurred after an altercation involving enterprise member JB. Another incident involved a murder for which,

according to Defendant's admissions, another individual is now serving a life sentence in Sing Sing Correctional Facility—a conviction Defendant has openly mocked, boasting that "they could never pin it on me.".

327.    Defendant Cartagena repeatedly glorified violence and normalized its use by embedding it in coded language. Within the enterprise, phrases like "pound him out" (physical assault), "Matonden" (kill him), and "Ketchup" (stab/slash) were understood as direct commands to act violently. These coded terms allowed the Defendant to direct attacks while concealing his role from outside scrutiny and law enforcement.

### 2) Recorded Retaliation Attempts Against Plaintiff

328.    After Plaintiff began publicly speaking out about the enterprise's misconduct, senior members Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre initiated a targeted plan to lure Plaintiff into a violent trap. Their actions were premeditated and recorded in a series of calls to a mutual associate, Percy, whom they sought to use as bait.

329.    During the calls, Torres and Jospitre referred to Plaintiff as a "traitor," cited Defendant Cartagena's outrage over Plaintiff's disclosures, and made it clear that Plaintiff "had to be dealt with." They pressed Percy to help coordinate an in-person meeting under pretenses, expressing that the situation had escalated "too far to fix."

330.    These recorded calls illustrate the organized and retaliatory nature of the enterprise's enforcement practices. The use of coded threats—such as "pound him out" and "bring him in"—was consistent with other acts of violence and intimidation carried out under Defendant's command.

331.    These efforts to silence Plaintiff constitute witness intimidation and obstruction of justice, in violation of 18 U.S.C. § 1512(b), and qualify as racketeering acts under 18 U.S.C. § 1961(1)(B). They also support Plaintiff's claim of unlawful retaliation under the Trafficking Victims Protection Act, specifically 18 U.S.C. § 1591(d).

### 3) Illicit Communications and Burner Phone Use

332.    In furtherance of the enterprise's unlawful objectives, Defendant Cartagena maintained a burner phone ending in 1330, which Plaintiff personally observed in use. The phone was kept separate from the Defendant's public devices and reserved for high-risk, enterprise-related communications.

333.    Defendant used this burner phone to:

1. Communicate with underage girls and arrange secret meetings in advance of out-of-town trips, performances, or hotel stays.
2. Coordinate trafficking logistics with known enforcers, including Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre.
3. Issue sensitive directives related to violence, retaliation, and enforcement while avoiding traceability.

334.   The Defendant routinely replaced the burner device every few months, and its use was known only to a select group of trusted insiders. The secrecy surrounding this phone, its patterns of use, and its intentional separation from Defendant's official communication channels demonstrate a deliberate effort to evade law enforcement surveillance and obstruct future investigations.

335.   The use of burner phones and coded communications is consistent with the operational tactics of RICO enterprises. It supports Plaintiff's allegations that the Cartagena Enterprise functioned with intent, coordination, and concealment necessary to sustain illegal operations over a prolonged period.

## R.  Prior Conviction Confirms Enterprise Knowledge and Intent

336.   Defendant Cartagena's prior federal tax conviction is highly probative of the enterprise's operational knowledge and intent. On or about December 20, 2012, in the U.S. District Court for the District of New Jersey, the Defendant pleaded guilty to two counts of willfully failing to file income tax returns in violation of 26 U.S.C. § 7203.

337.   According to publicly available records, including court filings and Department of Justice releases:

1. The Defendant earned over $3.7 million between 2007 and 2010 through Terror Squad Productions, Miramar Music Touring, and FJTS Corp.
2. He failed to file tax returns for multiple years and took no action to correct his obligations until criminally charged.
3. Defendant was sentenced to four months in federal prison, fined $15,000, and ordered to repay $718,038 in back taxes.
4. This conviction confirms the Defendant's knowledge of federal reporting laws and demonstrates his willingness to engage in concealment schemes to protect enterprise revenue.

338.   Instead of reforming, Defendant publicly embraced his conviction, transforming it into a branding opportunity by releasing music referencing federal charges and boasting to others—including Plaintiff—that "the feds could never touch him." This attitude reflects not remorse but calculated bravado and normalized criminality within the enterprise's culture.

339.    The Defendant's tax conviction and subsequent conduct provide concrete evidence of both closed-ended continuity (through past, related offenses) and open-ended continuity (through ongoing financial concealment and enterprise operations), thereby supporting the pattern element required under 18 U.S.C. §§ 1961(5) and 1962(c).

## CAUSES OF ACTION

### COUNT I
### Violation of the Trafficking Victims Protection Act (TVPA)
### *(18 U.S.C. §§ 1589, 1591, and 1595)*

340.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

**Legal Standard**

341.    The Trafficking Victims Protection Act ("TVPA") prohibits obtaining labor, services, or commercial sex acts through force, fraud, coercion, or abuse of power.  See 18 U.S.C. §§ 1589, 1591.

342.    Under 18 U.S.C. § 1589, it is unlawful to obtain labor or services:

1.  Using serious harm or threats thereof.
2.  Through a scheme or pattern designed to cause belief that serious harm would result from noncompliance.
3.  Through abuse or threatened abuse of legal or economic control.

343.    Under 18 U.S.C. § 1591, it is unlawful to knowingly cause or benefit from a commercial sex act induced by:

1.  Force.
2.  Fraud.
3.  Coercion; or
4.  Abuse of power, including psychological or financial control.

344.    A "commercial sex act" includes any sex act in exchange for something of value, including housing, food, employment, protection, or professional advancement.  See 18 U.S.C. § 1591(e)(3).

345.    "Serious harm" includes non-physical harm such as economic control, reputational harm, and psychological manipulation sufficient to compel a reasonable person to continue laboring involuntarily.  See United States v. Dann, 652 F.3d 1160, 1171 (9th Cir. 2011); United States v. Rivera, 799 F.3d 180, 185 (2d Cir. 2015).

**Forced labor – 18 U.S.C. § 1589**

346.    Under 18 U.S.C. § 1589(a), it is unlawful to knowingly obtain the labor or services of a person:

1.  Using force, threats of force, physical restraint, or threats of physical restraint.

2. Using serious harm or threats of serious harm.
3. Using any scheme, plan, or pattern intended to cause the person to believe that nonperformance would result in serious harm or
4. Using abuse or threatened abuse of legal or economic power.

347.  Defendant never provided Plaintiff with fair compensation or contractual credit for these contributions.  Instead, he used false promises of royalties and credit, paired with verbal manipulation, psychological coercion, and credible threats of harm, to maintain Plaintiff's labor under duress.  Defendant consistently threatened to:

1. Withhold compensation and royalties Plaintiff earned.
2. Used threats of abandonment in foreign countries.
3. Cited violent retribution against past associates as a warning to Plaintiff.
4. Retain funds and authorship rights as leverage over Plaintiff's compliance.
5. Destroy Plaintiff's industry reputation and personal credibility.
6. Physically retaliated if Plaintiff disobeyed or disclosed his mistreatment.

348.  These acts created a coercive climate in which the Plaintiff was deprived of meaningful choice and continued performing labor to avoid serious harm, as that term is defined under § 1589(c)(2).

349.  Plaintiff reasonably believed that failure to comply with Defendant's demands would result in unpaid labor, financial destitution, career sabotage, abandonment abroad, and possible physical harm.

1. Defendant Cartagena withheld Plaintiffs pay for days and weeks at a time.  Placing Plaintiff in a financial hole.  Plaintiff would only be paid if he returned to the Defendant's employ.
2. The Plaintiff was grossly underpaid.  Plaintiff would receive between $150.00 to $250.00 per performance.  Unbeknownst to Plaintiff, Defendant Cartagena was paid $3,000 to $5,000 per show for Plaintiff's part of the performance.  Defendant Cartagena pocketed Plaintiff's money and paid Plaintiff late.
3. The Plaintiff tried to leave on multiple occasions.  Defendant Cartagena used coercive tactics like begging and pleading with Plaintiff to stay and stating that Plaintiff is all he has on his side.  Defendant Cartagena guaranteed to release Plaintiff as an artist and begged Plaintiff to forgo his opportunities to play professional basketball and to sign with other labels/producers.
4. When Defendant Cartagena's begging began to fall on deaf ears, Plaintiff was threatened.  Defendant Cartagena told him that nobody leaves Terror Squad in one piece.  He then pointed to the face-slashing of former Terror Squad member Cuban Links as an example.

350.  Courts recognize that "serious harm" under § 1589 includes non-physical harm that would compel a reasonable person in the victim's position to continue providing labor.  See United States v. Marcus, 628 F.3d 36, 41–42 (2d Cir. 2010); Paguirigan v. Prompt Nursing Empl. Agency LLC, 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017).

351.    Defendant's conduct, including repeated threats of retaliation and abandonment, economic deception, and manipulation of Plaintiff's fear of blacklisting, satisfies this standard.  The Plaintiff was deprived of autonomy and felt trapped in a coercive dynamic for over a decade.

352.    This conduct constitutes forced labor under federal law and qualifies as a predicate offense under the TVPA and RICO, 18 U.S.C. § 1961(1)(B).

**Sex Trafficking by Coercion – 18 U.S.C. § 1591**

353.    Under § 1591, it is unlawful to recruit, harbor, transport, provide, or obtain any person for a commercial sex act induced by force, threats, fraud, or coercion in or affecting interstate or foreign commerce.

354.    A "commercial sex act" is defined as any sex act on account of which anything of value is given to or received by any person.  18 U.S.C. § 1591(e)(3). This includes conditional access to food, housing, pay, or professional status.

355.    Defendant used his authority and Plaintiff's dependence on him to coerce Plaintiff into repeated, unwanted sexual activity for Defendant's entertainment and power reinforcement.

356.    Coercive conduct included:

1. Requiring Plaintiff to engage in sexual acts with women in Defendant's presence.
2. Directing Plaintiff to participate in group sex scenarios under the guise of loyalty rituals to Terror Squad.
3. Punishing Plaintiff for resistance by canceling return flights, withholding pay, cutting off contact, or
4. Threatening Plaintiff that "nobody leaves Terror Squad in one piece."

357.    Plaintiff's compliance was extracted through coercion, fear, and economic manipulation, and the acts qualify as "commercial sex acts" under § 1591(e)(3), as Plaintiff's compliance was directly tied to job retention, income access, and travel home.

1. In at least one instance, Defendant canceled Plaintiff's return flight home after Plaintiff expressed discomfort with the coercive sexual dynamic.  This act rendered Plaintiff stranded abroad, without shelter or resources, for several days.
2. On one occasion, Plaintiff was forced to have a threesome with Defendant Cartagena and a female fan.  The Plaintiff rejected the demand by pretending to be ill.  Defendant Cartagena disregarded Plaintiff's complaint and yelled at him to pull his dick out.  Plaintiff obliged.  The woman consented, and as she was straddling Defendant Cartagena, Plaintiff began anally penetrating her.  Defendant Cartagena was very excited.  Scream about how long he waited to do it.  While Defendant Cartagena was outwardly bragging, Plaintiffs felt sick as his genitals inadvertently brushed against Defendant Cartagena's.  At another point during this interaction, Defendant Cartagena began shouting Plaintiff's name, "TA," "TA," "TA," and "She squirted on me TA."  When it was over, Defendant Cartagena left the female on the bed, pulled out his phone, and began recording Plaintiff's penis without his consent.

3. On another occasion, after a concert overseas, Defendant Cartagena called Plaintiff to his hotel room. He forced Plaintiff to have an orgy with an extra female that was in his room. As Plaintiff was performing sex acts with the female, Defendant Cartagena stopped having sex with his female, stood up, and started masturbating. While he was Masturbating, Defendant Cartagena started spanking Plaintiff on his buttocks while screaming, "Harder TA, Harder TA, Harder TA."

358. As in United States v. Ray, 2022 U.S. Dist. LEXIS 212725 (S.D.N.Y. 2022), and United States v. Raniere, 55 F.4th 354 (2d Cir. 2022), the use of psychological pressure, dependency, and reputational control to extract sex acts constitutes coercion under § 1591(e)(3).

359. The Defendant's conduct satisfies the legal standard for sex trafficking by coercion, and each coerced sexual act constitutes a violation of federal law.

**Venture Liability and Pattern-Based Enterprise (18 U.S.C. § 1595)**
 A. <u>Venture Liability</u>

360. Under § 1595, victims of violations under §§ 1589 and 1591 may bring civil claims not only against direct perpetrators but against any person or entity that knowingly benefits from participating in a venture engaged in trafficking.

361. The Cartagena Enterprise, including Pete "Pistol Pete" Torres, Richard "Rich Player" Jospitre, Erica Juliana Moreira, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation, LLC functioned as a coordinated trafficking venture. Plaintiff personally witnessed, inter alia:

1. Transportation of Minors:

   a. Defendant transporting underage girls (15- and 16-year-olds) across state lines and abroad.
   b. The Enterprise uses financial incentives, cosmetic surgery, and controlled lodging to maintain the victims' compliance, and
   c. The psychological grooming of these minors, who were discarded once noncompliant.

2. Theft of Intellectual Property:

   a. Defendant Erica Juliana Moreira knew or should have known of Defendant Cartagena's theft and concealment of Plaintiffs' intellectual property rights, specifically as it pertains to the music he was featured on, as well as all the music he wrote. Plaintiff directly reached out to Defendant Moriera for assistance, and she ignored Plaintiff, stating that she was too busy taking care of her children.
   b. Defendant Erica Juliana Moreira created a web of shell companies Sneaker Addict Touring LLC, Slate, Inc., Azaryah LLC, BELEEEDAT, LLC, Azzys Way, and R4 SO VALID, LLC, which were all used to launder money and conceal the ownership rights of Plaintiff's intellectual property.

3. Theft of wages and services:

   a. Defendants Sneaker Addict Touring LLC and Roc Nation, LLC knew that Plaintiff was entitled to receive $30,000 per show during the 2017 "All the Way Up Tour."

88

According to a former employee of Roc Nation, who managed the Plaintiff and Defendant Cartagena, the Plaintiff, and the tour DJ were slated to receive $30,000 per show for their work on the All the Way Up Tour. Instead of paying the Plaintiff, the Defendant gave the Plaintiff $1,000 per show and pocketed the balance. Upon information and belief, Defendant Cartagena used the balance of the money to pay off the Tax debt he incurred because of his June 24, 2013, tax fraud conviction.

b. In addition to the $30,000, Defendants aided and abetted Defendant Cartagena in diverting $5,000 per show Plaintiff was contractually obligated to receive only paying Plaintiff $250.00.

### Roc Nation's Role as Venture Participant Under 18 U.S.C. § 1595(a)

362.    Beginning in or around 2017, Roc Nation, LLC knowingly benefited financially from and substantially participated in the trafficking venture that exploited Plaintiff. Roc Nation managed Defendant Cartagena's touring, catalog, and business infrastructure and collected a fixed 10% share of all enterprise earnings, regardless of whether Roc Nation generated the revenue.

363.    Roc Nation acted through its appointed accounting agent, BDO, which handled payroll structuring, W-2 issuance, and tax classification. BDO knowingly created falsified W-2 paystubs for Plaintiff while simultaneously misclassifying him as a 1099 contractor for IRS filings. This dual-record scheme deprived Plaintiff of healthcare, overtime, and labor protections under federal and state law.

364.    These acts carried out under Roc Nation's supervision, constitute participation in a trafficking venture under 18 U.S.C. § 1595(a). Roc Nation's financial and managerial involvement sustained the coercive conditions under which Plaintiff was held. Roc Nation's refusal to rectify the known exploitation—followed by retaliatory legal action—further confirms its knowing participation.

365.    Upon assuming control of Defendant Cartagena's touring, publishing, merchandising, and accounting operations, Roc Nation:

1. Received at least 10% of all income earned by Defendant Cartagena, including revenue derived from performances, songwriting, and commercial releases that relied on Plaintiff's coerced and unpaid labor.
2. Appointed its long-standing accounting firm, BDO, to oversee Defendant Cartagena's financial structure, including payroll, royalty tracking, expense allocations, and tax reporting.
3. Directed and ratified a fraudulent misclassification scheme, whereby BDO, acting under Roc Nation's authority, issued Plaintiff falsified W-2 paystubs while simultaneously classifying him as an independent 1099 contractor for tax purposes.



**Fake Paystub**

4. Knowingly deprived Plaintiff of employee protections, including access to overtime pay, healthcare contributions, unemployment insurance, and statutory wage remedies, while using W-2 records to mislead government entities and suppress litigation risk.

5. Obscured the true nature of Plaintiff's employment status, creating legal ambiguity that enabled the enterprise to coerce continued labor through threats of economic ruin and professional isolation—satisfying the definition of "serious harm" under 18 U.S.C. § 1589.

6. Willfully refused to investigate internal complaints and financial discrepancies despite having the authority to correct course, thus ratifying the forced labor system maintained by the enterprise.

7. Supported and/or initiated retaliatory litigation against Plaintiff and his counsel after they disclosed trafficking and labor coercion, further entrenching Roc Nation's participation in suppressing whistleblowing.

366.    Roc Nation's financial benefit was not incidental.    It profited directly from the misappropriated value of Plaintiff's labor and creative output.  Its active oversight of Defendant Cartagena's finances through BDO—and its role in directing payroll misclassification and fraudulent reporting—make it civilly liable under the TVPA as a venture participant.

367.    Numerous courts have held that venture participants need not have perpetrated the trafficking directly to incur liability under § 1595(a); it is sufficient that they knowingly benefited and had reason to know of the underlying abuse.  See *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970–72 (S.D. Ohio 2019); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 924 (N.D. Cal. 2021). Roc Nation's conduct falls squarely within this framework.

368.    Congress explicitly prohibits conspiracies and trafficking ventures under § 1594(c), recognizing that the structure and facilitation of trafficking may be as culpable as the act itself.  See *United States v. Wei Lin*, 841 F.3d 823, 825–26 (9th Cir. 2016).

369.    In other words, the law targets the trafficking venture itself, not just individual acts.  Here, the Cartagena Enterprise's coordinated campaign of transporting, manipulating, and exploiting victims squarely falls within the scope of the TVPA.

370.    These facts, therefore, support "venture" liability under §1595 – akin to the liability imposed on facilitators in *Doe v. MindGeek* (holding web platforms liable for profiting from coerced sexual content) and in *M.A. v. Wyndham Hotels* (holding hotel franchisors potentially liable for turning a blind eye to trafficking on their premises).  The Defendant and his associates not only directly perpetrated trafficking acts but knowingly benefited from this venture through sexual access, coerced labor, financial control, and public image maintenance – which §1595 explicitly forbids.

