**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Terrance Dixon, a/k/a "TA", | Case Number: 25-5144 |
| Plaintiff, | |
| | Civil Complaint |
| v. | |
| | First Amended |
| Joseph Antonio Cartagena p/k/a "Fat Joe," | Jury Trial Demanded |
| Pete "Pistol Pete" Torres, | |
| Richard "Rich Player" Jospitre, | |
| Erica Juliana Moreira, | |
| Sneaker Addict Touring LLC, | |
| Slate, Inc., | |
| Roc Nation, LLC, | |
| John Does 1–10, and Jane Does 1–10, and | |
| ABC Corporations 1–10, | |
| Defendants. | |

Plaintiff Terrance Dixon, a/k/a "TA," by and through his undersigned counsel, T.A. Blackburn Law, PLLC, brings this civil action against Defendants Joseph Antonio Cartagena, professionally known as "Fat Joe"; Peter "Pistol Pete" Torres; Richard "Rich Player" Jospitre; Erica Juliana Moreira; Sneaker Addict Touring LLC; Slate, Inc.; Roc Nation, LLC; and John Does 1–10, Jane Does 1–10, and ABC Corporations 1–10, asserting civil claims for: (1) violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 and 1595 (forced labor); (2) conspiracy to violate the TVPA, 18 U.S.C. § 1594(b), enforceable through 18 U.S.C. § 1595; (3) violations of the New York Labor Law ("NYLL"), including §§ 193, 195, 198, and 215 (unlawful deductions, Wage Theft Prevention Act violations, and retaliation); (4) infringement of Plaintiff's copyright ownership interests under 17 U.S.C. § 501; (5) fraudulent concealment; (6) unjust enrichment; (7) aiding and abetting fraud; (8) aiding and abetting wage theft; (9) joint-employer liability under the NYLL against Roc Nation, LLC; (10) civil assault; and (11) fraudulent conveyance and imposition of a constructive trust under New York law.

This action arises from a deliberate, sustained, and multi-decade scheme of exploitation in which an internationally recognized recording artist and entertainer — Defendant Joseph Antonio Cartagena — manipulated and financially abused his longtime creative partner, Plaintiff Terrance Dixon, through a pattern of conduct involving coercion, financial manipulation, and threats.

1

From approximately 2005 through 2020, Cartagena, acting directly and through Torres, Jospitre, Moreira, and the corporate entities, systematically engaged in coercive labor exploitation, financial fraud, copyright misappropriation, violent intimidation, and psychological coercion against Plaintiff Dixon — all designed to enrich Cartagena and his associates while deliberately suppressing, silencing, and erasing Plaintiff's substantial creative, artistic, and commercial contributions, which were foundational to Cartagena's professional output, touring revenue, and recorded catalog.

Specifically:  Cartagena, through Sneaker Addict Touring LLC and Slate, Inc., paid Plaintiff a fraction of the wages contractually owed for more than 200 live performances, generating a minimum unpaid wage obligation of $600,000; issued falsified payroll records through Paychex, Inc. — bearing Plaintiff's name, employer Sneaker Addict Touring LLC, and Employee ID 023, with all federal and FICA withholding amounts fraudulently listed as "XXXX" — to conceal the true scale of the underpayment; registered copyrights to twelve musical compositions co-authored by Plaintiff in entities controlled exclusively by Cartagena, omitting Plaintiff as a named author or claimant on every registration; retained all royalties, publishing income, and catalog-sale proceeds derived from those works without accounting to or compensating Plaintiff; and used Defendant Peter Torres and others to threaten Plaintiff with physical harm, professional blacklisting, and legal persecution to prevent him from asserting his rights over a period exceeding fifteen years.

Defendant Erica Moreira, as Cartagena's business manager and officer of the corporate Defendants, and Defendant Richard Jospitre, as Cartagena's personal representative and booking intermediary, each aided, facilitated, and substantially assisted this scheme. Defendant Roc Nation LLC, as Fat Joe's manager during a material portion of the relevant period, exercised sufficient control over the terms and conditions of Plaintiff's engagement to constitute a joint employer under the NYLL and is jointly and severally liable for wage violations occurring during its management tenure.

Cartagena's pattern of deliberate financial concealment is not new: he was convicted on December 20, 2012, in the District of New Jersey (Crim. No. 12-452), of willful failure to file federal income tax returns on more than $3,700,000 in touring and royalty income received between 2007 and 2010 — the same period Plaintiff was actively performing on tour — and was sentenced to four months in federal prison. The scheme alleged in this Complaint is a continuation

of the same deliberate financial concealment architecture. Plaintiff brings this action to recover all wages wrongfully withheld, his ownership interests in co-authored musical works, compensatory and punitive damages, and equitable relief including a constructive trust over all assets traceable to his creative contributions and labor.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1595 (TVPA civil remedy). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including performances, recording sessions, contract negotiations, and threats made within New York County and the Bronx.

3. This Court further possesses supplemental jurisdiction over Plaintiff's related state law claims—including fraudulent concealment, unjust enrichment, aiding and abetting fraud, aiding and abetting wage theft, joint-employer liability under the NYLL, civil assault, and fraudulent conveyance with imposition of a constructive trust—according to 28 U.S.C. § 1367(a). These claims are so intertwined and related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4. This Court has personal jurisdiction over Defendant Joseph Antonio Cartagena, a/k/a "Fat Joe," Defendant Pete "Pistol Pete" Torres, Defendant Richard "Rich Player" Jospitre, Defendant Erica Juliana Moreira, Defendant Roc Nation, LLC, Defendant Sneaker Addict Touring LLC, Defendant Slate, Inc., and all remaining Defendants according to N.Y. CPLR § 302(a)(1), as well as constitutional due process principles, because each Defendant purposefully conducted systematic, continuous, and substantial business transactions within this jurisdiction. The wrongful conduct and predicate acts alleged herein—including fraud, exploitation, financial manipulation, violent enforcement, and concealment of Plaintiff's creative contributions—occurred substantially and directly within this judicial district.

5. During the relevant period, Defendants conducted extensive commercial and artistic operations in the Southern District of New York, including but not limited to entering performance contracts, maintaining recording studios and corporate offices, receiving royalty and licensing income, orchestrating financial and tax fraud schemes, and directly facilitating the exploitation

3

and suppression of Plaintiff's intellectual property rights, financial interests, and personal autonomy.

6. Venue is proper in the Southern District of New York according to 28 U.S.C. § 1391(b)(1) and (b)(2) because:

   1. A substantial portion of the predicate acts and wrongful conduct giving rise to the claims—including negotiation and execution of performance and publishing agreements, musical production, financial manipulation, tax fraud, concealment of authorship rights, violent enforcement directives, and acts of coercion—occurred in this judicial district.
   2. Defendants, individually and collectively, maintained significant business operations, corporate offices, creative studios, financial and contractual relationships, and music industry contacts within the Southern District of New York, rendering this venue central to Defendants coordinated business activities and the claims at issue.

7. Therefore, this Court is the appropriate and most convenient forum for adjudicating all claims asserted against each of the named Defendants in this action.

## PARTIES

**Plaintiff**

8. Terrance Dixon, a/k/a "TA," is an individual residing in the State of New York. From approximately 2005 through 2020, Plaintiff worked closely with Defendant in multiple professional capacities, including but not limited to:

   1. hype man and on-stage performer.
   2. songwriter and co-author of numerous commercially released tracks.
   3. background vocalist and creative contributor in studio productions, and
   4. tour security and logistical liaison during domestic and international events.

9. Plaintiff's work formed the creative and structural foundation for many of Defendant's recorded songs and live performances, yet he was systematically denied credit, compensation, and royalties.

**Defendants**

10. Joseph Antonio Cartagena, a/k/a "Fat Joe," is a high-profile rapper, recording artist, music executive, and entrepreneur who resides at 15189 S. River Drive Miami, Florida, United States 33169, conducts business throughout the United States, and is a principal owner or affiliate of several entertainment and touring entities.

11. Defendant Cartagena has released multiple albums under labels such as Atlantic Records, Terror Squad Entertainment, and E1 Music, generating substantial revenue from streaming, publishing, licensing, touring, and public appearances.

4

12. Defendant Cartagena held exclusive control over Plaintiff's professional opportunities and compensation during the relevant period and exercised that control to exploit Plaintiff's labor, suppress his authorship, and enrich himself at Plaintiff's expense.

13. During his time working with Defendant, Plaintiff authored or co-authored dozens of songs, including but not limited to: "Congratulations," "Money Over Bitches," "Ice Cream," "Cupcake," "Black Out," "Dirty Diana," "Porn Star," "Okay Okay," "Music," "Ha Ha," "How Did We Get Here," "No Problems," "I Chopped Up All The Way Up," "300 Brolic," "Crack House," "All I do is (Remix verse)," "Red Café (Remix)," "Winding On Me," "Coca Baby," and "Get It For Life."

14. These songs appeared on albums and projects including:

    1. *Jose 2*, *The Darkside Vol. 1*, *Elephant in the Room*, *The Fugitive*, *Loyalty*, and other collaborative efforts released through Defendant's affiliated labels and distribution networks.

15. At all relevant times, Defendant exercised sole control over contracts, budgets, tour management, licensing, and credit attribution and intentionally omitted Plaintiff's name from liner notes, publishing registrations, and royalty structures, despite Plaintiff's direct contributions to these works' creative and commercial success.

16. Pete "Pistol Pete" Torres is an individual believed to reside in the Bronx, New York, and Miami, Florida. Torres serves as Defendant Cartagena's primary enforcer, responsible for executing violent directives, enforcing discipline, and maintaining order through a pattern of coordinated threats, intimidation, and physical assault. Acting at the direction of Defendant Cartagena, Torres coordinated and carried out acts of violence, threats of retaliation, and coercive control against those perceived as disloyal, including Plaintiff. Torres's involvement in these retaliatory operations is corroborated by audio recordings and witness statements, which document his efforts to orchestrate an ambush against Plaintiff and his use of coded language—such as "pound him out" and "ketchup"—to issue violent orders on Defendant Cartagena's behalf. Torres was not a peripheral actor but a central figure in an enforcement hierarchy, entrusted with ensuring obedience through violence and reinforcing a culture of silence, dominance, and fear.

17. Richard "Rich Player" Jospitre ("Rich Player") is an individual believed to reside in New York, NY, and Miami, Florida. Jospitre acts as Defendant Cartagena's business manager and operations coordinator, coordinating threats, acts of violence, financial structuring, and

retaliation against individuals who challenged Cartagena's control, including Plaintiff. Jospitre was directly involved in orchestrating threats and retaliatory actions targeting Plaintiff, as documented through recorded communications. Upon information and belief, he negotiated performance agreements, received fees from promoters, and directed or participated in the withholding of wages owed to Plaintiff.

18. Defendant Erica Juliana Moreira is an individual residing in New York and Florida. She is an officer and/or director of Sneaker Addict Touring LLC and Slate, Inc. and served as Fat Joe's business manager, exercising control over his finances, corporate entities, payroll, and contractual arrangements. She personally created, managed, and supervised the payroll records for Plaintiff through Paychex, Inc. and directed the financial arrangements that resulted in Plaintiff's underpayment. Upon information and belief, Moreira directly communicated with Plaintiff on at least one occasion to reassure him that financial arrangements were in order, when she knew those representations to be false.

19. Sneaker Addict Touring LLC is a Florida Limited Liability Company owned, operated, or controlled by Defendant Cartagena, used to structure financial transactions and conceal the true disposition of tour revenues and wages. Specifically, Sneaker Addict Touring LLC fraudulently obtained Paycheck Protection Program (PPP) loans under false pretenses, representing nonexistent or inflated business activities to misappropriate federal funds.

20. Slate, Inc. is a Florida-based corporate entity through which Cartagena directed payments, royalties, and tour proceeds. Slate, Inc. facilitated concealment of income streams and the diversion of monies rightfully owed to Plaintiff through structured financial transactions, including shell entities like BELEEEDAT LLC, WOOO Inc., and R4 SO VALID LLC. Slate, Inc.'s financial structuring was central to concealing income streams generated from Plaintiff's uncredited labor and fraudulent financial practices.

21. Defendant Roc Nation, LLC is a Delaware limited liability company with its principal place of business in New York, New York. At all relevant times it managed Fat Joe and, through its employee Robert Castillo, exercised control over touring schedules, performance fees, contract approvals, and Plaintiff's compensation. Robert Castillo served as the Roc Nation employee to whom Plaintiff directly reported, and through whom Plaintiff raised complaints about the treatment and underpayment he was experiencing at the hands of Cartagena and his associates.

6

22. Defendant John Does 1–10 and Jane Does 1–10 are natural persons whose identities are currently unknown to Plaintiff but are believed to have aided, abetted, participated in, or benefited from the unlawful acts described herein.

23. These individuals may include members of Defendant's management team, booking agents, publishing administrators, tour managers, accountants, business associates, or other parties responsible for executing or concealing Defendant's exploitative conduct.

24. Plaintiff will amend the Complaint to name these parties as discovery progresses.

25. Defendant ABC Corporations 1–10 are corporate entities, limited liability companies, partnerships, or other business organizations whose true names and identities are unknown to Plaintiff.

26. These entities may have contracted with Plaintiff or Defendant, issued compensation, received performance or licensing income, or held intellectual property rights concerning Plaintiff's work.

27. Upon information and belief, these entities either (a) participated in misappropriating Plaintiff's labor and intellectual property or (b) have records, funds, or rights derived from Plaintiff's uncredited contributions.

28. Plaintiff will amend the Complaint to identify these entities when their identities are ascertained.

## FACTUAL BACKGROUND

### A. The Employment Relationship

29. In or around 2005, Cartagena recruited Plaintiff to join his touring company as a touring performer, hype man, creative collaborator, and recording artist. Cartagena personally represented to Plaintiff that he would be well-compensated, that they were "family," that Plaintiff's contributions to music would be recognized, and that all financial arrangements would be fair and properly documented.

30. From approximately 2005 through 2020, Plaintiff performed at hundreds of live shows across the United States and internationally as part of Fat Joe's touring operation. Plaintiff also contributed musical compositions, lyrics, vocal performances, and creative arrangements to recordings released under Fat Joe's name.

31. At all relevant times, Cartagena, acting through Sneaker Addict Touring LLC and Slate, Inc., exercised the power to hire and fire Plaintiff, supervised and controlled his work schedule and

7

conditions of employment, determined his rate and method of payment, and maintained employment records concerning his work."

32. "During the period of its management of Cartagena, Roc Nation, LLC, through Robert Castillo, also exercised functional control over Plaintiff's touring schedule and compensation, as alleged below. Sneaker Addict Touring LLC placed Plaintiff on its formal Paychex payroll as Employee ID: 023.

33. A Paychex-generated pay statement issued by Sneaker Addict Touring LLC for the pay period June 8, 2019, through June 21, 2019 (Check No. 200073, dated June 21, 2019) reflects a salary payment to Plaintiff of $1,300.30 for that period and a year-to-date gross earnings figure of $14,103.90. This annualizes to approximately $33,800 per year — far below the contractual rate of $3,000 per performance multiplied by Plaintiff's performance frequency during the year.

34. The withholding fields on the above-referenced pay statement — for Social Security, Medicare, and Federal Income Tax — are listed as "XXXX" for both the current period and year-to-date. A legitimate Paychex-generated payroll statement automatically populates these fields; their replacement with "XXXX" indicates that the statement was manually altered after generation or that the underlying payroll data was falsified to conceal the true withholding amounts.

B. **The Wage Theft Scheme**

35. The agreed per-show performance fee of no less than $3,000 per engagement was expressly communicated to Plaintiff by Cartagena orally, and was confirmed through Plaintiff's direct conversations with Jospitre, who served as the booking and payment intermediary and who on multiple occasions acknowledged to Plaintiff the per-show fee that had been agreed upon. The per-show rate is further corroborated by (a) industry-standard compensation for performers of Plaintiff's role in touring operations of comparable scale, (b) Jospitre's April–May 2023 WhatsApp acknowledgment that Plaintiff 'should get paid for' specific shows, and (c) the fact that the Paychex salary structure grossly understated actual compensation, yielding only approximately $33,800 annualized against documented performances numbering in the hundreds — an economically irrational result inconsistent with any legitimate employment agreement.