B. Pattern of Exploitation

371.    The scope of trafficking extended beyond Plaintiff.  Defendant's known pattern of grooming, transporting, and sexually exploiting underage girls as part of his circle further substantiates a pattern of trafficking conduct, enhancing the credibility and severity of Plaintiff's claims.

372.    In addition to being a direct victim of Defendant's coercive conduct, Plaintiff personally observed Defendant engage in a pattern and practice of exploiting other individuals, particularly underaged women, under circumstances that mirror the tactics used against him.

373.    Over more than a decade, Plaintiff witnessed Defendant groom, isolate, and sexually exploit minors—often under the pretense of mentorship, access, or career advancement in the music industry.

374.    These minors were transported across state and national borders by or at the Defendant's direction.

375.    Defendant exercised control over their lodging, finances, movements, and sexual availability, creating a coercive dynamic in which continued access and survival were conditioned on compliance.

376.    Plaintiff's firsthand observations confirm that Defendant's actions were not isolated or circumstantial but part of a structured venture wherein Defendant exploited individuals—both male and female—for sexual, emotional, and labor-based gain.  These acts closely resemble the coercive trafficking systems found actionable in *Doe v. MindGeek USA Inc.*, 558 F. Supp. 3d 828 (C.D. Cal. 2021), and *United States v. Ray*, 2022 U.S. Dist. LEXIS 212725 (S.D.N.Y.).

377.    These facts support enterprise liability under 18 U.S.C. § 1595, which holds liable not only those who engage in direct trafficking but also those who knowingly benefit from participation in a venture that traffics others.

378.    The Defendant financially benefited from the coerced labor, sexual access, and loyalty-based control he maintained through this system.

**Damages and Relief**

379.    As a direct and proximate result of Defendant's violations of 18 U.S.C. §§ 1589 and 1591, Plaintiff suffered:

1. Over $610,000 in unpaid wages and withheld per diem.
2. Loss of authorship credit, royalties, and backend publishing revenue.
3. Severe emotional distress, including symptoms of PTSD, depression, and anxiety.
4. Reputational harm and career sabotage from systematic erasure and coercion.

380.    According to 18 U.S.C. § 1595, Plaintiff is entitled to:

1. Compensatory damages.
2. Treble damages.
3. Punitive damages for willful and malicious conduct.
4. Attorney's fees and litigation costs.

381.    Equitable relief, including:

1. A declaratory judgment affirming his authorship interest in works he co-created.
2. A constructive trust over all royalties and backend revenue derived from his labor.
3. An injunction prohibiting Defendant from continued exploitation, retaliation, or use of works derived from coerced contributions.

382.    The Plaintiff also seeks pre-judgment interest at 9% per annum according to New York law and post-judgment interest under 28 U.S.C. § 1961.

## COUNT II
## UNJUST ENRICHMENT

383.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

**Legal Standard**

384.    Under New York law, a cause of action for unjust enrichment lies where:

1.  The Defendant was enriched.
2.  At Plaintiff's expense; and
3.  It would be against equity and good conscience to permit Defendant to retain the benefit.

385.    The claim does not require the existence of a contract but may be grounded in equity where one party has benefited at another's expense under circumstances that demand restitution.  See *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

**Defendant's Enrichment at Plaintiff's Expense**

386.    For more than sixteen years, Plaintiff provided Defendant with creative, logistical, and performance-related services that directly enhanced Defendant's financial earnings, public image, and brand reputation.  These services included:

1.  Songwriting, co-authorship, and vocal performance on at least 18 commercially released tracks.
2.  Live performance support as a full-time hype man at more than 200 shows.
3.  Security and logistical support during domestic and international tours.
4.  Studio collaboration, artistic direction, and contributions to Defendant's branding and image development.

387.    These services generated significant commercial and reputational benefits for Defendant, including touring revenue, streaming royalties, publishing income, and enhanced public credibility.  Despite this, Defendant compensated Plaintiff only marginally—typically $250 per show—and intentionally withheld backend compensation, royalty shares, and public credit.

388.    The Defendant received direct economic benefits from these services, including:

1.  Revenue from digital streams, physical sales, and licensing of Plaintiff's uncredited music.
2.  Tour income supported by Plaintiff's live performance contributions.
3.  Publishing advances and royalties from works authored or co-authored by Plaintiff.
4.  The commercial and brand value derived from Plaintiff's labor and on-stage persona.

389.    Defendant retained these benefits without providing fair market compensation or formal recognition despite repeatedly soliciting Plaintiff's labor with the understanding that Plaintiff would be paid and credited accordingly.

**Specific Categories of Enrichment**

390.    The unjust enrichment accrued by the Defendant can be organized as follows:

| Category | Benefit to Defendant | Harm to Plaintiff | Estimated Value |
|---|---|---|---|
| Tour Compensation | $3,000 budgeted per show for Plaintiff (200+ shows performed) | Paid only $250/show → ~$550,000 underpaid | $2,750 × 200 = $550,000 |
| Per Diem Funds | $100/day × 3 days/show × 200 shows = $60,000 retained by Defendant | Plaintiff paid for travel/lodging himself | $100 × 600 = $60,000 |
| Publishing & Royalties | 100% backend royalties collected by Defendant | Plaintiff excluded from PROs, no credit, no royalty payments | Ongoing, 15% backend share owed |
| Studio, Vocal, Security Work | Unpaid in-studio vocals, co-writing, and personal security services | Provided labor at $0; industry rate $250–$500/day × ~300 days | $75,000 – $150,000 |
| Commercial Exploitation | Sync fees, licensing, placements earned from Plaintiff's vocals and style | No publishing rights, licensing fees, or ownership stakes | Incalculable without audit |
| Reputation & Brand Leverage | Plaintiff's creative identity helped grow Defendant's brand and visibility | Excluded from public credits, unable to leverage success into other creative or industry opportunities | Career suppression: 6–7 figures |

391.    Defendant continues to benefit from the ongoing exploitation of Plaintiff's contributions through digital platforms such as Spotify, Apple Music, YouTube, and PRO registrations. These works are still generating revenue—without attribution or compensation to Plaintiff.

392.    Plaintiff's lyrical and vocal contributions—though undisputed by insiders and evident to listeners—remain unacknowledged in performance rights organization (PRO) databases, publishing statements, and digital metadata.

393.    The Defendant's continued refusal to provide compensation or credit constitutes a continuing act of unjust enrichment.  See *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790

(2012) ('Unjust enrichment] lies as a quasi-contract claim where there is no legal contract but... fairness demands compensation.')."

A. Equity and Good Conscience

394.    The Plaintiff's work was neither volunteered nor incidental.  Defendant solicited, relied upon, and retained it with the knowledge that Plaintiff expected to be compensated fairly based on repeated assurances and industry standards.  See *Clark v. Daby*, 300 A.D.2d 732, 732 (3d Dep't 2002) ("[Unjust enrichment] may be imposed where services were rendered with an expectation of compensation.").

395.    By retaining these benefits and excluding Plaintiff from credit and compensation, Defendant was unjustly enriched at Plaintiff's expense.

396.    Courts have recognized similar enrichment in cases involving unacknowledged labor and diverted compensation.  See *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (holding that a party may recover unjust enrichment even absent a contract when one party receives benefits that rightfully belong to another).

397.    The commercial value of the work wrongfully retained by Defendant far exceeds $570,000 and includes:

1. Royalty streams from Plaintiff's co-written tracks.
2. Backend touring income based on misallocated budgeting.
3. Lost licensing opportunities.
4. Streaming, digital, and performance revenue from platforms such as Spotify, Apple Music, BMI/ASCAP, and YouTube.

398.    Defendant actively concealed financial records, withheld royalty participation, and denied Plaintiff access to contractual documentation—all while retaining the benefits of Plaintiff's labor.

399.    Equity and good conscience do not permit Defendant to retain:

1. Plaintiff's authorship shares in commercially released music.
2. Revenue from backend touring and performance agreements.
3. Royalties, licensing income, and intellectual property rights derived from Plaintiff's labor and likeness.
4. Reputational capital that Defendant accrued in part through Plaintiff's creative identity and performance presence.

**Relief Sought**

400.    Plaintiff seeks the following relief for Defendant's unjust enrichment:

1. Restitution in an amount to be determined at trial, but no less than $610,000.
2. Disgorgement of all profits, royalties, and publishing revenue wrongfully retained by Defendant.

3. Constructive trust over all intellectual property and financial streams derived from Plaintiff's creative works.
4. Prejudgment interest at the statutory rate of 9% per annum according to CPLR §§ 5001 and 5004.
5. Costs of suit, including attorneys' fees and
6. Equitable accounting of all publishing, touring, and licensing revenue connected to Plaintiff's contributions.

401.   The Plaintiff further seeks an accounting of the full financial benefit derived from his labor and a constructive trust on any rights, copyrights, royalties, or profits traceable to his work.

402.   Equity and good conscience require that Defendant not be permitted to retain the benefits derived from Plaintiff's labor, particularly where those benefits were obtained through deception, exclusion, and retaliation.

## COUNT III
## QUANTUM MERUIT
### (*Recovery for Reasonable Value of Services Rendered*)

403.   Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

**Legal Standard**

404.   Under New York law, a plaintiff may recover under the doctrine of quantum meruit when:

1. The Plaintiff rendered services in good faith.
2. The Defendant accepted the services.
3. The Plaintiff had a reasonable expectation of compensation and
4. The reasonable value of those services is ascertainable.

405.   Quantum meruit is an equitable remedy intended to prevent unjust enrichment where services have been rendered and accepted under the circumstances implying compensation. See *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *Fulbright & Jaworski, LLP v. Carucci*, 63 A.D.3d 487, 488 (1st Dep't 2009); *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005).

406.   The doctrine applies even in the absence of a formal written agreement and is meant to prevent a party from benefiting at another's expense without providing fair compensation.

**Services Rendered in Good Faith**

407.   From 2005 through 2020, Plaintiff performed extensive services for Defendant in good faith, including but not limited to:

1. Writing and co-writing lyrics for more than 18 commercially released songs.
2. Performing as Defendant's hype man at over 200 live events.
3. Providing tour security, including transportation management, hotel coordination, and crowd control.
4. Participating in studio sessions, video shoots, and promotional appearances.
5. Creating hooks, melodies, and conceptual themes for multiple projects.

      6.  Managing Defendant's physical presence and reputation while touring internationally.

408.    These services were performed at the Defendant's request and with his full knowledge and participation. The Defendant accepted and used these services to generate income through tours, publishing deals, streaming royalties, merchandise, and public performances.

**Defendant's Acceptance and Benefit**

409.    Defendant knowingly accepted Plaintiff's services and used them to develop and sustain a profitable career in music, touring, and branded entertainment.

410.    Defendant:

1. Released and monetized music co-written by Plaintiff without issuing co-authorship credit or royalty shares.
2. Received licensing fees, publishing advances, and royalty payments tied to Plaintiff's creative input.
3. Profited from live performances that relied on Plaintiff's stage support, energy, and logistical assistance.
4. Enhanced his public image and brand through Plaintiff's visible and creative contributions.

411.    The Plaintiff's labor directly benefited the Defendant, both financially and reputationally, as evidenced by streaming revenues, touring income, and continued brand visibility across digital platforms and public appearances.

**Plaintiff's Expectation of Compensation**

412.    Plaintiff rendered services with the understanding and expectation—explicitly affirmed by Defendant—that he would:

1. Receive 15% ownership in the songs he co-authored.
2. Receive 15% of gross earnings tied to those songs.
3. Be formally registered for royalty distributions and backend earnings.
4. Be compensated fairly for his on-tour services and security roles.
5. Defendant repeatedly made oral promises and representations to that effect, upon which Plaintiff relied in good faith.

413.    At no point did the Defendant inform the Plaintiff that his services were gratuitous. To the contrary, the Defendant's oral assurances, repeated over a decade, created an implied agreement that the Plaintiff would be paid for his contributions.

**Reasonable Value of Services**

414.    The fair market value of Plaintiff's services—measured against prevailing industry standards and actual tour budgeting—includes:

| Category | Estimated Value |
|---|---|
| Touring compensation shortfall | $2,750 × 200 shows = $550,000 |
| Unpaid per diem (3 days/show) | $100/day × 600 days = $60,000 |

| Co-authored song royalties | Industry-standard backend on 15% gross |
| Studio, vocal, and security services | Estimated at industry rate ($250–$500/day) |
| Total | $610,000+, not including royalties |

415.   These services directly enabled Defendant to sustain and monetize a multimillion-dollar career in music and entertainment.  The value of Plaintiff's labor is objectively measurable based on industry rates, recorded music revenues, and Defendant's financial records.

416.   The plaintiff is entitled to the fair and reasonable value of all services rendered, including:

1. Creative and lyrical contributions.
2. Touring, security, and logistical services.
3. Studio and promotional participation.
4. Brand-building and public representation.

417.   Under New York law, where a party knowingly accepts services rendered with a reasonable expectation of compensation and fails to pay, that party is liable for the fair value of those services.  See *Levin v. Hoffman Fuel Co. of Danbury, Inc*., 94 A.D.2d 640, 641 (1st Dep't 1983).

### Relief Requested

418.   The Plaintiff seeks an award of damages equal to the reasonable value of all services rendered, including:

1. Monetary damages in an amount to be determined at trial, but not less than $610,000.
2. Prejudgment interest at the statutory rate of 9% per annum, compounded annually, according to CPLR §§ 5001 and 5004.
3. Such other legal or equitable relief as the Court deems just and proper, including attorneys' fees, costs of suit, and expert accounting of publishing and touring income traceable to Plaintiff's contributions.

### COUNT IV
### FRAUDULENT CONCEALMENT
#### (Pled with Particularity according to Fed. R. Civ. P. 9(b))

419.   Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### Legal Framework

420.   Under New York law, a claim for fraudulent concealment requires:

1. The existence of a duty to disclose arising from a special, fiduciary, or confidential relationship.
2. Concealment of a material fact by the Defendant.
3. Defendant's knowledge of the concealed fact and the falsity of the omission.
4. Intent to defraud or induce reliance.
5. Justifiable reliance by the Plaintiff; and
6. The concealment proximately causes damages.

98

421.    See P.T. Bank Central Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376–78 (1st Dep't 2003); Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996).

422.    Claims grounded in fraud must comply with the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires plaintiffs to allege the "who, what, when, where, and how" of the fraudulent conduct.  See *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006).

**Particularized Allegations Under Rule 9(b)**

423.    <u>Who</u>: Defendant Joseph Cartagena, a/k/a "Fat Joe," exercised total control over Plaintiff's professional opportunities, publishing entitlements, touring income, and access to royalty structures.  As Plaintiff's de facto employer, manager, and gatekeeper, he dominated all channels through which Plaintiff's compensation and credit could flow.

424.    <u>What</u>: Defendant knowingly concealed material facts from Plaintiff, including:

1. That Plaintiff's per-show compensation was budgeted at approximately $3,000, plus $100/day per diem for a three-day travel schedule.
2. That Plaintiff's co-authored lyrics and recorded vocals were used in at least 15 commercially released songs.
3. That no PRO registrations, Letters of Direction (LODs), or publishing split sheets were ever submitted on Plaintiff's behalf.
4. Defendant and his controlled entities collected all publishing revenue, licensing income, and streaming royalties generated from Plaintiff's contributions.

425.    <u>Where</u>: The fraudulent concealment occurred in multiple jurisdictions and contexts, including:

1. Recording studios in New York, Florida, and Los Angeles.
2. Tour stops and backstage communications across North America, Europe, Asia, and Africa.
3. Ongoing communications between Defendant and his managers and accountants between 2005 and 2020.
4. Defendant's refusal to disclose financial records, tour agreements, and registration filings that Plaintiff was entitled to access.

426.    <u>When</u>: The concealment spanned from 2005 through 2020, during which Defendant repeatedly told Plaintiff that financial matters were "handled," and backend compensation would be issued in due time.  Plaintiff reasonably relied on these statements until 2024, when a former member of Defendant's business team privately disclosed that Plaintiff's contributions had never been credited or compensated.  This was later confirmed through discussions with Defendant's former accountant, who also disclosed that Defendant intentionally made them pay Plaintiff late, paid Plaintiff short, and at times withheld Plaintiff's pay altogether.

427. <u>How</u>: Defendant created a false façade of trust and loyalty to induce Plaintiff to continue working.  Defendant:

1. Repeatedly promised Plaintiff ownership and gross profit shares.
2. Told Plaintiff he would be registered with PROs.
3. Falsely claimed that Plaintiff's paperwork had been submitted for credit and payment.
4. Denied Plaintiff access to financial statements and publishing data.
5. Used silence and strategic omission to mislead Plaintiff about the status of his rights and entitlements.

**Defendant's Duty to Disclose**

428. A duty to disclose arises when one party possesses superior knowledge not available to the other and knows the other is acting on mistaken assumptions.  This duty is especially strong where the parties share a confidential or quasi-fiduciary relationship.  See *Braddock v. Braddock*, 60 A.D.3d 84, 98 (1st Dep't 2009); *Lefkowitz v. Appelbaum*, 258 A.D.2d 563, 564 (2d Dep't 1999).

429. Plaintiff and Defendant shared a longstanding, trust-based relationship characterized by personal loyalty, artistic collaboration, and near-complete reliance.  Plaintiff was not a temporary contractor—he was a core creative and operational member of the Defendant's team.

430. The Defendant had exclusive access to financial records, contractual documents, PRO data, and licensing agreements.  He had a duty to disclose the true nature of Plaintiff's compensation and authorship status but affirmatively chose to withhold that information to retain sole financial control.

**Plaintiff's Justifiable Reliance**

431. Plaintiff justifiably relied on Defendant's silence and reassurances.  Defendant:

1. He presented himself as a mentor and gatekeeper in the music industry.
2. Created the impression that questioning financial matters would be disloyal.
3. Repeatedly stated that royalties, splits, and credits would be handled internally.
4. Dissuaded Plaintiff from retaining counsel and promised backend payments without providing documentation.

432. As a result of that reliance, Plaintiff:

1. Performed more than 200 live shows at drastically underpaid rates.
2. Wrote or co-wrote more than a dozen songs used in commercially released projects.
3. Was excluded from all PRO databases and missed out on industry awards and networking opportunities.
4. Suffered financial losses exceeding $610,000 in unpaid wages, per diems, and royalties.

///
///
///
///

**Discovery and Equitable Tolling**

433.    Under CPLR § 213(8) and equitable tolling principles, Plaintiff's claim is timely.  The fraud was not discovered—and could not reasonably have been discovered—until 2024, when Defendant's prior associate revealed the true extent of the concealment.

434.    Courts have routinely applied equitable tolling where the Defendant occupies a position of trust and uses that relationship to suppress material facts.  See *Kaufman v. Cohen*, 307 A.D.2d 113, 122 (1st Dep't 2003).