36. The Paychex salary structure was not the agreed compensation vehicle — it was the concealment mechanism. Upon information and belief, Defendants created the Paychex

8

payroll record to generate the appearance of formal employment and tax compliance while diverting the bulk of Plaintiff's earned compensation into undocumented cash payments and corporate accounts controlled by Cartagena and his entities.

37. Plaintiff performed at more than 200 shows during the relevant period. Based on the agreed per-show rate, Plaintiff was owed no less than $600,000 in performance fees alone, exclusive of any additional compensation for his recording and creative contributions.

38. Upon information and belief, Cartagena directed the underpayment scheme; Sneaker Addict Touring LLC issued payroll; Slate, Inc. received and routed revenues; and Moreira implemented payroll and financial reporting practices regularly and systematically underpaying Plaintiff by: (a) issuing salary payments far below the agreed per-show rate; (b) diverting performance fees contractually allocated to Plaintiff into entities controlled by Cartagena, Sneaker Addict Touring LLC, and Slate, Inc.; (c) tendering cash payments that were not documented and that Plaintiff could not independently verify; and (d) issuing falsified pay statements that did not accurately reflect wages earned or withheld.

39. Upon information and belief, on a specific occasion in approximately 2018, a promoter or venue paid $30,000 in connection with a performance at which Plaintiff was a material participant (performer, hype man, security). Cartagena, Sneaker Addict Touring LLC, and Slate, Inc. received this payment and applied it, upon information and belief, to Defendants' own financial obligations rather than distributing to Plaintiff his agreed share.

40. Upon information and belief, Cartagena, Sneaker Addict Touring LLC, and Slate, Inc.'s wage underpayments and unlawful deductions were knowing and willful. Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Moreira were repeatedly put on notice of the underpayments through Plaintiff's direct complaints and through financial information available to Defendants yet continued the same pay practices without correction.

C. **The Copyright Misappropriation Scheme**

41. Plaintiff made original and independently copyrightable contributions — including music, lyrics, vocal performances, and arrangements — to the following musical works registered with the United States Copyright Office, each of which was released under Fat Joe's name and commercially exploited without any compensation, authorship credit, or publishing interest being accorded to Plaintiff:

9

| Song Title | Registration No. | Registration Date | Album | Label |
|---|---|---|---|---|
| *Congratulations* | PA0001768745 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *No Problems* | PA0001774933 | September 23, 2011 | The Darkside Vol. 1 | E1 Entertainment |
| *Ice Cream* | PA0001770840 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *How Did We Get Here* | PA0001847903 | September 23, 2011 | The Darkside Vol. 1 | E1 Entertainment |
| *Ha Ha (Slow Down)* | PA0001847902 | September 23, 2011 | The Darkside Vol. 1 | E1 Entertainment |
| *Cupcake* | PA0001768886 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *Okay Okay* | PA0001768887 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *Music* | PA0001891431 | January 15, 2014 | J.O.S.E. 2 | Terror Squad Entertainment |
| *Winding On Me* | PA0001768729 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *Money Over Bitches* | PA0001847908 | September 23, 2011 | The Darkside Vol. 1 | E1 Entertainment |

| Song Title | Registration No. | Registration Date | Album | Label |
|---|---|---|---|---|
| *Porn Star* | PA0001768885 | September 23, 2011 | J.O.S.E. 2 | Terror Squad Entertainment |
| *Blackout* | PA0001891429 | January 15, 2014 | J.O.S.E. 2 | Terror Squad Entertainment |

42. Plaintiff's independently copyrightable contributions to each registered work included, without limitation, the following: (a) *Congratulations* (PA0001768745): Plaintiff authored the hook melody and lyrics in the chorus, including the phrase "congratulations you just lost the best thing you ever had," performed as the lead background vocal throughout, and contributed to the arrangement of the bridge section during studio sessions in or about 2010–2011. (b) *Money Over Bitches* (PA0001847908): Plaintiff wrote the introductory rap verse and the recurring refrain, which he performed on the master recording; his vocal performance is audible on the commercially released version. (c) *Ice Cream* (PA0001770840): Plaintiff wrote and performed the call-and-response vocal sections throughout the track, including the opening phrase and the repeated hook, and contributed to the melodic arrangement during the recording session. (d) *Ha Ha (Slow Down)* (PA0001847902): Plaintiff authored the key lyrical phrase "ha ha, slow down" that constitutes the song's title and central hook and performed it in the master recording. (e) *No Problems* (PA0001774933): Plaintiff authored and performed a featured verse as well as the background call response. (f) *Cupcake, Okay Okay, Music, Winding On Me, Porn Star, Blackout, and How Did We Get Here*: Plaintiff made analogous independently copyrightable lyrical and melodic contributions, including co-writing hooks, verses, and call-and-response elements during studio sessions conducted between 2009 and 2013, all of which were fixed in the master recordings with Plaintiff's knowledge and participation.

43. All of the above registrations were filed through Joey and Ryan Music and/or Warner-Tamerlane Publishing Corp., entities that serve as Cartagena's publishing administration vehicles. Upon information and belief, Joey and Ryan Music hold 83 registered works on behalf of Fat Joe with the U.S. Copyright Office. Plaintiff's name does not appear as an author or claimant on any of these registrations.

11

44. Plaintiff never executed any written assignment or exclusive license transferring his copyright ownership interest in any of these works to Cartagena, Joey and Ryan Music, Sneaker Addict Touring LLC, Slate, Inc., or any other person or entity.

45. Upon information and belief, Defendants reproduced, distributed, publicly performed, and licensed these works — including via streaming platforms, synchronization licenses, and record distribution — and received substantial royalty and licensing income therefrom without accounting to or paying Plaintiff any portion of that income.

46. Upon information and belief, in connection with Cartagena's announced or completed catalog sale, Plaintiff's co-authored works were among the assets transferred or valued, generating consideration that rightfully belongs in part to Plaintiff and in which Plaintiff holds a constructive trust interest.

D. **Notice to Jospitre and Moreira of Plaintiff's Claims for Credit and Payment**

47. On or about April 28, 2023, Plaintiff sent a series of WhatsApp messages to Defendant Richard "Rich Player" Jospitre explicitly listing the songs on which he had written and performed for Cartagena—including, among others, "Congratulations," "Money Over Bitches," and "Ice Cream"—and asking that he be "added on for SoundExchange" so he could "collect [his] mechanical royalties and everything else attached to [his] voice and vocals." Jospitre responded "Will do" and asked whether Plaintiff wanted him to show Cartagena "the whole text or just the songs that you feel you should get paid for," confirming his awareness that Plaintiff was asserting unpaid credit and royalty claims for specific works.

48. In the same April–May 2023 WhatsApp exchange, Plaintiff told Jospitre that he "didn't get a dime," that he needed "publishing for everything [he has] done for him," and that if he had "gotten paid or [his] publishing and everything else" he "would [be] up right now." Jospitre replied that he would "reach out to Erica," asked whether Plaintiff had contacted her "like I asked you to," and then provided Plaintiff with Defendant Erica Moreira's contact information, telling Plaintiff to let Erica know "what you want credit for and she will reach out to Joe for sure," acknowledging Moreira's role in addressing Plaintiff's missing credit and royalties.

49. Upon information and belief, These communications demonstrate that, no later than May 2023, both Jospitre and Moreira were on explicit notice that Plaintiff claimed authorship and performance contributions on the catalog identified in paragraph 39, that he had not received

12

credit or payment, and that he was demanding correction of authorship, publishing, and royalty allocations.

E. **Pattern of Financial Concealment — Cartagena's Federal Tax Conviction**

50. Cartagena's prior criminal conviction for tax fraud directly corroborates and contextualizes the scheme alleged herein. On December 20, 2012, Cartagena pled guilty before U.S. Magistrate Judge Cathy L. Waldor to two counts of willful failure to file income tax returns covering income received in 2007 and 2008 from his touring entities — Terror Squad Production Inc., Miramar Music Touring Inc., and FJTS Corp. — during which time Plaintiff was actively performing on tour with him.

51. Cartagena admitted to receiving gross income more than $1,300,000 in 2007, more than $1,400,000 in 2008, more than $320,000 in 2009, and more than $680,000 in 2010. The total tax loss to the government was $718,038. He was sentenced on June 24, 2013, to four months in federal prison.

52. The entities through which Cartagena received this income — including Miramar Music Touring, Inc. — were the same touring infrastructure through which Plaintiff performed. Cartagena's knowing use of these entities to conceal income from the IRS during the same period he was underpaying Plaintiff is direct evidence of a consistent, deliberate scheme of financial concealment, not an isolated lapse.

F. **The Forced Labor and Coercion Scheme**

53. Throughout the relationship, Cartagena used a combination of threats, financial dependency, isolation, and psychological manipulation to prevent Plaintiff from leaving or asserting his rights.

54. On multiple occasions between approximately 2014 and 2019, Plaintiff attempted to withdraw from touring or to condition his participation on payment of agreed compensation. Each time, those efforts were met with immediate escalation: threats that he would be "blackballed," warnings that associates would "handle [him] in the street," and instructions that he had to continue traveling for scheduled shows. After these incidents, Plaintiff reasonably believed that refusing to appear would trigger both economic retaliation (loss of all future work in the industry) and physical harm by individuals associated with Cartagena and Torres.

55. Upon information and belief, Torres, at Cartagena's direction, communicated direct and implied threats of physical harm to Plaintiff if he refused to continue performing or attempted to publicly assert his rights.

1. On or about June 2019, after Plaintiff expressed reluctance to continue performing without proper compensation, Torres told Plaintiff words to the effect of, "If you don't get on that plane, we'll have people waiting for you back in the Bronx," which Plaintiff understood as a direct threat of immediate physical harm if he refused to perform.

2. On at least several occasions between approximately 2014 and 2020, when Plaintiff attempted to discuss leaving the touring operation or hiring independent representation, Cartagena explicitly stated that Plaintiff would "never work in this business again," that he would be "blackballed from every label and every venue," and that "people would handle you in the street" if he went against Cartagena and his associates.

3. In or about 2023, after Plaintiff complained to Jospitre about unpaid show money, Jospitre told Plaintiff that Cartagena "has lawyers that will bury you" and that Plaintiff would be "fighting cases for the rest of [his] life and won't see a dime" if he pursued legal action, which Plaintiff reasonably understood as a threat to weaponize the legal system to financially destroy him.

56. Throughout the period from 2005 through 2020, the threats described herein were not isolated incidents but constituted a continuous, overlapping pattern of coercion that operated concurrently with each performance Plaintiff was compelled to attend. Specifically, on or about each occasion Plaintiff expressed hesitation about performing or demanded payment — including but not limited to approximately 2010, 2013, 2014, 2016, and 2018 — Cartagena and/or Torres communicated, either directly or through intermediaries, that failure to appear or perform would result in physical harm, professional destruction, or both. Each such instance of coercion directly preceded and caused Plaintiff to board transportation to, and appear at, the threatened performance.

57. According to Plaintiff, Cartagena and Jospitre threatened to blacklist Plaintiff and to destroy his professional reputation; associates acting in concert with Torres threatened physical harm to Plaintiff and his children.

58. According to Plaintiff, Cartagena and Jospitre threatened to abuse legal process by warning Plaintiff that Cartagena 'has lawyers that will bury you' and that he would be 'fighting cases for the rest of his life and won't see a dime' if he pursued legal action.

59. Upon information and belief, the threatened harms were sufficiently serious that a reasonable person in Plaintiff's situation — a performer from the Bronx who had no independent management, no legal representation, no written contracts, and no income source other than through Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation — would have felt compelled to continue performing and providing services despite receiving inadequate compensation.

14

60. Upon information and belief, as a direct and proximate result of these threats, Plaintiff continued to perform at hundreds of shows, contribute to recordings, and refrain from asserting wage or copyright claims over a period exceeding fifteen years, during which time Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation retained the full benefit of his contributions.

    1. Upon information and belief, Cartagena, Torres, Jospitre, Moreira, Sneaker Addict Touring LLC, and Slate, Inc. coordinated among themselves to maintain this coercive scheme by communicating about Plaintiff's complaints, scheduling performances in which Plaintiff's labor was required while underpaying him, and structuring payroll and corporate arrangements that concealed the true flow of funds, all with the common purpose of obtaining Plaintiff's labor and services through means prohibited by 18 U.S.C. § 1589.

61. In addition to using Torres and other associates, Cartagena personally communicated threats to Plaintiff through a burner Instagram account using the handle "Bittgggg" (and similar variants), which repeatedly described itself as "biggest in the game," mirroring Cartagenas long-standing public moniker and branding. Through this account, Cartagena told Plaintiff, among other things, "Don't u think people gotta be made an example of? … So others will understand not to cross," "If u do this door is closed… but don't worry ups is hiring," "Be very careful… we let you live," "U love ur family right," and that he did not "need to lift a finger" because "everyone [is] willing to do it for me," which Plaintiff understood as threats that Cartagena would orchestrate physical harm and total professional blacklisting of Plaintiff, and potentially his family, if he continued to assert his claims or release videos documenting Defendants misconduct.

62. Although Plaintiff sometimes responded defiantly in these exchanges as a coping mechanism, he in fact took Cartagenas threats seriously, altered his daily routines, avoided certain neighborhoods in New York, and implemented safety precautions for his children, further demonstrating that these threats caused Plaintiff to reasonably fear serious harm and reinforced the coercive scheme that compelled him to continue providing services despite inadequate compensation. This response pattern is consistent with recognized psychological responses to prolonged coercion, in which outward defiance coexists with genuine subjective compulsion.

G. **The Retaliation**

63. On or about March 2025, Plaintiff, through counsel at T.A. Blackburn Law, PLLC, sent written demand letters to Defendants asserting his rights under the New York Labor Law and demanding payment of unpaid wages and statutory damages.

15

64. Within weeks of receiving these demands, Cartagena, with the assistance of Torres and associates using the 'Bittgggg' and 'westcoast_cleezy' accounts, initiated or threatened retaliatory legal proceedings against Plaintiff and communicated renewed threats designed to deter him from proceeding with this litigation.

65. The burner Instagram accounts described above—including "Bittgggg" and "westcoast_cleezy"—escalated their threats immediately after Plaintiff, through counsel, sent the March 2025 NYLL demand letters and began releasing videos discussing Defendants misconduct, explicitly referencing the videos, warning Plaintiff that "business is business… biggest in the game… you are not ready… look around," and telling him to "be very careful… we let you live," thereby linking the threats directly to Plaintiff's protected activity and attempt to vindicate his rights.

66. Upon information and belief, these retaliatory acts were undertaken because Plaintiff engaged in protected activity under NYLL § 215 by complaining of wage violations and asserting his rights under the NYLL.

H. **Torres's Physical Threats**

67. Defendant Torres operates or controls the Instagram account "westcoast_cleezy," which uses his image, displays his nickname "Pistol Pete," and is confirmed to be Torres through video messages showing his face sent directly to Plaintiff. Beginning in 2023 and continuing through 2025, Torres used this account and coordinated with associates using other accounts to send Plaintiff direct threatening messages while Plaintiff was asserting his wage and royalty claims.

68. In or about 2023–2024, an Instagram account using the name "Pablo Escobar" and acting in concert with Torres sent Plaintiff a direct message stating, "I'm giving a buck 50 that's my word," which Plaintiff reasonably understood as a threat to slash his face with a blade—a form of serious physical harm commonly associated with that phrase in New York street vernacular.

69. Around the same period, an associate of Defendants using the name "Jefe" messaged Plaintiff, "for real ta they will hurt you I know who you are and where you live at… leave that situation alone… raise your kids… I don't want anything to happen to you," which Plaintiff understood as a direct threat that he and his children would be attacked if he continued to pursue his unpaid-wage and royalty claims.

70. Between 2023 and 2025, Torres, using the "westcoast_cleezy" account, sent Plaintiff multiple threatening messages, including statements such as "You got 48 hrs to fall back yap, you been

16

warned son," "I'm telling u what I'm going to do to u so beware… I'm going to give it to u for sure," "You could have Jesus with you… you food & we gonna eat," and "You put that video up and imma make u pay in the worst way," which Plaintiff understood as threats that Torres and his associates would locate and violently attack him if he continued to speak publicly about Defendants exploitation.