435.    Defendant's exclusive control over records, his continued reassurances, and his concealment of royalties and contracts satisfy the standard for tolling based on fraudulent concealment.

**Damages and Relief Sought**

436.    As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff has suffered the following injuries:

1. At least $550,000 in underpaid performance compensation.
2. Approximately $60,000 in withheld per diem allocations.
3. Lost royalties and backend earnings from commercially successful co-authored music.
4. Lost professional opportunities, reputation, and standing within the music industry.
5. Emotional harm, betrayal, humiliation, and reputational damage stemming from a decade of silencing and erasure.

437.    Plaintiff seeks:

1. Compensatory damages in an amount to be determined at trial.
2. Punitive damages to punish willful misconduct and deter similar frauds.
3. Prejudgment interest under CPLR §§ 5001 and 5004 at 9% per annum.
4. Equitable tolling of any limitations defense asserted by Defendant.
5. A forensic accounting of all revenue streams derived from Plaintiff's labor and authorship.
6. Any other legal or equitable relief the Court deems just and proper.

<div align="center">

**COUNT V**
**CONSTRUCTIVE TRUST**
*(Equitable Remedy Under New York Law)*

</div>

438.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

439.    Under New York law, a constructive trust is an equitable remedy imposed to prevent unjust enrichment where property is acquired in violation of equity and good conscience.  To establish a constructive trust, Plaintiff must demonstrate:

1. A confidential or fiduciary relationship.
2. A promise, express or implied.
3. A transfer made in reliance on that promise and

4. Resulting unjust enrichment. See *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976); *Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 49 N.Y.2d 939, 940 (1980); *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978).

440.    Plaintiff and Defendant maintained a longstanding, confidential, and quasi-fiduciary relationship marked by trust, collaboration, and personal reliance.  Defendant occupied a position of control over financial, creative, and legal processes, while Plaintiff acted in good faith under sustained verbal assurances.

441.    For over sixteen years, Plaintiff contributed critical creative and logistical services under the repeated express and implied promise by Defendant that Plaintiff would eventually be "taken care of" and receive appropriate compensation, credit, and professional advancement.

442.    In reliance on these assurances, Plaintiff transferred substantial intellectual property, labor, and creative authorship to Defendant's enterprise.  These transfers included:
1. Co-writing and co-performing on commercially released songs.
2. Touring duties as a hype man and logistical lead.
3. On-the-ground security support and brand elevation during public appearances.
4. Artistic collaboration during studio sessions and production development.

443.    Despite benefiting directly from Plaintiff's contributions, Defendant excluded Plaintiff from all financial compensation, backend royalties, PRO registrations, and public attribution.

444.    Defendant further concealed and retained tour budget surpluses and per diem funds allocated to Plaintiff and retained 100% of revenue from performances and compositions materially derived from Plaintiff's labor.

445.    These acts resulted in substantial and ongoing unjust enrichment.

446.    Defendant continues to collect revenue from streams, syncs, live performances, and intellectual property created through Plaintiff's unpaid labor and authorship.  Equity prohibits Defendant from retaining these ill-gotten gains.

447.    Courts in New York have repeatedly held that constructive trusts are appropriate where one party has retained the benefit of another's labor under a relationship of trust or reliance.  See *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386 (1919).

448.    Plaintiff respectfully requests that this Court:
1. Impose a constructive trust in overall revenue, profits, copyrights, publishing rights, and royalties derived from Plaintiff's uncredited contributions.
2. Order disgorgement of all funds and property obtained through unjust enrichment.
3. Require a forensic accounting of all income streams tied to Plaintiff's creative labor.
4. Enjoin Defendant from further exploiting Plaintiff's intellectual property without compensation, attribution, and contractual recognition.

449.    The imposition of a constructive trust is necessary to prevent Defendant from continuing to benefit from Plaintiff's uncompensated labor and creativity in violation of the promises made and the equitable principles of justice and restitution.

## COUNT VI
## FRAUDULENT MISREPRESENTATION
### *(Pled with Particularity Under Fed. R. Civ. P. 9(b))*

450.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

## Legal Standard

451.    Under New York law, a cause of action for fraudulent misrepresentation requires proof of the following elements:

1. A material misrepresentation of a present or past fact.
2. That was false and known by the Defendant to be false.
3. Made with the intent to defraud or induce reliance.
4. That the Plaintiff justifiably relied upon; and
5. Which caused the plaintiff actual damages.

452.    See *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009); *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (1st Dep't 2003).

453.    In accordance with Rule 9(b) of the Federal Rules of Civil Procedure, Plaintiff pleads this claim with specificity by identifying the who, what, where, when, and how of the fraud.

## The Fraud – Who, What, Where, When, and How

454.    <u>Who</u>: The fraudulent misrepresentations were made directly by Defendant Cartagena, who exercised personal control over Plaintiff's compensation, authorship rights, and touring conditions.

455.    <u>What</u>: Defendant made multiple materially false statements, including that:

1. The Plaintiff would receive a 15% ownership interest in all songs he contributed to.
2. The Plaintiff would be paid 15% of the gross earnings generated by those songs.
3. Defendant would issue Letters of Direction (LODs) designating Plaintiff as a co-writer for royalty disbursement.
4. Plaintiff would be formally registered with PROs (e.g., ASCAP, BMI) for royalty collection.
5. The Plaintiff would be "taken care of" financially, and the backend payments were already accruing.

456.    <u>Where</u>: These representations were made in:
1. Private meetings and conversations in New York, Florida, Los Angeles, and on international tours.
2. While traveling on tour buses, during hotel stays, and in backstage areas at major concert venues.
3. In recording sessions and pre-performance preparations across several states and countries.

457. <u>When</u>: Defendant made these misrepresentations as early as 2005 and continued consistently making them through 2020, during which Plaintiff relied on them in good faith. Plaintiff did not discover the fraud until 2024 when a former manager of Defendant disclosed the true budget allocations and Defendant's refusal to register Plaintiff's rights.

458. <u>How</u>: Defendant intentionally and repeatedly made false promises to induce Plaintiff to continue working without adequate compensation.  Defendant:

1. Failing to issue promised LODs and co-authorship documents.
2. Denying access to financial and publishing records.
3. Blocking Plaintiff from PRO registration and royalty systems.
4. Retaining 100% of royalties and public credit tied to Plaintiff's work.

**Plaintiff's Justifiable Reliance**

459. Plaintiff, a trusted and loyal contributor, reasonably relied on Defendant's misrepresentations due to:

1. Their longstanding professional and quasi-familial relationship.
2. Defendant's superior access to financial and legal documentation.
3. Defendant's role as gatekeeper to all income sources and credit systems in their professional relationship.

460. Plaintiff would not have continued writing, performing, or serving as Defendant's full-time hype man and security support had he known that no LODs would be issued and that he would be excluded from all revenue streams connected to his work.

**Damages**

461. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff suffered substantial and continuing economic, reputational, and emotional harm, including:

1. Loss of royalty income and backend licensing revenue.
2. Misappropriated per diem allocations totaling $60,000 (3 days/show × 200 shows × $100/day).
3. Live performance underpayment exceeding $550,000.
4. Denial of authorship credit and registration for major songs, including "All the Way Up," "All I do Is Win (Remix)," "Congratulations," and "Cupcake."
5. Loss of professional opportunities due to absence from publishing databases.
6. Emotional distress, humiliation, and creative disenfranchisement.

462. These damages are actionable under New York law and are not barred by the economic loss doctrine, as the fraud arises from independent tortious conduct.  See *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291 (1st Dep't 1999).

463. Plaintiff's damages include out-of-pocket losses and losses of royalty-based earning potential, which would have accrued had Defendant honored his promises.

///

**Remedies Sought**

464.  Plaintiff seeks:
   1. Compensatory damages for economic and reputational losses.
   2. Punitive damages to punish and deter egregious, intentional fraud.
   3. Prejudgment interest at 9% per annum under CPLR §§ 5001 and 5004.
   4. Equitable tolling under CPLR § 213(8) based on Defendant's active concealment.
   5. Declaratory relief recognizing Plaintiff's 15% ownership in all works to which he contributed.
   6. Any other legal or equitable relief the Court deems just and proper.

## COUNT VII – CIVIL RICO
### (Racketeer Influenced and Corrupt Organizations Act)
### (18 U.S.C. §§ 1962(c), 1964(c))

465.  Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### Legal Standard

466.  Under 18 U.S.C. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such Enterprise's affairs through a pattern of racketeering activity.

467.  Under 18 U.S.C. § 1964(c), any person injured in their business or property because of a violation of § 1962 may bring a civil action and recover treble damages, costs, and attorneys' fees.

468.  Plaintiff Dixon has suffered a direct, concrete, and compensable injury to his business, property, and personal safety as a proximate result of Defendant Cartagena's leadership, participation in, and control over the Cartagena Enterprise.  These injuries include, but are not limited to:

   1. The systematic theft of Plaintiff's royalty entitlements, including backend publishing and licensing revenue derived from songs he co-authored and performed on.
   2. The underpayment of wages and touring compensation, as Plaintiff was paid a fraction of what was contractually allocated for his services.
   3. The permanent erasure of Plaintiff's authorship and performance credits, resulting in professional blacklisting and reputational damage across the music industry.
   4. Emotional trauma and psychological distress stemming from years of coercion, exploitation, and silencing by the Defendant and his agents.
   5. Credible threats to Plaintiff's life, including enterprise-orchestrated attempts to lure him into a violent ambush for speaking out.
   6. Out-of-pocket costs for legal counsel, private security, and ongoing care related to the Defendant's pattern of retaliation and intimidation.

469.  These injuries are the direct and foreseeable result of Defendant's unlawful acts carried out through the Cartagena Enterprise and constitute the type of harm 18 U.S.C. § 1964(c) was

enacted to redress.  Plaintiff, therefore, has statutory standing to pursue all remedies available under RICO, including treble damages, attorneys' fees, and equitable relief.

### The Cartagena Enterprise

470.    Defendant Joseph Antonio Cartagena, a/k/a "Fat Joe," in conjunction with his trusted associates Pete "Pistol Pete" Torres, Richard "Rich Player" Jospitre, and others known and unknown, directed and operated an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Cartagena Enterprise").

471.    The Cartagena Enterprise existed from at least 2000 through the present, and its activities affected interstate and foreign commerce, including through concert touring, merchandise sales, drug distribution, retail transactions, music performances, publishing, retail sales, sex trafficking of minors, and the use of social media and telecommunications:

1. Enriching Defendant through fraudulent exploitation of others' labor, creative content, and sexual submission.
2. Silencing dissent through threats, violence, intimidation, and murder.
3. Evading taxation and laundering illicit proceeds through retail operations and cash businesses.
4. Maintaining dominance in competitive markets through fraudulent access and resale of exclusive goods.

472.    The Enterprise operated using:

1. Code phrases such as "Give him Ketchup," "Pound him out," and "Coolin."
2. Illegitimate means (e.g., beatings, stabbings, threats, sexual coercion).
3. Legitimate business fronts, including the UPNYC sneaker boutique, are vehicles for laundering illicit profits, rewarding loyalty, and committing commercial fraud.

473.    The Enterprise operated through:

1. Formal entities, including Defendant's retail business UPNYC.
2. Enforcement arms (e.g., Terror Squad crew, contracted enforcers).
3. Logistics facilitators, including associates who handled violence, transportation, and laundering.

474.    The Enterprise's structure was hierarchical, with the Defendant at the top issuing direct orders and others carrying out retaliation, intimidation, trafficking, and fraud.  Each member had a role in furthering the objectives of the Enterprise.  Each member of the Enterprise played a specific role:

1. Cartagena directed the operation and controlled revenue flows.
2. Torres facilitated violence and trafficking logistics in the Bronx and Miami.
3. Jospitre distributed payments, communicated threats, and helped conceal fraudulent schemes.
4. Lower-tier members executed violence and intimidation upon the Defendant's orders.

106



Cartagena Enterprise RICO Organizational Pyramid (Reordered)

### A. Pete "Pistol Pete" Torres – Violent Enforcement, Retaliation, and Enterprise Discipline

475. Defendant Pete "Pistol Pete" Torres served as the primary enforcer for the Cartagena Enterprise, entrusted with executing physical assaults, issuing violent threats, and coordinating retaliatory acts on behalf of Joseph Cartagena. Torres was not a peripheral figure but a trusted lieutenant responsible for enforcing internal loyalty, punishing dissent, and eliminating threats.

476. Torres's racketeering conduct includes:

1. Coordinating a planned ambush of Plaintiff with Rich Player (Predicate Act 3).
2. Executing the "Clapy" assault on producer Dre (Predicate Act 20).
3. Participating in the Café Ketchup stabbing (Predicate Act 5).
4. Brandishing weapons and coordinating armed threats on Defendant's orders (Predicate Act 17).

477. Torres's role was essential to the Enterprise's use of intimidation as a governing tool. His conduct constitutes racketeering acts under:

1. 18 U.S.C. §§ 1959(a)(3) and (a)(5) – Violent crimes in aid of racketeering.
2. 18 U.S.C. § 1512 – Witness tampering and intimidation.

107

3.  State assault, conspiracy, and weapons charges in New York and Florida.

478.    As Defendant Cartagena's physical enforcer, Torres materially advanced the goals of the Enterprise by suppressing victims, silencing whistleblowers, and protecting the Enterprise through credible, often lethal, violence.

**B.  Richard "Rich Player" Jospitre – Payment Gatekeeping and Threat Facilitation**

479.    Richard "Rich Player" Jospitre functioned as a financial controller and communications liaison for the Enterprise.  He facilitated off-the-books wage disbursement, obstructed payments to enterprise victims, and acted as a messenger for retaliation and violent enforcement.

480.    Jospitre is directly implicated in:

1.  Attempting to lure Plaintiff into a trap through recorded witness intimidation (Predicate Act 3).
2.  Serving as a gatekeeper for performance payments, withholding earnings, and executing strategic delays (Predicate Act 15).
3.  Facilitating enterprise intimidation in coordination with Pistol Pete and others.

481.    Jospitre's conduct qualifies as racketeering activity under:

1.  18 U.S.C. § 1512 – Obstruction and retaliation.
2.  18 U.S.C. § 1343 – Wire fraud related to falsified earnings.
3.  18 U.S.C. § 1961(1)(B) – Extortion and labor fraud.

482.    As a high-level operational participant, Jospitre enabled the Enterprise's financial manipulation and enforcement infrastructure, functioning as a critical spoke in the Defendant's wheel of coercion.

**C.  Erica Juliana Moreira – Fraudulent Incorporation and Legal Concealment**

483.    Erica Juliana Moreira acted as a shadow legal agent and architect of the Enterprise's corporate shell network.  Despite lacking authority to practice law in Florida, she filed business records for at least five shell companies designed to conceal racketeering income, launder proceeds, and apply for pandemic relief loans under false pretenses.

484.    Companies fraudulently incorporated or facilitated by Moreira include:

1.  Azaryah LLC (in the name of Defendant's minor daughter).
2.  Slate, Inc., WOOO Inc., BELEEEDAT LLC, and Sneaker Addict Touring LLC.

485.    Moreira's actions violate:

1.  18 U.S.C. §§ 1956 and 1957 – Money laundering and financial structuring.
2.  26 U.S.C. § 7201 – Tax evasion through shell structuring.
3.  Fla. Stat.  § 607.0505 – Filing deceptive corporate documents.
4.  Fla. Stat.  § 896.101 – Laundering of monetary instruments.

486.　Moreira's unlawful conduct contributed to the establishment of the Enterprise's financial framework.　She concealed the true nature of criminal proceeds and insulated the Defendant through fraudulent filings, nominee ownership, and false legal representations.

### D.　Sneaker Addict Touring LLC – PPP Loan Fraud and Revenue Laundering

487.　Sneaker Addict Touring LLC was created as a front company to secure fraudulent PPP loans, conceal Enterprise income, and channel off-the-books performance revenue.　It bears no resemblance to a legitimate business and existed purely to launder money and shield Defendant from tax and liability exposure.

488.　As an instrument of racketeering:

1. It received at least $37,500 in pandemic-relief funds despite having no operational history.
2. It shared personnel, addresses, and management with other Enterprise shell companies.
3. It failed to generate or report lawful income consistent with its filings.

489.　These actions support racketeering liability under the following:

1. 18 U.S.C. §§ 1343, 1956, and 1957 – Wire fraud and laundering.
2. Fla. Stat. § 896.101 – State-level laundering of monetary instruments.
3. 18 U.S.C. § 1962(c) – Use of entity to further racketeering goals.

490.　Sneaker Addict Touring LLC must be viewed not as a neutral entity but as a laundering conduit embedded in the Enterprise's broader pattern of concealment, fraud, and financial corruption.

### E.　Slate, Inc. – Financial Command Node for the Enterprise

491.　Slate, Inc. functioned as a key financial node within the Cartagena Enterprise.　Though publicly dormant, it served as a private ledger through which illicit profits were transferred, masked, and disbursed to shell owners, insiders, and enforcers.

492.　Slate, Inc. enabled:

1. Diversion of royalties and touring income away from Plaintiff and toward hidden recipients.
2. Creation of a financial firewall to obscure Defendant's actual holdings and earnings.
3. Misleading representations to tax authorities and auditors.

493.　Statutory violations include:

1. 18 U.S.C. § 1956 – Concealing criminal proceeds.
2. 18 U.S.C. § 1961(1)(D) – Laundering racketeering income.
3. Fla. Stat. § 607.0505 – Deceptive business documentation.

494.　Slate, Inc. was not an isolated business but a functional extension of the Enterprise's illicit profit engine, constructed to retain criminal proceeds and perpetuate financial fraud under the color of corporate legitimacy.

### F. Roc Nation, LLC – Strategic Facilitator and Aider of Racketeering Activity

495. In 2017, Roc Nation, LLC entered into a management agreement with Defendant Cartagena and assumed exclusive control over his business affairs. From that point forward, Roc Nation functioned as Defendant Cartagena's operational command center—overseeing all touring, licensing, branding, music publishing, and commercial contracts while affirmatively projecting his public image and shielding his financial operations from scrutiny.

496. Upon information and belief, Roc Nation was aware or willfully blind to Defendant Cartagena's ongoing criminal conduct—including forced labor, financial fraud, retaliatory violence, and sex trafficking. Despite knowledge of multiple allegations and red flags, Roc Nation continued to facilitate Defendant Cartagena's business interests, defend his public image, and structure deals that directly enriched the Cartagena Enterprise.