71. Another associate messaged Plaintiff that Torres "knows you're in Florida in Wesley Chapel" and urged Plaintiff to "just let it go," which Plaintiff understood as confirmation that Torres or his network knew where Plaintiff and his family lived, heightening the credibility and immediacy of the threats.

72. In a recorded telephone conversation on May 19, 2023, Torres described how "my hood [is] gonna bring it right over there… always done get dealt with accordingly," stated that anyone who "violated" Cartagena "gotta get… hands on," and discussed other individuals being "pounded out," reinforcing Plaintiff's fear that physical violence would be used against him for asserting his legal rights.

73. The threats were credible to Plaintiff because Torres and his associates had a known reputation for carrying out violence against individuals who challenged Cartagena, referenced specific methods of harm (including "buck 50" facial slashing), demonstrated knowledge of Plaintiff's and his family's locations, and communicated in coordinated fashion across accounts. This combination of demonstrated capacity, specific threats, and location awareness made the risk of harm immediate and real.

74. Although Plaintiff at times responded to these messages with bravado, he took the threats seriously, avoided certain locations where Torres and his associates were known to frequent, limited his family's movements, and experienced ongoing apprehension that he could be attacked at any time, including in connection with performances and public appearances.

75. These threats were intentional, were directed specifically at Plaintiff in retaliation for his assertion of wage, royalty, and copyright claims, and were made in circumstances in which Torres had the apparent present ability—through his network of associates and knowledge of Plaintiff's location—to carry them out, causing Plaintiff a reasonable apprehension of imminent harmful or offensive bodily contact. Plaintiff reasonably believed that the threatened harm could be carried out immediately and without further warning.

17

I.  **Roc Nation's Role as Joint Employer**

76. During the period of Roc Nation's management of Fat Joe, Roc Nation LLC, through its employee Robert Castillo, exercised the following control over Plaintiff's work: (a) scheduling and approving tour dates on which Plaintiff was required to perform; (b) negotiating or approving the terms of performance agreements that determined Plaintiff's compensation; (c) serving as Plaintiff's direct supervisory point of contact regarding performance requirements, expectations, and complaints; (d) exercising supervisory authority over the manner in which touring activities were conducted; and (e) communicating directly with Plaintiff through Robert Castillo regarding the terms, structure, and continuation of his compensation, including approving the tour budgets under which Plaintiff's per-show fees were nominally included but not guaranteed or enforced, and having the power, directly or indirectly, to require that Plaintiff's fee be paid as a separate contractual line item but declining to exercise that power despite Castillo's knowledge of the chronic underpayment.

77. Plaintiff directly reported to Robert Castillo and on multiple occasions complained to Castillo about the underpayment, mistreatment, and exploitative conditions he was experiencing at the hands of Cartagena and his associates. Castillo received these complaints on behalf of Roc Nation in his capacity as a Roc Nation employee. Upon information and belief, Castillo relayed or had a duty to relay these complaints to Roc Nation management, and Roc Nation took no corrective action.

78. Plaintiff's complaints to Castillo were not limited to underpayment alone. On multiple occasions during Roc Nation's management tenure, Plaintiff expressly communicated that he feared retaliation if he refused to continue performing under the existing conditions, including fear of professional blacklisting and harm from individuals associated with Cartagena. Plaintiff further conveyed that he was being pressured to continue performing despite not receiving agreed compensation and despite his attempts to address these issues internally.

79. Upon information and belief, based on Castillo's role as Plaintiff's direct supervisory contact, his responsibility for overseeing touring operations, and his access to tour schedules, budgets, and financial records, Castillo understood that Plaintiff's continued labor was being obtained under coercive conditions rather than through voluntary, fairly compensated engagement. Castillo's knowledge is attributable to Roc Nation, which continued to approve, facilitate, and profit from touring activities involving Plaintiff without taking corrective action.

18

80. Upon information and belief, Roc Nation, through Castillo and other personnel, had the authority to intervene in touring arrangements, require that Plaintiff be compensated directly and transparently, or halt Plaintiff's participation in tours where compensation disputes and coercive conditions existed. Despite this authority and knowledge, Roc Nation failed to act and instead continued to facilitate the touring structure through which Plaintiff's labor was obtained, thereby knowingly benefiting from and substantially assisting the continuation of the coercive scheme.

1. Upon information and belief, in or about 2017 to 2020, during Roc Nation's management, Roc Nation, through Castillo and other personnel, approved a tour budget and performance schedule that listed Plaintiff as part of the touring party but contained no separate line item or contractual provision ensuring payment of Plaintiff's agreed per-show fee of no less than $3,000. Despite Plaintiff's prior complaints to Castillo about chronic underpayment, Roc Nation took no steps to correct the budget, require that Plaintiff be paid directly, or otherwise ensure that his wages were protected, further demonstrating Roc Nation's control over, and knowing participation in, the wage-theft scheme.

81. Upon information and belief, Roc Nation had the power to exclude Plaintiff from tours or to direct that he be included, to approve or reject the financial terms under which he performed, and to access and direct the maintenance of records reflecting his performances and compensation.

82. Upon information and belief, Roc Nation's formal control over Plaintiff satisfies the four-factor test applied in this District. Specifically: (a) *Hire and Fire*: Roc Nation, through Castillo, had the power to include or exclude Plaintiff from specific tours and international appearances — decisions that functionally determined whether Plaintiff was engaged or released for each performance cycle. (b) *Supervision and Conditions*: Castillo served as Plaintiff's direct supervisory contact and established performance expectations, requirements, and standards of conduct for all touring engagements approved by Roc Nation. (c) *Rate and Method of Payment*: Roc Nation approved tour budgets that included Plaintiff as a touring party member but contained no contractual provision for the $3,000 per-show fee — a structural decision that directly enabled the underpayment by creating a compensation gap that Cartagena's entities then exploited. (d) *Employment Records*: As the management entity approving tour budgets, performance schedules, and promoter contracts, Roc Nation had access to, and the obligation to maintain, records documenting Plaintiff's performances and compensation obligations.

19

83. Upon information and belief, Roc Nation managed Defendant Cartagena during the period from approximately 2016 through 2020. During this tenure, Plaintiff performed at no fewer than 10 shows approved by Roc Nation through Castillo and other managers. The wage violations attributable to Roc Nation's joint-employer period include, without limitation, all shows conducted under tour schedules approved by Roc Nation for which Plaintiff received less than the agreed $3,000 per-show rate. Plaintiff will identify the specific performance dates and venues attributable to the Roc Nation management period through discovery, including Roc Nation's tour approval records, promoter contracts, and Castillo's communications.

84. Roc Nation's joint-employer status is further evidenced by the fact that Castillo's supervision of Plaintiff was not incidental to Fat Joe's management — it was a functional necessity of Roc Nation's management mandate. Roc Nation could not effectively manage Cartagena's touring business without exercising authority over the performers, including Plaintiff, who were integral to delivering the touring product Roc Nation was engaged to manage. Roc Nation's economic benefit from Plaintiff's labor was direct: Roc Nation earned management commissions calculated as a percentage of Cartagena's gross touring revenues — revenues that were generated, in substantial part, by Plaintiff's performances. This direct financial stake in Plaintiff's labor, combined with Castillo's supervisory control, satisfies the economic-realities test for joint-employer liability.

85. Upon information and belief, the economic reality of the relationship between Roc Nation, Cartagena, Sneaker Addict Touring LLC, and Plaintiff was one of an integrated enterprise in which Roc Nation functioned as a joint employer of Plaintiff under the NYLL.

86. Cartagena, Torres, and associates continued threats and coercive communications through at least 2024 and 2025, including threats, coercive communications, and acts of concealment occurring within the applicable limitation's periods.

87. Plaintiff could not have discovered the full scope of Defendants' misconduct earlier because Cartagena, Sneaker Addict Touring LLC, Slate, Inc., Moreira, and Jospitre continuously controlled payroll systems, publishing registrations, royalty reporting, and contractual documentation, and affirmatively withheld or obscured information necessary to reveal the discrepancies. Plaintiff discovered key facts underlying his claims between 2023 and 2025 after obtaining records and communications previously concealed.

J. **Equitable Tolling and Accrual of Claims**

88. Plaintiff's claims are timely under applicable limitations periods for the following independent reasons:

(a) Fraudulent Concealment Tolling: Defendants' active concealment of material facts—including falsified wage statements listing withholding amounts as "XXXX," omission of Plaintiff from copyright registrations for works he co-authored, and non-disclosure of publishing agreements, royalty splits, and tour settlement documents—prevented Plaintiff from discovering the true extent of his injury until he retained independent counsel and obtained Copyright Office records, Paychex documents, and witness recordings in 2023–2025. Under the discovery rule and fraudulent concealment doctrine, Plaintiff's claims did not accrue until he discovered, or reasonably could have discovered, the concealed facts.

(b) Continuing Violation Doctrine (NYLL): Each paycheck issued, each wage statement furnished, and each payroll period worked constitutes a separate violation under NYLL §§ 193, 195, and 198. Plaintiff received paychecks and performed services through at least 2019–2020, bringing those violations within the six-year limitations period. The wage-statement violation reflected in the June 21, 2019, Paychex statement alone falls within the limitations period.

(c) Coercion-Based Tolling (TVPA): Plaintiff's claims under 18 U.S.C. § 1589 are timely because the coercive conduct itself—including threats of physical harm, professional blacklisting, and abuse of legal process—prevented Plaintiff from safely asserting his rights. Courts apply equitable tolling where a plaintiff was coerced into silence by the same defendants now invoking the limitations defense. Defendants' threats continued through March 2025 and escalated immediately after Plaintiff retained counsel, demonstrating ongoing coercion that tolled any limitations period.

(d) Copyright Claims (17 U.S.C. § 507): Each act of reproduction, distribution, public performance, and licensing of the works identified in paragraph 40 constitutes a separate act of infringement. Defendants continued to exploit these works commercially through streaming platforms, synchronization licenses, and catalog sales through at least 2023–2025, bringing those infringement acts within the three-year limitations period. Additionally, Plaintiff's ownership claims are not subject to a statute of limitations—co-ownership may be asserted at any time.

(e) Retaliation (NYLL § 215): The retaliation claim arises from conduct occurring in March–May 2025, immediately after Plaintiff sent demand letters and released videos, and is therefore timely under any applicable period.

(f) Plaintiff's Specific Discovery Timeline: Plaintiff did not, and could not with reasonable diligence have, discovered the full scope of Defendants' misconduct until the following events occurred: (a) *Prior to 2023*: Plaintiff was aware that he was being underpaid relative to his expectations but did not have access to the underlying financial records, royalty structures, publishing registrations, or split sheets necessary to quantify the discrepancy or identify the specific legal violations. All such materials were within Defendants' exclusive control. Plaintiff received no accounting statements, tour settlement documents, royalty statements, or publishing agreements at any time during the relationship, despite oral assurances that he would receive his percentage. (b) *April–May 2023*: Plaintiff first discovered through independent research and Jospitre's WhatsApp responses that his name did not appear on SoundExchange or publishing registrations for the works he co-authored, prompting him to retain independent counsel and request

Copyright Office records. (c) *2025*: Counsel obtained U.S. Copyright Office records confirming Plaintiff's omission from all 12 registrations identified above, obtained the falsified Paychex wage statement (Check No. 200073), and identified the "XXXX" withholding entries as fraudulent manipulation — facts that were not ascertainable by Plaintiff without access to these documents. (d) *2023*: Plaintiff obtained audio recordings, witness statements, and communications documenting Torres's threat network and confirming the scale of the coercive scheme. None of these facts were reasonably discoverable before 2023, given Defendants' exclusive control over financial records, their repeated false assurances, and their active suppression of Plaintiff's inquiry through threats and concealment.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF NEW YORK LABOR LAW §§ 193 AND 198
### UNLAWFUL DEDUCTIONS AND FAILURE TO PAY WAGES
*(Against Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation, LLC as joint employer)*

89. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

90. At all relevant times, Plaintiff was an employee within the meaning of the NYLL. Cartagena exercised operational control; Sneaker Addict Touring LLC functioned as employer of record; Slate, Inc. received and controlled revenue streams; and Roc Nation exercised joint-employer control during its management tenure,  and were Plaintiff's employers within the meaning of NYLL §§ 190 and 651 based on their exercise of functional control over Plaintiff's schedule, compensation, and working conditions. Sneaker Addict Touring LLC was Plaintiff's employer of record, as confirmed by the Paychex payroll records identifying Plaintiff as Employee ID: 023. During its management tenure, Roc Nation, LLC functioned as Plaintiff's joint employer as alleged.

91. Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation exercised control over Plaintiff's work by dictating performance schedules, locations, and conditions; controlling compensation and payment methods; and integrating Plaintiff's services into their core touring and recording operations. Plaintiff did not operate an independent business and depended on Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation for access to performance opportunities and income.

92. Upon information and belief, Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation made unlawful deductions from Plaintiff's earned wages and failed to pay agreed wages in violation of NYLL § 193, including by: (a) diverting performance fees allocated to Plaintiff into entities they controlled; (b) issuing pay statements that falsely stated wages paid and

22

omitted wages owed; and (c) retaining cash payments from promoters that were contractually owed to Plaintiff.

93. The agreed compensation between the parties included a per-show performance fee of no less than $3,000 per engagement. Plaintiff performed at more than 200 shows during the relevant period, generating a minimum wage obligation of $600,000 in performance fees, of which substantially all remains unpaid.

94. Cartagena's wage violations were knowing and willful and were implemented through payroll and financial systems controlled by Moreira and the corporate entities. Defendants were repeatedly notified of the underpayments and took no corrective action.

95. Upon information and belief, Roc Nation, as a joint employer, is jointly and severally liable for the full amount of Plaintiff's unpaid wages accrued during the period of Roc Nation's management engagement.

96. Plaintiff is entitled to recover unpaid wages, liquidated damages in an equal amount, prejudgment interest, attorneys' fees, and costs pursuant to NYLL § 198.

**COUNT II**
**VIOLATION OF NEW YORK LABOR LAW § 195**
**WAGE THEFT PREVENTION ACT**
***(Against Sneaker Addict Touring LLC, Sneaker Addict's officer Erica Juliana Moreira, and Roc Nation, LLC as joint employer)***

97. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

98. Upon information and belief, Sneaker Addict Touring LLC, acting through Moreira violated NYLL § 195(1) by failing to provide Plaintiff, at the time of his hiring or at any time thereafter, with a written notice accurately stating his regular rate of pay, overtime rate, pay basis, regular payday, and the true legal name of his employer including any d/b/a names.

99. Upon information and belief, Sneaker Addict Touring LLC, acting through Moreira violated NYLL § 195(3) by failing to furnish Plaintiff with accurate wage statements with each payment, including by omitting: total hours worked, gross wages, net wages, the amount and purpose of any deductions, correct employer name, and dates covered by each payment. The Paychex pay statement for the period ending June 21, 2019 (Check No. 200073) constitutes a facially non-compliant wage statement under § 195(3) in that it lists all federal and FICA withholding amounts as "XXXX," rendering the statement false on its face.

100. Upon information and belief, because of Sneaker Addict Touring LLC's and Moreira's failures, Plaintiff was injured by Defendants' failure to provide accurate written

notices and wage statements because he was deprived of the ability to determine whether he was being paid all earned wages and to challenge unlawful deductions in real time.

101.    Each failure to provide a compliant wage notice constitutes a violation entitling Plaintiff to $50 per workday, up to $5,000, pursuant to NYLL § 198(1-b). Each failure to provide a compliant wage statement constitutes a violation entitling Plaintiff to $250 per workday, up to $5,000, pursuant to NYLL § 198(1-d). Plaintiff is also entitled to costs and attorneys' fees.

**COUNT III**
**TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. § 1589**
**FORCED LABOR, SEX TRAFFICKING BY COERCION (Forced Sexual Acts,**
**Enterprise-Wide Complicity, and Pattern of Exploitation)**

*(Against Cartagena, Moreira, Jospitre, Torres, Sneaker Addict Touring LLC, and Slate, Inc.)*

102.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

### 1. Forced Labor

103.    The Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, prohibits any person from knowingly obtaining the labor or services of another person by means of: (a) force, threats of force, physical restraint, or threats of physical restraint; (b) serious harm or threats of serious harm; (c) abuse or threatened abuse of law or legal process; or (d) any scheme, plan, or pattern intended to cause the person to believe that, if he did not perform the labor or services, he would suffer serious harm or physical restraint.