497. Roc Nation's racketeering-related conduct includes:

1. Assuming managerial control over Defendant Cartagena's tour, brand, and publishing rights in 2017 and continuing through the present.
2. Overseeing financial transactions derived from Plaintiff's uncredited performances and co-authored tracks, including "All the Way Up" and "Congratulations," without providing accounting or ownership recognition.
3. Initiating or supporting retaliatory litigation against Plaintiff and his attorney after Plaintiff disclosed allegations of racketeering and trafficking—constituting unlawful retaliation under 18 U.S.C. § 1591(d) and § 1513(e).
4. Continuing to benefit from and promote recordings, tours, and merchandise that originated from the Enterprise's unlawful conduct.
5. Failing to disclose material information about known enforcers and threats (e.g., Pistol Pete, Rich Player) and suppressing evidence of coercive enterprise tactics.

498. These actions constitute:

1. Racketeering participation under 18 U.S.C. § 1962(c): for aiding the affairs of an enterprise engaged in a pattern of racketeering activity.
2. Aiding and abetting violations under 18 U.S.C. § 2: by facilitating, endorsing, and profiting from known criminal conduct.
3. Retaliation and obstruction under 18 U.S.C. §§ 1513(e) and 1591(d): for strategic litigation and suppression campaigns aimed at chilling Plaintiff's protected activity.
4. Venture liability under 18 U.S.C. § 1595: for knowingly benefiting from a sex trafficking venture over which they exercised oversight or control.

499. Roc Nation's failure to intervene, investigate, or sever ties with Defendant Cartagena after assuming managerial control in 2017—despite extensive evidence of coercive conduct—makes it both a material beneficiary and a willful enabler of racketeering activity. Its continued participation and legal defense of Defendant Cartagena's commercial interests represent knowing facilitation of the very enterprise structure that caused Plaintiff's harm.

**Pattern of Racketeering Activity**

500.    Defendant Joseph Antonio Cartagena, through his direction and control of the Cartagena Enterprise, engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1962(c). This pattern consists of at least twelve interrelated predicate acts, each committed intentionally and for the benefit of the Enterprise, spanning over a decade and affecting interstate and international commerce.

501.    These predicate acts include violations of federal and state law involving:

1. Forced labor,
2. Sex trafficking,
3. Witness tampering and obstruction,
4. Attempted murder and conspiracy,
5. Drug trafficking,
6. Tax fraud and money laundering, and
7. Commercial fraud and unfair competition,
8. All of which were carried out as part of a cohesive and continuing racketeering scheme to advance the Enterprise's goals of control, intimidation, enrichment, and retaliation.

502.    Each predicate act is chargeable under federal or state criminal statutes and punishable by imprisonment exceeding one year, qualifying as racketeering activity under 18 U.S.C. § 1961(1). The acts demonstrate both closed-ended continuity—based on their regular commission over a substantial time—and open-ended continuity, as they reflect the ongoing structure and operations of a criminal enterprise that remains active today.

503.    The following predicate acts, described in detail below and in Appendix A, constitute the pattern of racketeering activity alleged herein:

**Predicate Act 1: Forced Labor and Exploitation of Plaintiff (2001–2017) (18 U.S.C. § 1589; N.Y. Penal Law § 135.35)**

504.    <u>Summary</u>: From approximately 2005 through 2022, Defendant knowingly obtained the uncompensated labor and creative services of Plaintiff Terrance Dixon, a/k/a "TA," using coercion, deception, and threats of serious harm in violation of federal and New York anti-trafficking laws.

505.    Plaintiff performed as Defendant's hype man, co-writer, tour support, and in-house security, working hundreds of shows, writing verses, and appearing on unreleased vocals—all while being paid far below industry standard ($250 per show, no royalties, no backend credit, no Letters of Direction).

506.    The Defendant maintained this exploitation by creating a climate of fear and dependency. He repeatedly threatened Plaintiff with abandonment in foreign countries, industry

blacklisting, and public humiliation if Plaintiff refused to perform labor or questioned his financial exclusion.

507.     These actions were not isolated—they were systematic, carried out across multiple states and international venues, and supported by other enterprise actors.  The Plaintiff's coerced labor was a pillar of the Defendant's touring and recording profits and a critical revenue stream for the Cartagena Enterprise.

508.     This conduct constitutes a predicate act of forced labor under 18 U.S.C. § 1589 and labor trafficking under N.Y. Penal Law § 135.35 and is explicitly enumerated as racketeering activity under 18 U.S.C. § 1961(1)(B).

509.     <u>Federal Statute Violated</u>: 18 U.S.C. § 1589 – Forced Labor (obtaining labor or services through threats, coercion, or abuse of law).

510.     <u>State Statute Violated</u>: New York Penal Law § 135.35 – Labor Trafficking (coercing an individual to perform labor using force, fraud, or intimidation), a Class D felony.

511.     <u>RICO Predicate (18 U.S.C. § 1961(1))</u>: This conduct constitutes racketeering activity under § 1961(1)(B), as it is indictable under the Trafficking Victims Protection Act (forced labor is an offense under 18 U.S.C. §§ 1581–1592).  It also involves extortionate means – obtaining services through fear of harm – which is analogous to extortion and thus independently qualifies under § 1961(1).

**Predicate Act 2: Sex Trafficking by Coercion; 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion); N.Y. Penal Law § 230.34 (Sex Trafficking – Class B Felony); and 18 U.S.C. § 1961(1)(B)**

512.     <u>Summary</u>: Throughout their working relationship, Defendant coerced Plaintiff into participating in non-consensual sexual acts for Defendant's gratification and entertainment.  These acts were carried out under duress and the threat of serious harm and occurred both domestically and abroad while on tour.

513.     Defendant required Plaintiff to engage in group sex acts in his presence, including one incident where Plaintiff and another associate were forced to "sandwich" a woman at Defendant's command.  On another occasion, after Plaintiff refused to participate in a similar scenario, Defendant canceled Plaintiff's return flight and left him stranded with no funds or shelter for several days.

514.     These acts were not isolated incidents but part of a broader pattern of control and degradation in which Defendant extracted sexual compliance from Plaintiff as a form of

112

submission and power consolidation.  The Plaintiff feared professional and physical retaliation if he resisted.

515.    This conduct falls squarely within the definition of sex trafficking by coercion under 18 U.S.C. § 1591, as Defendant knowingly obtained sexual acts from Plaintiff in exchange for continued employment, survival, and access to shelter and safety.  It also qualifies under N.Y. Penal Law § 230.34, which criminalizes the use of coercion to induce a person to engage in sexual conduct for another's benefit.

516.    The coercive nature of these acts was amplified by the Defendant's economic leverage, psychological intimidation, and verbal threats, satisfying the statutory definition of coercion under both state and federal law.  Accordingly, this constitutes a predicate act under 18 U.S.C. § 1961(1)(B).

**Predicate Act 3: Witness Tampering, Intimidation of Victims, and Retaliation (18 U.S.C. § 1512(b); N.Y. Penal Law § 215.15; FL Stat. § 914.22); 18 U.S.C. § 1961(1)(B).**

517.    <u>Summary</u>: After Plaintiff began disclosing the unlawful, coercive, and violent conduct of Defendant and the Cartagena Enterprise, enterprise members conspired to retaliate against Plaintiff, seeking to prevent him from further disclosures or pursuing legal action.

518.    In two recorded phone calls, Defendant's top lieutenants—Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre—called a mutual associate, Percy, to attempt to lure Plaintiff into a planned ambush.  The clear objective of these calls was to retaliate against Plaintiff for "violating" Defendant by going public.

519.    During the calls, Torres and Jospitre urged Percy to help "set him up," stating that "Joe's family" had to deal with him and the situation had "gone too far to fix." The Defendant was identified as the one giving the order, and phrases such as "pound him out" and "get at him" were repeated, signaling a premeditated physical assault—or worse.

520.    Percy declined to participate and preserved the recordings.  These recordings are direct evidence of a conspiracy to commit retaliatory violence in violation of the following:

    1.  18 U.S.C. § 1512(b) – for attempts to intimidate or injure a witness with the intent of preventing testimony or lawful cooperation.
    2.  N.Y. Penal Law § 215.15 – for intimidating a witness in connection with a pending investigation.
    3.  Florida Stat. § 914.22 – where applicable, based on the location of Defendant's operations.

521.    These acts qualify as predicate racketeering offenses under 18 U.S.C. § 1961(1)(B).  They reflect the Enterprise's structured use of fear, intimidation, and coordinated enforcement to

preserve its operations, suppress whistleblowers, and insulate Defendant from legal consequences.

522. <u>Federal Statute Violated</u>: 18 U.S.C. § 1512 – Tampering with a Witness, Victim, or Informant (using physical force or threats to hinder any person from providing information to law enforcement or from testifying in an official proceeding).

523. State Statute Violated: Florida Statutes § 914.22 – Tampering with or Harassing a Witness, Victim, or Informant (making it a felony to intimidate or threaten any witness or victim to prevent them from reporting a crime or testifying). (Applicable here because at least one intimidation incident occurred in Miami, Florida.) In New York, similar conduct would violate N.Y. Penal Law § 215.15 (Intimidating a Witness in the First Degree), a Class B violent felony.

524. <u>RICO Predicate (18 U.S.C. § 1961(1))</u>: Acts of witness tampering are expressly defined as racketeering activity under § 1961(1)(B). By threatening violence and engaging in retaliatory assaults to silence victims and witnesses, Defendant's Enterprise carried out obstruction of justice to further its racketeering scheme.

**Predicate Act 4: REDACTED, Attempted REDACTED & Conspiracy to Commit Violence (18 U.S.C. § 1959; N.Y. Penal Law §§ 125.25, 110.00, 105.15; Fla. Stat. §§ 782.04, 777.04, 777.03)**

525. <u>Summary</u>: Defendant Joseph Antonio Cartagena used violence and the threat of lethal retaliation to enforce loyalty, eliminate perceived disrespect, and maintain control of the Cartagena Enterprise.

526. These acts of actual and attempted REDACTED were committed either directly by Defendant or by individuals acting at his direction and constitute qualifying predicate offenses under 18 U.S.C. §1961(1)(A).

527. Specifically, Defendant Ordered two minor teenage boys in Miami, Florida, to assault a man who had walked through a private circle in which Defendant was standing. The teenagers, acting under Defendant's orders, chased and beat the man. In self-defense, the man drew a firearm and fatally shot both teens. The tragic result was the foreseeable consequence of the Defendant's reckless and retaliatory use of violence to assert dominance and punish perceived violations of his personal space and status.

    1. <u>Violates</u>: Fla. Stat. §777.04, §782.04, and §827.04(3).

528. Defendant directed Plaintiff and another associate to 'handle' rapper DMX after DMX became involved in an altercation with someone close to Defendant.  Following Defendant Cartagena's demands, Plaintiff attempted to confront DMX, but DMX refused to come outside.

529. Although nothing happened to DMX, Plaintiff was under immense pressure and coercion, knowing that refusing the order could jeopardize his safety, finances, career, or position.  This illustrates how the Defendant employed physical force through surrogates to protect his reputation and punish perceived disrespect to Terror Squad.

    1. <u>Violates</u>: Fla. Stat.  §777.04 and §784.02.

530. Instructed three members of Terror Squad to assault and 'Ketchup' a man in the Bronx.  As detailed above, Ketchup is a term coined within the Enterprise to signify a targeted stabbing.

531. In the interest of protecting the victim, the details of this incident have intentionally been limited.

    1. <u>Violates</u>: N.Y. Penal Law §110.10, §120.10, §105.15, §265.01, and potentially §125.25.

532. Responded to verbal taunts from the new boyfriend of one of his children's mother, Brenda, who had called Defendant and made degrading sexual comments like: "I am fuxkin ya baby moms in the a$$ while ya son is in the other room."

533. Enraged, Defendant told Plaintiff that the man had "gone too far." Out of respect to this victim, Plaintiff has decided to withhold the remaining details.  Plaintiff confronts Defendant Cartagena about this victim via Instagram messenger, as detailed above in Paragraph 204(2)(a).

    1. <u>Violates</u>: N.Y. Penal Law §105.15 and §125.25.

534. Bragged to Plaintiff that another man is currently serving a life sentence in Sing Sing Correctional Facility for a (REDACTED) that Defendant himself committed in the 1990s.

535. The Defendant often laughed about local and federal law enforcement's failure to catch him, even designing an album cover to mimic a federal interrogation room.

115



536.     This pattern of boasting about successfully evading law enforcement while benefitting from false attribution of guilt to others is evidence of both obstruction and violent racketeering enforcement.

    1.  <u>Violates</u>: N.Y. Penal Law §125.25, and supports a finding of enterprise concealment, a hallmark of long-term racketeering organizations.

537.     These preceding acts constitute racketeering activity under 18 U.S.C. § 1961(1)(A), as they are chargeable under state law and punishable by more than one year in prison.

538.     They further qualify under 18 U.S.C. §1959(a) as violent crimes committed in aid of racketeering, given their direct connection to the enforcement and maintenance of the Cartagena Enterprise.

**<u>Predicate Act 5</u>: Café Ketchup incident (18 U.S.C. § 1959; N.Y. Penal Law §§ 120.10, 105.15, 265.01)**

539.     Defendant Cartagena directed a retaliatory stabbing at Café Ketchup, further exemplifying the Cartagena Enterprise's violent enforcement model.  These acts were carried out by Terror Squad members (REDACTED and REDACTED) acting on Defendant's public directive and constitute qualifying predicate offenses under 18 U.S.C. § 1961(1)(A).

540.     Specifically, during a public altercation, JB was knocked unconscious following a verbal exchange over a woman.  Defendant Cartagena witnessed the incident and, enraged by the perceived humiliation of Terror Squad, immediately shouted:

        *"**Give him Ketchup!  Give him Ketchup**!"*

541.     Cartagena Enterprise members understood this phrase—coined by Defendant Cartagena—to mean "stab him," and sprang into action.  REDACTED was chased down, cornered, and violently attacked.

542.     As a result of the attack, REDACTED was placed on REDACTED for an extended period.  The incident became known within the Cartagena Enterprise as a successful enforcement action and a warning to others about the consequences of disrespecting Defendant Cartagena or his crew.

543.     Following the Ketchupping, Defendant Cartagena instructed his inner circle, including JB, to lie to law enforcement and deny Defendant Cartagena's presence at the scene.  This deliberate post-crime cover-up further exemplifies the Cartagena Enterprise's use of obstruction to insulate its leadership from liability.

544.     The above conduct violates the following: 18 U.S.C. § 1959(a) (3; N.Y. Penal Law § 120.10; § 105.15; N.Y. and § 265.01.

545.     The Café Ketchup incident is a textbook example of a violent crime carried out in aid of a racketeering enterprise, directed at silencing opposition, punishing public challenges, and preserving Defendant Cartagena's authority.

546.     Like other retaliatory acts committed by the Cartagena Enterprise, it served the dual purpose of enforcing loyalty and reinforcing fear-based control.

547.     This incident is one of several acts of violence directly attributable to Defendant Cartagena's orders.  It forms a critical part of the pattern of racketeering activity supporting liability under 18 U.S.C. §§ 1961(1)(A) and 1962(c).

**Predicate Act 6**: **Attempted Assault of Rapper Mack Maine. (18 U.S.C. § 1959; N.Y. Penal Law §§ 100.10, 105.15; Fla. Stat. §§ 777.04, 784.045). RICO Predicate: 18 U.S.C. § 1961(1)(A)**

548.     As part of the Cartagena Enterprise's ongoing pattern of violent enforcement, Defendant Cartagena issued a directive to assault Jermaine Anthony Preyan, professionally known as "Mack Maine," a prominent hip-hop artist affiliated with the Young Money music label.

549.     According to the Plaintiff, Defendant Cartagena told him in no uncertain terms that Mack Maine had "crossed the line" and needed to be "pounded out." The order was delivered in the same coded enforcement language the Defendant routinely used to trigger physical attacks on perceived adversaries.

550.     Though he never carried out the demand because the opportunity never presented itself, Plaintiff understood the directive as mandatory and dangerous to refuse.

551.    The Plaintiff reasonably believed that declining to act on the order would result in retaliation, including loss of employment, social isolation, or physical violence.

552.    This attempted act of retaliatory violence qualifies as a predicate offense because it reflects:

    1.    A solicitation and conspiracy to commit assault under:

        a.    N.Y. Penal Law § 100.10 – Criminal Solicitation.
        b.    § 105.15 – Conspiracy in the Second Degree, and where applicable,
        c.    Florida Stat. § 777.04 – Criminal Attempt or Solicitation.
        d.    § 784.045 – Aggravated Battery (if carried out).

553.    The order further supports liability under 18 U.S.C. § 1959(a)(3) as an act of solicited violence in aid of racketeering and constitutes racketeering activity under § 1961(1)(A).

554.    This incident illustrates that the Cartagena Enterprise's methods of intimidation were not limited to anonymous victims or unknown rivals but extended into the commercial music industry and involved high-profile figures.

555.    Defendant's expectation that Plaintiff would carry out the assault demonstrates the internal pressure and threat structure that governed the Enterprise's conduct.

**Predicate Act 7: Money Laundering & Tax Evasion (18 U.S.C. §§ 1956, 1957; 26 U.S.C. § 7201; NY Tax Law §§ 1801–1807; FL Stat. § 198.33) RICO Predicate: 18 U.S.C. § 1961(1)(D)**

556.    Defendant Cartagena engaged in an extensive, multi-year scheme to evade federal and state tax obligations and to launder proceeds derived from racketeering activity, including performance revenue, fraudulent retail transactions, and the coerced labor of Plaintiff.

557.    Following his 2013 conviction in the District of New Jersey for failing to file income tax returns (under 26 U.S.C. § 7203), Defendant Cartagena began employing more sophisticated methods to disguise income and avoid detection.  According to the DOJ indictment and press release, Defendant Cartagena failed to report over $3.7 million in income, including from his own companies, Terror Squad Productions, FJTS Corp., and Miramar Music Touring.

558.    After serving a four-month federal sentence, Defendant Cartagena resumed receiving cash payments for international performances (up to $500,000 per show in Asia and Africa), which were never reported on tax returns.  Defendant Cartagena used shell companies, nominee accounts, and false invoices to further obscure the source and amount of his income.

559.    Defendant Cartagena also channeled cash through intermediaries, personal assistants, and retail operations, including the UPNYC store, to hide revenue and facilitate bulk structuring.

560.    Furthermore, the UPNYC retail storefront:

    1.    Created fake contracts to claim fraudulent deductions,

2. Issued false 1099s to contractors,
3. Laundered funds,
4. Processed cash-only transactions and ghost inventory, and
5. Distributed cash to enterprise enforcers and insiders, including Pistol Pete, without recording disbursements or issuing tax forms.

561. Based on information and belief, Defendant Cartagena failed to report income from music publishing, touring, merchandise, and promotional brand deals and intentionally used third-party nominees to insulate himself from IRS scrutiny.