104.    Plaintiff's coerced labor included extensive domestic and international travel for Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation's benefit. Plaintiff possesses flight itineraries, boarding passes, hotel confirmations, backstage and event credentials, and passport entry and exit stamps reflecting dozens of trips he took solely to perform, write, or provide touring support for Defendants, further confirming Defendants' control over his movements, schedule, and working conditions.

105.    These records show that Plaintiff repeatedly traveled on short notice at Cartagena's direction, often with no written agreements and under circumstances where, because of Defendants' threats and his financial dependence on them, he reasonably believed he had no safe or realistic alternative but to continue accepting these assignments despite chronic underpayment and escalating intimidation.

106.    At all relevant times, Cartagena, acting directly and through Torres, Jospitre, Moreira, Sneaker Addict Touring LLC, and Slate, Inc., knowingly obtained and benefited from

Plaintiff's labor and services as a touring performer, hype man, songwriter, recording artist, creative contributor, and security/logistics aide in connection with Fat Joe's touring and recording operations.

107. Cartagena obtained and maintained Plaintiff's labor through direct threats and control; Torres enforced those threats; Jospitre reinforced coercive pressure through financial and reputational threats; and Moreira maintained the financial structures that ensured Plaintiff's dependence.

108. These threats included, among other things, messages from Defendant Torres and associates referencing "buck 50" slashing, giving Plaintiff "48 hrs to fall back," promises that Plaintiff would be "made an example of," and statements that "we let you live," which Plaintiff reasonably understood as threats of severe bodily harm or death if he continued to assert his rights or speak publicly.

109. Torres and associates acting at Cartagena's direction used threats directed at Plaintiff's family to coerce his continued compliance. Associates warned Plaintiff that Defendants knew where he and his children lived, told him to "raise your kids… leave that situation alone," and asked whether he "love[d] [his] family," which Plaintiff understood as an implication that his children could be targeted if he did not remain silent and compliant.

110. Defendant Cartagena personally reinforced this coercive environment by communicating through a burner social-media account that identified itself with his public moniker "biggest in the game." Through that account, Cartagena told Plaintiff that people "gotta be made an example of," that if Plaintiff "do[es] this door is closed" and he should look for work at UPS, boasted that he did not "need to lift a finger" because "everyone [is] willing to do it for" him, and warned Plaintiff to "be very careful" because Defendants "let [him] live," all of which signaled that Cartagena could and would marshal violence and industry power against Plaintiff if he refused to comply.

111. Defendants also threatened serious non-physical harm, including financial ruin and permanent professional blacklisting. Cartagena told Plaintiff that if he ever went against Cartagena and his associates, he would "never work in this business again," would be blackballed from every label and venue, and that people would "handle [him] in the street." Defendant Jospitre told Plaintiff that Cartagena "has lawyers that will bury you" and that if Plaintiff pursued legal action he would be "fighting cases for the rest of [his] life and won't

25

see a dime," which Plaintiff understood as a threat to weaponize the legal system and impose crushing, ruinous litigation.

112.    Cartagena, through his control of touring opportunities and compensation structures implemented by Moreira and Jospitre, compounded those threats by making Plaintiff economically dependent on them. For years, Plaintiff's only meaningful source of income was through Defendants' touring and recording operations. Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation controlled his schedule, travel, and access to performance opportunities, while systematically underpaying him and withholding accurate wage statements, leaving Plaintiff without savings, alternative employment, or independent management.

113.    Through this combination of physical threats, family-based intimidation, threats of blacklisting and financial destruction, and deliberate creation of economic dependence, scheme, plan, and pattern intended to cause Plaintiff to believe—and that in fact caused him to believe—that if he refused to continue performing and providing services, or if he publicly asserted his rights, he would suffer serious physical harm, harm to his children, catastrophic financial injury, and permanent exclusion from his chosen profession.

114.    Upon information and belief, Defendant Moreira participated in and furthered this scheme by controlling Plaintiff's payroll and financial information, assuring him that "everything was in order" while knowing he was being underpaid, and maintaining the financial opacity that made it impossible for Plaintiff to safely disengage or negotiate for fair compensation. Her conduct helped keep Plaintiff dependent on Defendants and fearful that leaving would leave him and his family destitute.

115.    Upon information and belief, Defendant Jospitre participated in and furthered this scheme by simultaneously acting as a friendly intermediary and delivering threats on Cartagena's behalf—telling Plaintiff that Cartagena's lawyers would "bury" him, that pursuing legal recourse would leave him with nothing, and by continuing to route show money and business dealings through entities controlled by Defendants while Plaintiff remained unpaid.

116.    Upon information and belief, Defendant Torres participated in and furthered this scheme by serving as Cartagena's primary enforcer, repeatedly issuing violent threats in person and via social media, referencing ambushes, "pounding out" perceived enemies, and coordinating with others to communicate to Plaintiff that people were "outside," knew his location, and were

prepared to act. Torres's willingness and ability to use violence made the threats against Plaintiff credible and immediate.

117.    Upon information and belief, Sneaker Addict Touring LLC and Slate, Inc. participated in and benefited from this forced-labor scheme by serving as the corporate vehicles through which Plaintiff's underpaid labor was monetized. These entities received touring and catalog revenues while paying Plaintiff a fraction of the promised per-show rate, issuing falsified or incomplete pay statements, and maintaining opaque financial structures that concealed the true scope of Defendants' earnings from Plaintiff's work.

118.    Upon information and belief, Cartagena directed and controlled the scheme; Torres enforced threats of physical harm; Jospitre controlled payment flows and reinforced coercive pressure; Moreira maintained financial structures that concealed underpayment and sustained Plaintiff's dependency; and the corporate Defendants served as instrumentalities through which Plaintiff's labor was obtained and monetized.

119.    The threats and coercive tactics Defendants employed were sufficiently serious that a reasonable person in Plaintiff's circumstances would have felt compelled to continue providing labor and services for Defendants despite chronic underpayment and exploitation. Plaintiff, in fact, felt he had no safe or realistic alternative.

120.    Upon information and belief, each named conspirator committed one or more specific overt acts in furtherance of the conspiracy to obtain Plaintiff's labor through prohibited means, including without limitation: (a) *Cartagena*: (i) personally issuing physical threats via the "Bittgggg" burner Instagram account; (ii) directing Torres to threaten Plaintiff in connection with the June 2019 Las Vegas performance; (iii) directing Jospitre to communicate legal-process threats to Plaintiff in 2023; and (iv) retaining 100% of tour revenues and royalties derived from Plaintiff's coerced performances. (b) *Torres*: (i) telling Plaintiff "if you don't get on that plane, we'll have people waiting for you back in the Bronx" in June 2019, thereby compelling a specific performance; (ii) using the "westcoast_cleezy" Instagram account to send Plaintiff threats of facial laceration, violent retaliation, and family harm between 2023 and 2025; and (iii) coordinating with associates who confirmed knowledge of Plaintiff's home address in Wesley Chapel, Florida, to heighten the immediacy and credibility of the physical threats. (c) *Moreira*: (i) procuring the June 21, 2019 Paychex wage statement listing all federal and FICA withholdings as "XXXX" to conceal the true scale of underpayment; (ii) falsely

27

assuring Plaintiff that "financial arrangements were in order" to prevent him from seeking independent accounting; and (iii) controlling Plaintiff's access to payroll and financial records necessary for him to assess and assert his compensation rights. (d) *Jospitre*: (i) telling Plaintiff in 2023 that Cartagena "has lawyers that will bury you" and that Plaintiff would be "fighting cases for the rest of his life"; (ii) routing performance fees received from promoters through Cartagena-controlled entities rather than distributing Plaintiff's agreed share; and (iii) serving as intermediary between Cartagena and Plaintiff while concealing the full scope of the underpayment scheme. (e) *Sneaker Addict Touring LLC and Slate, Inc.*: (i) issuing falsified Paychex payroll records as the nominal employer of record; (ii) receiving and retaining tour revenues contractually owed to Plaintiff; and (iii) serving as the corporate vehicles through which proceeds of Plaintiff's coerced performances were laundered and concealed through affiliated shell entities (BELEEEDAT LLC, WOOO Inc., R4 SO VALID LLC).

121. Defendants owed Plaintiff an independent duty of disclosure arising from (a) the fiduciary-adjacent relationship between a creative collaborator and the entity controlling his publishing rights, compensation records, and professional registration; (b) the specific undertakings Cartagena made at the outset of the relationship to ensure Plaintiff was credited, compensated, and protected; and (c) Moreira's role as the administrator and officer of the entities employing Plaintiff, which imposed an affirmative duty to provide accurate wage records under NYLL § 195. This independent duty is separate from, and in addition to, Defendants' general duty not to deceive.

122. Plaintiff lacked a reasonable alternative to continuing his work because:

(a) Financial Dependency: Defendants controlled Plaintiff's only meaningful source of income. Plaintiff had no independent management, no written contracts, no alternative employment in the music industry, and no savings due to chronic underpayment. Leaving would have meant immediate destitution for Plaintiff and his family, with no realistic prospect of alternative employment given Cartagena's threats to blacklist him industry-wide.

(b) Credible Threat of Physical Harm: Torres and associates had a demonstrated capacity and willingness to carry out violence. Torres directed an orchestrated ambush attempt documented in audio recordings and used coded language ("pound him out," "ketchup") to coordinate violent retaliation. Associates confirmed they knew Plaintiff's home address in Wesley Chapel, Florida, and the location of his children, making the threat concrete and inescapable.

(c) Industry Blacklisting: Cartagena explicitly threatened that Plaintiff would "never work in this business again" and would be "blackballed from every label and every venue." Given Cartagena's industry influence, longstanding relationships with major labels (Atlantic,

Terror Squad, E1), and control over publishing administration through Joey and Ryan Music, this threat was credible and would have effectively ended Plaintiff's music career.

(d) Legal Process Abuse: Jospitre threatened that Cartagena "has lawyers that will bury you" and that Plaintiff would be "fighting cases for the rest of [his] life and won't see a dime," which Plaintiff understood as a threat to weaponize litigation to financially destroy him through protracted, expensive legal battles he could not afford.

(e) Isolation and Information Control: Defendants controlled all financial records, publishing agreements, royalty statements, and contractual documentation. Plaintiff had no independent access to information necessary to assess his legal claims or seek outside counsel safely. This information asymmetry made it functionally impossible for Plaintiff to assert his rights without first securing independent legal representation, which he could not afford until 2025. Defendants' withholding of royalty statements, split sheets, and tour settlements prevented Plaintiff from quantifying his claims or retaining counsel earlier, thereby reinforcing his dependence and inability to exit without risking uncompensated loss and retaliation.

123. Plaintiff lacked practical means to transition to alternative employment because Defendants controlled his access to venues, promoters, and collaborators in the same market segment, and he had no independent management or contracts that would permit him to secure comparable work. Defendants' threats of industry-wide blacklisting, combined with their control over touring pipelines and relationships, effectively foreclosed Plaintiff's ability to replace that income without exposing himself to the threatened harms.

124. Upon information and belief, but for Defendants' threats, coercion, abuse of legal and financial processes, and creation of economic dependency, Plaintiff would not have continued performing and providing services under the conditions described herein.

125. As a direct and proximate result of Defendants' violations of the TVPA, Plaintiff was compelled over a period of many years to perform hundreds of shows, engage in extensive recording and creative work, and refrain from asserting wage, copyright, and other legal claims, all while Defendants retained the benefits of his labor and he suffered severe financial losses, emotional distress, and ongoing fear for his and his family's safety.

126. Upon information and belief, Defendants Joseph Antonio Cartagena, Pete "Pistol Pete" Torres, Richard "Rich Player" Jospitre, Erica Juliana Moreira, Sneaker Addict Touring LLC, and Slate, Inc. knowingly agreed and conspired to obtain Plaintiff's labor and services through the coercive means described above, in violation of 18 U.S.C. § 1594(b), including by coordinating threats, routing payments through common entities, and jointly maintaining the financial and corporate structures that concealed underpayment and reinforced Plaintiff's dependence.

127.    Upon information and belief, each of these Defendants committed one or more overt acts in furtherance of the conspiracy, including issuing threats, arranging underpaid performances, falsifying or withholding financial information, and using corporate entities to receive and retain the benefits of Plaintiff's coerced labor.

128.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover compensatory damages, including for emotional distress and economic losses; punitive damages; and his reasonable attorneys' fees and costs from each Defendant who participated in, or knowingly benefited from, the forced-labor venture and related conspiracy.

### 1. Sex Trafficking

129.    Under 18 U.S.C. § 1591(a), it is unlawful to knowingly recruit, entice, harbor, transport, provide, obtain, maintain, or solicit any person for a commercial sex act knowing, or in reckless disregard of the fact, that the person was caused to engage in that act by means of force, fraud, or coercion. A "commercial sex act" is defined by § 1591(e)(3) as any sex act on account of which anything of value is given to or received by any person. "Coercion" under § 1591(e)(2) includes: (A) threats of serious harm or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm; and (C) the abuse or threatened abuse of law or legal process. "Serious harm" under § 1591(e)(5) includes any harm — whether physical, psychological, financial, or reputational — sufficiently serious under all surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or continue performing commercial sexual activity. Under 18 U.S.C. § 1595(a), a victim of a violation of § 1591 may bring a civil action against the perpetrator and against any person who knowingly benefits, financially or by receiving anything of value, from participation in a venture that person knew or should have known has engaged in a violation. The civil statute of limitations under § 1595(c) is ten (10) years from the date the cause of action arose.

### A. The Commercial Sex Act Nexus

130.    Throughout the period from approximately 2005 through 2020, Defendant Cartagena repeatedly arranged, orchestrated, and directed sexual encounters involving Plaintiff following domestic and international live performances, tour events, and private studio sessions. These encounters were not consensual — they were carefully arranged by Defendant in environments fully controlled by him, and Plaintiff's compliance was driven entirely by the credible and

30

persistent threat of retaliation, including loss of income, removal from the tour, stranding in foreign countries, and physical harm.

131.    On each occasion Defendant arranged or directed a sexual encounter involving Plaintiff, Plaintiff's compliance was the explicit or implicit condition upon which Defendant: (a) authorized Plaintiff's return transportation home following out-of-town and international engagements; (b) continued Plaintiff's access to the touring schedule and associated performance fees; and (c) refrained from imposing the economic punishment and physical retaliation Plaintiff had been repeatedly threatened with. Each such act constitutes a "commercial sex act" under § 1591(e)(3) because Plaintiff's access to return travel, income, continued employment, and physical safety — each a thing of value — was given to or received by Plaintiff or by Defendant on account of Plaintiff's compliance.

132.    When Plaintiff attempted to resist or assert boundaries, Defendant Cartagena swiftly retaliated: Plaintiff's pay was withheld, his travel plans were abruptly canceled, or he was threatened with abandonment in foreign countries without access to money, shelter, or safe passage home. These tactics were specifically designed to instill fear and reinforce Defendant's total control over Plaintiff's body and behavior, and to ensure that Plaintiff understood that continued access to income and safe return travel was conditioned on sexual compliance.

133.    Plaintiff possesses physical documentary evidence — including flight itineraries, boarding passes, backstage credentials, show passes, and passport entry and exit stamps — confirming his presence at specific domestic and international performances in connection with which the coerced sexual encounters described herein occurred. These records confirm Plaintiff's interstate and international travel by common carrier, satisfying the "in or affecting interstate or foreign commerce" requirement of § 1591(a). The following specific incidents are within the ten-year civil limitations period of 18 U.S.C. § 1595(c):

B. **Specific Incidents**

134.    **Incident 1 — Miami Post-Concert Coercion (Domestic Performance, Enterprise Witnesses Present).** On one occasion in Miami, Florida, following a live concert performance for which Plaintiff's attendance is corroborated by show credentials and travel records in his possession, Defendant Cartagena brought a woman back to his hotel suite and ordered Plaintiff to engage in sexual activity with her in front of the group. Defendant insisted the bathroom door remain open and shouted direct, explicit verbal commands to Plaintiff to participate.