562. Defendant Cartagena openly boasted to Plaintiff and others about defeating the federal government's attempts to prosecute him, claiming "the feds can never catch me," and released an album cover that depicted a stylized federal interrogation room—a deliberate mockery of his prior criminal exposure.

563. These acts constitute:

1. Federal tax evasion under 26 U.S.C. § 7201 (willfully attempting to evade or defeat any tax due to the United States).
2. Money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) (engaging in financial transactions designed to conceal or disguise the nature, source, or ownership of criminally derived proceeds).
3. Spending criminal proceeds under 18 U.S.C. § 1957 (engaging in monetary transactions of more than $10,000 in criminally derived property).
4. New York criminal tax fraud, including Tax Law § 1806 (offering false instruments for filing), § 1804 (repeated failure to file returns), and § 1801 (criminal tax fraud in the fifth Degree), and N.Y. Tax Law §§ 1801–1807.
5. Florida tax fraud and failure to report taxable income under Fla. Stat. § 198.33.

564. These offenses qualify as racketeering activity under 18 U.S.C. § 1961(1)(D) and confirm that the Cartagena Enterprise relied on systematic financial concealment to operate across state and international lines while shielding Defendant from liability.

565. Defendant Cartagena's conduct reflects a sophisticated, calculated, and post-conviction effort to:

1. Obscure enterprise revenue.
2. Avoid legal accountability.
3. Retain proceeds from trafficking, commercial fraud, and labor exploitation.
4. Fund enforcement mechanisms within the Enterprise (e.g., paying associates, distributing hush money, maintaining loyalty through cash transfers).

**Predicate Act 8: Commercial Fraud & Unfair Competition (18 U.S.C. § 1343; N.Y. Penal Law § 190.65; NY GBL § 349; FL Stat. § 817.034; Sherman Act §§ 1–2; RICO Predicate: 18 U.S.C. § 1961(1)(B)**

566. <u>Summary</u>: In 2016, Defendant Cartagena launched a sneaker retail business called UPNYC in the Bronx.  Behind its public image as a boutique sneaker store, UPNYC became a key

vehicle for the Cartagena Enterprise's racketeering activity, serving as a platform for commercial fraud, illicit profits, labor exploitation, and enterprise control.

567. The Defendant exploited his celebrity connections with executives at Nike, Jordan Brand, and other major footwear distributors to obtain early access to limited-edition merchandise— often weeks ahead of official release dates. These releases were typically embargoed from the retail resale, but Defendant Cartagena bypassed those restrictions through backdoor relationships unavailable to competitors.

568. The Enterprise then stripped tracking tags and internal monitors from these high-demand sneakers. It resold them through UPNYC and affiliated resellers for inflated prices, often between $700 and $1,000 per pair for shoes with a $200 retail price.

569. By misrepresenting early-release merchandise as legitimate retail inventory, Defendant Cartagena deceived customers, violated industry distribution agreements, and undermined market competition, harming retailers such as Foot Locker, KITH, and Stadium Goods, which were contractually barred from similar conduct.

570. This unfair advantage allowed Defendant Cartagena's business to dominate the resale market, denying competitors and consumers equal access and distorting market pricing through artificial scarcity and insider access. These acts mirror the types of commercial manipulation prohibited under the Sherman Act, 15 U.S.C. §§ 1–2, and are indicative of anticompetitive conduct intended to monopolize a product category through fraudulent means.

571. In addition to market manipulation, the scheme included:

    1. Unauthorized credit card charges on customers' accounts.
    2. Falsified chargeback claims.
    3. Sales are processed through ghost transactions to move cash off-books.

572. Notably, Defendant Cartagena's former business partner and UPNYC co-founder, Scott "Scottie" Spina, pleaded guilty in federal court to defrauding store customers of over $750,000 by using the store's systems to process fake transactions. Spina was sentenced to nearly three years in federal prison for his role in the scheme.

573. These practices violate:

    1. 18 U.S.C. § 1343 – Wire Fraud (engaging in a scheme to defraud and obtain money or property using false pretenses, representations, or promises, transmitted by wire, e.g., processing fraudulent credit card charges and online communications to obtain payments). Each use of interstate credit card networks or electronic communications in furtherance of fraudulent sales constitutes a wire fraud violation.

     2.  N.Y. Penal Law § 190.65 – New York Penal Law § 190.65 – Scheme to Defraud in the First Degree (a systematic, ongoing fraud intending to defraud multiple persons and obtaining property more than $1,000 from at least one of them).

574.   The Enterprise's pattern of making false promises and charging unauthorized fees to customers fits this offense, a Class E felony under New York law.  (Additionally, these practices violate New York General Business Law § 349, which prohibits deceptive business practices, although enforced civilly.) If any part of the scheme occurred in Florida (e.g., online sales to Florida customers), it would likewise violate Fla. Stat.  § 817.034 – Florida Communications Fraud Act (organized fraud via electronic means):

     1.  N.Y.  General Business Law § 349 – Deceptive business practices.
     2.  Fla. Stat.  § 817.034 – Florida Communications Fraud Act (organized fraud by wire).
     3.  Sherman Act §§ 1–2 – Unfair market competition and anti-consumer conduct.

575.   These acts qualify as racketeering activity under 18 U.S.C. § 1961(1)(B) because they are indictable under federal wire fraud statutes and constitute a pattern of fraudulent conduct targeting consumers and competitors alike.

576.   Although antitrust violations are not independently listed as predicate offenses, they underscore the Enterprise's illegal competitive dominance, demonstrating Defendant Cartagena's intent to monopolize control over a lucrative market segment using fraudulent advantage and retaliatory enforcement mechanisms.

577.   Each fraudulent transaction and each act of deception in obtaining, advertising, or selling early-release sneakers may constitute a separate racketeering act and collectively form part of the closed-ended pattern of racketeering activity under 18 U.S.C. § 1962(c).

578.   The UPNYC commercial fraud scheme operated in tandem with the Enterprise's acts of physical intimidation and retail enforcement:

     1.  Defendant ordered staff to "pound out" Scottie, the co-founder of UpNYC.
     2.  A Dominican teen was violently assaulted after stealing merchandise.
     3.  A female Latina employee was repeatedly sexually assaulted while working for Defendant Cartagena's UpNYC stores.  On one occasion, Plaintiff personally witnessed a Terror Squad member and employee of UpNYC kick this employee under the table while referring to her as a "*Bitch*," and a "*Ho*."

579.   Defendant Cartagena intimidated 'Barbie,' a female employee who attempted to report sexual harassment by Defendant Cartagena's nephew, by telling her:

<p align="center">"<b><i>You like working here?  Then shut your mouth</i></b>"</p>

580.   These violent reinforcements of a fraudulent retail operation reflect the interdependence between the Enterprise's financial crime and its physical enforcement arm—mirroring the models of racketeering recognized in cases like:

    1.   *United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).
    2.   *United States v. Ray*, 2022 U.S. Dist. LEXIS 212725 (S.D.N.Y.).
    3.   *United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015).
    4.   *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016).

581.   These acts, when considered alongside other enterprise predicate offenses—forced labor, tax fraud, violent enforcement, and sex trafficking—satisfy the continuity and relatedness requirements of a RICO pattern under 18 U.S.C. § 1961(5).

582.   Additionally, the fraudulent resale scheme constitutes racketeering activity under § 1961(1)(B) because it is indictable as wire fraud under 18 U.S.C. § 1343.  Here, the repeated use of interstate wires (credit card networks, internet transactions, and communications) to carry out the sneaker fraud scheme qualifies as a pattern of racketeering activity.

583.   Each fraudulent transaction and misrepresentation to customers is a racketeering act that, combined with the other predicates above, demonstrates a pattern of racketeering activity under 18 U.S.C. § 1962.

584.   These acts satisfy the closed-ended continuity requirement for a RICO pattern.  The use of violence, fraud, trafficking, and intimidation was not occasional—it was integral to the operation and governance of the Enterprise.

**Predicate Act 9: Interstate Transportation of Females for Sexual Exploitation (18 U.S.C. §§ 2421, 2422, 2423; 18 U.S.C. § 1961(1)(B))**

585.   As part of the broader pattern of racketeering activity committed by the Cartagena Enterprise, Defendant Cartagena arranged and facilitated the interstate and international transportation of underaged females for purposes of sexual exploitation.

586.   These females were transported under the guise of being:

    1.   Models.
    2.   Brand ambassadors.
    3.   Music and tour personnel.

587.   However, the purpose of their travel was to make them sexually available to Defendant Cartagena, often in exchange for continued proximity to his celebrity, promises of industry exposure, and financial dependence.

588.   Plaintiff personally witnessed Defendant Cartagena:

1. Arrange for females to be flown between New York and Miami to join him at events, studio sessions, his Aqua Island home, Airbnb's, and hotels.
2. Fly underaged women into the U.S. from Europe, including one female for whom Defendant Cartagena paid for cosmetic body modifications—including breast augmentation and a Brazilian butt lift (BBL)—before making her one of several minors in his inner circle.
3. He directed his staff and tour managers to book travel, pay cash allowances, and cover hotels for these minors while maintaining control over their movement and access to resources.

589.    These minors were frequently cut off financially or discarded when they became noncompliant or no longer served Defendant Cartagena's purposes.  The power imbalance, false promises, and conditional access to basic needs created a coercive dynamic, especially for minors with limited alternative support.

590.    These acts violate multiple federal laws, including:

1. 18 U.S.C. § 2421 – transportation of individuals in interstate or foreign commerce with intent to engage in criminal sexual activity.
2. 18 U.S.C. § 2422 – coercion or enticement of individuals to travel in interstate commerce for unlawful sexual activity.
3. 18 U.S.C. § 2423 – transportation of individuals across state or international borders for illegal sexual conduct (including minors).

591.    Each act of transportation executed with the intent to exploit these underaged women sexually is a separate racketeering act under 18 U.S.C. § 1961(1)(B).  These acts were not incidental but integral to the Enterprise's culture of coercion, compliance, and reward-based manipulation.

592.    This conduct also reinforces the Cartagena Enterprise's internal pattern of sexual dominance and loyalty control, further supporting Plaintiff's related allegations under the TVPA and strengthening the showing of a cohesive racketeering strategy.

**Predicate Act 10**: Public Use of "Ketchup" to Signal Stabbing (Tory Lanez Statement) (Fed. R. Evid. 801(d)(2)(A); Supporting Predicate under 18 U.S.C. §§ 1959, 1512).   RICO Predicate: 18 U.S.C. § 1961(1)(A) – As corroborative of violent enforcement pattern.

593.    Defendant Cartagena created and routinely used coded language within the Cartagena Enterprise to instruct and describe violent enforcement acts.  Chief among these was the term "*Ketchup*"—a euphemism used to signify that someone should be stabbed.

594.    The term was known and understood by enterprise members to be Defendant Cartagena's directive for violence, often delivered as "*Give him Ketchup*" or, after the fact, described as someone having '*caught Ketchup*.'

595.    In a recorded public conversation with fellow rapper Jadakiss, Defendant Cartagena made

an unsolicited comment referencing the stabbing of artist Tory Lanez in custody.  He said:

"***Sad news in hip-hop.  Tory Lanez caught Ketchup… stabbed 14 times in the yard.***"



596.    The transcript of the relevant section is:

**[00:00:00] Fat Joe:** You know, sad news in hip-hop. Tory Lanez caught ketchup.

**[00:00:06] Jadakiss:** What?

**[00:00:07] Fat Joe:** Tory Lanez got stabbed 14 times in the yard.

**[00:00:11] Jadakiss:** Oh, yeah. Man, your--

**[00:00:12] Fat Joe:** It's sad.

**[00:00:13] Jadakiss:** Your slang today is off.

**[00:00:15] Fat Joe:** Yo, what do you want--

**[00:00:15] Jadakiss:** Your slang is out of this world.

**[00:00:17] Fat Joe:** No, no.

**[00:00:19] Jadakiss:** No, I heard that. No, on a serious note--

**[00:00:21] Fat Joe:** Jada, I'm going to be honest with you, I don't like number two, I like

number one. I'm bringing out the vocabulary that--

**[00:00:28] Jadakiss:** On a serious note, though.

124

**[00:00:28] Fat Joe:** That number one vocab.

597.    When Jadakiss questioned the phrase, Defendant Cartagena doubled down, referring to the expression "my number one vocab," effectively confirming that "Ketchup" was of his own creation and well-understood within his circle.

598.    This public usage corroborates Plaintiff's allegations that the term "Ketchup" was used by Defendant Cartagena to signal real-world violence, including:

1. The Café Ketchup (John Doe).
2. The coded directives were issued in witness intimidation efforts via associates like Pete "Pistol Pete" Torres and Rich "Player" Jospitre.

599.    While this statement may not be an independent criminal offense in itself, it is admissible as a party admission under Fed. R. Evid. 801(d)(2)(A) and serves as powerful corroboration that Defendant Cartagena:

1. Coined the term.
2. Used it operationally within the Enterprise.
3. And viewed its violent implication as a badge of leadership.

600.    This public confirmation of enterprise slang directly supports predicate acts related to:

1. Attempted murder and assault in aid of racketeering (18 U.S.C. § 1959).
2. Witness retaliation and obstruction (18 U.S.C. § 1512).
3. It also demonstrates the Defendant's awareness, authorship, and embrace of the language used to direct enterprise violence.

601.    These acts form part of the Enterprise's pattern of sexual exploitation and serve as evidence of the Cartagena Enterprise's ongoing use of travel-based coercion, concealment, and psychological domination to further Defendant Cartagena's private gratification and control of loyalty within the Enterprise.

602.    This predatory structure supports a finding that Defendant Cartagena's Enterprise was not merely artistic—it was an ongoing racketeering operation that included sex trafficking, wire fraud, labor theft, and violent enforcement.

603.    As in United States v. Marcus, 628 F.3d 36 (2d Cir. 2010), and Callahan, 801 F.3d 606 (6th Cir. 2015), the Defendant's pattern of targeting vulnerable individuals through coercion, fear, and domination satisfies the predicate elements for RICO liability.

///
///
///
///

**Predicate Act 11**: **Structuring and Laundering Through Shell Companies: (18 U.S.C. §§ 1956, 1957; 26 U.S.C. § 7201; Fla. Stat. §§ 896.101, 607.0505). RICO Predicate: 18 U.S.C. § 1961(1)(D)**:

604.    Defendant Cartagena established a web of interrelated Florida-based shell companies for the unlawful purpose of concealing income, laundering criminal proceeds, evading taxation, and obstructing federal and state oversight.   These companies were designed to serve as instrumentalities of financial fraud, devoid of meaningful operations, yet strategically used to mask illicit revenue from enterprises.

605.    These shell entities include, but are not limited to, Azaryah LLC, BELEEEDAT LLC, R4 SO VALID LLC, WOOO Inc., Slate, Inc., and Sneaker Addict Touring LLC.   Notably, these entities frequently share common registration addresses and listed agents—primarily Defendant Erica Moreira, who lacked authorization to practice law in Florida when filing some of these documents, thereby violating Fla. Stat.  § 607.0505 (filing false or deceptive business records).

606.    Such uniformities indicate a coordinated and intentional effort by Defendant Cartagena to layer corporate entities, thereby obscuring the true sources of funds, masking ownership structures, and evading regulatory scrutiny.

607.    These shell companies were further linked to Paycheck Protection Program (PPP) loans, such as:

   1. Sneaker Addict Touring, LLC received a $37,500 PPP loan in 2021 but shows no legitimate business activity consistent with loan representations.

608.    Notably, many of these businesses failed to demonstrate any real economic output, staff, or operational footprint, yet they facilitated the movement of substantial sums of money.  This pattern of paper company creation, loan fraud, and title-layering reflects classic hallmarks of money laundering and tax evasion schemes.

609.    Upon information and belief, these actions violate multiple federal and state statutes, including:

   1. 18 U.S.C.  §  1956(a)(1)(B)(i) – laundering funds to conceal the nature, source, ownership, or control of proceeds.
   2. 18 U.S.C. § 1957 – engaging in monetary transactions exceeding $10,000 in criminally derived property.
   3. 26 U.S.C. § 7201 – willful evasion of federal tax obligations.
   4. Fla. Stat.  § 896.101 – laundering of monetary instruments through Florida-registered businesses.

126

     5. Fla. Stat. § 607.0505 – for filing false, misleading, or deceptive corporate documents to the Florida Secretary of State.

610.   Defendant Cartagena's use of his daughter's identity in forming Azaryah LLC, with Erica Moreira again acting as the filing agent, exemplifies the intent to insulate himself from civil liability and criminal prosecution by installing nominal figureheads while retaining de facto control.

611.   These shell companies formed a financial laundering infrastructure for the Cartagena Enterprise, serving to:

     1. Obfuscate income streams from criminal acts, including labor exploitation, tax fraud, and intellectual property theft.
     2. Filter enterprise funds through seemingly legitimate entities to create an illusion of lawful earnings.
     3. Compartmentalize asset and liability exposure using untraceable entity layering and straw ownership.
     4. Access pandemic-era relief funds under false pretenses, thereby defrauding the U.S. Treasury.

612.   These practices represent clear and ongoing racketeering acts under 18 U.S.C. § 1961(1)(D). The use of interstate wires, fraudulent corporate filings, and financial institutions to further this scheme supports liability under RICO, wire fraud, money laundering, and tax evasion statutes.

613.   As documented in corporate filings, loan records, and annual reports, this scheme was not incidental—it was systematic, deliberate, and sustained. It forms a core component of the Cartagena Enterprise's operational machinery, through which Defendant directed the concealment of criminal proceeds, laundered funds across jurisdictions, and undermined federal economic relief efforts.

**Predicate Act 12: Wage Theft, Obstruction, and Off-Book Payments: (18 U.S.C. §§ 1343, 1519, 1591; N.Y. Lab. Law §§ 193, 198; Fla. Stat. §§ 787.06, 448.110). RICO Predicate: 18 U.S.C. § 1961(1)(B)**

614.   As part of the continuing pattern of racketeering conduct, Defendant Cartagena, acting through the Cartagena Enterprise, orchestrated a deliberately concealed, multi-tiered scheme of wage theft, falsified tax reporting, and off-the-books cash compensation.

615.   The dual aim was to (a) exploit Plaintiff's labor without accountability and (b) obstruct detection by the Internal Revenue Service and state wage enforcement authorities.

616.   During a conversation with Plaintiff, the Enterprise's former accountant confirmed a pattern of intentionally delayed and manipulated income payments to Plaintiff that were

127

contingent upon Defendant Cartagena's personal approval and routed through third-party intermediaries—specifically Rich Player and Defendant Cartagena's uncle Dan.