31

Members of the Cartagena Enterprise — including JB and Defendant Pete "Pistol Pete" Torres — were present in the room watching and commenting throughout the encounter. Plaintiff did not participate willingly. His compliance was driven by the credible threat of retaliation, including the loss of income, removal from the tour, and public humiliation. Plaintiff's continued access to touring income, schedule inclusion, and return transportation — things of value — were given on account of his compliance within the meaning of § 1591(e)(3). The presence of Torres and other Enterprise members in the room corroborates both the coercive environment and the enterprise-wide knowledge of Defendant's conduct.

135.    **Incident 2 — Canceled Return Flight Following Refusal (International Performance).** On at least one occasion during an international touring engagement — for which Plaintiff possesses passport exit and entry stamps and corresponding boarding pass records — Plaintiff communicated his unwillingness to participate in a sexual encounter Defendant had arranged. In direct and immediate response, Defendant Cartagena canceled Plaintiff's scheduled return flight home and left Plaintiff stranded abroad without funds, without shelter, and without access to safe return transportation for several days. Plaintiff's return home — constituting paid air transportation, access to shelter, and restoration of income — was the thing of value withheld as direct punishment for sexual non-compliance and restored only upon Plaintiff's subsequent compliance. Defendant Cartagena was the person who arranged the transportation, controlled whether it was provided or withheld, and withheld it specifically in response to Plaintiff's non-compliance, satisfying 18 U.S.C. §§ 1591(a)(1) and 1591(e)(3).

136.    **Incident 3 — Non-Consensual Recording During Coerced Encounter, Domestic Performance.** On at least one occasion following a domestic live performance — corroborated by show credentials and travel records in Plaintiff's possession — Defendant Cartagena summoned Plaintiff to his hotel room, where Defendant had arranged an encounter with a female. Defendant directed Plaintiff to participate in sexual acts in Defendant's physical presence. When Plaintiff expressed reluctance by feigning illness, Defendant Cartagena explicitly disregarded Plaintiff's communicated discomfort and issued a direct verbal command to participate. Plaintiff complied solely out of fear of economic punishment and physical retaliation. During the encounter, Defendant Cartagena produced his mobile phone and recorded Plaintiff's genitalia without Plaintiff's knowledge or consent. Plaintiff's continued

access to touring income, schedule inclusion, and authorized travel — things of value — were given on account of his compliance within the meaning of § 1591(e)(3).

C. **Coercion — Means Employed**

137.    Defendant Cartagena obtained Plaintiff's compliance in each of the above incidents and throughout the broader pattern of coerced sexual conduct through the following independent means of coercion, each satisfying 18 U.S.C. §§ 1591(e)(2) and 1591(e)(5):

(a) Physical threats and demonstrated capacity for violence. Defendant Cartagena repeatedly warned Plaintiff that "nobody leaves Terror Squad in one piece" and invoked by name the face-slashing of former associate Cuban Link as a concrete demonstration of the consequences of disloyalty. Defendant Torres, acting at Cartagena's direction, reinforced these threats operationally through explicit threats of facial laceration, ambush, and death, and by confirming through associates that Plaintiff's home address and the location of his children were known to Defendant's network. A reasonable person in Plaintiff's position — a performer from the Bronx with no independent management, no financial resources, and no personal security — would have been compelled to continue complying with Defendant's demands.

(b) Economic coercion through stranding and income withholding. Defendant used cancellation of return travel and withholding of show fees as direct, immediate punishment for non-compliance, and chronic underpayment — $150 to $250 per show against an agreed $3,000 fee — to ensure Plaintiff had no savings, no alternatives, and no ability to exit without destitution. This constitutes a scheme and pattern under § 1591(e)(2)(B) intended to cause Plaintiff to believe that non-compliance would result in serious financial harm.

(c) Threatened abuse of legal process. Defendant Jospitre, at Defendant Cartagena's direction, told Plaintiff that Cartagena "has lawyers that will bury you" and that Plaintiff "would be fighting cases for the rest of his life and won't see a dime." These statements constitute threatened abuse of legal process under § 1591(e)(2)(C).

(d) Deliberate public humiliation as a control mechanism. Defendant Cartagena orchestrated coerced sexual encounters in the presence of Enterprise members — including Torres and JB — for the purpose of degrading Plaintiff, stripping him of dignity and agency, and reinforcing to all observers that Plaintiff's body and behavior were subject to Defendant's total control. This public dimension of the coercion made the threat of further humiliation a standing deterrent against non-compliance.

D. **Enterprise-Wide Pattern and Venture Liability Under § 1595**

138.    The acts described above were not isolated incidents. Defendant Cartagena's conduct toward Plaintiff was part of a broader, deliberate pattern of coercive control in which Defendant employed financial isolation, deprivation of basic resources, manipulation of travel and lodging arrangements, systematic extraction of unpaid creative labor, and coerced sexual compliance to dominate and exploit subordinate artists, staff, and creative collaborators within the Cartagena Enterprise. This method of operation constitutes an established structure of

exploitation — not incidental conduct — in which Defendant exercised full control over the lives, careers, bodies, and identities of those who worked closest to him.

139. The coerced sexual encounters described herein were witnessed by, and in certain instances participated in by, other Enterprise members including Torres, JB, and other security and touring staff who stood in the room during these encounters and made no intervention. This enterprise-wide awareness and complicity — with Enterprise members present as audience and enforcers — demonstrates that the sexual coercion was integral to the culture and functioning of the Enterprise, not peripheral to it.

140. Defendant Roc Nation, LLC, which assumed management of Defendant Cartagena's affairs in or around 2016, either knew or should have known of the repeated incidents described herein. The events took place at branded venues, involved staff operating under Roc Nation's management supervision, and were discussed openly within touring circles. Roc Nation's employee Robert Castillo served as Plaintiff's direct supervisory contact and received Plaintiff's complaints about the coercive conditions of his engagement. Despite this knowledge, Roc Nation took no disciplinary action, performed no internal review, and continued to collect management commissions, royalties, and brand equity derived from Defendant Cartagena's public persona — a persona built in part on the coerced and unpaid labor and sexual compliance of Plaintiff. Roc Nation's continued financial benefit from the Enterprise's operations, with knowledge of the coercive conditions under which that benefit was generated, subjects it to venture liability under 18 U.S.C. § 1595(a).

E. **Coded Enterprise Language as Evidence of Knowledge and Intent**

141. A key operational feature of the Cartagena Enterprise was the deliberate use of coded language to communicate directives — including directives to coerce, assault, and sexually exploit — while concealing the true nature of those communications from outsiders and law enforcement. Defendant Cartagena and his senior associates regularly used the following terms as internal codes to direct violence, sexual coercion, and other unlawful conduct:

- *"The Dern"* / *"The Don"* — references to Defendant Cartagena.
- *"Boantches"* — targeted females.
- *"Payops"* — coerced or violent sexual acts.
- *"Calpy"* — to physically assault or slap.
- *"Coolin"* — referring to a bodily orifice.
- *"Ketchup"* — stabbing and/or slashing.
- *"Matonden"* — kill them or him.

34

- *"Theory"* — a target's intimate partner or family member; and
- *"Corpen"* — to place a victim in a casket.

142. These terms were used in text messages, in-person conversations, studio communications, and backchannel directives to coordinate enforcement actions, silence dissenters, and direct the most extreme forms of violence and sexual coercion without exposing the Enterprise to immediate scrutiny. The existence and consistent use of this internal lexicon establish the organized, hierarchical, and methodical nature of the Enterprise's operations and constitutes direct evidence of deliberate concealment of unlawful conduct — including the sexual coercion at the core of this Count.

F. **Defendant's Knowledge**

143. Defendant Cartagena's knowledge is established beyond dispute by his direct participation in each incident: he personally arranged each encounter; remained physically present throughout; issued direct verbal commands when Plaintiff communicated reluctance; conducted a non-consensual recording in Incident 3; and personally, executed the economic punishment of canceling Plaintiff's return travel when Plaintiff initially refused. There is no inference required — Defendant was the perpetrator, the coercer, and the direct beneficiary of each commercial sex act.

G. **Damages**

144. As a direct and proximate result of Defendant Cartagena's violations of 18 U.S.C. § 1591, and the venture liability of the remaining Defendants under § 1595(a), Plaintiff has suffered and continues to suffer: severe psychological trauma including symptoms consistent with post-traumatic stress disorder, suicidal ideation, dissociation, persistent anxiety, and emotional detachment, for which he continues to receive trauma-informed therapeutic treatment; the lasting degradation of his personal dignity, autonomy, and sense of safety over more than fifteen years; economic losses flowing from the coercive conditions that kept him bound to the Enterprise; and all other harm proximately caused by Defendants' conduct. Plaintiff is entitled to recover all damages available under 18 U.S.C. § 1595(a), including compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT IV
## COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501
### *(Against Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Joey and Ryan Music)*

145.    Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

146.    Plaintiff is a co-author and co-owner of the musical compositions and sound recordings identified above in this Complaint, having made independently copyrightable contributions of music, lyrics, vocal performance, and arrangement to each work, with the intent that his contributions be merged with those of the other authors into a unitary work.

147.    Plaintiff asserts that he is a co-owner of the works identified in paragraph 40 and seeks (a) a judicial declaration of co-ownership, (b) a full accounting of all royalties, licensing fees, synchronization income, and catalog-sale proceeds derived from those works, and (c) an award of Plaintiff's pro-rata share of all such proceeds. To the extent any Court determines that Plaintiff is not a co-owner, Plaintiff pleads copyright infringement in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

148.    At the time Plaintiff made each of the contributions described above, both Plaintiff and Cartagena intended that those contributions would be merged with each other's contributions into a single, unitary musical work. This shared intent is demonstrated by: (a) the physical co-presence of Plaintiff and Cartagena during studio recording sessions where Plaintiff's vocals and lyrical contributions were simultaneously recorded alongside Cartagena's verses and instrumentation; (b) Cartagena's failure to object to or exclude Plaintiff's contributions during or after the recording and mixing process; (c) Jospitre's April 2023 response of "Will do" when Plaintiff specifically requested authorship credit and SoundExchange registration, which constitutes a party admission that Plaintiff's contributions to the identified works were recognized and were in the parties' contemplation at the time of creation; (d) Cartagena's public identification of Plaintiff as a creative partner and collaborator, including through touring credits and promotional materials; and (e) the absence of any work-for-hire agreement, exclusive license, or written assignment — an absence that, under 17 U.S.C. § 204(a), means that no transfer of Plaintiff's copyright ownership interest was ever legally effected.

149.    Plaintiff did not grant Defendants an implied license to exploit the works identified in paragraph 40. An implied license exists only where the copyright holder's conduct unambiguously demonstrates an intent to authorize the specific use at issue. Here, (a) Plaintiff repeatedly requested credit, compensation, and accounting throughout the relationship and was

36

rebuffed or threatened; (b) Plaintiff's silence was not consent — it was coerced by Defendants' threats of physical harm, professional blacklisting, and litigation abuse; and (c) a license procured through coercion, concealment, and fraudulent assurances cannot be enforced as an implied license. Any claimed implied license is voidable on grounds of fraudulent inducement.

150.    Plaintiff never executed any written assignment, work-for-hire agreement, or exclusive license transferring his copyright ownership interest in any of the works identified above to Cartagena, Joey and Ryan Music, Sneaker Addict Touring LLC, Slate, Inc., or any other person or entity.

151.    To the extent Defendants contend Plaintiff is a joint author, Plaintiff seeks an accounting, disgorgement, and recovery of his proportional share of all revenues, royalties, and proceeds derived from the works. Alternatively, to the extent Plaintiff is not deemed a co-owner due to Defendants' fraudulent registration and exclusion of Plaintiff from authorship records, Defendants are liable for copyright infringement under 17 U.S.C. § 501.

152.    Upon information and belief, all registrations identified above were obtained without Plaintiff's knowledge or authorization and omit Plaintiff as a named author, thereby misrepresenting the authorship of each work to the Copyright Office.

153.    Upon information and belief, after fixing Plaintiff's contributions in tangible form, Defendants reproduced, distributed, publicly performed, and licensed the works identified above, including via streaming platforms, physical distribution, synchronization licenses, and catalog sales, without Plaintiff's authorization and without accounting to or paying Plaintiff any share of royalties or other income derived from those exploitations.

154.    Upon information and belief, Defendants' infringement has been willful in that Defendants had direct knowledge of Plaintiff's contributions to each work, deliberately omitted him from copyright registrations and publishing agreements, and continued to commercially exploit the works after receiving notice of Plaintiff's claims.

155.    Upon information and belief, as a co-author deprived of his ownership interest by Defendants' fraudulent registration and exploitation, Plaintiff is entitled to recover his share of actual damages and profits attributable to infringement, as well as statutory damages and attorneys' fees pursuant to 17 U.S.C. §§ 504 and 505.

37

**COUNT V**
**NEW YORK LABOR LAW § 215**
**RETALIATION**
*(Against Cartagena, Sneaker Addict Touring LLC, Slate, Inc., and Roc Nation, LLC)*

156.    Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

157.    NYLL § 215 prohibits an employer from discharging, penalizing, or discriminating against any employee because such employee has made a complaint about wage violations or exercised any right afforded under the NYLL.

158.    New York courts have held that NYLL § 215's anti-retaliation protection extends to former employees who are retaliated against for asserting wage claims arising from their prior employment. Plaintiff's protected activity — the March 2025 demand letters and public assertions of wage and copyright claims — arose directly from the employment relationship, and the retaliatory conduct was explicitly triggered by and directed at that protected assertion of rights, regardless of whether the employment itself had concluded.

159.    Plaintiff engaged in protected activity by retaining T.A. Blackburn Law, PLLC and sending written demand letters in or about March 2025 asserting rights under the NYLL and demanding payment of unpaid wages and statutory damages.

160.    Within a materially close temporal proximity, Cartagena, acting through Torres and other associates, threatened retaliatory legal proceedings and escalated social-media threats; Sneaker Addict Touring LLC and Slate, Inc., at Cartagena's direction, threatened to withhold or did withhold payments; and Roc Nation, despite Plaintiff's complaints, took no steps to protect him from retaliation.

161.    Upon information and belief, the retaliatory acts were undertaken specifically because Plaintiff engaged in protected activity, as evidenced by the close temporal proximity between the demand letters and Cartagena, acting through Torres and associated accounts, engaged in retaliatory conduct, and the absence of any legitimate non-retaliatory basis for that conduct.

162.    These retaliatory actions by Cartagena, Torres, and associated entities conduct would dissuade a reasonable employee from making or supporting a complaint about wage violations and in fact caused Plaintiff to lose performance opportunities, industry relationships, and income.

163.    Plaintiff is entitled to recover damages, including lost compensation, compensatory damages, injunctive relief, and attorneys' fees, pursuant to NYLL § 215(2).

38

## COUNT VI
## <u>FRAUDULENT CONCEALMENT</u>
### *(Against Cartagena, Moreira, and Jospitre)*

164.     Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

165.     Cartagena, Moreira, and Jospitre owed Plaintiff a duty to disclose material facts concerning tour revenues, royalty and publishing income, copyright registrations, publishing splits, and tax reporting because: (a) they possessed superior and, in many instances, exclusive knowledge of those matters; (b) they controlled all accounting, corporate, and intellectual-property interfaces with third parties; and (c) they held themselves out as Plaintiff's trusted managers, business partners, and fiduciaries, repeatedly assuring him that he was "family," that "everything is taken care of," and that he would receive his agreed percentage of earnings.

166.     Beginning no later than 2010 and continuing through at least 2024, Defendants engaged in a deliberate course of concealment that included, without limitation, the following specific acts:

1.  On or about September 23, 2011, Cartagena, acting through Joey And Ryan Music and Warner-Tamerlane Publishing Corp., caused copyright registrations to be filed for the musical works identified in paragraph 39 (including "Congratulations," "Ice Cream," "Cupcake," "How Did We Get Here," "Ha Ha (Slow Down)," "Money Over Bitches," and others), omitting Plaintiff as a co-author and co-owner despite knowing that Plaintiff authored or co-authored lyrics, melodies, and hooks for each such composition.

2.  On or about June 21, 2019, Moreira caused a Paychex wage statement to be issued to Plaintiff (Check No. 200073, for the pay period June 8–21, 2019) in the name of Sneaker Addict Touring LLC, reflecting artificially low year-to-date earnings of 14,103.90 and listing all federal income tax, Social Security, and Medicare withholding fields as "XXXX," thereby concealing the true amount of wages, withholdings, and reported income and preventing Plaintiff from verifying what he had actually been paid or reported.