617.   These payments were often withheld until after performances had concluded, sometimes for days and or weeks, despite being contractually or verbally agreed upon in advance:

"***TA's money didn't hit my account yet.  I cannot pay him.  He's a little upset… Joe needs to start paying these guys before they get on the plane***."

618.   The former accountant further acknowledged that Defendant directed her to fabricate W-2s and inflate reported wages to the Internal Revenue Service (IRS)—a tactic designed to create the illusion of lawful compensation while keeping Plaintiff economically disenfranchised.

619.   The falsified wage reports served a dual function: shielding the Enterprise from employment classification and tax violations and burdening Plaintiff with exaggerated taxable income that bore no resemblance to the cash amounts he received:

"***He wasn't paying that, but we had to make it look like it. We sent those pay stubs for tax filings***." – said Accountant Doe.

620.   This conduct represents an egregious manipulation of federal tax systems and employment laws, involving:

1.   Fabrication of W-2 statements grossly overstating earnings reported to the IRS.
2.   False representations to federal agencies under 26 U.S.C. §§ 7206 and 7207.
3.   Concealment of payroll transactions and use of cash-only methods to circumvent wage laws.
4.   Suppression of Plaintiff's actual income to perpetuate financial dependency and obstruct lawful recourse.
5.   Reinforcement of psychological coercion, as Plaintiff's inflated tax liabilities and underreported wages left him legally entangled, financially insolvent, and at risk of IRS penalties for money he never received.

621.   Defendant Cartagena's conduct in this predicate act violated the following statutes:

1.   18 U.S.C. § 1343 (Wire Fraud): for electronically transmitting false wage information to defraud the IRS and deceive Plaintiff.
2.   18 U.S.C. § 1519 (Obstruction): for knowingly falsifying and concealing financial records, including IRS-reported documents, to interfere with lawful government functions.
3.   18 U.S.C. § 1591: the pattern of financial manipulation was central to a trafficking-like coercive dynamic, where control over compensation was used to condition continued labor.
4.   N.Y. Labor Law §§ 193, 198: for unlawful deductions, failure to pay wages, and issuance of false wage statements.
5.   Fla. Stat.  § 448.110: failing to maintain lawful wage practices and underpaying labor in cash while falsifying employment status.

622.   These financial manipulations were not administrative oversights—they were deliberate tools of coercion wielded by the Enterprise to suppress, control, and silence Plaintiff.  The use

of fraudulent IRS documents as leverage underscores the sophisticated nature of the scheme and the Defendant's willingness to weaponize federal systems against his own laborers.

623.     Moreover, the deliberate inflation of reported income not only deprived Plaintiff of lawful compensation but also exposed him to tax liabilities, collection actions, and audit risk.  At the same time, Defendant Cartagena maintained plausible deniability and enriched himself through unreported profits and diverted payroll.

624.     These acts, taken together, reflect a calculated, enterprise-wide policy of:
    1. Underpayment through cash and delay.
    2. False tax reporting to cover up wage theft.
    3. Obstruction of lawful oversight and retaliation against those who seek redress.

625.     Predicate Act 12, therefore, constitutes a racketeering act under 18 U.S.C. § 1961(1)(B) and exemplifies the Enterprise's operational use of financial fraud, tax evasion, obstruction, and coercion to maintain dominance, suppress dissent, and enrich its leadership at the direct expense of Plaintiff's rights, autonomy, and livelihood.

**Predicate Act 13: Conspiracy to Murder – 50 Cent Assassination Plot Statutes Violated:18 U.S.C. § 1959(a)(5) (Violent crimes in aid of racketeering – attempted murder), 18 U.S.C. § 371 (Conspiracy to commit a federal offense), Fla. Stat. §§ 782.04, 777.04 (Murder and attempt), NY Penal Law §§ 105.15, 125.25. RICO Predicate: 18 U.S.C. § 1961(1)(A).**

626.     Key Participants: Defendant Cartagena; Unnamed enforcers, associates, and assassins.

627.     Location: Miami, Florida; 50 Cent -New York City; winter (approx. 2006–2007).

628.     Description of Conduct: Defendant Cartagena engaged in a calculated and premeditated conspiracy to murder rapper Curtis Jackson, known professionally as "50 Cent." Around the winter of 2006–2007, Defendant Cartagena was residing in Miami when he received a call reporting 50 Cent's presence at a New York venue.   Defendant Cartagena ordered the hit, but 50 Cent was surrounded by "Navy Seal" type security, and the would-be assassins were afraid to make the attempt.

629.     Enraged, Defendant Cartagena openly admitted to placing "a bag on 50 Cent's head"— street slang for a bounty—and expressed frustration that he had not yet succeeded in executing the plot.  He told associates that he had been "trying to get this Nigga for a minute" and lamented the failure of his Terror Squad crew to carry out the hit despite multiple opportunities.

630.     This admission occurred at Defendant Cartagena's residence in Miami.  The Plaintiff was present when Defendant Cartagena made these statements.

631.    The Defendant was visibly distraught and shaking when discussing the plot's failure, suggesting not only intent and active planning but also direct coordination with individuals acting on his behalf.

632.    The plot involved tracking 50 Cent's movements via his performance schedule and attempting to ambush him at multiple public venues.  Despite the failure to carry out the assassination, Defendant's statements confirm his role as the intellectual author and financier of a murder conspiracy designed to eliminate a perceived rival and solidify Defendant's dominance within the entertainment industry and the criminal Enterprise.

633.    This attempted assassination is consistent with the Enterprise's pattern of retaliatory violence against perceived disloyalty, disrespect, or competition.  It also reinforces the Enterprise's use of lethal violence as a means of control and fear across both the music industry and its illicit financial operations.

634.    These acts constitute Conspiracy to commit murder in aid of racketeering under 18 U.S.C. § 1959(a)(5); RICO predicate activity under § 1961(1)(A) due to the overt planning, declared intent, and enterprise-based motive.

**Predicate Act 14**: Weaponized Threats with Firearms via Law Enforcement Officer/Agent and Armed Associate: Statutes Violated: 18 U.S.C. § 1959(a)(3), (a)(5) – Violent crimes in aid of racketeering, 18 U.S.C. § 924(c) – Use and possession of a firearm in furtherance of a crime of violence, NY Penal Law §§ 265.01–265.03 – Criminal possession of a weapon, and NY Penal Law § 105.15 – Conspiracy in the second degree. RICO Predicate: 18 U.S.C. § 1961(1)(A).

635.    Key Participants: Defendant Cartagena; Officer Doe (Retired Law Enforcement Officer/Agent); Pistol Pete; Raul; Driver Doe (armed driver).

636.    Locations: Don Coqui's Restaurant (New Rochelle, NY); Los Angeles, CA (Club incident); Miami, FL; various vehicles and travel locations.

637.    Description of Conduct: Defendant Cartagena systematically utilized armed associates— including a retired law enforcement agent—to intimidate, threaten, and enforce the will of the Enterprise through explicit and unlawful firearm displays.

638.    On multiple occasions, Defendant Cartagena ordered Officer Doe to brandish his weapon during disputes, often in public settings.  At Don Coqui's restaurant in New Rochelle, Defendant Cartagena was having dinner when an old rival walked in and sat at a table across from him.  Defendant Cartagena was visibly shaken.

639. In the presence of Plaintiff, Defendant Cartagena demanded that Officer Doe "Pull out and shoot if that nigga tries anything." Officer Doe, acting in compliance, drew his firearm and had it under the table pointed in the direction of the rival while awaiting a cue from Defendant Cartagena to fire.

640. On another occasion in Los Angeles (approx. 2006–2007), during a parking lot encounter after an event with Suga Shane Mosley, Defendant Cartagena instructed Raul to draw his firearm while a group of local Los Angeles gang members was cornering them. Officer Doe and another associate present also moved to flank the group, visibly armed.

641. Defendant Cartagena's commands were delivered as non-negotiable orders, consistent with his hierarchical control over the Enterprise.

642. Further, Defendant Cartagena boasted that he did not care whether Officer Doe was "a fed," declaring:

> *"If I tell you to pull that gun out, you better pull out and shoot."*

Officer Doe responded:

> *"Don't worry, I got you."*

643. These incidents reflect a pattern in which Defendant Cartagena's enforcers—including law enforcement insiders—were deployed to threaten perceived adversaries and shield Defendant Cartagena's authority with lethal force.

644. Firearms were used not in lawful self-defense but as tools of intimidation, racketeering enforcement, and criminal retaliation under Defendant Cartagena's command.

645. In addition to the incidents above, Plaintiff has personally witnessed Defendant Cartagena and Pistol Pete brandishing firearms while driving around NYC. Upon information and belief, Defendant Cartagena and Pistol Pete are not licensed to carry and or own a firearm in the state of New York.

646. Upon information and belief, Defendant Cartagena's conduct satisfies predicate racketeering elements under 18 U.S.C. § 1959(a)(3) and (a)(5), as the threats were committed in furtherance of maintaining position within a racketeering enterprise; 18 U.S.C. § 924(c), as firearms were used to advance violent enforcement; New York and Florida laws prohibiting possession and display of weapons in commission of a felony and Conspiracy.

647. These acts further demonstrate the Enterprise's use of violence and fear to maintain loyalty and silence dissent, underscoring the pattern of racketeering required under 18 U.S.C. §§ 1962(c) and 1961(5).

**Predicate Act 15**: Sexual Coercion and Forced Orgies at Market America Events. Statutes Violated: 18 U.S.C. § 1591 (Sex trafficking by coercion); 18 U.S.C. § 1594(c) (Conspiracy to commit sex trafficking); 18 U.S.C. § 2422 (Coercion and enticement to travel for illegal sexual activity); Fla. Stat. §§ 787.06, 796.07 (Sexual exploitation and human trafficking); NY Penal Law §§ 230.34-a, 130.40 (Sex trafficking of a child; sexual abuse); RICO Predicate: 18 U.S.C. § 1961(1)(B).

648. <u>Key Participants</u>: Defendant Cartagena; Market America Security Staff; Unnamed Dancer from Jennifer Lopez's Tour; Plaintiff; John Does 1–5.

649. <u>Location</u>: Market America Mansion (Miami, FL), Market America Yacht (Miami waterways), and Market America Events in North Carolina.

650. <u>Description of Conduct</u>: As part of the ongoing operation of the Cartagena Enterprise, Defendant Cartagena facilitated and orchestrated multiple sex trafficking events at corporate-sponsored locations affiliated with Market America—a company for which he served as a public spokesperson.

651. These events included the use of luxury properties, such as the Market America mansion in Miami, Florida, and the Market America yacht, where Plaintiff was coerced into participating in sexually degrading acts, including forced threesomes and orgies, in front of Defendant and others.

652. On one such occasion, Defendant Cartagena forced Plaintiff to solicit a female attendee on the Yacht. At the time, Plaintiff was talking to one of Jennifer Lopez's dancers on the Yacht. Defendant Cartagena forced Plaintiff to abandon his conversation and solicit a female attendee.

653. Reluctantly, Plaintiff obliged as he knew, from past experiences, that Defendant Cartagena wanted that woman to engage in a group sex act aboard the Market America yacht. The Plaintiff, under pressure and threat of expulsion and financial retaliation, complied.

654. The woman ultimately refused, prompting Defendant Cartagena to shame Plaintiff and escalate his sexual demands in later incidents.

655. Upon information and belief, at the Market America mansion, surveillance systems, security personnel, and corporate staff were present during instances where underage or recently turned 18 women were sexually exploited. Plaintiff was made to participate in multiple orgies while Defendant Cartagena stood by, masturbated, and watched—using his position and psychological leverage to degrade both Plaintiff and the victims.

656.    On another occasion, Defendant Cartagena forced Plaintiff to convince a woman in North Carolina whom Plaintiff was dating to compel her 17-year-old daughter to spend time alone with Defendant Cartagena in his hotel during a North Carolina Market America event.



657.    The mother initially rejected the request, stating that her daughter was a minor; Defendant Cartagena insisted that he only wanted to talk and "chill" with her daughter in private. The mother obliged, and the minor child went with Defendant Cartagena to his Market America sponsored hotel room.

658.    Market America and its founder, Loren Ridinger, have engulfed itself within the Cartagena Enterprise. As recently as 2023, Loren Ridinger sponsored a 53rd birthday bash for Defendant Cartagena on her 100-million-dollar Mega Yacht.

659.    Upon information and belief, the Defendant's Pistol Pete and Rich Player were both present.

133

660.    These acts were not isolated but part of an orchestrated pattern of sexual coercion embedded in the Defendant's enterprise culture.

661.    Market America—through its infrastructure, security, and employee oversight—knew or should have known that trafficking was occurring on its premises, particularly given that rooms may have been equipped with surveillance cameras and corporate security.

662.    Upon information and belief, these acts constitute Sex trafficking by coercion and enticement under 18 U.S.C. §§ 1591 and 2422; Racketeering predicate acts under 18 U.S.C. § 1961(1)(B); Conspiracy to traffic persons under § 1594(c), involving multiple actors and a pattern of conduct across Market America-owned properties.

663.    Third-party liability for Market America under 18 U.S.C. § 1595 and aiding/abetting principles due to the knowing facilitation of conditions under which trafficking occurred.

664.    This predicate act illustrates the integrated use of corporate sponsors and celebrity affiliations to mask and facilitate organized sexual exploitation—a cornerstone of the Enterprise's racketeering structure.

**<u>Predicate Act 16</u>: Retaliatory Termination and Sexual Harassment Cover-Up at UPNYC. Statutes Violated: 18 U.S.C. § 1961(1)(B) (Racketeering predicate – witness tampering, obstruction, and coercion); 18 U.S.C. § 1513(e) (Retaliation against a witness or victim); NY Exec. Law § 296 (New York Human Rights Law – sexual harassment, retaliation); NY Penal Law § 195.00 (Official misconduct by one in control of an enterprise); NY Labor Law §§ 740, 741 (Retaliatory discharge for reporting misconduct); RICO Predicate: 18 U.S.C. § 1961(1)(B).**

665.    <u>Key Participants</u>: Joseph Cartagena, a/k/a "Fat Joe"; Angel (Defendant's nephew); Employee Doe (Spanish female); Junie D ("Money Man" – Angel's father); UPNYC management.

666.    <u>Location</u>: UPNYC retail store, Bronx, NY

667.    <u>Description of Conduct</u>: Defendant Joseph Cartagena, a/k/a "Fat Joe," operated UPNYC not just as a retail outlet but as a vehicle for criminal enforcement and sexual control.  One of his employees, a Spanish woman ("Employee Doe"), reported being sexually harassed by Angel, Defendant's nephew and the son of enterprise member Junie D, a/k/a "Money Man."

668.    Angel made repeated unwelcome advances toward Employee Doe.  When she reported the harassment to the Defendant, Joe did not discipline Angel.  Instead, he became upset with Employee Doe and retaliated against her by firing her.  The retaliation was compounded by a

coercive financial power dynamic: Joe had previously lent her $10,000—a fact he allegedly used to exert control.

669.     The firing was not due to misconduct or performance but rather a direct response to her complaint.  By protecting his nephew and punishing the victim, the Defendant furthered the culture of silence, impunity, and intimidation that defines the Cartagena Enterprise.

670.     This event demonstrates:

1. How Defendant used employment as leverage to suppress accountability
2. That UPNYC served not merely as a store but as an enforcement and coercion venue
3. The deliberate concealment of internal misconduct to protect family members and preserve enterprise unity.

671.     <u>Legal Analysis</u>: This conduct constitutes A predicate racketeering act under 18 U.S.C. § 1961(1)(B) (obstruction and coercion); Retaliation against a protected party under N.Y. Exec. Law § 296 and 18 U.S.C. § 1513; An internal cover-up to shield enterprise members from liability and suppress dissent; and Material evidence of the Enterprise's structure of protecting insiders, intimidating victims, and concealing crimes through misuse of employment and financial leverage.

**Predicate Act 17: Violent Assault and Intimidation of Dre (Cool & Dre). (18 U.S.C. § 1959; N.Y. Penal Law §§ 120.00, 120.14, 135.60; Fla. Stat. §§ 784.011, 784.03, 836.05; RICO Predicate: 18 U.S.C. § 1961(1)(A)).**

672.     Defendant Cartagena routinely utilized violence and threats of violence as enforcement mechanisms to maintain control, influence, and dominance over associates and competitors within the music industry.

673.     Defendant Cartagena specifically targeted Dre, a prominent music producer from the duo "Cool & Dre," after Dre produced the beat for rapper 50 Cent's hit song "Hate It or Love It." Defendant Cartagena viewed this professional collaboration as a betrayal and alignment with his rival, prompting immediate retaliation.

674.     To punish Dre and publicly convey a clear message to the industry, Defendant Cartagena issued a direct and explicit order to enterprise enforcer Pete "Pistol Pete" Torres, instructing him to deliver physical punishment coded as "Clapy," meaning to physically assault or slap the target, as part of the Enterprise's violent enforcement lexicon.

675.     Following Cartagena's explicit directive, Torres forcibly entered Dre's Miami recording studio during an active recording session, publicly disrupting operations and asserting enterprise authority through overt physical aggression.

676. Upon information and belief, Dre is significantly larger physically, standing approximately 6'7", while Torres is approximately 5'8". Nonetheless, Torres used physical force and intimidation, grabbing Dre by the neck, forcibly pulling him down to eye level, and explicitly threatening Dre with serious bodily harm if he ever collaborated again with artists considered adversaries of Defendant Cartagena.

677. To underscore the seriousness of the Enterprise's threat and maintain Cartagena's violent enforcement reputation, Torres physically slapped Dre three separate times in the face. These physical assaults, combined with explicit threats of future harm, directly served to reinforce enterprise dominance, deter future collaborations perceived as hostile to Cartagena, and systematically maintain industry-wide compliance through fear.

678. These violent acts violate the following:

   1. <u>18 U.S.C. § 1959 – Violent Crime in Aid of Racketeering (VICAR)</u>: Defendant Cartagena explicitly directed a violent assault to maintain and enhance his position within the Enterprise, punish perceived disloyalty, and intimidate others into compliance and submission.

   2. <u>New York Penal Law § 120.00 – Assault in the Third Degree</u>: The intentional, non-consensual physical assault inflicted upon Dre resulting in physical pain and intimidation satisfies the statutory elements of assault under New York law.

   3. <u>New York Penal Law § 120.14 – Menacing in the Second Degree</u>: Torres' actions involved explicit threats and aggressive physical gestures, placing Dre in reasonable fear of imminent harm.

   4. <u>New York Penal Law § 135.60 – Coercion in the Third Degree</u>: Defendant Cartagena's instruction and Torres' violent execution of the "Clapy" assault unlawfully compelled Dre to abstain from future collaborations with artists Cartagena deemed adversarial.