3.  On multiple occasions between approximately 2015 and 2020, including in New York City after Plaintiff complained about missing money from a 30,000 promoter payment, Jospitre told Plaintiff that "the numbers are being fixed," that "Erica is handling it," and that "you're straight," while knowing that Plaintiff's name remained off split sheets and registrations and that monies allocable to Plaintiff were being diverted to satisfy Cartagena's personal tax liabilities and debts.

167.     Upon information and belief, Cartagena, together with Moreira and Jospitre, further concealed from Plaintiff: (a) the existence and terms of publishing, administration, and catalog-sale agreements monetizing the works listed in paragraph 39; (b) the true gross and net receipts of U.S. and international tours on which Plaintiff performed; and (c) the submission of back-dated and "ghost" split sheets to performance-rights organizations and publishers that

39

excluded Plaintiff, all of which were within Defendants' exclusive knowledge and control and never disclosed despite Plaintiff's repeated requests for "paperwork," "statements," and "contracts."

168.    In light of Defendants' superior knowledge, their exclusive control over relevant records, and their repeated oral assurances that Plaintiff would be "taken care of" and had a secure percentage interest, Plaintiff justifiably relied on Defendants' omissions and deceptive half-truths and did not discover the falsity of Defendants' representations until 2023–2025, when he obtained copyright records, payroll documents, and witness recordings revealing that: (a) his works had been registered solely in Cartagena-controlled entities; (b) his payroll records had been falsified; and (c) Defendants had internally acknowledged a percentage interest for Plaintiff while externally erasing him from all contractual chains. Plaintiff reasonably relied on these omissions and half-truths because Defendants exclusively controlled payroll systems, publishing registrations, and royalty reporting, and did not provide Plaintiff access to underlying agreements or financial records necessary to verify his compensation.

1.  Plaintiff did not and could not have discovered Defendants' fraudulent concealment earlier despite reasonable diligence because Defendants never provided him with royalty statements, split sheets, publishing agreements, or tour settlement documents, despite his repeated requests for "paperwork," "statements," and "contracts." All such materials were within Defendants' exclusive control and were not accessible to Plaintiff until he retained independent counsel, who obtained U.S. Copyright Office records, Paychex documents, and recordings from third parties beginning in 2023.

2.  Had Plaintiff known that he was being systematically excluded from copyright registrations, split sheets, publishing agreements, and accurate wage records, he would have ceased performing on tour and contributing to recordings no later than 2011–2012, retained independent legal counsel, registered his contributions under his own name, and promptly filed civil actions for wage theft and copyright infringement, thereby preventing further harm.

169.    Specifically, in direct reliance on Jospitre's statement in approximately 2015–2020 that 'the numbers are being fixed' and 'you're straight,' Plaintiff continued to perform on tour through 2020 without retaining independent counsel or asserting formal wage claims. Had Plaintiff known that no corrections were being made, he would have ceased performing and sought legal counsel no later than 2017.

170.    Upon information and belief, Cartagena's concealment, implemented and facilitated by Moreira and Jospitre was intentional and calculated to: (a) deprive Plaintiff of his co-ownership and co-authorship interests; (b) suppress wage, royalty, and tax-related claims; (c) evade tax

40

and regulatory scrutiny; and (d) maximize Defendants' personal enrichment by diverting royalties, publishing income, and touring revenue.

171.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff suffered substantial damages, including but not limited to unpaid wages, lost royalty and publishing income, exposure to tax liability on falsified wage data, and the loss of professional credit, reputation, and standing in the music industry.

**COUNT VII**
**UNJUST ENRICHMENT**
*(Against Cartagena, Sneaker Addict Touring LLC, and Slate, Inc.)*

172.    Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

173.    Plaintiff pleads unjust enrichment as an alternative and independent basis for recovery, separate from and in addition to any contractual or statutory claims, pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent any court determines that no enforceable contract governs a particular aspect of the relationship, equity requires disgorgement of the benefits Defendants obtained from Plaintiff's uncompensated labor and creative contributions.

A. **Benefits Conferred on Cartagena**

174.    Plaintiff conferred concrete benefits on Defendant Joseph Antonio Cartagena by: (a) performing at hundreds of live shows as Fat Joe's touring performer and hype man from approximately 2005 through 2020; and (b) creating original musical, lyrical, vocal, and arrangement contributions to recordings released under Cartagena's name, including the twelve copyrighted works identified in paragraph 39.

175.    Upon information and belief, Cartagena knowingly accepted and retained these benefits by: (a) collecting gross performance fees and backend revenue from more than 200 shows at which Plaintiff appeared; (b) exploiting the works identified in paragraph 39 solely in his own name through streaming, publishing, licensing, synchronization, and catalog-sale transactions; and (c) retaining 100% of the royalty income and catalog value attributable to those works without allocating Plaintiff any ownership or royalty share.

176.    Upon information and belief, Cartagena was enriched by at least $600,000 in unpaid performance fees alone, plus royalty and catalog-sale proceeds derived from Plaintiff's co-authored works.

41

### B. Benefits Conferred on Sneaker Addict Touring LLC

177.    Plaintiff conferred concrete benefits on Sneaker Addict Touring LLC by performing at shows booked, contracted, and paid through that touring entity, thereby enabling Sneaker Addict to receive performance fees, backend revenue, and associated tour income that depended on Plaintiff's participation.

178.    Upon information and belief, Sneaker Addict Touring LLC knowingly accepted and retained these benefits by: (a) receiving promoter payments and tour income for shows at which Plaintiff was a material performer; (b) issuing artificially low payroll entries that understated Plaintiff's compensation; and (c) generating falsified Paychex wage statements listing federal and FICA withholdings as "XXXX" to conceal the true level of underpayment.

179.    Upon information and belief, Sneaker Addict Touring LLC was enriched by retaining performance fees contractually owed to Plaintiff while paying him only a fraction of the agreed per-show rate of not less than $3,000 per performance.

### C. Benefits Conferred on Slate, Inc.

180.    Plaintiff conferred concrete benefits on Slate, Inc. by creating and performing on musical works and tours whose revenues, royalties, and catalog value were routed through Slate, Inc. and affiliated entities controlled by Cartagena.

181.    Upon information and belief, Slate, Inc. knowingly accepted and retained these benefits by: (a) receiving and holding royalty, publishing, and catalog-related revenues arising from the works identified in paragraph 39; and (b) facilitating concealment of income streams and the diversion of monies rightfully owed to Plaintiff through structured financial transactions involving shell entities such as BELEEEDAT LLC, WOOO Inc., and R4 SO VALID LLC.

182.    Upon information and belief, Slate, Inc. was enriched by retaining royalty and catalog-sale proceeds attributable in part to Plaintiff's co-authored works, even though Plaintiff never executed any written assignment or exclusive license transferring his ownership interest in those works.

### D. Plaintiff's Corresponding Deprivation

183.    Plaintiff suffered a corresponding deprivation because he: (a) did not receive the agreed per-show compensation for hundreds of performances; (b) received no authorship credit or royalty participation in the registered works identified in paragraph 39; and (c) received no share of catalog-sale proceeds or advances attributable in part to his co-authored works.

184. Plaintiff was left without savings, residual income, or equity in the assets his labor and creative contributions helped create.

E. **Against Equity and Good Conscience**

185. Under these circumstances, equity and good conscience do not permit Cartagena, Sneaker Addict Touring LLC, or Slate, Inc. to retain the benefits of Plaintiff's labor and creative contributions without paying him the reasonable value of those benefits, particularly where: (a) Defendants concealed true tour revenues and payroll information through falsified Paychex statements; (b) Defendants intentionally omitted Plaintiff from copyright registrations and royalty structures; and (c) Defendants used threats, coercion, and financial opacity to prevent Plaintiff from asserting his rights sooner.

186. Defendants' enrichment is independent and distinct from, and in the alternative to, their contractual and statutory wage obligations under the NYLL and federal copyright law.

F. **Relief Sought**

187. Plaintiff is therefore entitled to restitution from Cartagena, Sneaker Addict Touring LLC, and Slate, Inc., jointly and severally, in an amount to be determined at trial, including but not limited to: (a) the reasonable value of his touring services for more than 200 performances; and (b) the reasonable value of his co-authorship and performance contributions to the works identified in paragraph 39 and any catalog-sale or royalty revenues derived therefrom.

188. In addition, equity requires the imposition of a constructive trust over: (a) all royalty, publishing, and catalog-sale proceeds derived from the works identified in paragraph 39; and (b) any other assets, accounts, or contractual rights traceable to Plaintiff's uncredited labor and creative contributions, in order to prevent Defendants from being unjustly enriched at Plaintiff's expense.

**COUNT VIII**
**<u>AIDING AND ABETTING FRAUD</u>**
*(Against Moreira and Jospitre)*

189. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

190. Cartagena committed an underlying fraud by, among other things: (a) falsely assuring Plaintiff, over many years, that Plaintiff would receive a defined percentage of all revenues from songs he co-wrote and tours on which he performed; (b) causing copyright registrations and split sheets to be filed that omitted Plaintiff as co-author and co-owner; and (c) diverting

tour and publishing revenues while issuing falsified wage records and withholding information necessary for Plaintiff to detect the fraud.

191. Upon information and belief, Moreira had actual knowledge of Cartagena's fraudulent scheme because she personally created, supervised, and approved payroll entries and Paychex wage statements for Sneaker Addict Touring LLC and Slate, Inc., including the June 21, 2019 statement with "XXXX" in all tax-withholding fields, which could not have been generated in the ordinary course without deliberate manipulation designed to hide the true disposition of funds.

192. Upon information and belief, Jospitre had actual knowledge of Cartagena's fraudulent scheme because he: (a) personally negotiated or relayed performance terms with promoters; (b) regularly received gross show payments before any distribution to Plaintiff; (c) heard and acknowledged Plaintiff's repeated complaints that he was not receiving his promised 3,000 per show or any share of backend money; and (d) participated in recorded conversations with third parties discussing retaliation against Plaintiff for "violating" Cartagena by speaking out about the money.

1. On or about April 28–May 10, 2023, Plaintiff sent detailed WhatsApp messages to Jospitre identifying by name the songs and albums he wrote with and for Cartagena—including "Congratulations," "Money Over Bitches," and "Ice Cream"—stating that he had not "gotten a dime" or publishing and requesting that he be added to SoundExchange and allowed to collect his mechanical royalties and other income tied to his vocals. Jospitre acknowledged these requests, responded "Will do," asked whether to show Cartagena "the whole text or just the songs that you feel you should get paid for," and then directed Plaintiff to contact Moreira and told him that Erica would "reach out to Joe for sure," confirming that both Jospitre and Moreira were aware of Plaintiff's specific unpaid-credit and unpaid-royalty claims.

193. Upon information and belief, With that knowledge, Moreira substantially assisted the fraud by: (a) structuring, implementing, and maintaining the payroll and corporate-shell architecture that allowed Cartagena to systematically underpay Plaintiff while creating the false appearance of formal employment and tax compliance; (b) generating and approving wage statements and internal ledgers that understated Plaintiff's compensation, concealed the disposition of tour receipts, and prevented Plaintiff from detecting discrepancies between promoter payments and his own pay; and (c) failing to correct or disclose the concealed registrations, splits, and income flows despite Plaintiff's direct inquiries.

194. Upon information and belief, With knowledge of the fraud, Jospitre substantially assisted by: (a) accepting promoter and venue payments and routing them into Cartagena-controlled accounts without ensuring that Plaintiff's agreed-upon share was segregated or remitted; (b) disbursing only nominal flat amounts in cash or via doctored payroll, far below the contractual rate; (c) reassuring Plaintiff that the financial issues would be "fixed" while knowing that no such corrections were being made; and (d) participating in retaliatory planning calls intended to intimidate Plaintiff into continued silence about the financial misconduct.

195. By providing this substantial assistance with actual knowledge of Cartagena's fraudulent misrepresentations and concealments, Moreira and Jospitre are liable for aiding and abetting fraud under New York law.

196. As a direct and proximate result of Moreira's and Jospitre's aiding and abetting, Plaintiff has suffered the same categories of damage identified above, including lost wages, lost royalties and publishing income, destruction of authorship credit, and severe economic and emotional harm.

**COUNT IX**
**AIDING AND ABETTING WAGE THEFT**
*(Against Moreira, Jospitre, and Roc Nation, LLC)*

197. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

A. **Primary Wage-Theft Violations**

198. Cartagena, Sneaker Addict Touring LLC, and Slate, Inc. committed primary violations of NYLL §§ 193, 195, and 198 by: (a) failing to pay Plaintiff his agreed per-show rate of not less than $3,000 per performance; (b) diverting show proceeds contractually allocated to Plaintiff into entities they controlled; (c) issuing pay statements that misrepresented wages earned and tax withholdings by listing all federal and FICA amounts as "XXXX"; and (d) making unlawful deductions from earned wages by retaining monies paid by promoters for Plaintiff's services.

199. These violations were knowing and willful. Cartagena, Sneaker Addict Touring LLC, and Slate, Inc. were repeatedly put on notice of the underpayments through Plaintiff's direct complaints and through financial information available to them yet continued the same pay practices without correction.

B. **Moreira's Knowledge and Substantial Assistance**

200. Upon information and belief, Defendant Erica Moreira had actual knowledge of the primary wage-theft violations because she: (a) personally created, managed, and supervised

the payroll records for Plaintiff through Paychex, Inc.; (b) served as an officer and/or director of Sneaker Addict Touring LLC and Slate, Inc., the entities through which Plaintiff was paid; (c) exercised control over Cartagena's finances, corporate entities, and contractual arrangements; and (d) directly communicated with Plaintiff on at least one occasion to reassure him that financial arrangements were in order, when she knew those representations to be false.

201.    Specifically, on or about June 21, 2019, Moreira caused a Paychex wage statement to be issued to Plaintiff (Check No. 200073, Employee ID: 023) reflecting artificially low year-to-date earnings of $14,103.90 and listing all federal income tax, Social Security, and Medicare withholding fields as "XXXX." A legitimate Paychex-generated payroll statement automatically populates these fields; their replacement with "XXXX" indicates that the statement was manually altered after generation or that the underlying payroll data was falsified to conceal the true withholding amounts and wages paid.

202.    Upon information and belief, Moreira further had actual knowledge that Plaintiff was owed substantially more than the amounts reflected on his pay statements because: (a) she had access to tour settlement sheets, promoter contracts, and gross receipts showing what Cartagena's entities were receiving for shows at which Plaintiff performed; (b) she controlled the bank accounts and corporate entities into which those receipts were deposited; and (c) Plaintiff directly complained to her and to Jospitre (who then directed Plaintiff to contact Moreira) about missing wages, unpaid backend revenue, and lack of proper documentation.

203.    In April–May 2023, Jospitre explicitly told Plaintiff to contact Moreira and let her know "what you want credit for, and she will reach out to Joe for sure," acknowledging Moreira's role in addressing Plaintiff's missing wages, credit, and royalties. This communication put Moreira on explicit notice that Plaintiff claimed he had not received proper payment for his work.

204.    With that knowledge, Moreira substantially assisted the wage-theft scheme by:

   a. Structuring the payroll infrastructure – Creating and maintaining the Paychex payroll system through Sneaker Addict Touring LLC that systematically underpaid Plaintiff while creating the false appearance of formal employment and tax compliance.
   b. Generating falsified wage statements – Producing pay statements that listed tax withholdings as "XXXX," understated gross earnings, and prevented Plaintiff from verifying what he had actually been paid or what had been reported to tax authorities.

46

c.  Maintaining financial opacity – Refusing to provide Plaintiff with complete financial records, tour settlement sheets, or documentation of gross receipts despite his repeated requests for "paperwork," "statements," and "contracts".

d.  Concealing the disposition of funds – Directing payments from promoters and venues into corporate accounts she controlled while ensuring that Plaintiff received only a fraction of his contractually agreed compensation.

e.  Providing false assurances – Reassuring Plaintiff that "everything was in order" and that financial arrangements were being properly handled, when she knew that he was being systematically underpaid and that accurate wage documentation was being withheld.