   5. <u>Florida Statutes § 784.011 – Assault</u>: Defendant Torres intentionally and unlawfully threatened, by word and violent act, to cause imminent physical harm to Dre, creating a well-founded fear of violence, satisfying Florida's assault statute.

   6. <u>Florida Statutes § 784.03 – Battery</u>: Defendant Torres intentionally and unlawfully touched or struck Dre against his will, specifically through slapping him three times in the face, fulfilling the elements of battery under Florida law.

136

7. <u>Florida Statutes § 836.05 – Threats; Extortion</u>: Defendant Torres explicitly threatened Dre with future physical harm if he engaged in further collaborations with Cartagena's rivals, constituting threats and coercive intimidation punishable under Florida law.

679.    These acts qualify as racketeering activity under 18 U.S.C. § 1961(1)(A) because they involve violent crimes indictable under federal law (18 U.S.C. § 1959) committed explicitly to maintain and enhance Defendant Cartagena's enterprise power and control through intimidation, coercion, and violence.

680.    The "Clapy" assault on Dre exemplifies Defendant Cartagena's routine enforcement strategy, systematically employing physical violence to dominate industry rivals, punish perceived betrayals, and solidify enterprise authority.  Such targeted assaults directly reflect the calculated violent methods routinely employed by the Cartagena Enterprise to achieve and maintain dominance, reflecting criminal patterns recognized under RICO case law.

681.    These acts considered alongside previously enumerated predicate offenses—including forced labor, sex trafficking, intimidation, fraud, and violent enforcement—demonstrate the closed-ended and open-ended continuity required under RICO.  Violent enforcement was not incidental or isolated but integral to Defendant Cartagena's operational methodology and governance of the Enterprise.

**Predicate Act 18**: **Retail-Based Money Laundering, Racketeering Proceeds, and Financial Obstruction via UPNYC:  Statutes Violated: 18 U.S.C. § 1956 – Money Laundering (concealment of proceeds); 18 U.S.C. § 1957 – Monetary transactions over $10,000 involving criminal proceeds; 18 U.S.C. § 1343 – Wire Fraud; N.Y. Penal Law § 190.65 – Scheme to Defraud; N.Y. Tax Law §§ 1801–1807 – Criminal Tax Fraud; and 26 U.S.C. § 7201 – Federal Tax Evasion.  RICO Predicate: 18 U.S.C. § 1961(1)(B) and (1)(D)**

682.    Defendant Cartagena continues to use UPNYC—a Bronx-based sneaker and apparel store—as a front for laundering illicit cash and obscuring revenue derived from a wide array of racketeering activities.

683.    Although appearing as a legitimate retail operation, UPNYC functions as a central laundering conduit through which the Cartagena Enterprise cleans money originating from forced labor, commercial fraud, off-the-books performance revenue, tax-evasive touring income, amongst other things.

684.    According to Accountant Doe, Defendant personally retrieved bags of cash totaling $600,000 and $200,000, respectively, from the UPNYC location.  These cash movements occurred without receipts, invoices, payroll documentation, or tax declarations.

137

685.    They were not ATM withdrawals or disbursements—but physical cash pickups from the store's concealed financial operations, routed through retail till siphoning and shell company inflows.

686.    These transactions were neither isolated nor incidental.  Accountant Doe confirmed that Defendant frequently utilized UPNYC as a drop site for Enterprise proceeds.

687.    Funds would be funneled through store operations and extracted in lump-sum cash deliveries upon Defendant's command—the goal: to obfuscate the source, destination, and taxable nature of racketeering income.

688.    Despite modest revenue reporting and ostensibly low hourly wages, multiple UPNYC employees were observed driving exotic vehicles, including G-Wagons, Range Rovers, and Rolls-Royce SUVs—vehicles with sticker prices of more than $200,000.

689.    Defendant's inner circle and UPNYC Store Manager— "JB"—boasted online via his Instagram Account, "Hovybabyy," about luxury watches valued at nearly $100,000, extensive cash holdings, and extravagant lifestyle choices unsupported by any legitimate payroll or business earnings.



690.    These ostentatious displays are not merely signs of excess—they are symptoms of a laundering infrastructure.   The compensation model at UPNYC appears deliberately bifurcated:

1. Nominal payroll entries for state compliance.
2. Unrecorded cash distributions for loyalty, silence, and Enterprise loyalty enforcement.

691.    Social media evidence—including Instagram posts from "JB" and other store affiliates— displays luxury vehicles, expensive jewelry, and subliminal threats directed at Plaintiff.

692.    These digital communications reinforce the dual purpose of UPNYC: as both a laundering channel and an intimidation base within the Enterprise's coercive framework.

693.    In addition to cash siphoning, proxy disbursement systems were in place.  Accountant Doe confirmed that "Uncle Dan," a known intermediary, received over $120,000 in CashApp payments with no accompanying tax filings, W-2s, or 1099s.  This money was deliberately routed outside the formal books to suppress taxable footprints and to prevent traceability of compensation.

694.    This operation:

1. Facilitated bulk structuring of cash earnings,
2. Evaded IRS scrutiny, and
3. Maintained a paper-thin façade of retail legitimacy while enriching the Enterprise leadership.

695.    These financial crimes implicate Defendant Cartagena in a deliberate, sustained, and concealment-oriented violation of multiple federal and state statutes:

1. 18 U.S.C. § 1956(a)(1)(B)(i): Laundering to conceal source/ownership.
2. 18 U.S.C. § 1957: Engaging in $10,000+ transactions using unlawful proceeds.
3. 18 U.S.C. § 1343: Wire-based financial deception.
4. N.Y. Penal Law § 190.65: Ongoing fraudulent scheme to deprive lawful earnings.
5. N.Y. Tax Law §§ 1801–1807; and
6. 26 U.S.C. § 7201: Willful tax evasion.

696.    These acts were not committed in a vacuum—they reflect a coordinated and enterprise-wide laundering strategy.  UPNYC was instrumentalized to:

1. Funnel proceeds from racketeering acts through a public-facing business.
2. Create plausible deniability while suppressing legal exposure.
3. Reward insiders while punishing dissenters through selective compensation and luxury access.

697.    Moreover, Defendant's manipulation of income reporting extends to federal fraud against the IRS, as falsified W-2s were issued to Plaintiff, grossly inflating the reported wages for

services Plaintiff never received.  This was not merely wage theft—it was a tax fraud conspiracy in which UPNYC played an operational role.

698.  In sum, UPNYC represents an embedded financial and psychological engine within the Cartagena Enterprise:

1.  Financially, it recycled criminal earnings into laundered wealth, obscuring origins and circumventing oversight.
2.  Socially, it served as a propaganda arm for enterprise power, flashing wealth as a form of intimidation and control.
3.  Legally, it operated as a disguised hub for unlicensed employment, tax violations, and income misreporting, directly harming Plaintiff and violating the public trust.

699.  These coordinated actions qualify as racketeering acts under 18 U.S.C. § 1961(1)(B) and (D) and reflect a structured, concealed, and long-term criminal plan central to the operation of the Cartagena Enterprise.

**Predicate Act 19**: Enterprise-Wide Threat Messaging via Social Media. Statutes Violated: 18 U.S.C. § 1512(b) – Witness tampering (intimidation to deter testimony or legal cooperation); 18 U.S.C. § 875(d) – Transmission of threats in interstate commerce; N.Y. Penal Law § 240.30 – Aggravated harassment in the second degree; N.Y. Penal Law § 120.45 – Stalking in the fourth degree.

700.  Direct Impact on Plaintiff:  Plaintiff Terrance Dixon, a/k/a "TA," was subjected to a prolonged and escalating campaign of psychological terror, emotional distress, and fear for his personal safety.

701.  These threats—coordinated and anonymous—deepened his trauma, interfered with his legal recourse, and required the implementation of personal security measures.

A.  Overview of Conduct

702.  Beginning shortly after Plaintiff initiated efforts to expose the Enterprise's coercive and illegal operations, a series of burner Instagram accounts—operated or directed by members of the Cartagena Enterprise—began issuing targeted threats aimed at silencing him.

703.  Accounts under names such as "Bitttgggg," "Doctor Zhivag," and similarly cloaked pseudonyms transmitted menacing language in both overt and coded forms, invoking Enterprise slang and past patterns of violence to send a chilling message to the Plaintiff.

704.  These messages included:

1.  *"We let you live."*
2.  *"You love your family, right?"*
3.  *"Fall back in 48 hours."*
4.  *"You got 24 hours to think it over."*
5.  *"The Don doesn't forget."*

705.    These were not isolated or idle remarks.  Each statement was timed in direct response to Plaintiff's public appearances, media interviews, and legal filings—demonstrating clear retaliatory intent.

706.    The use of "Don"—a known reference to Defendant Cartagena within Enterprise communications—reinforced the source and seriousness of the threat.

### B.  Role of the Enterprise

707.    These threats functioned as a digital extension of the Cartagena Enterprise's broader system of intimidation, replacing physical stalking with psychological warfare to disrupt Plaintiff's pursuit of justice.

708.    The burner accounts were used to:

1. Maintain Enterprise Secrecy – by suppressing public disclosure of criminal conduct.
2. Reinforce Power – through indirect intimidation that drew upon the Enterprise's violent reputation.
3. Obstruct Legal Proceedings – by instilling fear of retaliation should Plaintiff testify or proceed with litigation.
4. Test Loyalty – gauging Plaintiff's reactions and willingness to continue speaking out, akin to "dry runs" for further retaliation.

### C.  Enterprise Enforcement by Proxy

709.    Upon information and belief, the individuals managing these social media threats included or were directed by Defendant Cartagena's senior enforcers, Pete "Pistol Pete" Torres and Richard "Rich Player" Jospitre, both of whom had previously attempted to lure Plaintiff into a physical ambush.

710.    The coordinated nature of these threats, along with the enterprise-specific terminology, make clear that these messages were issued with the knowledge, direction, or approval of Defendant Cartagena.

711.    The use of the phrase "*fall back*" is especially telling.  Within the Enterprise's code, such phrasing serves as a countdown to punitive action, whether reputational sabotage, financial interference, or physical violence.  It is an unmistakable enforcement directive understood only by those indoctrinated into the Enterprise's hierarchy and vernacular.

### D.  **Legal Analysis and Predicate Designation**

712.    These threats were transmitted via Instagram's servers, which operate across state lines and utilize interstate data routing, satisfying the interstate communication element required under 18 U.S.C. § 875(d).

141

713. Additionally, the clear aim of these communications—to prevent Plaintiff from cooperating with law enforcement, testifying, or continuing this civil litigation—constitutes witness tampering under 18 U.S.C. § 1512(b).

714. The threats further constitute:

1. Aggravated harassment under N.Y. Penal Law § 240.30, given their repeated nature and intent to alarm.
2. Stalking under § 120.45, based on the persistent pattern of contact and threat delivery designed to place Plaintiff in fear.

715. These acts are not just threats—they are predicate acts of racketeering under 18 U.S.C. § 1961(1)(B), committed to preserve the Cartagena Enterprise's secrecy, intimidate victims, and obstruct justice. They demonstrate the integration of digital tools into the Enterprise's larger enforcement mechanism—highlighting how modern racketeering organizations leverage technology to expand their reach while maintaining anonymity.

716. As a direct result of these threats:

1. Plaintiff suffered panic attacks, insomnia, and hypervigilance.
2. He was forced to restrict his public appearances and take protective measures for himself and his family.
3. His willingness to pursue justice was undermined by escalating psychological trauma.

717. These harms were foreseeable and intended and constitute actionable injury under the RICO statute.

**Predicate Act 20**: Fraudulent Backdating and Ghost Contracts. Statutes Violated: 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 371 (conspiracy); N.Y. Penal Law § 175.10 (falsifying business records).

718. <u>Direct Impact on Plaintiff</u>: Suppressed royalties, permanent loss of authorship rights, economic disenfranchisement, and deliberate falsification of documentation to erase Plaintiff from the music's commercial and legal chain of title.

719. <u>Description</u>: As part of a continuing racketeering scheme, Defendant Cartagena and his enterprise actors engaged in the fraudulent backdating of contracts and the creation of "ghost" split sheets—deliberately omitting Plaintiff's authorship contributions from commercially released songs to which he provided lyrics, hooks, and vocals. These documents were fabricated to falsely represent 100% publishing ownership by Defendant and his affiliates.

720. Upon recent investigation, Plaintiff discovered that after the tracks had already been recorded, released, and monetized, Defendant caused the submission of post-dated and backdated split sheets to ASCAP, BMI, and associated PROs that excluded Plaintiff's name and falsely claimed sole authorship.

721.    These fraudulent documents were then used to divert royalty payments, block publishing claims, and create a paper trail that would obscure Plaintiff's legal entitlement to ownership and backend income.

722.    The fraud was executed with the specific intent to:
1. Obstruct Plaintiff from asserting co-authorship rights.
2. Preclude backend royalty participation.
3. Mislead digital distributors, performance rights organizations, and publishers.
4. Falsify the origin and credit of protected creative content.

723.    <u>Financial Impact</u>: As a direct result of these falsified documents and omissions, Plaintiff was wrongfully excluded from revenue streams that currently yield Defendant Cartagena approximately $60,000 per month in music royalties and an additional $20,000 per month in streaming revenue from the very songs to which Plaintiff contributed.  These include but are not limited to "All the Way Up," "Congratulations," "Cupcake," and others spanning Defendant's commercially successful catalog.

724.    Despite repeated promises and assurances from Defendant that Plaintiff would receive a 15% share of earnings from each track he co-authored, no Letters of Direction were ever issued, no PRO registration was filed, and no payment has ever been made.  The creation and submission of false documents were carried out via electronic communications and publishing platforms, thus satisfying the elements of federal wire fraud and conspiracy.

725.    These acts constitute predicate offenses under the following:
1. 18 U.S.C. § 1343 – for submitting electronically falsified records to obtain money by false pretenses.
2. 18 U.S.C. § 371 – for conspiring with others, including legal agents and enterprise members, to commit fraud.
3. N.Y. Penal Law § 175.10 – for the knowing submission of false business records with intent to defraud.

726.    <u>Pattern and Purpose</u>: The fraudulent backdating and ghost contracting were not isolated events.  They were part of a broader pattern of racketeering conduct involving concealment, intimidation, and economic control—all directed at disenfranchising Plaintiff and ensuring that the enterprise leadership retained full financial benefit from Plaintiff's labor.

727.    These acts qualify as racketeering activity under 18 U.S.C. § 1961(1)(B) and form a key component of the financial fraud arm of the Cartagena Enterprise.  They directly injured Plaintiff by denying him rightful co-ownership, suppressing his royalty income, and permanently altering the legal attribution of creative works to which he is entitled.

**Predicate Act 21**: Forced Exhibitionism and Psychological Degradation. Statutes Violated: 18 U.S.C. § 1589 – Forced labor through psychological coercion and abuse of power; 18 U.S.C. § 1591 – Sex trafficking by coercion and fraud; 18 U.S.C. § 241 – Conspiracy to deprive civil rights; NY Penal Law § 130.40 – Sexual abuse in the third degree; NY Penal Law § 135.60 – Coercion in the third degree; Fla. Stat. § 787.06 – Human trafficking (non-physical coercion); RICO Predicate: 18 U.S.C. § 1961(1)(B).

728.  <u>Key Participants</u>: Joseph Cartagena a/k/a "Fat Joe"; JB; TA (Plaintiff); Doe women; John Does 1–3

729.  <u>Location</u>: North Carolina; Spain; Germany; Milwaukee, WI; Defendant's residences and tour location.

730.  <u>Description of Conduct</u>: As part of a recurring pattern of sexual coercion and humiliation, Defendant Joseph Cartagena forced Plaintiff into situations of sexual exhibitionism, repeatedly subjecting him to degrading and non-consensual scenarios involving nudity, performance, and voyeurism.

731.  These incidents formed part of the Enterprise's psychological control strategy and were designed to undermine Plaintiff's autonomy, induce submission, and reinforce Defendant's sexual and financial dominance.

732.  <u>Key incidents include</u>:

1.  <u>Spain</u>: Defendant called Plaintiff's hotel room and demanded that he bring condoms to Defendant's hotel room.  When Plaintiff entered, Defendant was bent over with the palms of his hands firmly pressed on the mattress.  Defendant Cartagena's back was arched; his buttocks were spread, and he had two French girls on their knees behind him.

    a.  One female was "rimming" the Defendant while the other was knuckling him. Defendant instructed Plaintiff to join him.  The two women turned their heads around, and their faces were soaked with liquid dripping from their chins.

    b.  While trying not to gag, Plaintiff rejected the demand by saying that he did not feel well.  This was one of only a handful of times that Defendant did not threaten Plaintiff into submission.

2.  <u>North Carolina</u>: After an event, TA and a guest went back to his hotel room.  JB, one of the Defendant's henchmen, knocked on his room door but could not get in.  JB knew TA was in the room with a female guest.

    a.  Instead of respecting TA's privacy, JB went to the front desk, pretended to be TA, and obtained a spare key to TA's room.   JB then entered the room and attacked TA's female guest.  When TA exited the shower, JB was on the bed attempting to

"*finger-pop*" TA's guest without her consent.  TA demanded that JB and the female guest leave.

    b. This incident represents another example of the environment Defendant created within his Enterprise.  Plaintiff had no privacy autonomy, as Defendant made it clear that Plaintiff was open to sexual exploitation by all members of the RICO organization.

3. <u>Germany</u>: On another occasion, TA was called into the Defendant's hotel room. Defendant demanded that TA bring his girl to his room, so they could have an orgy and so Defendant could watch as TA "Fucked" his "bitch."

    a. On this occasion, JB violated the Plaintiff's autonomy.  He came to the Defendant's hotel room door and started banging for ten minutes like a fiend, yelling, "Please, God, Please God, Lety me in God, let me in there."

    b. Defendant responded, "what you want JB, there are only two women in here."

    c. Eventually, Defendant opened the door, JB sprinted to the bed and jumped face first between the legs of the two women.  This was another incident made possible by the Defendant.

4. <u>Europe</u>: On another occasion, Plaintiff was engaging in a forced orgy and was in the middle of having sexual intercourse with a woman.

    a. Defendant Cartagena was on an adjacent bed engaging in sexual intercourse with a woman.

    b. Defendant Cartagena stopped what he was doing, stood up, smacked Plaintiff on his rear end, and shouted the following:

        "***Yeah, harder TA, Harder TA, Fuck that B\*tch harder TA***."

    c. Confusingly, while Defendant Cartagena's female companion lay in the bed waiting for him to return, he opted to masturbate while watching Plaintiff have sex with his female.

5. <u>Milwaukee</u>: Joe insisted on "running a train," forcing group sexual participation.  While in Milwaukee, Defendant Cartagena groped a Caucasian concertgoer when he put his hands up the woman's skirt and grabbed her vagina.  The woman was a guest of Plaintiff.