C.  **Jospitre's Knowledge and Substantial Assistance**

205.  Upon information and belief, Defendant Richard Jospitre had actual knowledge of the primary wage-theft violations because he: (a) personally negotiated or relayed performance terms with promoters and venues; (b) regularly received gross payments for shows at which Plaintiff performed, including the approximately $30,000 payment described in paragraph 37; (c) directly heard Plaintiff's complaints, both orally and via WhatsApp messages, that he was not receiving his contracted per-show rate of $3,000 or any share of backend revenue; and (d) acknowledged those complaints by promising to "reach out to Erica" and directing Plaintiff to contact Moreira about missing wages and royalties.

206.  Specifically, on or about April 28 through May 10, 2023, Plaintiff sent detailed WhatsApp messages to Jospitre stating that he "didn't get a dime," that he needed "publishing for everything [he has] done for him," and that if he had "gotten paid or [his] publishing and everything else" he "would [be] up right now." Jospitre responded that he would "reach out to Erica," asked whether Plaintiff had contacted her "like I asked you to," and then provided Plaintiff with Moreira's contact information, confirming his knowledge of Plaintiff's unpaid-wage and royalty claims.

207.  With that knowledge, Jospitre substantially assisted the wage-theft scheme by:

a.  Accepting and diverting promoter payments – Receiving gross show payments from promoters and venues and routing them into accounts controlled by Cartagena and his entities without instructing that Plaintiff's agreed share be segregated or paid directly to him.

b.  Tendering only nominal payments – Providing Plaintiff with sporadic, undocumented cash payments or artificially low payroll entries far below the contractually agreed per-show rate, while retaining the balance for Cartagena's benefit.

c.  Concealing financial information – Failing to provide Plaintiff with copies of performance contracts, settlement sheets, or documentation showing what promoters actually paid, despite Plaintiff's repeated requests.

47

d. Providing false assurances – Reassuring Plaintiff that financial issues would be "fixed" and that Moreira was "handling it," while knowing that no such corrections were being made and that Plaintiff's name remained off contracts and internal accounting.

e. Participating in retaliation – After Plaintiff asserted his wage claims, telling Plaintiff that Cartagena "has lawyers that will bury you" and that Plaintiff would be "fighting cases for the rest of [his] life and won't see a dime" if he pursued legal action, thereby threatening to weaponize the legal system to financially destroy Plaintiff and deter him from pursuing his wage rights.

D. **Roc Nation's Knowledge and Substantial Assistance**

208. Upon information and belief, Defendant Roc Nation, LLC, through its employee and agent Robert Castillo, had actual or constructive knowledge that Plaintiff was not being paid his agreed rate because: (a) Castillo served as Plaintiff's direct supervisory contact and received multiple direct complaints from Plaintiff about chronic underpayment, missing per diems, and lack of backend compensation during Roc Nation's management tenure; (b) Roc Nation, through Castillo and other personnel, had contemporaneous access to tour settlement sheets, budgets, and performance contracts showing what promoters were paying Cartagena for shows where Plaintiff appeared; and (c) Roc Nation approved tour budgets and performance schedules that listed Plaintiff as part of the touring party but contained no separate line item or contractual provision ensuring payment of Plaintiff's agreed per-show fee.

209. Specifically, on multiple occasions during Roc Nation's management tenure (approximately 2017–2020), Plaintiff expressly communicated to Castillo that: (a) he was not receiving his agreed per-show compensation; (b) he was being pressured to continue performing despite not receiving proper payment; and (c) he feared retaliation if he refused to continue performing under the existing conditions, including fear of professional blacklisting and harm from individuals associated with Cartagena.

210. Upon information and belief, Castillo received these complaints in the course of his duties for Roc Nation and had actual or constructive authority to raise them with Roc Nation management and with Cartagena and his entities. Despite receiving these complaints, Roc Nation took no corrective action and instead continued to approve, facilitate, and profit from touring activities involving Plaintiff.

211. With that knowledge, Roc Nation substantially assisted the ongoing wage-theft scheme by:

a. Continuing to facilitate underpaid tours – Approving and scheduling tour dates and performance agreements that assumed Plaintiff's participation but did not ensure a dedicated payment obligation to him at his contractually agreed rate.

48

b. Failing to require proper contracting – Not requiring that Plaintiff be separately contracted, credited, or budgeted at his agreed $3,000 per-show rate, despite having the authority to impose such requirements as Cartagena's manager.

c. Taking no corrective action – Failing to investigate Plaintiff's complaints, failing to require transparent payment systems, and failing to halt Plaintiff's participation in tours where compensation disputes and coercive conditions existed.

d. Maintaining profitable relationship – Continuing to manage Cartagena as a profitable client while knowingly ignoring, and thereby effectively ratifying, the systematic non-payment of Plaintiff's wages.

e. Approving deficient budgets – In or about 2017 to 2020, approving a tour budget and performance schedule that listed Plaintiff as part of the touring party but contained no separate line item or contractual provision ensuring payment of Plaintiff's agreed per-show fee, despite Plaintiff's prior complaints to Castillo about chronic underpayment.

## E. Liability for Aiding and Abetting

212. Under New York law, a defendant is liable for aiding and abetting a primary tort if: (a) the defendant had actual knowledge of the primary violation; and (b) the defendant provided substantial assistance to the primary violator in committing the violation.

213. Moreira, Jospitre, and Roc Nation each had actual knowledge of the primary wage-theft violations committed by Cartagena, Sneaker Addict Touring LLC, and Slate, Inc., as detailed above.

214. Upon information and belief, each of these defendants, Moreira, Jospitre, and Roc Nation, provided substantial assistance to the primary violators by performing essential functions in the wage-theft scheme that enabled the violations to continue over many years, including structuring payroll systems, diverting promoter payments, generating falsified wage statements, concealing financial information, providing false assurances, and approving tours without ensuring proper payment.

215. By knowingly providing this substantial assistance to primary violators of the NYLL, Moreira, Jospitre, and Roc Nation are liable for aiding and abetting wage theft under New York common law.

## F. Damages

216. As a direct and proximate result of Moreira's and Jospitre's aiding and abetting wage theft, Plaintiff has suffered substantial damages, including: (a) loss of unpaid wages in excess of $600,000; (b) loss of the ability to timely challenge wage violations due to falsified or withheld documentation; (c) emotional distress from the ongoing exploitation and deception; and (d) loss of professional opportunities and industry standing.

217.    Plaintiff is entitled to recover from Moreira, Jospitre, and Roc Nation, jointly and severally, all unpaid wages, liquidated damages, statutory damages, prejudgment interest, costs, and attorneys' fees available under NYLL §§ 193, 195, 198, and 215.

## COUNT X
## JOINT EMPLOYER LIABILITY UNDER NYLL
### *(Against Roc Nation, LLC)*

218.    Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

219.    At all relevant times, Plaintiff was an employee within the meaning of the New York Labor Law ("NYLL"), including but not limited to §§ 190, 193, 195, 198, and 215, and Roc Nation, LLC was an employer or joint employer under those provisions.

220.    During the period that Roc Nation, LLC ("Roc Nation") managed Defendant Cartagena, Roc Nation exercised sufficient control over the terms and conditions of Plaintiff's work to render it a joint employer with Cartagena, Sneaker Addict Touring LLC, and Slate, Inc. for purposes of the NYLL.

A. **Roc Nation's Direct Control Over Plaintiff's Work Schedule and Performance Obligations**

221.    Roc Nation, acting through its employee Robert Castillo and other personnel, participated in scheduling and approving tour dates and appearances at which Plaintiff was required to perform; coordinated travel and logistics for those performances; and communicated performance requirements, call times, and other job-related directives to Plaintiff.

222.    Plaintiff directly reported to Robert Castillo throughout Roc Nation's management tenure. Castillo served as Plaintiff's primary point of contact for performance schedules, travel arrangements, and logistical coordination, and Plaintiff understood Castillo to have supervisory authority over Plaintiff's touring obligations on behalf of Roc Nation.

223.    Upon information and belief, Roc Nation had the power, directly or indirectly, to determine whether Plaintiff would be included on particular tours, to exclude him from tours, or to substantially influence whether Plaintiff would be used on shows and appearances, thereby exercising hiring and firing authority or substantial influence over Plaintiff's continued employment.

B. **Roc Nation's Authority Over Plaintiff's Compensation**

224.    Roc Nation and its agents had the authority to influence or determine Plaintiff's rate and method of payment by negotiating or approving performance budgets and guarantees, receiving or reviewing settlement sheets and promoter payments, and working with Cartagena

50

and his entities on how tour proceeds would be allocated among participants, including Plaintiff.

225.    Upon information and belief, in or about 2017 to 2020, during Roc Nation's management, Roc Nation, through Castillo and other personnel, approved a tour budget and performance schedule that listed Plaintiff as part of the touring party but contained no separate line item or contractual provision ensuring payment of Plaintiff's agreed per-show fee of no less than $3,000. Despite Plaintiff's prior complaints to Castillo about chronic underpayment, Roc Nation took no steps to correct the budget, require that Plaintiff be paid directly, or otherwise ensure that his wages were protected.

226.    Upon information and belief, Roc Nation maintained, or had the right to maintain, employment-related records concerning Plaintiff's work, including tour itineraries, performance schedules, settlement sheets, and communications reflecting his role, obligations, and compensation expectations on shows it managed.

C. **Roc Nation's Knowledge of Wage Violations and Failure to Remedy**

227.    Plaintiff complained directly to Roc Nation's employee Robert Castillo about chronic underpayment, missing compensation, and exploitative conditions in connection with Fat Joe's touring operations and expressed fear that he would face retaliation if he refused to perform or insisted on being paid correctly.

228.    Upon information and belief, Castillo received these complaints in the course of his duties for Roc Nation and had actual or constructive authority to raise them with Roc Nation management and with Cartagena and his entities; nevertheless, Roc Nation failed to take reasonable steps to investigate, correct, or prevent the ongoing NYLL violations against Plaintiff.

229.    Upon information and belief, Roc Nation knew or should have known that Plaintiff was being paid through Sneaker Addict Touring LLC and/or related entities, and that his compensation and wage documentation were materially inconsistent with the scope and frequency of his performances, yet Roc Nation continued to schedule and approve performances requiring Plaintiff's services without ensuring that he was properly paid.

D. **Joint-Employer Status Under Economic Realities Test**

230.    Under the "economic realities" and joint-employer doctrines applied by courts interpreting the NYLL, Roc Nation was Plaintiff's joint employer because, among other things:

51

a. it had the power, directly or indirectly, to hire and fire or to substantially influence whether Plaintiff would be used on tours and appearances.

b. it supervised and controlled, or had the right to supervise and control, Plaintiff's work schedule and the conditions under which he performed.

c. it determined, or had significant input into, Plaintiff's rate and method of payment by structuring performance agreements and budgets.

d. it maintained, or had access to, employment-related records concerning Plaintiff's work and compensation; and

e. the economic reality of the relationship among Roc Nation, Cartagena, Sneaker Addict Touring LLC, and Plaintiff was one of an integrated enterprise in which Roc Nation functioned as a central coordinating and supervisory authority over Plaintiff's touring work.

E. **Joint and Several Liability**

231. By virtue of its status as a joint employer, Roc Nation is jointly and severally liable under the NYLL for unpaid wages, unlawful deductions, wage-statement violations, and retaliation committed against Plaintiff during the period of its management of Cartagena and his touring operations.

232. As a direct and proximate result of Roc Nation's joint-employer conduct and its failure to prevent or correct ongoing NYLL violations, Plaintiff suffered loss of wages and benefits, emotional distress, and other damages in an amount to be determined at trial.

233. Pursuant to NYLL §§ 193, 195, 198, and 215, Plaintiff is entitled to recover from Roc Nation all unpaid wages, liquidated damages, statutory damages for wage-statement and notice violations, compensatory and punitive damages for retaliation, pre- and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT XI
## CIVIL ASSAULT
### (*Against Defendant Pete "Pistol Pete" Torres*)

234. Plaintiff realleges and incorporates by reference all prior paragraphs of this First Amended Complaint as if fully set forth herein

235. Under New York law, civil assault is the intentional placing of another person in reasonable apprehension of imminent harmful or offensive bodily contact.

1. **Pete "Pistol Pete" Torres**:

236. At all relevant times, Defendant Torres intentionally engaged in a pattern of conduct directed specifically at Plaintiff that was designed to threaten Plaintiff with serious physical violence and to place Plaintiff in immediate fear that he would be violently attacked.

237.    On or about June 2019, after Plaintiff expressed reluctance to continue performing without proper compensation, Defendant Torres told Plaintiff, in substance, "If you don't get on that plane, we'll have people waiting for you back in the Bronx." Plaintiff understood this as a direct threat that individuals associated with Torres would be physically present and ready to ambush and violently assault Plaintiff upon his return to the Bronx, and Plaintiff reasonably apprehended imminent harmful bodily contact because of this statement.

238.    Beginning in or about 2023 and continuing through at least 2025, Defendant Torres operated and controlled the Instagram account "westcoastcleezy," which used his image and nickname "Pistol Pete" and through which he sent Plaintiff multiple direct messages that explicitly threatened serious physical harm.

239.    In one such direct message, Defendant Torres told Plaintiff words to the effect of "You got 48 hrs to fall back yap, you been warned son," which Plaintiff reasonably understood as a demand that he cease his public and legal efforts within a short, fixed period or face physical retaliation thereafter, causing Plaintiff to apprehend that an imminent attack would follow if he did not comply.

240.    In another message, Defendant Torres told Plaintiff words to the effect of "I'm telling u what I'm going to do to u so beware… I'm going to give it to u for sure," which Plaintiff reasonably understood as a personal promise by Torres that he would inflict physical violence on Plaintiff, and Plaintiff apprehended that such violence could occur at any time and without further warning.

241.    Defendant Torres further told Plaintiff words to the effect of "You could have Jesus with you… you food we gonna eat," which Plaintiff reasonably understood as a threat that Torres and his associates would attack and severely injure Plaintiff regardless of who was with him, and Plaintiff apprehended imminent harmful bodily contact whenever he left his home or appeared in public.

242.    Defendant Torres also sent Plaintiff a message stating, in substance, "You put that video up and imma make u pay in the worst way," which Plaintiff reasonably understood as a conditional but immediate threat that any further public statements or videos would be met with violent retaliation, causing Plaintiff to fear that an attack could follow directly upon such activity.

243. During the same period, an individual acting in concert with Defendant Torres used an account identifying itself as "Pablo Escobar" to send Plaintiff the message, in substance, "I'm giving a buck 50 that's my word." Based on the common meaning of "buck 50" in New York street vernacular, Plaintiff reasonably understood this as a threat to slash his face with a blade, and because Plaintiff knew this message came from someone working with Torres, he apprehended that a facial slashing or similar violent attack could occur imminently.

244. Another individual, also acting in concert with Defendant Torres, sent Plaintiff a message stating, in substance, "for real ta they will hurt you I know who you are and where you live at… leave that situation alone… raise your kids… I don't want anything to happen to you," which Plaintiff reasonably understood as a threat that he and his children would be physically harmed at or near his home if he continued to pursue his unpaid wage and royalty claims, causing him to apprehend that such harm could be carried out at any time.

245. In a recorded telephone conversation on or about May 19, 2025, Defendant Torres told Plaintiff, in substance, that "my hood is gonna bring it right over there," that anyone who "violated" Defendant Cartagena "gotta get… hands on," and that others had been "pounded out" for perceived disloyalty. Plaintiff reasonably understood these statements as a direct warning that Torres would arrange for members of his neighborhood or associates to locate and physically attack Plaintiff for pursuing his claims, and Plaintiff apprehended that such an attack could occur imminently in the areas where he lived and traveled.

246. At the time Defendant Torres made each of the foregoing statements, Plaintiff knew that Torres had a network of associates in New York and Florida, knew Plaintiff's identity, and, at times, knew Plaintiff's specific location, including Wesley Chapel, Florida. Based on this knowledge, Plaintiff reasonably believed that Defendant Torres had the present ability, through himself and his associates, to carry out the threatened violence without advance notice.

247. As a direct and intended result of Defendant Torres's specific words and actions described above, Plaintiff experienced a constant and immediate apprehension that he would be subjected to harmful or offensive bodily contact at any time, including when returning to the Bronx, when moving about his neighborhood in Florida, when appearing in public, and when posting or speaking publicly about Defendants' conduct.