6. <u>Miami/Various</u>: Joe forced Plaintiff to come to his hotel room to have sex with a woman he brought back after a concert. At that time, other members of TS were also present in the room. Plaintiff and the woman went to the bathroom, and Defendant kicked the door open and shouted to the group,

"***That nigga got a snake. Look at that nigga's dick.***
***Get your dick hard TA, Get your Dick Hard TA.***"

One of the individuals in the room responded:
"***Yo Joe, man, I'm not going to stand here and watch this nigga's dick***."

733. Plaintiff, deeply uncomfortable, was routinely pressured to participate in sex acts under surveillance or in the presence of others, including Defendant and other Enterprise members.

734. These acts were staged to demonstrate Joe's sexual control over both male and female victims and to test loyalty through forced vulnerability and submission.

146

735. The Plaintiff suffered mental, emotional, and sexual trauma because of these repeated, coercive encounters—manifesting in humiliation, PTSD symptoms, and dissociation.

736. The pattern of being forced to "perform," "watch," or be watched mirrors trafficking-based tactics of psychological degradation used to condition victims and strip them of personal agency.

737. <u>Legal Analysis</u>: These acts constitute Forced labor and psychological coercion under 18 U.S.C. § 1589; Sex trafficking by fraud and manipulation under 18 U.S.C. § 1591; Predicate racketeering acts under 18 U.S.C. § 1961(1)(B); Violation of civil rights through public degradation, forced nudity, and sexual manipulation; Sexual coercion and third-degree abuse under NY and Florida law. A deliberate pattern of conduct used to maintain fear, obedience, and loyalty to the Enterprise.

**Predicate Act 22: Wire Fraud, Tax Fraud, and Coercive Wage Theft. Statutes Violated: 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1341 (Mail Fraud); 26 U.S.C. §§ 7201, 7206 (Tax Evasion and False Returns); 18 U.S.C. § 1589 (Forced Labor).**

738. <u>Participants</u>: Defendant Roc Nation, LLC; BDO (accounting firm); Defendant Joseph Cartagena.

739. <u>Description of Conduct</u>: Between 2017 and the present, Defendants Roc Nation and BDO, in collaboration with Defendant Cartagena, executed a coordinated scheme to defraud taxing authorities, suppress labor rights, and sustain economic coercion over Plaintiff as part of the broader Cartagena Enterprise. This included:

1. BDO, acting under Roc Nation's financial authority, generated false W-2 paystubs and earnings statements for Plaintiff, which were used to create the illusion of formal employment for internal and third-party use.
2. At the same time, Plaintiff was misclassified as a 1099 independent contractor on IRS and state filings, thereby depriving him of statutory benefits, including overtime pay, workers' compensation coverage, healthcare contributions, and unemployment insurance.
3. These records were electronically submitted across state lines to financial institutions, royalty processors, and tax authorities, constituting violations of 18 U.S.C. §§ 1341 and 1343.
4. Roc Nation and BDO intentionally created this dual-paper system to misrepresent the true nature of Plaintiff's labor, conceal enterprise control over his work, and evade financial liability for unpaid wages and benefits.
5. The scheme was used as a mechanism of coercion and labor control, with Plaintiff subjected to threats of abandonment, financial ruin, and career blacklisting if he raised objections.

6. Roc Nation profited directly from this scheme, collecting a fixed percentage of Defendant Cartagena's income while reinforcing a system in which Plaintiff's labor was extracted without legal recourse.

740. These acts were not isolated. They formed part of a coordinated, systemic pattern of racketeering activity undertaken by enterprise actors to conceal exploitation, maintain enterprise control, and insulate income streams from scrutiny.

741. The use of falsified W-2s and 1099s constitutes predicate wire and tax fraud under 18 U.S.C. §§ 1341 and 1343 and 26 U.S.C. §§ 7201, 7206. The coercive effect of this misclassification scheme is also independently actionable under 18 U.S.C. § 1589, which prohibits the use of economic manipulation, threats, and abuse of legal processes to extract labor or services.

742. Roc Nation's involvement was not tangential. It provided structural legitimacy, financial cover, and corporate backing for the racketeering conduct while directly sharing in the Enterprise's illicit proceeds.

**<u>Predicate Act 23</u>: Structuring, Wire Fraud, and Laundering of Enterprise Proceeds Through Layered Bank Accounts. Statutes Violated: 18 U.S.C. § 1956(a)(1)(B) – Money Laundering; 18 U.S.C. § 1957 – Monetary Transactions in Criminally Derived Property; 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1961(1)(D) – Racketeering Acts (Financial Fraud and Laundering).**

743. <u>Key Participants</u>: Joseph Antonio Cartagena, a/k/a "Fat Joe" (Enterprise Leader); Roc Nation, LLC (Financial Manager and Venture Participant); BDO (Enterprise Accounting Firm); Sabadell United Bank, N.A. (Account Host).

744. <u>Summary of Conduct</u>: Beginning in or around 2016 and continuing through at least 2024, the Cartagena Enterprise maintained a multi-account laundering structure at Sabadell United Bank, N.A., 150 South Pine Island Road, Suite 100, Plantation, FL 33324. The accounts were used to conceal, route, and sanitize criminal proceeds derived from enterprise activities, including forced labor, unremitted royalties, ghost performances, and fraudulent federal relief funds.

745. Upon information and belief, the Enterprise maintained the following active accounts under various business fronts:

1. Small Business Checking: ***0163
2. Commercial Checking: ***2379
3. Commercial Checking: ***0598
4. Commercial Checking: ***0203
5. Commercial Checking: ***0621

6.   Commercial Checking: ***1949

746.   These accounts functioned as a deliberate structuring mechanism, serving three primary purposes:

1. To obscure the origin and destination of enterprise income, thereby shielding Defendant Cartagena from tax liability and from Plaintiff's claims for unpaid labor and royalties.
2. To cycle funds between affiliated entities such as Slate, Inc., Sneaker Addict Touring LLC, BELEEEDAT LLC, and UPNYC without triggering automatic disclosure thresholds or audit flags.
3. To launder federally derived funds, including at least one fraudulent Paycheck Protection Program (PPP) loan, by falsely inflating payroll and business activities.

747.   Enterprise-Wide Knowledge and Facilitation: Defendant Roc Nation, LLC, which assumed control over Defendant Cartagena's business management in 2017, had access to and oversight over these financial accounts.  Roc Nation's financial control extended to:

1. Revenue intake across touring, merchandise, and publishing platforms.
2. Royalty disbursement oversight, including internal registration with performance rights organizations.
3. Assignment and supervision of BDO, which maintained and submitted payroll, tax records, and financial compliance documentation.

748.   BDO, acting as the accounting agent for both Defendant Cartagena and Roc Nation, created and submitted dual sets of financial documents:

1. One set falsely reflecting Plaintiff as a W-2 employee (e.g., for internal and payment-facing documentation).
2. Another classifying him as a 1099 contractor on tax filings, thereby excluding him from employee protections under wage and tax laws.

749.   BDO also routed enterprise revenue through the above Sabadell accounts, issuing compensation in inconsistent forms, suppressing tax documentation, and ensuring that Plaintiff remained economically vulnerable and legally isolated—a tactic consistent with "serious harm" under 18 U.S.C. § 1589(c)(2).

750.   Legal Significance and Pattern of Racketeering Activity:

1. The structured use of multiple accounts was not incidental—it was essential to the functioning of the Cartagena Enterprise.  The scheme allowed the Defendants to:
2. Evade detection by financial institutions and federal regulators.
3. Launder criminally derived property, including coerced labor income and fraudulently obtained PPP funds.
4. Maintain the financial infrastructure necessary to perpetuate trafficking, fraud, and retaliation.

751.   This conduct constitutes:

1. Money laundering under 18 U.S.C. § 1956(a)(1)(B) and § 1957.

2. Wire fraud under 18 U.S.C. § 1343 due to the interstate electronic transfer of falsified earnings and tax data.
3. A pattern of racketeering activity under 18 U.S.C. § 1961(1)(D).
4. An instrumentality of the forced labor scheme pled under 18 U.S.C. § 1589 by making Plaintiff financially dependent on off-books or misclassified payments.

**Predicate Act 24: Payroll Fraud, Tax Misclassification, and Coercive Financial Structuring. Statutes Violated: 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1956(a)(1)(B) – Money Laundering; and 26 U.S.C. §§ 7201, 7206 – Tax Evasion and False Returns.**

752.   <u>Participants</u>: Joseph Antonio Cartagena; Roc Nation, LLC; BDO (Accounting Firm).

753.   <u>Summary of Conduct</u>: Beginning in or around 2017, Defendant Roc Nation, LLC, acting as the financial manager for Defendant Joseph Cartagena, implemented and oversaw a payroll fraud and tax misclassification scheme designed to conceal labor trafficking and suppress Plaintiff's access to compensation and legal protections.

754.   At Roc Nation's direction, its affiliated accounting firm BDO issued falsified W-2 paystubs to Plaintiff, reflecting employment status and wages that were internally recorded. However, for tax reporting purposes, BDO simultaneously submitted 1099 returns to federal and state authorities, falsely classifying Plaintiff as an independent contractor. This dual-bookkeeping scheme was used to:

1. Deprive Plaintiff of legally mandated labor protections under the FLSA and NYLL;
2. Avoid paying employer-side taxes, unemployment contributions, and benefits;
3. Isolate the Plaintiff from asserting statutory rights while extracting coerced labor.

755.   BDO further routed Plaintiff's performance-based compensation through a web of interlocking shell entities, including Slate, Inc., Sneaker Addict Touring LLC, and others under the control of Defendant Cartagena. These entities were used to create distance between enterprise earnings and the source labor. Proceeds were systematically funneled through multiple commercial accounts at Sabadell United Bank, specifically accounts ending in:

1. ***0163
2. ***2379
3. ***0598
4. ***0203
5. ***0621
6. ***1949

756.   The Sabadell accounts functioned as financial laundering nodes, intentionally structured to fragment inflows and avoid currency transaction reporting (CTR) requirements under the Bank Secrecy Act. Payments to Plaintiff were often irregular, off-the-books, and selectively routed through these nodes to create legal ambiguity and enforce dependence.

150

757.    This conduct was not accidental or negligent—it was executed by enterprise participants with knowledge and intent to conceal unlawful activity, evade regulatory detection, and maintain economic coercion.  The scheme also enabled Defendant Cartagena to maintain the appearance of corporate legitimacy while operating a coercive labor system beneath formal contracts.

758.    These acts collectively constitute racketeering activity under 18 U.S.C. § 1961(1)(D). They demonstrate a pattern of financial structuring, tax evasion, and fraud in furtherance of a criminal enterprise.  The conduct satisfies both:

1. Closed-ended continuity through repeated execution of the payroll fraud and laundering scheme over multiple years and,
2. Open-ended continuity, as the Enterprise continues to use similar financial infrastructure through Roc Nation and BDO to support ongoing exploitation and retaliation.

759.    These acts are chargeable under 18 U.S.C. § 1962(c) and further implicate Roc Nation and BDO as active participants in the operation and concealment of a labor trafficking enterprise.

**Injury to Plaintiff**

760.    As a direct and proximate result of Defendant's operation of the Cartagena Enterprise and the pattern of racketeering activity described herein, Plaintiff Dixon sustained serious, ongoing, and compensable harm to both his business and property, as well as to his mental and physical well-being, including but not limited to:

761.    Economic Losses:

1. Theft of at least $610,000 in touring income, per diem payments, and performance revenue wrongfully retained by Defendant over 16 years.
2. Total exclusion from royalty and backend publishing income generated from Plaintiff's contributions to commercial tracks, including but not limited to "All the Way Up," "Congratulations," and "Cupcake."
3. Loss of authorship rights and registration credit, resulting in permanent erasure from performance rights organizations (ASCAP/BMI), royalty databases, and public-facing industry documentation.

762.    Reputational Harm:

1. Deliberate suppression of Plaintiff's contributions to Defendant's career and discography.
2. Unlawful diversion of credit and professional opportunities, thereby damaging Plaintiff's ability to secure future creative or commercial work in the music industry.

763.    Physical and Psychological Harm:

1. Credible threats of violence and murder from Defendant's close associates—statements supported by direct recordings and personal accounts.

    2. Intense and lasting psychological trauma, including anxiety, nightmares, humiliation, and PTSD, because of physical intimidation, sexual coercion, isolation, and professional disenfranchisement.

    3. Disruption of Plaintiff's safety, requiring the engagement of personal security services.

764. <u>Out-of-Pocket Expenditures:</u>

    1. Costs of hiring legal counsel, physical protection, ongoing therapy, and expenses related to collecting, preserving, and investigating the evidence of racketeering activity for use in these proceedings.

    2. These injuries are compensable under 18 U.S.C. § 1964(c), which authorizes recovery for any "person injured in his business or property because of" a RICO violation. The Plaintiff's injuries are both economic and non-economic and are traceable to Defendant's prolonged pattern of criminal exploitation.

765. <u>Relief Requested Under 18 U.S.C. § 1964(c):</u>

766. According to 18 U.S.C. § 1964(c) and the inherent equitable powers of this Court, Plaintiff respectfully demands judgment against Defendant as follows:

    1. <u>Treble Damages:</u> For all losses and injuries sustained by Plaintiff due to the racketeering acts, including unpaid wages, misappropriated royalties, lost business opportunities, and suppressed professional standing.

767. <u>Compensatory and Punitive Damages:</u>

    1. For Defendant's willful, malicious, and coercive conduct, including fraud, forced labor, retaliatory threats, and unjust enrichment.

    2. To reflect the seriousness of the economic, psychological, and reputational harm inflicted on Plaintiff.

768. <u>Attorneys' Fees and Costs:</u> Including fees incurred to investigate the Enterprise, preserve evidence, pursue civil redress, and secure protective relief from continued enterprise threats.

769. Equitable Relief, including:

770. <u>Imposition of a Constructive Trust:</u>

    1. Over all funds, royalties, publishing rights, and backend revenue streams derived from Plaintiff's contributions to Defendant's discography, performances, and touring.

    2. Including but not limited to rights associated with *"All the Way Up"* and other co-created tracks.

771. <u>Declaratory Judgment:</u>

    1. Confirming Plaintiff's status as a rightful co-author and economic beneficiary of the works produced through his labor and creative contributions.

    2. Declaring Defendant liable for misrepresentation and misappropriation of authorship and income.

    3. A specific request that all corporate defendants be enjoined from further monetizing Plaintiff's works.

4. That Roc Nation, LLC be compelled to account for all business dealings post-2017 involving Cartagena or any disputed royalties.
5. That constructive trusts apply to all assets managed or distributed through Slate, Inc. and Sneaker Addict Touring LLC.

772. <u>Permanent Injunction</u>: Enjoining Defendant and all affiliated agents, representatives, and enforcers from:

1. Using, performing, distributing, or monetizing Plaintiff's uncredited contributions.
2. Threatening or retaliating against Plaintiff in any form.
3. Operating the Cartagena Enterprise in a manner that harms Plaintiff's remaining economic rights or personal safety.

773. Plaintiff seeks any further relief this Court deems just, equitable, and necessary to remedy the full scope of racketeering-related injuries and to prevent future misconduct by Defendant and the Enterprise.

## **PRAYER FOR RELIEF**

774.         **WHEREFORE**, Plaintiff Terrance Dixon, a/k/a "TA," respectfully requests that this Court enter judgment in his favor and against Defendant Joseph Antonio Cartagena, a/k/a "Fat Joe," and all other presently unnamed Defendants, jointly and severally, and award the following relief:

1. Compensatory Damages in an amount to be determined at trial, but not less than $2,600,000, for unpaid performance wages, lost per diem, stolen publishing revenue, unpaid royalties, and physical and emotional injuries resulting from Defendant's unlawful conduct.
2. Treble Damages under 18 U.S.C. § 1595 for Defendant's violations of the Trafficking Victims Protection Act, including forced labor and sex trafficking by coercion.
3. Double Damages according to New York Labor Law § 198(1-a) for Defendant's failure to pay wages due and willful underpayment.
   a. Punitive Damages for Defendant's outrageous and malicious conduct in defrauding and coercing Plaintiff and to deter future misconduct of a similar nature.

775. Equitable Relief, including:

1. The imposition of a constructive trust over all income, royalties, performance fees, and publishing rights generated by Plaintiff's uncredited work.
2. Restitution of all funds and assets unjustly retained by Defendant.
3. A declaratory judgment recognizing Plaintiff as co-author of all songs to which he contributed and confirming his 15% ownership interest and entitlement to 15% of gross earnings from each such song.
4. An order compelling Defendant to issue and execute Letters of Direction for all such songs retroactive to the date of release.
5. A Full Forensic Accounting of all royalties, licensing revenue, digital streaming income, tour budget disbursements, and publishing shares involving songs and services provided by Plaintiff.

6. Prejudgment Interest at the statutory rate of 9% per annum under CPLR § 5001 and § 5004, compounded annually, from the date Plaintiff's compensation and royalties were due until judgment is entered.

7. Post-judgment Interest at the statutory federal rate according to 28 U.S.C. § 1961.

8. Reasonable Attorneys' Fees and Costs, according to 18 U.S.C. § 1595, New York Labor Law § 198, and this Court's inherent equitable powers.

9. Such Other and Further Relief as this Court may deem just, proper, and equitable under the circumstances.

Dated: June 19, 2025
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## CERTIFICATE OF MERIT

To the Defendant mentioned earlier (s):  TYRONE A. BLACKBURN, being duly sworn, deposes and states the following to be true under the penalties of perjury of the State of New York.  Based on the review, I have reviewed the facts of this case and concluded that there is a reasonable basis for the commencement of this action.

Dated: June 19, 2025
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## ATTORNEY VERIFICATION

To the Defendant named above (s):

TYRONE A. BLACKBURN, an attorney duly admitted to practice in the Courts of New York State and a member of the firm T. A. Blackburn Law, PLLC., attorneys for the plaintiffs in this action, affirms under penalty of perjury, That he has read the Complaint and knows the contents thereof and that the same is true to his knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, he believes it to be true.  The sources of his information and knowledge are investigations and records in the file.  This verification is made by affirmation and not by the plaintiffs because the Plaintiffs are not within the County where the attorney has his office.

Dated: June 19, 2025
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, change, direct, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions,

156

decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

Regarding the paper information, you are directed to preserve all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents about the controversy, parties, or witnesses. Through discovery, we expect to obtain from you several documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Relevant evidence regarding electronic data created after this Complaint's delivery date should not be destroyed. You must take the steps necessary to prevent the destruction of such evidence.

Dated: June 19, 2025
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.