248. In response to Defendant Torres's threats, Plaintiff altered his daily routines, avoided neighborhoods and venues where Defendant Torres and his associates were known or believed

54

to be present, limited the movements and public activities of his children, and took other safety precautions, demonstrating that he actually apprehended imminent physical harm because of Torres's conduct.

249. Upon information and belief, Defendant Torres's actions were intentional, willful, malicious, and undertaken for the purpose of intimidating Plaintiff, silencing him, and punishing him for asserting his legal and economic rights, and not for any legitimate purpose.

250. As a direct and proximate result of Defendant Torres's civil assault, Plaintiff has suffered and continues to suffer severe emotional distress, anxiety, fear for his own safety and that of his family, disruption of his daily life, loss of peace of mind, and other non-economic damages in an amount to be determined at trial.

251. Defendant Torres's conduct was so extreme, outrageous, and malicious as to warrant an award of punitive damages to punish him and to deter similar conduct in the future.

1. **Joseph Cartagena**:

252. At all relevant times, Defendant Cartagena intentionally engaged in threatening conduct directed specifically at Plaintiff that was calculated to place Plaintiff in immediate fear that he would be violently attacked.

253. On multiple occasions between approximately 2014 and 2018, when Plaintiff attempted to discuss leaving the touring operation or hiring independent representation, Defendant Cartagena told Plaintiff, in substance, that Plaintiff would "never work in this business again," that he would be "blackballed from every label and every venue," and that "people would handle you in the street" if Plaintiff went against Cartagena and his associates.

254. Plaintiff reasonably understood Defendant Cartagena's statement that "people would handle you in the street" as a threat that Cartagena would cause other individuals to locate and physically attack Plaintiff in public, and Plaintiff apprehended that such an attack could occur without warning in the neighborhoods and venues where he lived and worked.

255. In addition to his in-person threats, Defendant Cartagena personally communicated threats to Plaintiff through a burner Instagram account using the handle "Bittgggg" and similar variants, which repeatedly described itself as "biggest in the game," mirroring Cartagena's long-standing public moniker and branding, and which Plaintiff reasonably believed was controlled by Cartagena.

256. Through the "Bittgggg" account, Defendant Cartagena told Plaintiff, among other things, "Don't u think people gotta be made an example of? … So, others will understand not to cross," which Plaintiff reasonably understood as a warning that Cartagena would have him violently attacked to make an example of him for others, causing Plaintiff to apprehend that such an attack could occur imminently if he continued asserting his rights.

257. In another message from the "Bittgggg" account, Defendant Cartagena told Plaintiff, in substance, "If u do this door is closed… but don't worry ups is hiring," which Plaintiff reasonably understood as a threat that if he continued with his public and legal efforts, Cartagena would permanently end his music-industry career and leave him vulnerable to street-level retaliation, contributing to Plaintiff's apprehension of imminent physical harm.

258. Defendant Cartagena further told Plaintiff via the "Bittgggg" account, "Be very careful… we let you live," which Plaintiff reasonably understood as an explicit statement that Cartagena and his associates had previously refrained from killing or seriously injuring him but could withdraw that restraint at any time, causing Plaintiff to apprehend that a life-threatening attack could occur without further warning.

259. Defendant Cartagena also sent Plaintiff a message stating "U love ur family right," which Plaintiff reasonably understood as a threat that Cartagena could have harm inflicted not only on Plaintiff but also on his children and other family members if Plaintiff continued to speak publicly or pursue his claims, causing Plaintiff to apprehend imminent harm to himself whenever he moved about with or near his family.

260. Defendant Cartagena further boasted, through the "Bittgggg" account, that he did not "need to lift a finger" because "everyone [is] willing to do it for me," which Plaintiff reasonably understood as a statement that Cartagena had a ready network of individuals willing to carry out violent attacks on his behalf, and that such attacks could be ordered and executed at any time.

261. At the time Defendant Cartagena made each of the foregoing statements, Plaintiff knew that Cartagena had long-standing ties to individuals capable of violence and that those individuals knew where Plaintiff lived and travelled; based on this knowledge, Plaintiff reasonably believed that Cartagena had the present ability, through his associates, to carry out the threatened violence without advance notice.

262. As a direct and intended result of Defendant Cartagena's specific words and actions, Plaintiff experienced an ongoing and immediate apprehension that he would be subjected to harmful or offensive bodily contact at any time, including in the streets of New York, near his home, and in other public places where Cartagena's associates could encounter him.

263. In response to Defendant Cartagena's threats, Plaintiff altered his daily routines, avoided certain neighborhoods in New York, implemented safety precautions for his children, and lived in continuous fear that he or his family could be violently attacked, demonstrating that he actually apprehended imminent physical harm because of Cartagena's conduct.

264. Upon information and belief, Defendant Cartagena's actions were intentional, willful, malicious, and undertaken for the purpose of intimidating Plaintiff, silencing him, and punishing him for attempting to vindicate his legal and economic rights, and not for any legitimate purpose.

265. As a direct and proximate result of Defendant Cartagena's civil assault, Plaintiff has suffered and continues to suffer severe emotional distress, anxiety, fear for his own safety and that of his family, disruption of his daily life, loss of peace of mind, and other non-economic damages in an amount to be determined at trial.

266. Defendant Cartagena's conduct was so extreme, outrageous, and malicious as to warrant an award of punitive damages to punish him and to deter similar conduct in the future.

267. To the extent any of the foregoing assault claims arise from conduct occurring prior to the one-year limitations period for civil assault under CPLR § 215(3), those claims are timely under the doctrine of equitable tolling because: (a) Defendants' ongoing and escalating threats prevented Plaintiff from safely seeking legal redress; (b) the continuing tort doctrine applies — each new threatening communication renewed and extended Plaintiff's apprehension of imminent harm, with the most recent threats occurring in March–May 2025, within the limitations period; and (c) threats directed at Plaintiff's children constituted a form of coercion that continued unabated through 2025, making the entirety of the threat campaign a single, continuous tortious act.

268. WHEREFORE, Plaintiff demands judgment on this Count XI against Defendants Joseph Antonio Cartagena and Pete "Pistol Pete" Torres, jointly and severally, and respectfully requests that the Court award Plaintiff compensatory damages in an amount to be determined at trial for the emotional distress, fear, anxiety, disruption of daily life, and other injuries caused

by Defendant Cartagena's civil assault, award Plaintiff compensatory damages in an amount to be determined at trial for the emotional distress, fear, anxiety, disruption of daily life, and other injuries caused by Defendant Torres's civil assault, award Plaintiff punitive damages against Defendant Cartagena in an amount sufficient to punish him for his intentional, malicious misconduct and to deter similar conduct in the future, award Plaintiff punitive damages against Defendant Torres in an amount sufficient to punish him for his intentional, malicious misconduct and to deter similar conduct in the future, award pre-judgment and post-judgment interest as permitted by law, award Plaintiff his reasonable attorneys' fees and costs to the extent permitted by law, and grant such other and further relief as the Court deems just and proper.

## COUNT XII
## FRAUDULENT CONVEYANCE AND CONSTRUCTIVE TRUST
### (Former New York Debtor & Creditor Law §§ 273–276 and Related Doctrines)
### (Against Cartagena, Slate, Inc., and Transferee Defendants ABC Corp 1.)

269. Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

270. Plaintiff is a present and future creditor of Cartagena and his affiliated entities within the meaning of former New York Debtor and Creditor Law ("DCL") because Plaintiff holds, and has asserted in this action, substantial claims for unpaid wages, statutory damages, copyright ownership and infringement, trafficking-related civil damages, and fraud-based relief.

271. The specific affirmative acts of concealment include, without limitation, the following:

- On or about June 21, 2019, Moreira caused the issuance of Paychex Check No. 200073 to Plaintiff listing all federal and FICA withholding amounts as "XXXX" — a deliberate falsification designed to prevent Plaintiff from determining his true gross wages, withholding rates, and net pay.
- Between 2011 and 2014, Cartagena caused copyright registrations for the 12 works identified above to be filed with the U.S. Copyright Office through Joey and Ryan Music, omitting Plaintiff as a named author — a specific, false representation to a federal agency that directly suppressed Plaintiff's ability to establish or assert his ownership interests.
- On or about 2018, 2019, 2020, and 2023, Moreira directly communicated to Plaintiff that "financial arrangements were in order" when she knew that Plaintiff's per-show fees were being systematically underpaid and that payroll records were being falsified — a specific, affirmative misrepresentation on which Plaintiff relied in continuing to perform.
- Between 2015 and 2023, Jospitre repeatedly failed to provide Plaintiff with split sheets, publishing agreements, or tour settlement documents despite Plaintiff's requests, constituting fraudulent concealment by omission in circumstances where Jospitre had a duty to disclose.

272. Upon information and belief, after Plaintiff began asserting his rights—including through demand letters transmitted in or about March 2025—Cartagena caused his interests in royalty

58

streams, publishing rights, and catalog-sale proceeds, including interests tied to the works identified above, to be transferred, assigned, pledged, or otherwise encumbered in favor of Slate, Inc., other affiliated entities, and/or third-party catalog purchasers for little or no fair consideration, with the purpose and effect of placing assets beyond the reach of Plaintiff and other creditors..

1. As set forth above, by April–May 2023 Jospitre and Moreira had actual knowledge that Plaintiff claimed authorship and royalty rights in the catalog identified in paragraph 39, that he had not received credit or payment, and that he was seeking to correct authorship, publishing, and SoundExchange allocations.
2. Upon information and belief, with that knowledge, Moreira and Jospitre substantially assisted Cartagena in executing the fraudulent transfers described in paragraph 133 by advising on, structuring, or approving the transfer of royalty, publishing, and catalog interests into Slate, Inc. and other affiliated entities for little or no fair consideration; coordinating with accountants, lawyers, and catalog purchasers to implement those transfers; and reassuring Plaintiff that Erica would "do her best to accommodate" him while knowing that assets were being moved beyond his reach. By knowingly providing this substantial assistance to Cartagena's fraudulent conveyances, Moreira and Jospitre are liable for aiding and abetting those transfers and are subject to the same avoidance, constructive-trust, and restitution remedies as Cartagena and the transferee entities.

273. Upon information and belief, these transfers are fraudulent as to Plaintiff under former DCL § 276 because they were made with actual intent to hinder, delay, or defraud present and future creditors, as evidenced by badges of fraud including: (a) the insider nature of the transferees; (b) the lack of fair consideration; (c) Cartagena's knowledge of Plaintiff's claims at the time of transfer; and (d) the timing of the transfers in close proximity to Plaintiff's demands and anticipated litigation.

274. Upon information and belief, Defendants made the following specific transfers in furtherance of the fraudulent conveyance scheme:

(a) On or about 2019, Slate, Inc. transferred approximately $30,000 in touring revenues derived from performances at which Plaintiff appeared to BELEEEDAT LLC, an entity with no legitimate operational purpose, for no documented consideration, at a time when Slate, Inc. was indebted to Plaintiff for unpaid wages exceeding $600,000;
(b) On or about 2025, Cartagena, through Slate, Inc. and/or WOOO Inc., transferred or assigned royalty streams derived from the twelve registered works identified in paragraph 40 — in which Plaintiff holds a co-ownership interest — to a third-party catalog purchaser for consideration, without accounting to Plaintiff for his pro-rata share;
(c) The PPP loan proceeds obtained by Sneaker Addict Touring LLC on the basis of fraudulently inflated payroll records — payroll records which listed Plaintiff as an employee while falsifying his withholding data — were diverted to Cartagena's personal benefit rather than retained in Sneaker Addict Touring LLC as required.

275.    Independently, and to the extent the transfers rendered Cartagena insolvent or occurred while he was insolvent, they are constructively fraudulent as to Plaintiff under former DCL §§ 273 and 273-a because they were made without fair consideration at a time when Cartagena either was, or was thereby rendered, unable to satisfy his obligations to present and future creditors, including Plaintiff.

276.    Upon information and belief, because of these fraudulent conveyances, assets that should be available to satisfy Plaintiff's claims have been wrongfully diverted and concealed within Slate, Inc., affiliated entities, and/or subsequent transferees, unjustly frustrating Plaintiff's ability to collect on any judgment in this action.

277.    Equity requires the imposition of a constructive trust over: (a) all catalog-sale proceeds traceable to Plaintiff's co-authored works; (b) all royalty, publishing, and neighboring-rights streams in which Plaintiff holds an equitable share; and (c) any substitute assets into which such proceeds have been converted or commingled. Defendants hold these assets as constructive trustees for Plaintiff's benefit.

278.    Plaintiff is entitled to an order: (a) avoiding and setting aside the fraudulent conveyances described above; (b) imposing a constructive trust over the transferred property and all proceeds thereof; (c) directing an accounting of all transfers of interests in royalty, publishing, and catalog assets traceable to Plaintiff's work; and (d) granting such other and further equitable and monetary relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Terrance Dixon, a/k/a "TA," respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally where permitted by law, and award the following relief:

1. Compensatory damages for unpaid wages, unlawful deductions, and all other relief available under the New York Labor Law, including liquidated damages, prejudgment interest, statutory damages, and attorneys' fees and costs pursuant to NYLL §§ 193, 195, 198, and 215.

2. Compensatory, statutory, and punitive damages against the TVPA Defendants under 18 U.S.C. §§ 1589, 1594, and 1595, including damages for physical, emotional, psychological, and economic harms caused by Defendants forced-labor and coercion scheme.

3. Actual damages, including but not limited to unpaid royalties, profits, and license fees, together with statutory damages to the extent elected, and full costs and attorneys' fees, for copyright infringement under 17 U.S.C. §§ 501–505.

4. A declaratory judgment that Plaintiff is a co-author and co-owner of the musical works identified in the Complaint and is entitled to corresponding registration, credit, and royalty allocations.

5. Restitution and disgorgement of all monies, profits, and other benefits unjustly obtained by Defendants because of the conduct alleged herein.

6. Damages and equitable relief for fraudulent concealment, aiding and abetting fraud, aiding and abetting wage theft, and related common-law claims in an amount to be determined at trial.

7. An order imposing a constructive trust over all assets, royalty streams, catalog-sale proceeds, and other property traceable to Plaintiff's creative contributions and labor, including but not limited to interests held through Joey and Ryan Music, Sneaker Addict Touring LLC, Slate, Inc., and any successor or affiliated entities.

8. Avoidance of any fraudulent conveyances and transfers of assets made to hinder, delay, or defraud Plaintiff, together with appropriate equitable relief under New York law.

9. Compensatory and punitive damages for civil assault and related intentional torts, in an amount to be determined at trial.

10. Pre- and post-judgment interest at the maximum rates allowed by law.

11. Reasonable attorneys' fees, expert fees, and costs of suit as permitted by statute or common law.

12. Such other and further legal and equitable relief as the Court deems just and proper.

Dated: March 25, 2026
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

**CERTIFICATE OF MERIT**

To the Defendant mentioned earlier (s):  TYRONE A. BLACKBURN, being duly sworn, deposes and states the following to be true under the penalties of perjury of the State of New York.  Based on the review, I have reviewed the facts of this case and concluded that there is a reasonable basis for the commencement of this action.

Dated: March 25, 2026
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

61

**ATTORNEY VERIFICATION**

To the Defendant named above (s):

TYRONE A. BLACKBURN, an attorney duly admitted to practice in the Courts of New York State and a member of the firm T. A. Blackburn Law, PLLC., attorneys for the plaintiffs in this action, affirms under penalty of perjury, That he has read the Complaint and knows the contents thereof and that the same is true to his knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, he believes it to be true. The sources of his information and knowledge are investigations and records in the file. This verification is made by affirmation and not by the plaintiffs because the Plaintiffs are not within the County where the attorney has his office.

Dated: March 25, 2026
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

**PRESERVATION NOTICE**

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, change, direct, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site

62

account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

Regarding the paper information, you are directed to preserve all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents about the controversy, parties, or witnesses. Through discovery, we expect to obtain from you several documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed

(e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Relevant evidence regarding electronic data created after this Complaint's delivery date should not be destroyed. You must take the steps necessary to prevent the destruction of such evidence.

Dated: March 25, 2026
Brooklyn, New York

*/s/Tyrone A. Blackburn*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com
