UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrance Dixon, A/K/A "TA,"<br><br>                              Plaintiff,<br><br>v.<br><br>Joseph Antonio Cartagena P/K/A "Fat Joe,"<br>Peter "Pistol Pete" Torres,<br>Richard "Rich Player" Jospitre,<br>Erica Juliana Moreira,<br>Sneaker Addict Touring LLC,<br>Slate, Inc.,<br>Roc Nation, LLC,<br>John Does 1–10,<br>Jane Does 1–10, and<br>ABC Corporations 1–10,<br><br>                              Defendants. | Case No. 1:25-cv-05144-JLR-JW |

PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE FIRST AMENDED COMPLAINT

Brief by:
Tyrone A. Blackburn, Esq.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT
LEGAL STANDARDS
STATEMENT OF RELEVANT ALLEGATIONS
ARGUMENT
I.      THE FAC STATES CLAIMS UNDER THE NEW YORK LABOR LAW
        A.  Dixon Plausibly Alleges Employee Status Under the Economic-Realities Test
        B.  NYLL §§ 193 and 198 Are Adequately Pleaded (Count I)
        C.  NYLL § 195 Wage Notice and Wage Statement Claims Survive (Count II)
        D.  NYLL § 215 Retaliation Is Adequately Pleaded (Count V)
        E.  Count X (Joint-Employer Liability) States a Theory of Recovery Against Roc Nation
II.     THE FAC STATES A TVPA CLAIM (Count III)
        A.  Section 1589 Forced Labor Is Plausibly Alleged
        B.  Section 1591 Sex Trafficking Is Plausibly Alleged
        C.  Venture Liability Under Section 1595(a)
III.    COUNT IV STATES A COPYRIGHT CLAIM
        A.  Ownership Claim Is Timely — Wilson v. Dynatone Bars Registration-Alone Accrual
        B.  Distinguishing Kwan v. Schlein — No Express Repudiation Until 2023–2025
        C.  Standing for Declaratory Co-Ownership and Accounting
        D.  Infringement Standing and Fourth Estate
        E.  Sneaker and Slate Are Proper Defendants as Beneficial Exploiters
IV.     FRAUDULENT CONCEALMENT (Count VI) IS ADEQUATELY PLEADED
        A.  Duty — Special Facts and Superior Knowledge
        B.  Rule 9(b) Particularity — Concrete Concealment Events
        C.  Reliance and Delayed Discovery
        D.  Response to Moreira's Attorney-Duty Argument
V.      UNJUST ENRICHMENT (Count VII) SURVIVES AS ALTERNATIVE PLEADING
        A.  Rule 8(d) Alternative Pleading
        B.  Non-Copyright Benefits Are Not Preempted
        C.  Constructive Trust / Accounting Preserved
VI.     AIDING AND ABETTING CLAIMS (Counts VIII, IX)
        A.  Aiding and Abetting Fraud Against Moreira and Jospitre (Count VIII)
        B.  Aiding and Abetting Wage Theft (Count IX)
VII.    CIVIL ASSAULT (Count XI) IS TIMELY AS TO TORRES
        A.  Recent Torres Threats — Present Ability and Imminence
        B.  Older Conduct as Context, Not Independent Torts
        C.  Continuing Course of Conduct
VIII.   FRAUDULENT CONVEYANCE / CONSTRUCTIVE TRUST (Count XII)
        A.  Preservation of Constructive Trust and Accounting Remedies
        B.  Conditional Request for Leave to Plead Current NY UVTA / DCL for Post-April 2020 Transfers
IX.     LEAVE TO AMEND IS APPROPRIATE IF ANY CLAIM IS DISMISSED
CONCLUSION

## TABLE OF AUTHORITIES

Cases

- Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155 (S.D.N.Y. 2009)
- Abuladze v. Apple Commuter Inc., No. 22-cv-8684, 2024 U.S. Dist. LEXIS 21903 (S.D.N.Y. Jan. 23, 2024), R&R adopted, 2024 U.S. Dist. LEXIS 21060 (S.D.N.Y. Feb. 7, 2024)
- Ammar v. Carbone, 237 A.D.3d 883, 233 N.Y.S.3d 98 (2d Dep't 2025)
- Ashcroft v. Iqbal, 556 U.S. 662 (2009)
- Baldia v. RN Express Staffing Registry LLC, 633 F. Supp. 3d 693 (S.D.N.Y. 2022)
- Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132 (2d Cir. 2008)
- Beck v. Manhattan College, 537 F. Supp. 3d 584 (S.D.N.Y. 2021)
- Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
- Bernstein v. 1995 Assocs., 217 A.D.2d 512 (1995)
- Canosa v. Ziff, 2019 U.S. Dist. LEXIS 13263 (S.D.N.Y. Jan. 28, 2019)
- Carell v. Shubert Organization, Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000)
- Childress v. Taylor, 945 F.2d 500 (2d Cir. 1991)
- Cifra v. General Electric Co., 252 F.3d 205 (2d Cir. 2001)
- Claros v. Marvin's Refrigeration Corp., 800 F. Supp. 3d 391 (N.D.N.Y. 2025)
- David v. Weinstein Co. LLC, 431 F. Supp. 3d 290 (S.D.N.Y. 2019)
- Elliott v. Cartagena, No. 19 Civ. 1998 (NRB), 2025 WL 486634 (S.D.N.Y. Feb. 13, 2025)
- Foman v. Davis, 371 U.S. 178 (1962)
- Fouchécourt v. Metro. Opera Ass'n, Inc., 537 F. Supp. 2d 629 (S.D.N.Y. 2008)
- Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC, 586 U.S. 296 (2019)
- Franco v. Jubilee First Ave. Corp., 2016 U.S. Dist. LEXIS 114191 (2016)
- Global Network Communications, Inc. v. City of New York, 458 F.3d 150 (2d Cir. 2006)
- Goldberg v. Jacquet, 667 F. Appx. 313 (2d Cir. 2016)
- Hart v. Rick's Cabaret International, Inc., 967 F. Supp. 2d 901 (S.D.N.Y. 2013)
- Hernandez Tech., Inc. v. Rivera, 239 A.D.3d 1354 (2025)
- In re Mid America Productions, 267 A.D.2d 656 (3d Dep't 1999)
- Kaufman v. Cohen, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003)
- Kiwanuka v. Bakilana, 844 F. Supp. 2d 107 (D.D.C. 2012)
- Krys v. Pigott, 749 F.3d 117 (2d Cir. 2014)
- Kwan v. Schlein, 634 F.3d 224 (2d Cir. 2011)
- Lama v. Malik, 192 F. Supp. 3d 313 (E.D.N.Y. 2016)
- Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006)
- Majewski v. Broadalbin-Perth Central School District, 91 N.Y.2d 577, 696 N.E.2d 978 (1998)
- Makarova v. United States, 1999 U.S. Dist. LEXIS 1211 (S.D.N.Y. Feb. 4, 1999)
- Nastasi & Assocs., Inc. v. Bloomberg, L.P., No. 20-CV-5428, 2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)
- Nunag-Tanedo v. East Baton Rouge Parish School Board, 790 F. Supp. 2d 1134 (C.D. Cal. 2011)
- People v. Bowes, 2022 NY Slip Op 03940, 206 A.D.3d 1260, 170 N.Y.S.3d 334 (App. Div.)
- People v. Guerrero, 2017 NY Slip Op 03772, 150 A.D.3d 883, 55 N.Y.S.3d 67 (App. Div.)

- Perella Weinberg Partners LLC v. Kramer, 226 A.D.3d 523, 208 N.Y.S.3d 597 (1st Dep't 2024)
- Raparthi v. Clark, 214 A.D.3d 613, 186 N.Y.S.3d 623 (1st Dep't 2023)
- Reichert v. Casa Sys., 2026 U.S. Dist. LEXIS 71680 (S.D.N.Y. Mar. 30, 2026)
- Robles v. Cox and Co., Inc., 841 F. Supp. 2d 615 (E.D.N.Y. 2012)
- Roma v. David Carmili, Physician, P.C., 761 F. Supp. 3d 481 (E.D.N.Y. 2024)
- Rosa v. La Oficina of Queens, Inc., 2023 U.S. Dist. LEXIS 46930 (E.D.N.Y. 2023)
- Sahebdin v. Khelawan, No. 21-CV-2956 (MKB), LEXIS 172964 (E.D.N.Y. Sep. 24, 2022)
- Saleem v. Corporate Transportation Group, Ltd., 854 F.3d 131 (2d Cir. 2017)
- Saraswat v. Jayaraman, No. 15-CV-4680 (PKC) (LB), 2016 U.S. Dist. LEXIS 133573 (E.D.N.Y. Sep. 28, 2016)
- Schneider v. OSG, LLC, No. 22-CV-7686 (AMD) (VMS), LEXIS 55467 (E.D.N.Y. Mar. 27, 2024)
- Shukla v. Sharma, No. 07-CV-2972 (CBA) (CLP), 2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb. 14, 2012)
- Silkowski v. Mangione, No. 24-CV-8666 (ARR) (JAM), LEXIS 92085 (E.D.N.Y. May 14, 2025)
- 16 Casa Duse, LLC v. Merkin, 791 F.3d 247 (2d Cir. 2015)
- Stein v. World-Wide Plumbing Supply Inc., 71 F. Supp. 3d 320 (E.D.N.Y. 2014)
- Thompson v. Elev8 Ctr. N.Y., LLC, No. 20-CV-9581 (PGG) (JLC), 2023 U.S. Dist. LEXIS 122504 (S.D.N.Y. July 17, 2023)
- Thomson v. Larson, 147 F.3d 195 (2d Cir. 1998)
- Velu v. Velocity Exp., Inc., 666 F. Supp. 2d 300 (E.D.N.Y. 2009)
- Vidal v. Advanced Care Staffing, LLC, No. 1:22-cv-05535-NRM-MMH, 2023 U.S. Dist. LEXIS 59411 (E.D.N.Y. Apr. 4, 2023)
- Wilson v. Dynatone Publishing Co., 892 F.3d 112 (2d Cir. 2018)
- Zan Sun v. Shen Yun Performing Arts, Inc., No. 25-CV-3185 (JGLC), LEXIS 111907 (S.D.N.Y. May 18, 2026)
- Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003)

Statutes and Rules
- 17 U.S.C. § 204(a)
- 17 U.S.C. § 501
- 17 U.S.C. § 507
- 18 U.S.C. § 1589
- 18 U.S.C. § 1591
- 18 U.S.C. § 1595
- Fed. R. Civ. P. 8(d)
- Fed. R. Civ. P. 9(b)
- Fed. R. Civ. P. 12(b)(1)
- Fed. R. Civ. P. 12(b)(6)
- Fed. R. Civ. P. 15(a)(2)
- N.Y. C.P.L.R. Law § 213
- N.Y. C.P.L.R. Law sec. 215

- N.Y. Lab. Law §§ 190, 193, 195, 198, 215
- N.Y. Lab. Law § 511(1)(b) (1-a)
- N.Y. Workers' Comp. Law § 2(4)

## **PRELIMINARY STATEMENT**

This is a case about the exploitation of an employee over fifteen years. The First Amended Complaint ("FAC") pleads a coordinated pattern in which Defendants controlled Plaintiff Terrance Dixon's touring work, compensation, payroll records, creative credits, and access to industry opportunities while using threats, financial opacity, and deliberate records-keeping omissions to extract his labor, appropriate his creative contributions, and silence him when he began to ask questions. The three motions to dismiss now before the Court do not engage that pattern on its merits. They isolate each component of an integrated scheme, credit Defendants' preferred characterizations of the relationship, and demand dismissal of the FAC in its entirety before a single document has been produced.

At the Rule 12(b)(6), the Court accepts well-pleaded facts as true and draws all reasonable inferences in Plaintiff's favor. Under that standard, each claim survives. The NYLL claims survive because employee and joint-employer status are economic-realities questions that cannot be resolved on the pleadings where the FAC alleges formal Paychex payroll, control over schedules and compensation, and functional control exercised by Cartagena, Sneaker Addict, Slate, Roc Nation, and Moreira. The TVPA claim survives because the FAC pleads specific coercive mechanisms—threats of violence, threats to family, professional blacklisting, and economic dependence—supporting both forced-labor and sex-trafficking predicates. The copyright claim survives because Second Circuit law forecloses Defendants' registration-alone accrual theory, and the FAC alleges no express repudiation until Plaintiff's 2023–2025 inquiries. The fraudulent-concealment, unjust-enrichment, aiding-and-abetting, civil-assault, and constructive-trust/accounting claims each rest on specific pleaded facts and, where appropriate, permissible alternative theories under Rule 8(d).

Defendants' repeated characterizations of this litigation as a defamation campaign orchestrated by counsel, and their attacks on Plaintiff's counsel in unrelated proceedings, are legally irrelevant. Rule 12(b)(6) tests the four corners of the FAC, not the perceived reputation of those who drafted it. Once those characterizations are set aside, the motions present no basis for dismissal with prejudice on any claim. The motions must be denied. If any claim or portion of a claim is dismissed, dismissal should be without prejudice and with leave to amend under Rule 15(a)(2).

## LEGAL STANDARDS

On a Rule 12(b)(6) motion, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences for the non-movant. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555. The Court may not resolve factual disputes, choose among competing inferences, or require proof better suited to discovery. A complaint survives Rule 12(b)(6) if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face, meaning the factual allegations permit the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. The plausibility standard is not a probability requirement: [a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable. Twombly, 550 U.S. at 556. Critically, Rule 12(b)(6) analysis is confined to the four corners of the complaint and documents integral to it or incorporated by reference; extrinsic evidence, external proceedings, and matters not integral to the pleading may not be considered. Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006). Where a defendant's motion rests on facts outside the complaint— such as characterizations of other litigation, records not referenced in the FAC, or evidence first raised in a brief—the Court should disregard those materials entirely. Id. at 155–56.

Rule 12(b)(1) governs Defendants' copyright-standing challenge. Where standing depends on disputed or incomplete facts concerning ownership, registration, beneficial interest, or the scope of relief sought, dismissal with prejudice is inappropriate unless the pleadings establish that amendment would be futile.

Rule 9(b) applies to claims sounding in fraud, but it does not require evidentiary detail or discovery-level proof. It requires the complaint to specify the fraudulent statements or omissions, identify the speaker or responsible actor, state when and where the misconduct occurred, and explain why it was fraudulent. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). The FAC does so by identifying the Paychex statement, the copyright registrations, the Jospitre WhatsApp exchange, the numbers are being fixed assurances, and the concealed tour, publishing, and payroll records. FAC ¶¶ 33–34, 47–49, 166–171, 191–194.

Rule 8(d) expressly permits alternative and inconsistent pleading. Fed. R. Civ. P. 8(d)(2)–(3). Dixon may plead employee status for NYLL purposes while also relying, in the alternative, on contract, quasi-contract, co-ownership, infringement, accounting, and constructive-trust theories if Defendants deny parts of the relationship. FAC ¶¶ 89–101, 145–188, 218–233. A pre-

suit demand letter's invocation of another statute does not waive the right to plead NYLL coverage where the pleaded economic reality supports it.

Rule 15(a)(2) provides that leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Even where a prior amendment has been filed, leave remains appropriate where targeted amendments could cure technical defects without prejudice—particularly as to statutory labels, registration/standing particulars, Rule 9(b) details, or current-DCL transfer allegations. In considering whether leave to amend should be granted, courts weigh the Foman v. Davis factors: undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility of amendment. Foman v. Davis, 371 U.S. 178, 182 (1962). Absent a showing of those factors—none of which Defendants can establish here on the current record—leave to amend is not merely permitted but presumptively appropriate. Id.

## STATEMENT OF RELEVANT ALLEGATIONS

Plaintiff incorporates by reference the factual allegations of the First Amended Complaint as if fully set forth herein. See Fed. R. Civ. P. 10(c); FAC ¶¶ 1–297. The specific paragraph references supporting each cause of action are set forth in the argument that follows.

## ARGUMENT

I.     THE FAC STATES CLAIMS UNDER THE NEW YORK LABOR LAW

A.  Dixon Plausibly Alleges Employee Status Under the Economic-Realities Test

Employee status under the NYLL turns on economic reality, not labels. Saleem v. Corporate Transportation Group, Ltd., 854 F.3d 131, 139–40 (2d Cir. 2017); Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141–43 (2d Cir. 2008); Zheng v. Liberty Apparel Co., 355 F.3d 61, 71–72 (2d Cir. 2003). That inquiry is rarely resolved on a complaint where the pleaded facts support competing inferences. The FAC pleads more than a label: Dixon was placed on Sneaker Addict's formal Paychex payroll as Employee ID 023, received a salary-style Paychex wage statement, had his touring schedule and performance obligations dictated by Defendants, lacked independent management and written contracts, depended on Defendants for touring income, and performed integral services for Cartagena's touring and recording operations. FAC ¶¶ 31–40, 59, 76–85, 89–101, 112. Each of the NYLL control factors supports employee status on the current pleadings. Dixon did not work at his own convenience: his schedule was set by Cartagena, Sneaker Addict, and Roc Nation and was not negotiable without financial and physical consequence. FAC ¶¶ 31, 59, 76–85. He was not free to engage in other employment: Defendants

controlled his music-industry relationships and threatened blacklisting if he worked with competitors or departed. FAC ¶¶ 54–59, 112. He was on Defendants' formal Paychex payroll. FAC ¶¶ 33–34. His services were integral to Defendants' touring enterprise: Cartagena's shows required a hype man, and Dixon performed that role exclusively for over two hundred shows. FAC ¶¶ 29–30, 89–96. The economic-realities test turns precisely on these functional indicia, and all of them cut toward employee status.

### 1. Response to the Joint MTD

The Joint Defendants argue that Dixon's NYLL claims fail because he purportedly admitted independent-contractor status in a demand letter and was paid per show. That argument improperly elevates a pre-suit legal label over the FAC's pleaded economic facts. A worker may be paid by the piece, job, day, or show and still be an employee where the alleged employer controls scheduling, opportunities, compensation methods, and records. Dixon pleads that Cartagena and his entities recruited him, assigned him to tours and performances, controlled his work schedule and conditions, determined and manipulated his compensation, maintained payroll records, issued pay statements through Sneaker Addict, and integrated his services into the core touring product. FAC ¶¶ 29–40, 89–96.

The NYLL's employment-status determination focuses on the degree of control over the results produced or the means used to achieve them, evaluated through five factors: whether the worker worked at his own convenience, was free to engage in other employment, received fringe benefits, was on the employer's payroll, and was on a fixed schedule. Velu v. Velocity Exp., Inc., 666 F. Supp. 2d 300, 305–06 (E.D.N.Y. 2009). Dixon was on Sneaker Addict's formal Paychex payroll, performed exclusively for Cartagena for fifteen years, had no independent management, and could not freely decline shows without economic and physical reprisal. FAC ¶¶ 31–40, 53–62, 89–96. A self-serving characterization in a pre-litigation demand letter does not conclusively establish independent-contractor status, and the Court should not resolve this fact-intensive inquiry at the pleading stage. Id. (the determination of whether a worker is an employee or an independent contractor is a fact-intensive inquiry that focuses on the degree of control exercised by the purported employer).

Defendants' reliance on Hart v. Rick's Cabaret International, Inc., 967 F. Supp. 2d 901 (S.D.N.Y. 2013), underscores why dismissal is inappropriate. Hart held, after extensive analysis of control and economic reality, that dancers were employees notwithstanding industry labels and

purported agreements because the putative employer exercised practical control over their work. Id. at 912–20. Here, the relevant inquiry is the same functional control; the FAC alleges that Defendants controlled Dixon's access to performances, travel, pay, and records and that he depended on Defendants for his income and music-industry opportunities. FAC ¶¶ 31, 59, 76–85, 90–91, 112, 122–123.

The misclassification patterns the FAC alleges is not novel. Courts in this circuit have repeatedly encountered situations where putative employers used labels, payment structures, and written disclaimers to disguise employment relationships, and they have consistently reserved the classification determination for the finder of fact. Each of those decisions confirms the same principle: where the pleaded facts allege the functional hallmarks of an employment relationship, the classification question cannot be resolved against the plaintiff at the pleading stage. Here, those hallmarks are present: formal payroll, schedule control, exclusive service, industry-access dependence, and integration into the core touring product.

Defendants may argue that performing artists are categorically different from the workers in the labor-law cases cited above. That categorical argument is without merit. The Second Circuit and courts in this District have consistently applied the economic-realities framework to performing artists, entertainment workers, and creative professionals in the live-performance industry. Hart, 967 F. Supp. 2d at 912–20. There is no creative professional carve-out to the economic-realities test. A performer who is placed on formal payroll, has his schedule dictated by a single employer across hundreds of performances over fifteen years, and lacks any independent market presence or management structure is not a contractor by virtue of his profession. FAC ¶¶ 29–40, 89–96.

2. Response to Roc Nation (joint employer / functional control)

Roc Nation argues that it was merely Cartagena's manager and that all Roc allegations are conclusory. The FAC alleges otherwise. Roc Nation, through Castillo, allegedly scheduled and approved tour dates on which Dixon was required to perform, negotiated or approved performance-agreement terms affecting compensation, served as Dixon's direct supervisory point of contact, exercised supervisory authority over touring activities, communicated directly with Dixon about compensation structure, approved tour budgets, and had the power to require Dixon's agreed fee as a separate line item. FAC ¶¶ 76–82. Dixon directly reported to Castillo and complained to him about underpayment, mistreatment, exploitative conditions, and fear of

retaliation. FAC ¶¶ 77–80. Roc Nation allegedly continued to approve tours and receive management commissions from gross touring revenues generated in part by Dixon's performances. FAC ¶¶ 80–84, 140.

Those facts plead functional control under Zheng and joint employment under Barfield. Zheng, 355 F.3d at 72; Barfield, 537 F.3d at 143. Roc Nation stresses that Cartagena also controlled Dixon. But joint employment exists precisely because more than one entity may control different aspects of the work relationship. Barfield, 537 F.3d at 141–42. Allegations that Cartagena exercised exclusive or sole control over some aspects of the enterprise do not negate alternative and additional allegations that Roc Nation exercised functional control during the management period. FAC ¶¶ 12, 15, 76–85, 218–233; Fed. R. Civ. P. 8(d)(2)– (3).

The Zheng factors for joint employment assess: (1) whether the premises and equipment of the putative joint employer were used in the work; (2) whether the contractor had a business that could or did shift as a unit from one putative employer to another; (3) the extent to which the workers performed a discrete line-job integral to the putative joint employer's process of production; (4) whether responsibility under the contract could pass from one subcontractor to another without material changes; (5) the degree to which the putative joint employer or its agent supervised the work; and (6) whether the workers worked exclusively or predominantly for the putative joint employer. Zheng, 355 F.3d at 71–72. Applying those factors: Roc Nation's management personnel used tour logistics, schedules, budgets, and settlement frameworks within Roc Nation's management infrastructure (factor 1); Dixon's role as hype man was not fungible— Cartagena relied on his specific relationship with Dixon (factor 2); Dixon's performance role was integral to Cartagena's touring product and therefore to Roc Nation's commissioned revenue (factor 3); Castillo directly supervised tour activities and served as Dixon's supervisory contact (factor 5); and Dixon worked exclusively for Cartagena for fifteen years during Roc Nation's management period (factor 6). FAC ¶¶ 76–85. These factors, applied to the pleaded facts, raise a plausible inference of joint employer status that cannot be resolved on a motion to dismiss.

Roc Nation also attacks allegations made on information and belief. That objection fails where the facts lie principally within Roc Nation's possession. Tour budgets, settlement sheets, promoter contracts, management communications, and Castillo's internal reporting are not public records available to Dixon before discovery. FAC ¶¶ 76–85, 77–80. At the pleading stage, Dixon may allege facts on information and belief where the factual support is peculiarly within

Defendants' knowledge and the FAC provides the basis for the belief—Castillo's supervisory role, Dixon's direct complaints, Roc Nation's management of Cartagena's touring operations, and Roc Nation's commission interest. FAC ¶¶ 76–85, 77–80.

### 3. Response to Moreira (officer / payroll control / not merely attorney)

Moreira's supplemental motion argues that she was only Cartagena's lawyer and not Dixon's employer. The FAC does not rely on attorney status. It alleges operational payroll and corporate control: Moreira was an officer and/or director of Sneaker Addict and Slate, served as business manager, controlled finances, corporate entities, payroll, and contractual arrangements, personally created, managed, and supervised Dixon's Paychex payroll records, caused the June 2019 wage statement, and controlled access to payroll and financial information. FAC ¶¶ 18, 33–34, 38, 98–99, 114, 120, 166, 191–194, 200–204. Those allegations address the economic-realities factors Moreira says are absent: determining or administering payment, maintaining records, and exercising control over wage statements and payroll.

Moreira's reliance on Ammar v. Carbone, 237 A.D.3d 883 (2d Dep't 2025), and similar employer-status cases is premature because the FAC alleges more than a bare title. It alleges that Moreira personally performed the payroll and wage-record functions at issue. FAC ¶¶ 18, 98–99, 166, 200–204. If discovery shows Moreira acted solely as outside counsel without operational control, she may renew that argument later. On a motion to dismiss, however, the Court must accept the pleaded operational role and draw the reasonable inference that Moreira acted as an officer, payroll administrator, agent, or person exercising employer-like control over wage records. FAC ¶¶ 18, 38, 98–99, 200–204.

### 4. The demand-letter independent contractor reference does not defeat pleading in the alternative

Defendants' demand-letter argument fails for three reasons. First, a legal characterization in a pre-suit demand letter is not a binding judicial admission of employee status. The economic-realities test turns on facts. Second, Rule 8(d) permits Dixon to plead alternative theories: if Defendants deny employee status, Dixon may preserve contractor, freelance, contract, unjust-enrichment, and accounting theories while also pleading NYLL employee status based on payroll and control. Fed. R. Civ. P. 8(d)(2)– (3). Third, the letter's reference to freelance protections is not inconsistent with the FAC's factual allegations that Sneaker Addict placed Dixon on payroll, that Paychex issued wage statements, that Defendants maintained employment records, and that Defendants controlled the conditions under which he performed. FAC ¶¶ 31–40, 89–101.

5. New York's Statutory Presumption That Performing Artists Are Employees Reinforces the Economic-Realities Analysis

The economic-realities factors already establish employee status on the pleadings. New York's statutory treatment of performing artists reinforces that conclusion. Under N.Y. Workers' Compensation Law § 2(4) and the parallel New York Unemployment Insurance Law provision, N.Y. Labor Law § 511(1)(b) (1-a), a professional musician or a person otherwise engaged in the performing arts, and performing services as such for a television or radio station or network, a film production, a theatre, hotel, restaurant, night club or similar establishment is deemed an employee unless, by written contract, such musician or person is stipulated to be an employee of another employer covered by this chapter. N.Y. Lab. Law § 511(1)(b) (1-a); N.Y. Workers' Comp. Law § 2(4). Courts in this District have applied that presumption to hold performing artists to be statutory employees of the entities that engage their services. Fouchécourt v. Metro. Opera Ass'n, Inc., 537 F. Supp. 2d 629, 633 (S.D.N.Y. 2008) (under N.Y. Workers' Comp. Law § 2(4) all musicians and performing artists are deemed to be employees of the entity engaging their services absent a qualifying written contract to the contrary); Makarova v. United States, 1999 U.S. Dist. LEXIS 1211 (S.D.N.Y. Feb. 4, 1999) (the court held that Natalia Makarova, a professional ballet dancer performing in the musical play On Your Toes, was a special employee of the John F. Kennedy Center for the Performing Arts (the "Kennedy Center")  for Workers' Compensation purposes).

The court's legal reasoning focused on the application of New York's multi-factor control test and the consistent treatment of performing artists as employees, specifically rejecting the notion that Makarova's star or principal artist status defeated her classification as an employee; In re Mid America Productions, 267 A.D.2d 656 (3d Dep't 1999) (the Appellate Division, Third Department affirmed a decision of the Unemployment Insurance Appeal Board holding performing artists—specifically soloists engaged to perform at Carnegie Hall—are employees of the entity that engages them and produces the concert. Matter of Women's Project & Prods., Inc. (Commissioner of Labor), 182 A.D.3d 944 (2020), § 25.09 Unemployment Insurance.  Under, NY CLS Labor § 511.  the statute creates a rebuttable presumption of employment for professional musicians and performing artists performing services for a theater or similar establishment. Matter of Women's Project & Prods., Inc. (Commissioner of Labor), 182 A.D.3d 944 (2020), § 25.09 Unemployment Insurance, Matter of Griffs Global Corp. (Commissioner of Labor), 210 A.D.3d 1349 (2022).  The putative employer bears the burden of rebutting this statutory presumption, which can only be achieved by producing a written contract establishing that the performing artist

is the employee of another covered employer. Matter of Women's Project & Prods., Inc. (Commissioner of Labor), 182 A.D.3d 944 (2020), § 25.09 Unemployment Insurance, Matter of Griffs Global Corp. (Commissioner of Labor), 210 A.D.3d 1349 (2022).

Dixon acknowledges that §§ 2(4) and 511(1)(b) (1-a) originate in the Workers' Compensation Law and Unemployment Insurance Law rather than in Article 6 of the Labor Law itself. That distinction does not defeat their relevance. The statutory presumption articulates a considered legislative judgment—one adopted specifically to correct the same misclassification pattern the FAC alleges—that performing artists engaged by touring, recording, and nightclub operators occupy the functional role of employees. That legislative determination reinforces the economic-realities control-based analysis that governs Dixon's NYLL claims and confirms that treating a fifteen-year exclusive hype man as an independent contractor departs from New York's baseline treatment of performing artists. See Saleem, 854 F.3d at 139–40. The FAC alleges precisely the relationship the statute contemplates: Cartagena, Sneaker Addict, and Slate operated a touring and recording enterprise; they engaged Dixon to perform hype-man services at over two hundred shows; no written contract stipulates that Dixon was the employee of any different covered employer; and Sneaker Addict in fact placed Dixon on formal Paychex payroll. FAC ¶¶ 29–40, 89–96. Because no written stipulation to the contrary exists on the face of the FAC, the § 2(4)/§ 511 presumption operates in Dixon's favor at the pleading stage and, at minimum, cannot be resolved against him on a Rule 12(b)(6) record. Even if the Court treats the presumption as strictly controlling only for workers' compensation and unemployment insurance purposes, it remains persuasive evidence that New York's public policy classifies performing artists engaged in the touring and nightclub economy as employees for purposes of wage protection—not as freelancers subject to unilateral withholding, deduction, and non-payment. That legislative policy is directly relevant to how the economic-realities test should be applied to Dixon's NYLL claims.

B.  NYLL §§ 193 and 198 Are Adequately Pleaded (Count I)
    1.  Timely 2019–2020 discrete wage events
Defendants argue that Count I is time-barred and that all alleged wage events are too old. The FAC pleads paychecks, pay statements, and services through at least 2019–2020, including a June 21, 2019, Paychex wage statement and Roc Nation-era shows between approximately 2017 and 2020. FAC ¶¶ 83, 88(b), 95. Even under Defendants' accrual theory, each paycheck or wage payment is a discrete event with its own limitations period. The defense therefore cannot obtain dismissal of the entire claim by pointing to older wage events. At minimum, wage events on or

after June 19, 2019, and 2020 payroll or performance events, remain timely or require discovery to identify precise dates. FAC ¶¶ 33–40, 83, 88(b), 92–96. A statute-of-limitations defense, even if partially meritorious, warrants dismissal only of time-barred individual claims, not wholesale dismissal of the entire wage claim with prejudice. Lama v. Malik, 192 F. Supp. 3d 313 (E.D.N.Y. 2016).

Roc Nation argues that no 2020 paycheck date is pleaded. That is not a basis for dismissal with prejudice where Roc Nation and the other Defendants possess the schedules, settlement sheets, promoter contracts, and payroll records needed to identify the precise wage periods. FAC ¶¶ 83, 88(b), 95, 77–80. The FAC pleads that Dixon performed services through 2020, that Roc Nation managed Cartagena through 2020, and that wage violations occurred during that period. FAC ¶¶ 30, 83, 88(b), 95. That is enough to permit discovery. Precise paycheck dates and Paychex records are the type of information peculiarly within Defendants' possession; requiring Dixon to plead those records before obtaining them in discovery would effectively foreclose wage claims in the most common case where an employer controls its own payroll records. FAC ¶¶ 33–40, 83, 88(b), 95, 77–80.

The Roc Nation-era wage events are further supported by the FAC's allegations concerning Castillo's direct supervision, tour approvals, and budget access during the 2016–2020 management period. FAC ¶¶ 76–85. Roc Nation cannot simultaneously claim it was merely a passive manager with no operational involvement and also deny that it has records of the tours it approved, the budgets it reviewed, and the compensation arrangements it was asked to supervise. FAC ¶¶ 76–85, 77–80. If Roc Nation has no records relevant to Dixon's wage claims for the 2016–2020 period, it can say so in a sworn interrogatory response; it cannot obtain dismissal by asserting factual gaps that are of its own creation.

2. Executive Order No. 202.8 tolling extends the look-back period

Even as to pre-June 2019 wage events, the NYLL limitations period is extended by 228 days under New York Executive Order No. 202.8 and its successors, tolling recognized by courts throughout the Second Circuit in federal NYLL cases. Abuladze v. Apple Commuter Inc., No. 22-cv-8684, 2024 U.S. Dist. LEXIS 21903 (S.D.N.Y. Jan. 23, 2024), R&R adopted, 2024 U.S. Dist. LEXIS 21060 (S.D.N.Y. Feb. 7, 2024) (confirming EO 202.8 added 228 days to the NYLL look-back window); Silkowski v. Mangione, No. 24-CV-8666 (ARR) (JAM), LEXIS 92085 (E.D.N.Y. May 14, 2025) (The court denied the defendant's motion to dismiss the plaintiff's New York Labor

Law (NYLL) wage claims, holding plaintiff could proceed with her NYLL claims dating back six years and 228 days. The court explicitly reaffirmed that the 228-day tolling period resulting from Governor Andrew Cuomo's Executive Order No. 202.8 adds 228 days to the standard six-year statute of limitations for NYLL claims, effectively extending the recoverable damages period.) Applied to Dixon's June 19, 2025, filing date, the tolled look-back extends to approximately November 4, 2018—six years and 228 days—reaching additional wage events that Defendants argue are time-barred.

The EO 202.8 tolling is not merely procedural background; it has substantive significance for this case. The FAC alleges that Dixon performed for Cartagena on multiple tours between 2018 and 2019, well within the 228-day extended window, and that those tours generated promoter payments from which Dixon's agreed share was not paid. FAC ¶¶ 33–40, 83, 88(b), 93–96. Application of the 228-day toll brings those pre-June 2019 tours squarely within the limitations period. Moreover, the FAC's June 2019 Paychex wage statement—which the FAC alleges reflects a pattern of underpayment throughout the Paychex period—confirms that at least some wage events within the tolled look-back period also involved the falsified withholding fields that are central to the § 195 claim. FAC ¶¶ 33–34, 99, 166. The combination of the six-year limitations period, the 228-day EO 202.8 toll, and the fraudulent-concealment toll creates a look-back period that encompasses essentially the entire Roc Nation management era and reaches substantially into the pre-Roc Nation period. Defendants cannot obtain dismissal of Count I on limitations grounds without demonstrating that no wage event falls within that extended window—a showing they cannot make at the pleading stage without the performance and payroll records that remain in their possession. FAC ¶¶ 33–40, 83, 88(b), 93–96, 77–80.

The majority rule applying EO 202.8 to NYLL claims in federal court is well-established in the Second Circuit. As noted in Silkowski, courts across the circuit have held that the executive order constitutes a tolling of the state statute of limitations and that federal courts sitting in diversity apply state tolling provisions. Silkowski v. Mangione, No. 24-CV-8666 (ARR) (JAM), LEXIS 92085 (E.D.N.Y. May 14, 2025); Abuladze, No. 22-cv-8684, 2024 U.S. Dist. LEXIS 21903 (S.D.N.Y. Jan. 23, 2024), R&R adopted, 2024 U.S. Dist. LEXIS 21060 (S.D.N.Y. Feb. 7, 2024). Defendants have not identified any Second Circuit authority rejecting EO 202.8 tolling for NYLL wage claims in federal court. In the absence of such authority, this Court should apply the majority rule and extend the look-back period accordingly.

3.  Retroactivity of the No Wage Theft Loophole Act

Roc Nation and the Joint Defendants argue that the 2021 amendments to §§ 193 and 198 are non-retroactive. Dixon does not need a retroactivity ruling to survive. Count I pleads timely 2019–2020 discrete payroll and wage events, specific deductions and diversions, and concealed wage-record manipulation. FAC ¶¶ 33–40, 88(b), 92–96, 166, 198–204. Moreover, the FAC pleads post-2021 retaliation and ongoing threats that are unambiguously covered regardless of retroactivity.

Nevertheless, the retroactivity question is not as settled as Defendants assert. The Fourth Department has held that the No Wage Theft Loophole Act is remedial legislation warranting retroactive application, reasoning that the legislature's express immediate effective date and its characterization of the Act as a remedial clarification of preexisting law demonstrate legislative intent to reach pending wage disputes. Hernandez Tech., Inc. v. Rivera, 239 A.D.3d 1354 (2025). The New York Court of Appeals has not resolved the issue. This Court sitting in diversity must predict how that court would rule, and the Act's detailed legislative history and remedial purpose—closing what the legislature itself called a judicially created loophole—favor retroactivity.

Defendants' First Department authorities, Perella Weinberg Partners LLC v. Kramer, 226 A.D.3d 523 (1st Dep't 2024), and Raparthi v. Clark, 214 A.D.3d 613 (1st Dep't 2023), represent one side of a genuine split. Their reasoning rests primarily on Majewski v. Broadalbin-Perth Central School District, 91 N.Y.2d 577, 696 N.E.2d 978 (1998), which emphasized that whether a remedial statute applies retroactively turns on legislative intent. But Majewski does not foreclose retroactivity—it shifts the inquiry to whether the legislature expressly stated its retroactive intent. Here, the legislature did exactly that: it described the Act as remedial, directed it take effect immediately, and expressly stated that prior judicial interpretations had misconstrued the statute. Hernandez, 239 A.D.3d at 1357. The First Department in Perella Weinberg and Raparthi held that the amendment does not apply retroactively, but those decisions predate the fuller legislative record on which more recent courts have relied. Nor did they address the principle that where the legislature enacts an amendment to correct a judicial misinterpretation of a prior statute, the amendment is presumed to clarify rather than change the law and may therefore be applied to pending cases. Under that principle—well-established in New York law—the No Wage Theft Loophole Act applies to the pending conduct alleged by Dixon.

This Court sitting in diversity must predict where the New York Court of Appeals will land given the current appellate split. The Court of Appeals has consistently applied a purposivist approach to wage-law interpretation, reading Article 6 broadly to protect workers and resolve ambiguities in favor of coverage. The Court of Appeals has also credited legislative declarations of remedial purpose and has applied retroactivity in other wage-statute contexts where the legislature's declared intent was to reach pending disputes. Given the legislature's emphatic language—completely and without exception—describing Article 6's prohibition on wage theft, this Court should predict that the Court of Appeals would hold the Act applies retroactively, or at minimum should decline to dismiss Count I with prejudice while that question remains unresolved at the appellate level. Dismissal with prejudice on a retroactivity question that the Court of Appeals itself has not yet decided would be an inappropriate use of Rule 12.

Even under a prospective-only reading, the FAC independently supports liability. Count I pleads 2019–2020 wage events that postdate the pre-2021 judicial interpretations Defendants rely upon. FAC ¶¶ 33–40, 88(b), 92–96. It pleads that pay-period accruals occurred through at least late 2019 and through the Roc Nation management period in 2020. FAC ¶¶ 83, 88(b), 95. To the extent the existing § 193 framework prior to the 2021 amendment covered deductions from earned wages, the FAC alleges exactly that: Defendants deducted from Dixon's agreed $3,000 per-show fee by unilaterally substituting a $1,300.30 Paychex salary payment and treating the remainder as unreported, diverted income rather than wages. FAC ¶¶ 33–40, 92–94, 198–201. That is a deduction theory, not merely a failure-to-pay theory. Whether it succeeds requires application of the economic-realities facts, not a threshold retroactivity ruling that wipes out the entire count. Even assuming arguendo that the Court were to conclude that the Act does not apply retroactively, dismissal with prejudice of the entire Count I would be improper: at minimum, the June 2019 Paychex deduction theory, the 2020 wage events, the EO 202.8-tolled pre-June 2019 events, and the retaliation-related wage-withholding allegations all survive independently of any retroactivity determination.

4. Concealed deductions / manipulated wage records theory

Defendants frame Count I as merely a pre-2021 failure to pay theory under § 193. The FAC pleads more. It alleges that Defendants made unlawful deductions from earned wages by diverting performance fees allocated to Dixon into entities they controlled, issuing pay statements that falsely stated wages paid and omitted wages owed, and retaining promoter payments contractually

owed to Dixon. FAC ¶¶ 36–40, 92–94. It alleges that the June 2019 Paychex statement listed withholdings as "XXXX," that such fields should automatically populate on legitimate Paychex statements, and that the alteration concealed the true amount of wages, withholdings, and reported income. FAC ¶¶ 33–34, 99, 166, 201. Those allegations plead a deductions and wage-record manipulation theory, not only wholesale nonpayment.

The deduction theory is significant and independent. N.Y. Lab. Law § 193 has always prohibited unauthorized deductions from earned wages, even before the 2021 amendment. A deduction within the meaning of § 193 includes any reduction in the amount of wages actually paid to an employee below the amount contractually owed. The FAC alleges precisely that: Defendants agreed to pay Dixon $3,000 per show, issued a Paychex salary payment of $1,300.30 for the June 8–21, 2019 pay period, and diverted the difference into Cartagena-controlled entities rather than paying it to Dixon. FAC ¶¶ 35–40, 92–94. The $1,300.30 Paychex salary payment was not a separate agreed compensation structure; it was a fraction of the $3,000 per-show fee attributable to the performances in that period, with the remainder improperly withheld. FAC ¶¶ 33–40, 92–94. That is an unlawful deduction under pre-2021 § 193. The additional promoter-payment allegation—that Dixon was owed a share of a $30,000 promoter payment that Jospitre received and retained—is an independent deduction event. FAC ¶¶ 39, 92. The Goldberg rule excluding total nonpayment from pre-2021 § 193 does not cover specific identified deductions from identified payments to which Dixon had an immediate entitlement.

Defendants cite cases such as Goldberg v. Jacquet, 667 F. Appx. 313 (2d Cir. 2016), for the proposition that pre-2021 § 193 did not cover total withholding of wages. Goldberg does not require dismissal where the complaint alleges specific deductions, diversion of allocated performance fees, falsified wage statements, and concealed withholdings. Id. at 314. The FAC identifies the specific mechanism: Paychex payroll, false or incomplete withholding fields, diversion of promoter payments, and retention of cash or performance proceeds owed to Dixon. FAC ¶¶ 33–40, 92, 166, 198, 201–204. Moreover, even under Goldberg, the § 198 damages provision has always authorized a private right of action for underpayment of wages without the same deduction-versus-nonpayment distinction that applies to § 193. Whether § 198(1-a) independently supports Count I even if § 193's deduction theory does not is a question of statutory construction that militates in Dixon's favor and does not warrant dismissal with prejudice.

5.  Fraudulent-concealment tolling

The limitations defense also cannot be resolved on the pleadings because the FAC pleads fraudulent concealment and delayed discovery. Defendants controlled payroll systems, publishing registrations, royalty reporting, tour settlement documents, and contractual records; they allegedly withheld those materials, gave oral assurances, and concealed the true flow of funds. FAC ¶¶ 36, 47–49, 87–88, 164–171. Dixon alleges he did not obtain key Paychex, copyright, recording, and witness materials until 2023–2025. FAC ¶¶ 88(f), 168. He alleges that before 2023 he knew he was being underpaid relative to expectations but lacked the records needed to quantify the discrepancy, identify the specific legal violations, or determine the actors involved. FAC ¶¶ 87–88, 168–169. That is enough to plead tolling at the Rule 12(b)(6) stage.

Defendants contend that awareness of underpayment defeats tolling. But the FAC distinguishes awareness that money was missing from knowledge of the concealed payroll, withholding, settlement, registration, and royalty structures through which the claims accrued and could be pleaded. FAC ¶¶ 87–88, 164–171. A plaintiff can know he is being shorted while still being prevented from discovering the facts necessary to identify the legal violation, the responsible entities, the amounts, and the concealed deductions or diversions. FAC ¶¶ 33–40, 47–49, 87–88, 166–171.

C.  NYLL § 195 Wage Notice and Wage Statement Claims Survive (Count II)
1.  The June 2019 Paychex statement as concrete injury

Defendants argue that Count II lacks standing, injury, or a false statement because the June 2019 Paychex statement shows gross and net wages that are the same. The FAC alleges a concrete informational injury: the statement listed all federal income tax, Social Security, and Medicare withholding fields as "XXXX," omitted required deduction information, failed to accurately identify wages earned, and deprived Dixon of the ability to determine whether he was being paid all earned wages or challenge unlawful deductions in real time. FAC ¶¶ 33–34, 98–100, 166, 201. That is precisely the type of wage-statement harm § 195 addresses. Roma v. David Carmili, Physician, P.C., 761 F. Supp. 3d 481 (E.D.N.Y. 2024), (the plaintiff alleged she received no paystubs at all over a multi-year period, and that this directly caused her to be unaware of deductions being taken for student loan payments that were never made — producing a concrete financial injury (tax penalties and interest)). Count II is not limited to a single statement: Rosa v. La Oficina of Queens, Inc., 2023 U.S. Dist. LEXIS 46930 (E.D.N.Y. 2023) (the court held that the defendants were liable for violating N.Y. Lab. Law § 195 because they failed to provide the

plaintiff with the required wage statement). Under this statutory framework, a new violation of N.Y. Lab. Law § 195 arises each pay period in which a compliant wage statement is not furnished); Thompson v. Elev8 Ctr. N.Y., LLC, No. 20-CV-9581 (PGG) (JLC), 2023 U.S. Dist. LEXIS 122504 (S.D.N.Y. July 17, 2023) (because the baseline wage claims were not permanently resolved or dismissed with prejudice, evaluating or dismissing the derivative wage-statement and wage-notice claims would be premature while the related wage claims remained active through the amendment process).

The defense asks the Court to infer from the same gross and net pay that no withholding information was required. But the FAC alleges that the "XXXX" entries were not ordinary; they were manual alterations or falsified data concealing the true withholding amounts and wage reporting. FAC ¶¶ 33–34, 99, 166, 201. At the Rule 12(b)(6) stage, the Court must credit that allegation and draw the inference that the statement was facially non-compliant and injurious. FAC ¶¶ 99–100.

2.   Section 195(1) wage-notice claim: renewed-engagement theory

Dixon was initially retained in 2005, before the Wage Theft Prevention Act's April 9, 2011, effective date. However, his engagement evolved and was restructured over fifteen years—including new touring arrangements and a new management relationship with Roc Nation beginning around 2016. Courts have recognized that an employment relationship can be renewed or restructured in ways that reset the relevant statutory date. Franco v. Jubilee First Ave. Corp., 2016 U.S. Dist. LEXIS 114191 (2016) (denying summary judgment on § 195(1)(a) where employment dates were genuinely disputed, including whether the plaintiff was hired anew after the WTPA's April 9, 2011, effective date).  Whether Dixon's role was renewed or restructured post-April 9, 2011, is a factual question not properly resolved on the pleadings.

The FAC alleges a substantial restructuring of the relationship around 2016 when Roc Nation took over Cartagena's management. FAC ¶¶ 21, 76–77. That management change brought new contractual arrangements, new tour agreements, new supervisory personnel, and a new compensation structure—circumstances that could constitute a new hiring triggering § 195(1)'s notice obligations as to the new arrangement. FAC ¶¶ 76–85. Whether the Roc Nation-era arrangement constituted a new hiring, renewal, or material modification of Dixon's engagement is a factual question that Defendants cannot resolve on a Rule 12 motion. The Paychex payroll itself—which appears to have commenced in connection with the Roc Nation period—may reflect

a new payroll enrollment that constitutes a hiring date for § 195(1) purposes. FAC ¶¶ 33–34, 76–85, 95. Those facts, drawn in Dixon's favor, permit the inference of a post-WTPA hiring date that brings § 195(1) claims within the statute.

Further, even if § 195(1) does not independently reach Dixon's initial 2005 engagement, it requires employers to give notice in writing of any material changes to wage information before such changes take effect. N.Y. Lab. Law § 195(1)(a). The shift from agreed per-show compensation of $3,000 to the Paychex salary structure, if that shift constituted a change in the terms of compensation, required written notice under § 195(1)(a). FAC ¶¶ 33–40, 92–94. Defendants never provided that notice. FAC ¶¶ 97–101. That is independently actionable as a § 195(1) violation even as to pre-WTPA employees, because the obligation to notify of changes arose at the time of each change, not only at the time of the original hiring.

### 3. Moreira's payroll and wage-statement role

Moreira argues that § 195 applies only to employers and that she was not an employer. Count II alleges that Sneaker Addict acted through Moreira, that Moreira created, managed, and supervised payroll records, that Moreira caused the June 2019 Paychex statement, and that she exercised control over the payroll information that § 195 required to be accurate. FAC ¶¶ 18, 33–34, 98–99, 166(2). These allegations plausibly plead liability as an officer, agent, payroll controller, or individual exercising employer-like authority over wage records. FAC ¶¶ 18, 33–34, 98–99, 166(2), 200–204.

Even if the Court finds the present allegations insufficient to impose direct § 195 liability on Moreira, dismissal should be without prejudice. Dixon can amend to plead Moreira's formal titles, payroll authority, communications, entity control, and involvement with Paychex in greater detail. FAC ¶¶ 18, 166, 200–204.

### 4. Roc Nation via joint-employer theory

Roc Nation argues that it did not issue wage statements. Count II proceeds against Roc Nation through joint-employer liability. The FAC alleges that Roc Nation had access to and maintained or had the right to maintain employment-related records, including tour itineraries, schedules, settlement sheets, and compensation communications; that Roc Nation approved budgets and schedules without ensuring proper payment; and that it functionally controlled Dixon's work during its management period. FAC ¶¶ 76–85, 79–82. If Roc Nation was a joint employer, it may be liable for statutory wage-notice and wage-statement violations during its joint-employer tenure. FAC ¶¶ 90, 95.

D. <u>NYLL § 215 Retaliation Is Adequately Pleaded (Count V)</u>

1. Protected activity: March 2025 demand letters

The FAC pleads protected activity: in March 2025 Dixon, through counsel, sent written demand letters asserting NYLL rights and demanding unpaid wages and statutory damages. FAC ¶¶ 63, 156–159. Defendants argue that the letters did not mention the NYLL or invoked freelance protections. That dispute cannot defeat the pleaded allegation that the letters complained of wage violations and demanded unpaid wage compensation. FAC ¶¶ 63, 159. Section 215 protects complaints and assertions of wage rights, not only letters using statutory labels. Reichert v. Casa Sys., 2026 U.S. Dist. LEXIS 71680 (S.D.N.Y. Mar. 30, 2026) (The court held that direct informal complaints about underpayment to supervisory personnel are sufficient to qualify as protected activity under N.Y. Lab. Law § 215. It resolved the defendants' motion for judgment on the pleadings; the court rejected the argument that the plaintiff failed to plausibly allege participation in a protected activity, determining that her informal, internal complaints sufficiently put her employer on notice of acts violating the NYLL). A pre-litigation demand letter asserting NYLL wage claims constitutes protected activity, and late or absent AG notice is not a condition precedent to the claim. Under New York statutory interpretation, where a legislature intends to establish a condition precedent to maintaining a civil action, it utilizes express, mandatory language. Bernstein v. 1995 Assocs., 217 A.D.2d 512 (1995) (where the Legislature intends to make pre-suit notice a condition precedent, it uses express mandatory language; absent such language, notice provisions are treated as administrative rather than jurisdictional.) The sole purpose of such provisions is to ensure that the Attorney General is apprised of the circumstances of the litigation, and they do not constitute a jurisdictional or procedural bar to a plaintiff's private recovery. Bernstein v. 1995 Assocs., 217 A.D.2d 512 (1995).

2. Adverse action and the three-element framework

The FAC pleads adverse action: within weeks, Cartagena, acting through Torres and associated accounts, threatened retaliatory legal proceedings, escalated social-media threats, and linked the threats to Dixon's videos and legal claims; Sneaker Addict and Slate threatened to withhold or did withhold payments; and Roc Nation failed to protect Dixon despite prior complaints. FAC ¶¶ 64–66, 156–163. The three elements of a § 215 retaliation claim are: (1) protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection. The FAC satisfies all three. Bad-faith or groundless litigation instituted against a former employee who asserted statutory wage rights is actionable under § 215

because of its in terrorem effect. The fact that a prior motion to dismiss in a related proceeding was denied does not conclusively establish good faith; the ultimate merit of Cartagena's claims has not been adjudicated.

The FAC alleges that Cartagena initiated legal proceedings and threatened further proceedings directed at Dixon within weeks of the March 2025 demand letters, that the threatened proceedings tracked the demand letters' subject matter, that Torres's social-media threats escalated and referenced Dixon's protected wage assertions, and that no additional basis for the threatened legal action existed independent of Dixon's exercise of his statutory rights. FAC ¶¶ 63–66, 156–163. Whether those proceedings were brought in good faith or in retaliation is a factual question that cannot be resolved at the pleading stage. Defendants' argument that the letters invoked independent contractor protections rather than NYLL protections does not affect the analysis: the substance of the complaint—unpaid wages—is what matters, not the specific statutory label used. Reichert v. Casa Sys., 2026 U.S. Dist. LEXIS 71680 (S.D.N.Y. Mar. 30, 2026).

### 3. Causation and temporal proximity

Causation is plausibly pleaded through close temporal proximity and content. The threats escalated immediately after the March 2025 demand letters and public wage assertions; the messages referenced Dixon's videos and warned him to stop; and the FAC alleges the threats were undertaken because of his protected wage activity. FAC ¶¶ 63–66, 160–162. Defendants argue that some threats predated the demand letters. Earlier threats provide context for why later threats were credible; they do not negate the pleaded escalation after protected activity. FAC ¶¶ 61–75, 156–163.

Temporal proximity alone can establish the causal connection at the pleading stage where the adverse action follows the protected activity by weeks or months. Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (temporal proximity of approximately three weeks between protected activity and adverse action is sufficient, standing alone, to establish the causal element of a retaliation claim at the prima facie stage). Here, Dixon pleads both: the temporal proximity of the escalating threats to the demand letters and the explicit content of the threats, which referenced Dixon's videos, his legal assertions, and his public conduct following the March 2025 demand. FAC ¶¶ 63–66, 160–162. Those allegations plausibly plead causation and do not require Dixon to exclude every innocent explanation for Defendants' conduct at the pleading stage. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555–56.

Defendants may argue that the retaliation claim fails because Dixon was no longer an employee at the time of the March 2025 events. That argument misreads the statute. NYLL § 215 expressly protects former employees who assert wage rights after separation, and courts in this circuit have consistently held that post-employment retaliation triggered by a wage complaint is actionable under the statute. The TVPA and NYLL retaliation protections would be meaningless if former employees who feared retaliation could be silenced by threats made after they left the employer's control. FAC ¶¶ 53–75, 156–163. The in terrorem effect of retaliatory litigation and physical threats is, if anything, more severe when directed at a former employee who lacks the protection of ongoing employment and the ability to invoke internal-complaint mechanisms.

### 4.  AG notice is curable

Courts interpreting New York Labor Law (NY CLS Labor § 215), hold that the requirement to serve notice of the action on the Attorney General at or before the commencement of the suit is not a condition precedent to bringing an action.  NY CLS Labor § 215, Kubersky v Cameron Indus., Inc., 173 A.D.3d 541 (2019).  Rather, a plaintiff's failure to timely provide such notice is a curable defect that does not require or warrant dismissal of the action with prejudice.  Kubersky v Cameron Indus., Inc., 173 A.D.3d 541 (2019), Ji v. Belle Work Beauty, Inc., 2010 N.Y. Misc. LEXIS 3825 (2010).  To establish this standard, New York courts rely on the Court of Appeals' seminal decision in Columbia Gas of N.Y. v. New York State Elec. & Gas Corp.  Kubersky v Cameron Indus., Inc., 173 A.D.3d 541 (2019), Ji v. Belle Work Beauty, Inc., 2010 N.Y. Misc. LEXIS 3825 (2010).  In Columbia Gas, which interpreted identical at or before the commencement statutory notice language in General Business Law (GBL) § 340(5), the Court of Appeals concluded that the notice requirement may not be considered a condition precedent to the plaintiff's cause of action. Kubersky v Cameron Indus., Inc., 173 A.D.3d 541 (2019), Ji v. Belle Work Beauty, Inc., 2010 N.Y. Misc. LEXIS 3825 (2010), Fertel v. Roosevelt Raceway, Inc., 94 Misc. 2d 822 (1978).  The Court of Appeals determined that the requirement is designed solely to apprise the Attorney-General that such an action was commenced so that he would be aware of the circumstances, rather than to establish a jurisdictional hurdle. Kubersky v Cameron Indus., Inc., 173 A.D.3d 541 (2019), Ji v. Belle Work Beauty, Inc., 2010 N.Y. Misc. LEXIS 3825 (2010), Fertel v. Roosevelt Raceway, Inc., 94 Misc. 2d 822 (1978). FAC ¶¶ 63–66, 156–163.

### 5.  Roc-specific failure-to-act after complaints

Roc Nation argues that it did not retaliate and had no duty to protect Dixon. The FAC pleads Roc Nation's retaliation liability through joint-employer and agency principles and through

its failure to act after direct complaints to Castillo about underpayment and fear of retaliation. FAC ¶¶ 77–80, 160. If Roc Nation is found to be a joint employer, its failure to investigate or correct retaliation arising from wage complaints during and after the employment relationship is actionable. FAC ¶¶ 76–85, 218–233. If the Court concludes the current facts are too sparse as to Roc Nation's post-demand conduct, leave should be granted to plead additional complaint, notice, and retaliation facts.

Roc Nation's argument that it had no duty to protect Dixon after receiving complaints is factually and legally incorrect on the current pleadings. A joint employer has an obligation to take reasonable steps to address wage and labor violations of which it has actual notice, and its failure to do so can constitute actionable retaliation or aiding and abetting of the underlying violations. The FAC pleads that Castillo received Dixon's complaints about underpayment, coercive conditions, and fear of retaliation—not as a passive bystander, but as Roc Nation's management representative with supervisory authority over the touring operations. FAC ¶¶ 77–80. Roc Nation's decision to continue approving tours and receiving commissions after receiving those complaints is not neutral management conduct; it is, as pleaded, an affirmative choice to benefit from the coercive enterprise while taking no steps to protect Dixon. FAC ¶¶ 80–84, 140. That conduct supports both the TVPA venture-liability theory and the NYLL retaliation theory as applied to Roc Nation.

6. The demand letter's invocation of freelance protections does not waive NYLL coverage

Defendants seize on the March 2025 demand letter's reference to independent contractor protections and freelance-worker statutes to argue that Dixon has conceded his non-employee status. That argument fails at multiple levels. First, a pre-suit demand letter is a settlement communication, not a judicial admission. The purpose of the letter was to assert all potentially applicable statutory rights in order to maximize Dixon's leverage and avoid waiving any theory. Characterizing Dixon's work as independent contractor work in that context was a litigation strategy to preserve freelance-worker claims, not a binding factual admission about his legal employment status under the NYLL's economic-realities test. Second, Rule 8(d) expressly permits pleading employee status and independent-contractor status in the alternative, and the demand letter's invocation of one theory does not waive the other. Fed. R. Civ. P. 8(d)(2)– (3). Third, even if the letter is properly considered—which it should not be on a Rule 12(b)(6) motion without further context—a single characterization in a pre-litigation demand letter cannot overcome the

economic-realities test's fact-intensive multifactor analysis. The Court should not resolve the employee-versus-contractor question—which turns on fifteen years of conduct, financial records, payroll documents, and industry-specific facts—based on a label in a demand letter.

E.  Count X (Joint-Employer Liability) States a Theory of Recovery Against Roc Nation

Roc Nation is correct that joint-employer liability is a theory of liability rather than an independent substantive cause of action. Dixon therefore does not oppose dismissal of Count X as a standalone count if the Court deems that clarification necessary. But the allegations in Count X should not be struck or disregarded. They are incorporated into and support Counts I, II, V, and IX against Roc Nation. FAC ¶¶ 218–233. The proper course is to construe Count X as a pleaded theory of recovery, not to dismiss the underlying NYLL claims or erase the factual allegations that establish Roc Nation's functional control.

Roc Nation's opposition to Count X conflates two distinct questions: whether joint-employer liability is a standalone cause of action (it is not), and whether the underlying factual allegations of joint employment support the NYLL and TVPA counts (they do). The latter question is all that matters. The FAC pleads extensive and specific facts about Roc Nation's operational role: Castillo served as Dixon's direct supervisory contact; Roc Nation approved tour dates and budgets; Roc Nation received direct complaints about underpayment and coercive conditions; Roc Nation had access to settlement sheets and compensation arrangements; Roc Nation received management commissions tied to gross touring revenues generated by Dixon's labor. FAC ¶¶ 76–85, 77–80. Those are not conclusory recitations of joint-employer elements. They are specific factual allegations that, if proven, establish functional control sufficient to support joint-employer liability under Barfield and Zheng. Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141–43 (2d Cir. 2008); Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003). Whether Roc Nation's conduct constitutes joint employment is a question of fact that is not resolved by pointing to Cartagena's primary control. The FLSA and NYLL both recognize multi-entity joint employment, and each entity's degree of control is assessed independently. If Count X is dismissed as a standalone count, its allegations should be expressly preserved and incorporated into Counts I, II, V, and IX, and the Court should clarify that their dismissal as a separate count does not prejudice Dixon's ability to proceed against Roc Nation on those substantive counts.

Roc Nation's separate procedural argument—that Dixon exceeded the scope of leave by adding NYLL claims—does not justify dismissal with prejudice. The FAC's NYLL claims arise

from the same nucleus of facts already at issue: Dixon's touring work, compensation, payroll records, Paychex documents, threats, and concealment. FAC ¶¶ 29–40, 53–88, 89–101, 156–163. The amendment did not inject an unrelated transaction; it pleaded legal theories flowing from the same underpayment and payroll facts Defendants had already challenged. FAC ¶¶ 33–40, 87–88, 89–101. To the extent prior leave was construed as limited, Rule 15(a)(2) supplies the answer: the Court should deem the NYLL allegations properly pleaded or grant leave nunc pro tunc because the claims are factually intertwined, Defendants have briefed them on the merits, and no discovery schedule has been prejudiced by their inclusion. Fed. R. Civ. P. 15(a)(2). Dismissal with prejudice would elevate a case-management point over the merits of wage claims grounded in the same pleaded course of conduct. FAC ¶¶ 33–40, 89–101, 156–163, 218–233.

The Joint Defendants' footnote argument that Dixon did not plead Attorney General notice under NYLL § 215(2)(b) likewise does not warrant dismissal with prejudice. Count V pleads the protected activity, retaliatory acts, and causal connection. FAC ¶¶ 63–66, 156–163. If the Court requires a specific allegation of notice, Dixon can plead compliance or cure any notice defect by amendment; the absence of a notice allegation does not defeat the substantive plausibility of retaliation where Defendants do not claim surprise about the conduct at issue. FAC ¶¶ 63–66, 156–163. The Court should not dismiss a timely retaliation claim based on a curable notice pleading issue.

## II.    THE FAC STATES A TVPA CLAIM (Count III)
### A.  Section 1589 Forced Labor Is Plausibly Alleged

Section 1589 prohibits obtaining labor or services through force, threats of force, threats of serious harm, threatened abuse of law or legal process, or a scheme intended to cause the person to believe nonperformance would result in serious harm or restraint. 18 U.S.C. § 1589(a), (c)(2). The serious-harm inquiry considers the victim's background and circumstances and may include physical, psychological, financial, reputational, and legal harms. FAC ¶¶ 53–62, 102–128. The statutory means of compulsion are stated in the alternative—Dixon need not allege every traditional hallmark of forced labor to state a viable claim.

### 1.  Serious harm, threats, reputational and economic coercion

The FAC pleads serious harm. Dixon alleges that, when he attempted to withdraw from touring or condition participation on payment, Defendants threatened that he would be blackballed, that people would handle him in the street, that he would never work in the business again, and that he would face legal and financial ruin. FAC ¶¶ 54–59, 111–123. He alleges chronic

underpayment and deliberate economic dependence: Defendants controlled his only meaningful source of income, access to touring opportunities, travel, and performance fees. FAC ¶¶ 59–60, 112–124. He alleges that these threats caused him to continue performing hundreds of shows and refrain from asserting wage and copyright claims. FAC ¶¶ 60, 119, 124–128.

The Second Circuit and district courts within it have described the § 1589(c)(2) serious harm standard as incorporating any harm—physical, psychological, financial, or reputational—that would compel a reasonable person of the same background and circumstances to continue performing labor. The standard is explicitly victim-centered and contextual. Baldia v. RN Express Staffing Registry LLC, 633 F. Supp. 3d 693, 706–08 (S.D.N.Y. 2022) (explaining that § 1589(c)(2) reaches any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that under all the surrounding circumstances would compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services, and requiring courts to consider the particular vulnerabilities of a person in the victim's position). The statutory language of § 1589(a)(4) is particularly significant here: it reaches any scheme intended to cause [the person] to believe that, if [the person] did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. 18 U.S.C. § 1589(a)(4). The inquiry is whether the defendant intended to cause that belief—not whether the threatened consequences were objectively certain or imminent. Id. The FAC pleads precisely that intended-belief structure: Cartagena and associates created a coercive environment through accumulated threats, financial control, and demonstrated willingness to follow through on consequences, with the intent and effect of causing Dixon to believe that nonperformance would result in serious harm. FAC ¶¶ 54–60, 108–124.

Defendants argue that economic pressure is just ordinary employment pressure. The FAC alleges more than fear of losing a job. It alleges a pattern of physical threats, family threats, blacklisting by a powerful industry actor, abuse of legal process, travel control, withholding of money, and financial opacity that prevented Dixon from safely leaving or enforcing his rights. FAC ¶¶ 53–62, 67–75, 108–123. Vidal v. Advanced Care Staffing, LLC, No. 1:22-cv-05535-NRM-MMH, 2023 U.S. Dist. LEXIS 59411 (E.D.N.Y. Apr. 4, 2023) (threatened financial harm from a 'loser pays' arbitration provision can constitute a threat of serious harm under § 1589 sufficient to render an arbitration delegation clause invalid at the preliminary injunction stage). Shukla v. Sharma, No. 07-CV-2972 (CBA) (CLP), 2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb.

14, 2012) (assessing coercion under the TVPA based on the totality of the circumstances). Whether a reasonable person in Dixon's position would feel compelled is a fact question.

The theory of economic coercion in the FAC is grounded not in ordinary employment pressure but in deliberate and sustained financial deprivation used as a lever of control. Defendants allegedly kept Dixon economically dependent by underpaying him relative to the agreed rate, preventing him from accumulating resources that would allow safe departure, controlling the financial records that would allow him to quantify his claims, and dominating his industry relationships so that leaving would mean professional extinction. FAC ¶¶ 59–60, 87–88, 112–124. Here, the FAC alleges that Defendants created Dixon's economic vulnerability through underpayment, blacklisting threats, financial opacity, and industry-access control. FAC ¶¶ 59–60, 112–124. The question is not whether Dixon was impoverished in an absolute sense, but whether Defendants used financial control to eliminate his realistic alternatives. That is a factual question for trial, not a legal determination at the pleading stage.

Defendants further argue that the absence of squalid living conditions, immigration-based threats, or language-barrier vulnerabilities defeats the claim. That argument is foreclosed by the statute's text and consistent case authority. Schneider v. OSG, LLC, No. 22-CV-7686 (AMD) (VMS), LEXIS 55467 (E.D.N.Y. Mar. 27, 2024) (recognizing that § 1589(a)(4) captures coercive conduct operating through the cumulative effect of threatening circumstances rather than a single overt act of violence); Claros v. Marvin's Refrigeration Corp., 800 F. Supp. 3d 391 (N.D.N.Y. 2025) (denying motion to dismiss § 1589 claim where recently arrived, non-English-speaking plaintiffs alleged that defendants leveraged an undefined debt and repeated threats to make them pay to compel continued labor, and holding threats of serious financial harm combined with vulnerability and isolation suffice under § 1589(c)(2)). Baldia v. RN Express Staffing Registry LLC, 633 F. Supp. 3d 693 (S.D.N.Y. 2022), confirms that threats of financial harm are cognizable under the TVPA. Congress's 2008 amendments to the TVPA expressly broadened the statute to remove the requirement that a victim be physically restrained or subject to traditional trafficking hallmarks; the amendments were designed precisely to capture coercive labor arrangements that do not involve physical captivity, immigration threats, or visible confinement. The cases Defendants cite involving traditional trafficking patterns—physical restraint, squalid conditions, confiscated passports—describe the paradigmatic TVPA case, not the exclusive one. This Court has repeatedly applied the statute to professional and economic coercion without requiring

traditional trafficking indicia. *Zan Sun v. Shen Yun Performing Arts, Inc.*, No. 25-CV-3185 (JGLC), LEXIS 111907 (S.D.N.Y. May 18, 2026).

Defendants also contend that Cartagena's social-media statements—look for work at UPS, we let you live, warnings to be very careful—are vague and untethered to Dixon's labor. The TVPA's definition of serious harm under § 1589(c)(2) expressly includes psychological coercion. These statements, viewed in context of Dixon's fifteen-year economic dependence on Defendants' operation, plausibly constitute the kind of coercive scheme the TVPA was enacted to address. *Saraswat v. Jayaraman*, No. 15-CV-4680 (PKC) (LB), 2016 U.S. Dist. LEXIS 133573 (E.D.N.Y. Sep. 28, 2016) (TVPA forced labor allegations survive dismissal where the complaint plausibly describes a coercive scheme, and that the nexus between threats and continued labor is a factual question). The nexus between these statements and Dixon's continued labor is not resolvable at the Rule 12(b)(6) stage. Moreover, we let you live and be very careful are not garden-variety expressions of frustration from a business adversary. In the context of fifteen years of alleged physical threats, references to street violence, family threats, and known location information, those statements carry an unmistakable meaning: continued silence and compliance, or else. FAC ¶¶ 54–62, 67–75, 108–123.

### 2. Threats to family / safety and blacklisting

The FAC pleads threats to family and physical safety. Associates warned that Defendants knew where Dixon and his children lived, told him to raise his kids and leave the situation alone, and asked whether he loved his family. FAC ¶¶ 61–62, 68–75, 108–110, 122. Torres and associates allegedly referenced buck 50 slashing, 48 hrs., ambushes, people waiting in the Bronx, and the ability to bring violence right over there. FAC ¶¶ 55, 67–75, 108–120, 236–251. Cartagena allegedly threatened that Dixon would be blackballed from every label and venue and that people would handle him in the street. FAC ¶¶ 54–59, 111–123. These allegations are not generalized workplace grievances; they plead threats of serious harm under § 1589.

The blacklisting allegations are an independent and significant form of serious harm under § 1589(c)(2). Professional blacklisting by a powerful industry actor—one who controls venue access, industry relationships, and collaborator access—can constitute a threat of reputational and financial harm sufficiently serious to compel a reasonable person to continue performing labor. *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011) (threats of professional blacklisting and adverse immigration consequences sufficiently

allege serious harm under § 1589 and that the fear of professional exile from a specialized field is cognizable TVPA harm). Here, the FAC alleges that Cartagena and his associates threatened to blackball Dixon from every label and venue, and that Cartagena's connections in the music industry were extensive enough to carry out that threat credibly. FAC ¶¶ 54–59, 111–123. Dixon had spent fifteen years building his professional identity and livelihood within Cartagena's orbit; a blacklisting threat from the person who controlled that orbit was not an empty ultimatum. The Court must draw that reasonable inference in Dixon's favor.

Family safety threats occupy a distinct and particularly serious place in the § 1589 analysis. The FAC does not allege generic hostility; it alleges specific threats identifying Dixon's children and their locations, direct questions about whether he loved his family, and statements that people would handle him in his own neighborhood. FAC ¶¶ 61–62, 68–75, 108–110, 122. A reasonable person confronting threats to his children's safety combined with demonstrated knowledge of their location would reasonably believe that nonperformance would result in harm to his family. Kiwanuka v. Bakilana, 844 F. Supp. 2d 107, 115–16 (D.D.C. 2012) (where a defendant demonstrated knowledge of the victim's personal circumstances and used that knowledge to reinforce threats, the coercive effect of the threats on the victim's willingness to continue labor is a question for the finder of fact, not for the court on a motion to dismiss). The specificity of the family-threat allegations—the reference to children, to loving one's family, to raising them and leaving the situation alone—makes those threats far more concrete and personal than the generalized hostility that courts have found insufficient in TVPA cases.

Torres's June 2019 statement—If you don't get on that plane, we'll have people waiting for you back in the Bronx—is not ambiguous; it is a direct threat of physical violence against Dixon in his own neighborhood. Any purported ambiguity about its meaning presents a factual dispute improper for resolution at the Rule 12(b)(6) stage. Even if the threat was delivered at the moment of performance rather than before, it is part of a sustained coercive pattern conditioning Dixon's continued participation in future engagements. The TVPA does not require that each discrete threat precede each discrete act of labor. Courts assess the cumulative coercive environment. Baldia, 633 F. Supp. 3d at 706. The cumulative assessment is essential here: each individual threat, viewed in isolation, might arguably be characterized as an expression of frustration or hyperbole. Viewed together—physical threats, family threats, location references, blacklisting threats, financial

control, records opacity, and stranding—the pattern describes a coercive scheme of the kind § 1589 was designed to reach.

### 3. No reasonable alternative

Defendants argue that Dixon eventually left in 2020 and therefore could have left earlier. That asks the Court to infer voluntariness from eventual separation. The FAC pleads that Dixon lacked a safe or realistic alternative because Defendants controlled his income, venues, promoters, collaborators, travel, payroll records, publishing information, and industry access; because he had no independent management, no written contracts, no savings due to chronic underpayment, and no access to the records needed to assert his claims; and because threats to him and his family continued after he began asserting rights. FAC ¶¶ 59–62, 87–88, 112–124, 168–169. A victim's eventual exit does not retroactively make earlier coerced labor voluntary. Sahebdin v. Khelawan, No. 21-CV-2956 (MKB), LEXIS 172964 (E.D.N.Y. Sep. 24, 2022) (confirming that TVPA forced-labor claims survive where defendants used a combination of economic dependency, document confiscation, threats of physical harm, and confinement to prevent a worker from leaving). What changed in 2020 to enable departure is a factual matter for discovery; requiring Dixon to plead the precise mechanism of escape at the Rule 12(b)(6) stage imposes a pleading burden the TVPA and Iqbal/Twombly do not require.

The no reasonable alternative analysis under § 1589 does not require that the victim be physically incapable of leaving. It requires that, under all the circumstances, a person of the victim's background and in the victim's situation would not have a safe and realistic alternative to continuing to provide labor. The relevant question is not whether Dixon could have left the metropolitan area, found alternative employment, or physically removed himself from a tour venue. The relevant question is whether the cumulative effect of threats, financial control, industry blacklisting, records opacity, and family danger made it unsafe or realistically impossible for Dixon to assert his rights, cease performing, and pursue the claims he was owed. Sahebdin, No. 21-CV-2956 (E.D.N.Y. Sep. 24, 2022); Baldia, 633 F. Supp. 3d at 707.

The FAC pleads the specific circumstances that eliminated Dixon's realistic alternatives. He had spent fifteen years building an identity entirely within Cartagena's professional sphere. He had no independent management. He had no written contracts of his own. He had been systematically underpaid and had no savings commensurate with the 200+ shows he performed. He had no independent knowledge of his royalty or publishing entitlements. He had been warned

repeatedly that attempting to leave or assert claims would result in blacklisting, physical harm, and harm to his family. FAC ¶¶ 59–62, 87–88, 112–124. The threats were not directed at abstract employment consequences; they were directed specifically at Dixon's professional survival, physical safety, and his children. When a defendant has used fifteen years of deliberate economic engineering and credible physical threats to eliminate a victim's realistic alternatives, the victim's eventual departure—once circumstances changed or one threat failed to materialize—does not establish that alternatives were available throughout. What changed, and whether it reflects the elimination of coercive conditions or simply the accumulation of sufficient evidence to seek legal assistance, is a question of fact that cannot be resolved at the pleading stage.

4.    The reasonable person standard and the Stillwell analogy

Defendants analogize to Stillwell and argue that Dixon—an adult male with tour security experience—could have simply walked away. That analogy fails. Dixon is not a registered nurse or law school graduate with portable credentials and multiple employment options. His entire professional identity, industry relationships, and income for fifteen years were controlled by and channeled through Cartagena's operation. The § 1589(c)(2) reasonable person of the same background and in the same circumstances standard requires individualized assessment. Zan Sun v. Shen Yun Performing Arts, Inc., No. 25-CV-3185 (JGLC), LEXIS 111907 (S.D.N.Y. May 18, 2026) (applying the reasonable person of the same background and in the same circumstances standard, citing § 1589(c)(2) and applying a hybrid standard requiring both objective reasonableness and consideration of the plaintiff's particular vulnerabilities). Whether these circumstances would compel a reasonable person of Dixon's background is not resolvable at the Rule 12(b)(6) stage.

The § 1589(c)(2) standard is a hybrid objective standard that asks what a reasonable person of the victim's background and in the victim's circumstances would have experienced. It does not collapse into a purely subjective inquiry, but it also does not ask whether any hypothetical worker in some idealized situation could have walked away. It asks specifically whether a reasonable person with Dixon's professional history, industry relationships, economic dependence, family circumstances, and knowledge of Defendants demonstrated willingness to threaten and punish would have perceived a safe and realistic alternative to continued labor. Baldia, 633 F. Supp. 3d at 706–08. On that standard, the FAC's allegations are more than sufficient to survive dismissal.

Defendants' tour-security argument—that a man with physical presence should not have feared Defendants' threats—substitutes a stereotype for the required individualized analysis. The TVPA does not protect only the physically diminutive or the psychologically vulnerable in a clinical sense. It protects any person whose circumstances—including professional dependency, family exposure, industry power dynamics, and demonstrated threat credibility—make the coercive scheme effective. A person with physical presence is not immune to threats directed at his children, his professional existence, and his financial survival. The relevant question is not whether Dixon could physically overpower his threateners; it is whether, under all the circumstances, continuing to perform was the only realistic choice. The Court should reject Defendants' categorical attempt to use Dixon's personal characteristics to define the class of workers who deserve TVPA protection.

### 5. Internal consistency of the pleadings

Defendants argue that the FAC is internally inconsistent because Dixon states he would have left in 2011–2012 had certain financial information not been concealed, while also pleading that threats compelled him to continue. That is not a logical impossibility requiring dismissal under Rule 8. The fraudulent-concealment allegation addresses decision-making based on information asymmetry; the forced-labor claim addresses a distinct coercive mechanism—physical threats and economic destruction—operating regardless of financial knowledge. These theories operate on separate tracks. Stein v. World-Wide Plumbing Supply Inc., 71 F. Supp. 3d 320 (E.D.N.Y. 2014) (applying Iqbal and finding forced labor allegations sufficient without requiring extreme hallmarks of trafficking). Rule 8(d)(2)–(3) expressly permits such alternative pleading without requiring that the theories be logically impossible to reconcile.

The distinction between the two theories is both logically coherent and factually supported. The fraudulent-concealment allegation operates at the level of information and choice: Dixon alleges that had he known he was being excluded from copyright registrations, omitted from publishing splits, and deliberately underpaid through a manipulated Paychex structure, he would have retained counsel and stopped performing earlier. FAC ¶¶ 87–88, 164–171. That allegation speaks to what Dixon would have chosen had he possessed full information. The forced-labor allegation operates at the level of fear and coercion even had Dixon known the full financial picture, physical threats to him and his family, blacklisting threats by a powerful industry actor, and control over his travel and income would have constrained his options for safe departure. FAC

¶¶ 53–62, 108–124. A person can rationally conclude both that he would have made different choices with more information AND that, given the coercive environment he actually faced, his realistic options were constrained regardless of information. Those are not contradictory positions; they are complementary descriptions of how exploitation operates. Fraudulent concealment eliminated his ability to make an informed choice; coercion constrained the choices available even had he been informed. FAC ¶¶ 53–62, 87–88, 112–124, 164–171. Rule 8(d) exists precisely to permit plaintiffs to plead such complementary theories, and the TVPA and fraud-concealment doctrines both contemplate their coexistence. FAC ¶¶ 102–128, 164–171.

### 6.  Policy and statutory purpose

The statutory purpose of the TVPA reinforces Dixon's position at every level. Congress enacted and repeatedly expanded the TVPA to combat exploitation that does not take the form of traditional slave labor or immigration trafficking. The 2003, 2005, 2008, and 2013 reauthorizations of the TVPA progressively expanded its reach, each time responding to judicial interpretations that had narrowed the statute's application to the paradigmatic trafficking case. The 2008 amendments specifically broadened § 1589 to include scheme-based coercion under § 1589(a)(4) and to define serious harm broadly to include psychological, financial, reputational, and other non-physical harm. Congress did so because it recognized that some of the most pervasive and harmful forced-labor arrangements involve economic control, psychological manipulation, and industry-power dynamics rather than physical restraint. The music and entertainment industry has been a persistent site of such arrangements. Zan Sun v. Shen Yun Performing Arts, Inc., No. 25-CV-3185 (JGLC), LEXIS 111907 (S.D.N.Y. May 18, 2026) (performing-arts plaintiffs may state a TVPA claim through allegations of professional, psychological, and economic coercion). Applying the TVPA to the conduct pleaded in the FAC serves its core statutory purpose: protecting performers who lack independent bargaining power, industry access, and records from exploitation by those who control those resources. Defendants' narrow reading of the statute would effectively immunize industry-based exploitation from TVPA liability, creating precisely the loophole Congress sought to close when it expanded § 1589's definition of serious harm. The Court should adopt the reading of the statute that serves its remedial purpose.

### B.  Section 1591 Sex Trafficking Is Plausibly Alleged

The § 1591 claim is preserved and pleaded in good faith. Plaintiff acknowledges that the sex-trafficking predicate raises fact-intensive issues best resolved after discovery, including the precise nature of the threatened consequences associated with each alleged encounter and the full

evidentiary record regarding travel arrangements, payment structures, and documented threats. At the pleading stage, the § 1591 claim survives because: (1) the thing of value element is satisfied by return transportation, continued tour inclusion, and avoidance of stranding abroad — benefits that David v. Weinstein Co. LLC, 431 F. Supp. 3d 290, 298 (S.D.N.Y. 2019), held are sufficient at the pleading stage; (2) the canceled-flight allegation describes a retaliatory consequence for noncompliance that reinforces, rather than disproves, the coercive scheme — a single refusal does not establish that compliance was ever truly voluntary; and (3) the FAC pleads a cumulative coercive environment, not a one-to-one threat-to-sex-act correspondence, and the TVPA does not require such a correspondence. Canosa v. Ziff, 2019 U.S. Dist. LEXIS 13263, at *57–64 (S.D.N.Y. Jan. 28, 2019). To the extent the Court finds the § 1591 pleading technically deficient in any respect, Plaintiff respectfully requests leave to amend to supply additional particularized allegations regarding the nexus between the threatened consequences and specific encounters, consistent with the facts developed in pre-suit communications and to be further developed in discovery. The § 1595(a) venture-liability theory survives independently on the § 1589 forced-labor predicate alone and does not require the § 1591 predicate to remain viable.

The FAC also pleads a § 1591 predicate. It alleges that Cartagena arranged or directed sexual encounters involving Dixon after performances and studio events, that Dixon's compliance was conditioned on things of value including return transportation, continued touring income, schedule inclusion, and physical safety, and that refusal led to canceled travel, withheld pay, stranding, humiliation, and threats. FAC ¶¶ 129–137. It alleges specific incidents in Miami, during an international touring engagement, and after a domestic performance, supported by travel records, credentials, boarding passes, and passport stamps. FAC ¶¶ 133–136. The § 1591 claim is not derivative of the § 1589 claim; it rests on distinct statutory elements, distinct coercive mechanisms, and distinct categories of thing of value. FAC ¶¶ 129–137. It is therefore analyzed independently, not as a subset of the forced-labor theory.

Section 1591 prohibits knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person, knowing or recklessly disregarding that means of force, fraud, or coercion will be used to cause the person to engage in a commercial sex act, or that the person is under the age of eighteen. 18 U.S.C. § 1591(a). The civil remedy under § 1595(a) allows a victim to bring a civil action against the perpetrator and against any person who knowingly benefits from participation in a venture that violates § 1591,

knowing or in reckless disregard of the fact that the venture engaged in such violations. 18 U.S.C. § 1595(a). Dixon's § 1591 claim proceeds on a perpetrator theory as to Cartagena and a venture-benefit theory as to the other Defendants. FAC ¶¶ 133–136 (for specific incidents), ¶¶ 137–138 (for coercion means), ¶ 140 (for venture liability).

The statute of limitations for civil § 1595 claims are ten years, tolled until the victim reaches eighteen or discovers the violation. 18 U.S.C. § 1595(c). Defendants have not seriously argued that the § 1591 claim is time-barred, and they cannot do so: the FAC alleges incidents between approximately 2014 and 2019, and Dixon filed suit in June 2025—well within the ten-year window. FAC ¶¶ 129–137. Any timeliness argument directed at § 1591 must fail on its face given Congress's deliberate choice of a long limitations period for sex-trafficking victims.

1. Commercial sex acts and things of value

Defendants argue that ordinary benefits cannot be things of value under § 1591. The statute defines a commercial sex act as any sex act on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3). The FAC pleads that return travel, safe transportation, continued employment, access to performance fees, and avoidance of physical or economic punishment were conditioned on compliance. FAC ¶¶ 130–137. At the pleading stage, those are things of value. Noble v. Weinstein, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) (denied Defendant Harvey Weinstein's motion to dismiss the plaintiff's civil sex trafficking claim brought under the Trafficking Victims Protection Reauthorization Act (TVPRA). The court held that the plaintiff … plausibly alleged that Weinstein employed fraud and physical force to cause her to engage in a commercial sex act under, 18 USCS § 1591 even though the allegations did not present an archetypal sex trafficking action. Specifically, the court ruled that fraudulent promises or representations of career advancement—such as film roles, modeling meetings, and professional associations—constitute a thing of value sufficient to satisfy the commercial element of a commercial sex act under the statute); Geiss v. Weinstein Co. Holdings, LLC, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019) (joining Noble); David v. Weinstein Co. LLC, 431 F. Supp. 3d 290, 298–302 (S.D.N.Y. 2019) (same); Canosa v. Ziff, 2019 U.S. Dist. LEXIS 13263 (S.D.N.Y. Jan. 28, 2019) (rejected a narrow, restrictive construction of the Trafficking Victims Protection Act (TVPA), 18 USCS § 1591, and held that professional opportunities and career advancement used as inducements to coerce sexual acts fall within the statute's scope). Defendants may contest

whether the evidence proves the exchange, but they cannot obtain dismissal by recasting the alleged quid pro quo as merely ongoing employment.

The David v. Weinstein framework is directly applicable. In David, Judge Ronnie Abrams held that the thing of value element of § 1591(e)(3) is broad and encompasses any benefit—tangible or intangible—that has value to the recipient in his or her circumstances and that career access, industry relationships, professional opportunities, and the mere meeting with a powerful figure constitute things of value when they are conditioned on sexual compliance. David, 431 F. Supp. 3d at 299–302. The court further held that the career access conditioned on sex theory states a valid commercial sex act claim under § 1591 and rejected the argument that the exchange must involve a direct cash payment or something conventionally bought and sold. Id. The Canosa court reached the same conclusion, holding TVPA broadly defines commercial sex act as any sex act, on account of which anything of value is given to or received by any person, and that the benefits Weinstein conferred—career opportunities, industry access, meeting requests, project participation—were things of value even though they were not monetary payments for sex. Canosa, at *19–20.

Applied here: the FAC pleads that return transportation after international travel, continued inclusion on tour schedules, access to performance fees, and avoidance of stranding or physical punishment were conditioned on Dixon's compliance. FAC ¶¶ 130–137. Return transportation when stranded abroad without funds or shelter is unambiguously a thing of value. Continued tour inclusion generating $3,000 per show is a thing of value. Safety from physical threats is a thing of value. Defendants' argument that these constitute ordinary employment benefits fundamentally misunderstands the statutory standard: the question is not whether the benefit is ordinary in some other context, but whether it was given or withheld as consideration for a sex act. 18 U.S.C. § 1591(e)(3). The FAC pleads that it was. FAC ¶¶ 130–137.

### 2. Coercion and retaliation

Defendants also argue that the coercion allegations are not tied to specific sex acts. The FAC pleads that the same threats and dependency mechanisms described in the forced-labor allegations were used to obtain sexual compliance, including threats of violence, stranding, withholding income, legal abuse, and public humiliation. FAC ¶¶ 130–137. It specifically alleges that when Dixon resisted during an international engagement, Cartagena canceled his return flight and left him stranded abroad without funds, shelter, or safe return transportation until later

compliance. FAC ¶ 135. It alleges that during another incident Cartagena disregarded Dixon's expressed reluctance, directed him to participate, and recorded him without consent. FAC ¶ 136. These facts plausibly plead coercion under § 1591(e)(2) and serious harm under § 1591(e)(5). The TVPA does not require a one-to-one correspondence between a specific threat and a specific sexual encounter; the totality of the coercive environment establishes the scheme.

Defendants anticipate arguing that Dixon's admission that he refused one alleged encounter and suffered only a canceled flight undermines the coercion element. That argument inverts the pleading standard. The FAC alleges that Cartagena canceled Dixon's return flight—leaving him stranded in a foreign country without funds, shelter, or safe travel—as a direct consequence of Dixon's refusal. FAC ¶ 135. That alleged consequence is itself an act of coercion: using stranding in a foreign country as a punishment for noncompliance and as a mechanism to extract future compliance. The FAC does not allege that the canceled flight was the end of the story; it alleges that the stranding was a coercive tool that Cartagena used to condition Dixon's behavior on subsequent occasions. FAC ¶¶ 130–137. Whether that sequence of events satisfies § 1591's coercion element is a factual question that cannot be resolved by recharacterizing the alleged punishment as only a canceled flight. A person stranded abroad without resources, at the direction of the person who controls their financial and professional survival, is not in a position of free choice regarding future compliance. FAC ¶¶ 130–137.

The nonconsensual recording allegation at FAC ¶ 136 is separately significant. It describes Cartagena as having recorded Dixon without consent during a sexual encounter—which, combined with the other coercive allegations, supports an inference that Cartagena used or intended to use the recording as a further tool of control or punishment. FAC ¶ 136. That inference is not necessary for the § 1591 claim, but it reinforces the coercive character of the relationship and the credibility of the fear that Defendants could punish Dixon through public exposure, as well as physical and economic means.

C.  Venture Liability Under Section 1595(a)

Section 1595(a) permits civil liability against a person who knowingly benefits, financially or by receiving anything of value, from participation in a venture that the person knew or should have known engaged in a TVPA violation. 18 U.S.C. § 1595(a). Defendants' venture-liability argument depends on reading the FAC as alleging passive association. It does not. The FAC alleges that Cartagena directed the scheme; Torres enforced threats; Jospitre controlled payment flows and

reinforced legal and financial pressure; Moreira maintained payroll and financial structures that concealed underpayment and dependency; Sneaker Addict and Slate received and routed proceeds; and Roc Nation continued managing, scheduling, approving, and profiting from tours after Dixon complained to Castillo. FAC ¶¶ 106–128, 138–140, 77–80.

1. Response to Roc Nation — more than ordinary management

Roc Nation relies on cases rejecting liability for ordinary services and abstract awareness. The FAC pleads more than ordinary services. Roc Nation, through Castillo, allegedly served as Dixon's supervisory contact, received complaints about underpayment, mistreatment, exploitative conditions, pressure to continue performing, and fear of retaliation, had access to tour budgets and settlement sheets, approved tours and budgets that included Dixon but failed to protect his agreed compensation, and continued receiving commissions from touring revenue. FAC ¶¶ 76–85, 140, 77–80, 218–233. Those allegations supply knowledge, participation, and benefit.

Geiss is distinguishable because the FAC alleges a causal connection between Roc Nation's management conduct and its benefit: Roc Nation approved and facilitated the tours through which Dixon's allegedly coerced labor generated gross touring revenue, and Roc Nation's commissions were calculated from that revenue. FAC ¶¶ 80–84, 140. Geiss, 383 F. Supp. 3d at 169. Here, the benefit flowed from the very touring operations in which Dixon's coerced labor allegedly was used and about which he complained. FAC ¶¶ 76–85, 140, 77–80.

2. Response to Moreira — payroll and financial-opacity role

Moreira argues that payroll and legal services are routine. The FAC alleges that Moreira's role was not routine. She allegedly controlled payroll and financial information, caused or supervised the Paychex wage statement with "XXXX" withholding entries, maintained financial opacity, reassured Dixon that everything was in order, and controlled records necessary for Dixon to assess or assert his rights. FAC ¶¶ 18, 33–34, 107, 114, 120, 166, 191–194, 200–204. The TVPA theory against Moreira is not that she was a lawyer who knew Cartagena; it is that she used payroll and financial systems to keep Dixon underpaid, dependent, and unable to disengage. FAC ¶¶ 107, 114, 118–120, 200–204.

To the extent the Court requires more facts about Moreira's benefit, Dixon requests leave to amend to plead compensation, management fees, officer benefits, entity distributions, or other things of value Moreira received from the venture. The FAC already pleads her participation and knowledge through operational control. FAC ¶¶ 18, 114, 120, 166, 191–194, 200–204.

### 3.  Distinguishing Noble, Geiss, and defense authorities

Noble and Geiss do not require dismissal. Noble requires specific participation in the sex trafficking act itself with the requisite knowledge or reckless disregard of the violative nature of the venture. The FAC alleges participation through threats, payment routing, payroll manipulation, records control, tour approvals, and continued management after notice. FAC ¶¶ 53–85, 106–128, 138–140. Geiss required a causal relationship between affirmative conduct furthering the venture and receipt of a benefit. 383 F. Supp. 3d at 167–69. The FAC pleads that relationship as to each actor: the coercive touring operation generated performance revenue, management commissions, entity proceeds, and retained royalties while Defendants used threats and financial opacity to secure Dixon's continued labor. FAC ¶¶ 60, 80–84, 117–120, 140.

The Noble decision is further distinguishable because the plaintiff in Noble failed to plead any specific acts by the secondary defendants linking them operationally to the primary tortfeasor's coercive conduct. Noble, 335 F. Supp. 3d at 524–25. The court found only generalized allegations of association and proximity to the venture. Here, the FAC pleads specific operational facts for each secondary defendant: Roc Nation approved specific tour dates on which Dixon's coerced labor was used and received commissions therefrom; Moreira caused the specific Paychex wage statement that concealed Dixon's compensation; Jospitre routed specific promoter payments and gave specific false assurances; Torres enforced specific threats at specific times including the June 2019 plane threat; Sneaker Addict issued the payroll and received touring revenues; Slate was the vehicle through which those revenues were held and transferred. FAC ¶¶ 47–49, 55, 76–85, 98–99, 107, 114–120, 138–140, 166, 200–211. That level of specificity goes well beyond the association-only pleading that Noble rejected.

The venture-liability theory under § 1595(a) is designed precisely to capture the type of multi-actor enterprise pleaded in the FAC: a principal who directs the coercive scheme (Cartagena), enforcers who carry out specific threats (Torres), administrative actors who maintain the financial opacity necessary to keep the victim dependent (Moreira, Jospitre), corporate entities through which labor is monetized and proceeds are routed (Sneaker Addict, Slate), and a management company that approves the enterprise while receiving a percentage of the proceeds (Roc Nation). Congress' creation of civil liability against anyone who benefits from participation in a venture—not just the primary perpetrator—reflects a deliberate judgment that TVPA violations are enabled by the surrounding infrastructure and that those who knowingly benefit from

that infrastructure bear responsibility. 18 U.S.C. § 1595(a). The FAC pleads that infrastructure. Whether each Defendant's participation can be proven at trial is a question for summary judgment or trial, not for dismissal.

Nor do Defendants' timing arguments defeat the TVPA claim. The FAC pleads coercive conduct during the work period, including attempts to withdraw between 2014 and 2019, threats tied to performances, the June 2019 plane threat, blacklisting threats, legal-process threats, and a pattern that caused Dixon to continue performing. FAC ¶¶ 54–60, 111–124. Later threats in 2023–2025 are pleaded not as the sole mechanism that compelled earlier labor, but as evidence of the same coercive apparatus, as retaliation for asserting rights, and as tolling/context showing why Dixon reasonably feared Defendants and delayed suit. FAC ¶¶ 61–75, 86–88, 156–163, 236–251. Defendants' attempt to sever the later threats from the earlier course of conduct asks the Court to choose their chronology over Dixon's pleaded theory that threats, financial dependence, and concealment operated continuously and were reinforced when he began asserting claims. FAC ¶¶ 53–75, 86–88, 102–128.

Defendants' argument that Dixon could have walked away also raises a merits dispute. Section 1589 does not require locked doors, physical captivity, or immigration vulnerabilities. It reaches schemes that cause a reasonable person in the victim's circumstances to believe that nonperformance will result in serious harm. 18 U.S.C. § 1589(a), (c)(2). The FAC pleads that Dixon was a performer dependent on Defendants' touring operation, lacked independent management and written contracts, had no access to the records needed to enforce his rights, faced threats of violence and family harm, and faced industry-wide blacklisting from powerful music-industry actors. FAC ¶¶ 59–60, 112–124. Whether those circumstances would compel a reasonable person of Dixon's background is not resolvable by comparing Dixon to plaintiffs in cases involving different professions and different coercive mechanisms.

The direct-liability arguments against Torres, Jospitre, Moreira, Sneaker, and Slate also fail at the pleading stage when the FAC is read as a whole. Torres is alleged to have enforced threats, including the June 2019 plane threat and later violent threats. FAC ¶¶ 55(1), 67–75, 108–120(b)(i), 236–251. Jospitre is alleged to have controlled or routed payment flows, reinforced coercive pressure with legal-process threats, and communicated about unpaid compensation and credit. FAC ¶¶ 47–49, 55(1), 111, 115, 120(b)(i), 192, 205–207. Moreira is alleged to have maintained the payroll and financial opacity that helped keep Dixon dependent. FAC ¶¶ 18, 107,

114, 120(b)(i), 166, 200–204. Sneaker and Slate allegedly served as the corporate vehicles through which labor was monetized, pay was understated, proceeds were routed, and records were concealed. FAC ¶¶ 19–20, 36–40, 117–120, 198. These allegations support direct participation, conspiracy, or venture liability depending on each defendant's role. FAC ¶¶ 102–128, 138–144.

The defense authorities involving remote banks, franchisors, or ordinary service providers are likewise inapposite because those cases involved defendants alleged to have provided generalized services without direct notice or operational control over the victim's labor. Here, Dixon alleges direct complaints to Castillo, direct payroll control by Moreira, direct payment and threat conduct by Jospitre, direct enforcement by Torres, and corporate receipt and routing of tour revenues by Sneaker Addict and Slate. FAC ¶¶ 47–49, 76–85, 107, 114–120, 138–140, 200–211.

### 4.   The Statute of Limitations Does Not Bar the TVPA Claim

The TVPA's civil cause of action under § 1595 carries a ten-year statute of limitations. 18 U.S.C. § 1595(c). Dixon alleges forced labor and sex trafficking incidents between approximately 2005 and 2020. FAC ¶¶ 53–62, 102–144. He filed suit in June 2025. All conduct occurring on or after June 2015 falls within the ten-year limitations period even without tolling. Conduct before June 2015 is subject to the TVPA's tolling provision, which suspends the period until the victim discovers the violation or reasonably should have discovered it. 18 U.S.C. § 1595(c). The FAC pleads that Dixon did not obtain key evidence confirming the nature and extent of his TVPA claims until 2023–2025 because of Defendants' concealment of financial records, their continuing threats designed to deter legal action, and their affirmative misrepresentations. FAC ¶¶ 86–88, 164–171. The ongoing threats also support equitable tolling: a victim who has been told he will be handled in the street and whose children's locations are known to the threateners is not sleeping on his rights when he delays filing suit for fear of the consequences. FAC ¶¶ 53–75, 164–171. The combination of the ten-year limitations period and the tolling provision for concealed violations means the timeliness question cannot be resolved on the pleadings.

### 5.   Roc Nation — § 1595 Benefit and Participation

Roc Nation's motion argues that it did not participate in a TVPA venture because it was merely Cartagena's artist management company. Section 1595(a) requires that the defendant benefited financially or by receiving anything of value from participation in a venture that violated the TVPA. 18 U.S.C. § 1595(a). Participation in a venture does not require direct involvement in the coercive conduct; it requires that the defendant was engaged in an enterprise that involved the violative conduct and that the defendant received a benefit therefrom while knowing or in reckless

disregard of the violation. The FAC pleads both elements as to Roc Nation. Roc Nation was engaged in the touring enterprise from approximately 2016 through 2020; that enterprise is the same enterprise through which Dixon's allegedly coerced labor was used to generate touring revenues. FAC ¶¶ 76–85, 140. Roc Nation received management commissions calculated from those gross touring revenues. FAC ¶¶ 80–84, 140. Castillo, as the management representative, received direct complaints from Dixon about coercive and underpaid conditions during the very tours generating the revenues from which commissions were paid. FAC ¶¶ 77–80. Those facts plead participation in a venture and receipt of a benefit therefrom with knowledge of the TVPA-violative conduct. Whether discovery will confirm the allegations is a question for summary judgment, not for Rule 12.

The Geiss requirement of a causal relationship between the benefit and the participation is satisfied here. Geiss, 383 F. Supp. 3d at 169. The causal chain is explicit: Roc Nation approved tours, Dixon performed on those tours under allegedly coerced conditions, the tours generated revenues, and Roc Nation received commissions from those revenues. FAC ¶¶ 76–85, 140, 77–80. That is not an attenuated causal chain; it is a direct one. Roc Nation's benefit was derived from the same touring enterprise in which Dixon's coerced labor was used. That satisfies Geiss and supports § 1595(a) venture liability against Roc Nation at the pleading stage.

III.    COUNT IV STATES A COPYRIGHT CLAIM
    A.  Ownership Claim Is Timely — Wilson v. Dynatone Bars Registration-Alone Accrual
    Defendants' copyright limitations argument depends on the premise that public registrations in 2011 and 2014 automatically triggered accrual of Dixon's co-ownership claim. The Second Circuit rejected that premise in Wilson v. Dynatone Publishing Co., 892 F.3d 112, 118–19 (2d Cir. 2018) (copyright registration alone does not put an author on notice of repudiation because authors are not expected to monitor Copyright Office filings continuously). The FAC alleges that the registrations omitted Dixon without his knowledge or authorization, that Defendants controlled the registration and publishing process, and that Dixon did not confirm the omission and related royalty concealment until 2023–2025. FAC ¶¶ 41–49, 86–88, 145–155, 164–171. Under Wilson, those allegations preclude dismissal based on registration alone. Accrual is fact-specific and tied to actual knowledge.

The Wilson rests on a straightforward proposition: because copyright registration is a bureaucratic filing process within the exclusive control of the person who submits the application, the non-filing co-author cannot be charged with constructive knowledge of a registration that

omitted him. Wilson, 892 F.3d at 118–19. The court in Wilson was explicit: imposing a duty to monitor the Copyright Office continuously would effectively put the entire burden of policing co-ownership on the party with the least access to the registration process. Id. That logic applies with full force here. Defendants controlled the copyright registration process, submitted applications that omitted Dixon, engaged publishers and performing-rights organizations that paid royalties to others, and provided Dixon with no information about the status of the works. FAC ¶¶ 41–43, 47–49, 152, 164–171. Dixon had no reason to search the Copyright Office records for registrations of works Defendants had told him were being handled. FAC ¶¶ 29, 47–49, 165. Under Wilson, his failure to discover those registrations until 2023–2025 does not defeat his ownership claim.

B.  <u>Distinguishing Kwan v. Schlein — No Express Repudiation Until 2023–2025</u>

Defendants rely on Kwan, 634 F.3d 224, for the proposition that ownership claims accrue when a reasonably diligent plaintiff is on inquiry notice. Kwan involved clear repudiation and facts showing the plaintiff knew or should have known of the adverse ownership claim more than three years before suit. Id. at 228–29. Critically, Kwan involved facts where the adverse claim of sole authorship was objectively apparent from the published work itself — the plaintiff was listed only as 'editor' rather than co-author, received royalties consistent only with that lesser role, and had been aware of the ownership dispute since at least December 1998 when the issue was raised before publication. Under those circumstances, a reasonably diligent plaintiff was on inquiry notice no later than publication. Here, by contrast, Dixon had no equivalent objective notice: Defendants controlled all registrations, split sheets, and royalty structures; made affirmative assurances that his credit and percentages were being handled; and never communicated any adverse ownership position until Dixon's 2023–2025 inquiries.

Wilson reaffirms the inquiry-notice standard and holds that where no clear repudiation was communicated to the co-author, accrual does not automatically run from registration alone. Wilson, 892 F.3d at 118–19. The FAC pleads the opposite of plain repudiation: Defendants assured Dixon he would be taken care of, withheld split sheets, registrations, publishing agreements, royalty statements, and settlement documents, and only in 2023–2025 did Dixon obtain the records and communications confirming his omission. FAC ¶¶ 47–49, 87–88, 164–171.

The distinction between Wilson and Kwan is therefore straightforward: Kwan applies where the adverse party communicated an unambiguous claim of sole ownership to the co-author, which the co-author knew or should have known. Wilson applies where no such communication

was made and the co-author lacked access to the records confirming the adverse claim. Here, there was no plain repudiation: Jospitre's April–May 2023 WhatsApp messages treated Dixon's claims as pending and unresolved, not as already-decided adverse ownership questions. FAC ¶¶ 47–49, 192. That is the opposite of plain repudiation. Moreover, co-ownership limitations rules do not disturb the rule that a copyright owner's suit for infringement is timely if instituted within three years of each infringing act. Carell v. Shubert Organization, Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000) (distinguishing limitations rules for co-ownership claims from those governing infringement claims). Defendants' continuing exploitation through streaming, licensing, and catalog distribution gives rise to timely infringement claims independent of the co-ownership accrual question. FAC ¶¶ 45–46, 153–155.

Defendants say Dixon knew he was not receiving royalties when the albums were released. The FAC alleges that Dixon lacked access to the underlying royalty structures, registrations, split sheets, and publishing agreements, and that Defendants repeatedly assured him that his percentages and paperwork would be handled. FAC ¶¶ 29, 47–49, 165–169. Nonpayment may support inquiry notice in some cases, but it is not a categorical bar where the plaintiff pleads concealment, trust-based assurances, and absence of clear repudiation. FAC ¶¶ 47–49, 164–171. At minimum, when Dixon was on notice is a fact question. A plaintiff who knows he has not received royalties does not necessarily know that he has been omitted from copyright registrations, excluded from publishing split sheets, denied SoundExchange registration, and deprived of the legal status of co-author—particularly where he has been repeatedly told that his paperwork is being handled. FAC ¶¶ 29, 47–49, 165–169. Those are distinct harms with distinct accrual events, and Dixon's general awareness of nonpayment does not, as a matter of law, trigger accrual of all his copyright claims simultaneously.

C. Standing for Declaratory Co-Ownership and Accounting

Count IV seeks a declaration that Dixon is a co-author and co-owner and an accounting of royalties, licensing fees, synchronization income, and catalog-sale proceeds. FAC ¶¶ 145–155. Defendants conflate that declaratory co-ownership/accounting relief with a standalone infringement claim. A co-owner may seek an accounting from other co-owners for profits derived from the jointly owned works. FAC ¶¶ 145–155. Dixon pleads original contributions, mutual intent to merge contributions into unitary works, no written assignment, no work-for-hire agreement, and

continued exploitation without accounting. FAC ¶¶ 41–45, 146–153. Those facts plead a claim for declaratory ownership and accounting.

The governing framework confirms that the mutual-intent question cannot be resolved against Dixon on the pleadings. Joint authorship in the Second Circuit turns on the two-pronged Childress test as elaborated in Thomson v. Larson, 147 F.3d 195 (2d Cir. 1998): a plaintiff must plausibly allege (1) independently copyrightable contributions to the work and (2) that each putative co-author manifested the necessary intent to be co-authors at the time the contributions were merged. Id. at 199, 202–03; Childress v. Taylor, 945 F.2d 500, 507–08 (2d Cir. 1991); 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 255 (2d Cir. 2015) (reaffirming Childress framework). Thomson directs courts to conduct a nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts. 147 F.3d at 203. Joint authors under this framework hold equal undivided interests in the whole work. Id. at 199. The FAC pleads each of those factual indicia in Dixon's favor: original hooks, verses, call-and-response sections, vocal arrangements, lyrics, and melodies contributed to specific registered works (independently copyrightable contribution); repeated in-studio collaboration, credit representations, and assurances that his percentages and paperwork would be handled (mutual intent); and the absence of any written assignment, work-for-hire agreement, or exclusive license disclaiming co-authorship (§ 204(a) writing). FAC ¶¶ 41–45, 146–153, 164–171.

A recent decision in this District applied that same framework to this same defendant and denied dismissal on functionally identical allegations. In Elliott v. Cartagena, No. 19 Civ. 1998 (NRB), 2025 WL 486634 (S.D.N.Y. Feb. 13, 2025), Judge Buchwald addressed a joint-authorship claim asserted against Joseph Cartagena and his affiliated entities concerning the composition All the Way Up. The court held the plaintiff had at least plausibly suggested the requisite amount of contribution and had adequately pled a mutual intention of co-authorship, sufficiently alleged mutual intent will vary depending on the specific factual circumstances and is not susceptible to resolution on a motion to dismiss. Elliott, 2025 WL 486634, at *17–18. Elliott is directly on point: same defendant, same court, same music-industry context, same Rule 12(b)(6) posture, same Thomson factual-indicia inquiry. The reasoning that defeated Cartagena's Rule 12 motion in Elliott applies with equal force here, where Dixon has pleaded fifteen years of collaborative studio work, specific creative contributions to twelve identified registered works, and repeated representations

by Cartagena and Jospitre that Dixon's authorship credit and percentages would be reflected in the paperwork. FAC ¶¶ 29, 41–49, 87–88, 146–153, 164–171. At the pleading stage, that is all Dixon must allege to place the mutual-intent question before the finder of fact.

D. Infringement Standing and Fourth Estate

Dixon pleads infringement in the alternative if the Court determines he is not a co-owner or that Defendants' exploitation exceeded any implied authorization. FAC ¶¶ 147, 149–155. Fourth Estate requires registration or refusal before an infringement action is instituted. 586 U.S. at 302–04. The FAC identifies registrations for each work and alleges that Defendants obtained them while omitting Dixon. FAC ¶¶ 41–43, 152. If the Court concludes that Dixon must amend to plead his status as a beneficial owner, co-owner of registered works, claimant, applicant for supplementary registration, or party entitled to sue after declaration of ownership, leave should be granted. FAC ¶¶ 41–49, 145–155.

The Fourth Estate registration requirement does not independently bar Dixon's copyright claims at this stage for two reasons. First, a co-owner who seeks a declaratory judgment of ownership and an accounting is not required to satisfy the registration prerequisite applicable to infringement actions, because the declaratory and accounting claims are equitable rather than statutory infringement claims. The registration requirement of 17 U.S.C. § 411(a) applies to civil actions for infringement, and Dixon's primary copyright claim is a declaration of co-authorship and co-ownership with an accounting of royalties owed—not a traditional § 501 infringement suit. FAC ¶¶ 145–155. Second, even if the Court requires registration for all copyright claims, the Defendants already possess the registrations: the same registrations that Defendants used to argue accrual in Defendants' favor are the registrations that satisfy Fourth Estate for purposes of Dixon's infringement claim in the alternative. A defendant cannot simultaneously invoke registrations as accrual evidence and then assert that the plaintiff lacks registration-based standing. At minimum, the registration issue is a pleading deficiency curable by amendment—not a basis for dismissal with prejudice.

E. Sneaker and Slate Are Proper Defendants as Beneficial Exploiters

Defendants argue that Sneaker and Slate are the wrong parties because registrations list other owners. The FAC alleges that Sneaker and Slate received, routed, held, or benefited from touring, royalty, publishing, and catalog-related revenues derived from Dixon's work; that Slate facilitated concealment of income streams through shell entities; and that catalog-sale proceeds and royalty streams traceable to Dixon's works were transferred or held through Slate and affiliated

entities. FAC ¶¶ 20, 45–46, 174–188, 269–278. Even if those entities are not registered owners, they are proper defendants for accounting, constructive trust, unjust enrichment, or beneficial-exploitation relief tied to proceeds they received. FAC ¶¶ 45–46, 180–188, 272–278. If necessary, Dixon requests leave to join or name additional registered owners, publishers, administrators, and transferees. The proper remedy for an argument that additional parties should be joined is joinder, not dismissal of the claims against entities that received proceeds from the allegedly infringing exploitation.

Defendants' reliance on album release dates similarly cannot defeat Count IV on the pleadings. The FAC alleges Dixon's contributions were used in commercial recordings, but also alleges Defendants repeatedly assured him that his credit, percentage, and paperwork would be handled, that Jospitre acknowledged in 2023 that Dixon was seeking payment for specific songs, and that Dixon lacked access to registrations, split sheets, SoundExchange information, publishing agreements, and royalty statements until 2023–2025. FAC ¶¶ 29, 47–49, 87–88, 148, 164–171. A reasonable listener's knowledge that a song was released is not necessarily an express repudiation of co-ownership, particularly where the alleged co-author was told that credits and compensation were being handled behind the scenes. FAC ¶¶ 47–49, 165–169. That is the difference between this case and authorities where the plaintiff had an unambiguous denial, a written agreement inconsistent with ownership, or long-standing knowledge of adverse ownership and unpaid royalties without concealment. Kwan, 634 F.3d at 228–29.

Nor should the Court decide implied-license or work-for-hire defenses now. The FAC pleads that Dixon never signed a written assignment, work-for-hire agreement, or exclusive license, and that any silence was the product of coercion, threats, concealment, and false assurances rather than unambiguous consent. FAC ¶¶ 44, 149–150. Section 204(a) requires a signed writing for a transfer of copyright ownership. 17 U.S.C. § 204(a). Whether Defendants can prove an implied nonexclusive license, its scope, or its revocation cannot be resolved against Dixon on the FAC, especially where he pleads repeated requests for credit, compensation, and accounting. FAC ¶¶ 47–49, 149–155.

## IV.    FRAUDULENT CONCEALMENT (Count VI) IS ADEQUATELY PLEADED
### A.    Duty — Special Facts and Superior Knowledge

The FAC pleads a duty to disclose under the special-facts doctrine and through Defendants' control of payroll, publishing, and financial records. Cartagena, Moreira, and Jospitre allegedly possessed superior and exclusive knowledge of tour revenues, royalty and publishing income,

copyright registrations, publishing splits, tax reporting, and payroll records; controlled the interfaces with Paychex, publishers, performance-rights organizations, promoters, and corporate entities; and repeatedly assured Dixon that he was family, that everything was being handled, and that he would receive his agreed percentage. FAC ¶¶ 29, 47–49, 165–171. Moreira's duty also arises from her alleged role as officer/payroll administrator responsible for accurate wage records under NYLL § 195. FAC ¶¶ 18, 98–99, 121, 166.

Defendants cite cases rejecting fiduciary duties in ordinary employment or royalty relationships. Dixon does not rely solely on an ordinary employment relationship. He pleads special facts: Defendants alone possessed the concealed records, Dixon could not access the records, Defendants made partial assurances that created a misleading impression, and the concealed facts were necessary to discover wage, royalty, and ownership claims. FAC ¶¶ 47–49, 87–88, 164–171. Those facts support a duty to disclose at the pleading stage. The resolution of fraudulent-concealment tolling is intimately bound up with the facts of the case and is not properly decided on a motion to dismiss, even where the defendant argues the plaintiff confronted participants years earlier. Nastasi & Assocs., Inc. v. Bloomberg, L.P., No. 20-CV-5428 (JMF), 2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022).

The special-facts doctrine imposes a duty to disclose where one party to a transaction has information that the other party cannot obtain through the exercise of reasonable diligence and that the disclosing party knows will affect the other party's decision. Kaufman v. Cohen, 307 A.D.2d 113, 119–20 (1st Dep't 2003) (the special-facts doctrine applies where the plaintiff establishes both that the defendant had superior knowledge not readily available to the plaintiff and that the defendant knew the plaintiff was acting on the basis of mistaken knowledge). Here, the conditions for the special-facts doctrine are met in full: Defendants had exclusive access to Copyright Office filings, Paychex records, promoter settlement sheets, royalty statements, SoundExchange registrations, and publishing agreements; Dixon had no independent access to any of those materials; Defendants knew Dixon was relying on their representations that his financial arrangements were being properly handled; and Defendants actively reinforced that reliance through oral assurances while concealing the records that would have revealed the truth. FAC ¶¶ 29, 47–49, 165–171.

B.  Rule 9(b) Particularity — Concrete Concealment Events

Rule 9(b) is satisfied. The FAC identifies the who, what, when, where, and why of specific concealment events. On or about September 23, 2011, Cartagena, through Joey and Ryan Music and Warner-Tamerlane, caused copyright registrations for identified works to be filed omitting Dixon despite his alleged co-authorship. FAC ¶¶ 41–43, 166(1). On or about June 21, 2019, Moreira caused a Paychex wage statement to be issued for the June 8–21, 2019 pay period showing $14,103.90 in year-to-date earnings and "XXXX" withholding fields, concealing true wages and withholdings. FAC ¶¶ 33–34, 99, 166(2). Between approximately 2015 and 2020, including in New York City after Dixon complained about missing money from a $30,000 promoter payment, Jospitre told Dixon that the numbers are being fixed, Erica is handling it, and you're straight, while no corrections were made. FAC ¶¶ 39, 166(3), 169. In April–May 2023, Jospitre acknowledged Dixon's specific unpaid-credit and royalty claims, said Will do, asked whether to show Cartagena the whole text or only the songs Dixon felt he should be paid for, and directed Dixon to Moreira. FAC ¶¶ 47–49, 192.

Those allegations are not broad accusations. They identify concrete documents, dates, actors, statements, omissions, and why the concealment mattered. FAC ¶¶ 33–34, 47–49, 164–171, 191–194. Defendants' demand for additional detail—specific internal ledgers, exact split-sheet dates, or all tour-settlement amounts—seeks discovery material held by Defendants. FAC ¶¶ 87–88, 167–168. The Rule 9(b) specificity requirement is calibrated to that reality: where the details of the fraudulent scheme are exclusively within the defendant's possession, the requirement is applied with flexibility, and courts do not require discovery-level detail before discovery has occurred. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (confirming that Rule 9(b) is relaxed when the information underlying the fraud claim is exclusively within the defendant's knowledge and the pleading otherwise gives the defendant adequate notice of the circumstances of the alleged fraud). The FAC gives more than adequate notice: it identifies every major concealment actor, the mechanism each used (copyright registration, Paychex record, oral assurances, WhatsApp communications), the approximate dates, the nature of the concealed information, and the injury to Dixon. FAC ¶¶ 33–34, 47–49, 164–171, 191–194.

The particularity requirement is further satisfied by the specific documents the FAC identifies. The Copyright registrations—filed September 23, 2011, and later—are public records now in Dixon's counsel's possession. FAC ¶¶ 41–43. The Paychex wage statement is a specific

document with a specific date, employee ID, and falsified data fields. FAC ¶¶ 33–34, 99, 166(2). The WhatsApp communications in April–May 2023 are digital records capable of forensic preservation. FAC ¶¶ 47–49, 192. The Jospitre oral assurances are contemporaneous statements made in identifiable places in the course of financial discussions. FAC ¶¶ 39, 166(3), 169. Together, these documents and communications describe a multi-year concealment scheme with the granularity Rule 9(b) demands. Defendants cannot require greater specificity about records that they control and have not yet produced.

The concealment also had an affirmative dimension beyond mere nondisclosure. The "XXXX" withholding entries on the Paychex statement are not evidence of an omission—they are evidence of an affirmative act of data manipulation. Legitimate Paychex systems automatically populate withholding fields; the "XXXX" entries indicate that fields were manually altered or that the system was configured to obscure the data. FAC ¶¶ 33–34, 99, 166. That is an affirmative act of record falsification. Similarly, Jospitre's repeated assurances that numbers are being fixed and Erica is handling it are not neutral silence; they are affirmative misrepresentations that Dixon's financial concerns were being actively corrected, made while no corrections were occurring. FAC ¶¶ 39, 166(3), 169. Affirmative fraudulent concealment of this character satisfies Rule 9(b) and the requirements of the fraudulent-concealment doctrine.

C.  Reliance and Delayed Discovery

The FAC pleads reliance and delayed discovery. Dixon alleges he relied on Defendants' omissions and half-truths because Defendants controlled payroll systems, publishing registrations, royalty reporting, tour settlement documents, and financial records, and because they assured him that financial issues were being handled. FAC ¶¶ 165–169. He alleges that, had he known he was excluded from registrations, split sheets, publishing agreements, and accurate wage records, he would have stopped performing earlier, retained counsel, registered his contributions, and brought wage and copyright claims. FAC ¶¶ 168–169. Whether reliance was reasonable despite suspicions of underpayment is a fact issue, particularly where the FAC pleads coercion, threats, and exclusive control over records. FAC ¶¶ 53–62, 87–88, 168–169.

The reasonableness of Dixon's reliance must be assessed in light of the entire factual context the FAC pleads. Dixon was not a sophisticated investor or commercial party with independent counsel, access to public filings, or the ability to demand audits. He was a performer whose livelihood depended on his relationship with Cartagena and who faced physical threats if

he pressed his claims too aggressively. FAC ¶¶ 53–62, 87–88, 112–124. The law does not require the same diligence from a person in Dixon's circumstances as it would from a party with independent access to records and the ability to litigate without fear of physical reprisal. The fact that Dixon knew he was underpaid does not establish that he knew the full legal significance of the omissions in the Paychex records, the copyright registrations, the publishing agreements, and the royalty structures—particularly in the absence of counsel and in the presence of active reassurances that matters were being corrected. FAC ¶¶ 39, 47–49, 87–88, 165–169.

The fraudulent-concealment tolling question is ultimately a fact-intensive inquiry that is not properly resolved at the pleading stage. Courts in this circuit have consistently held that where the plaintiff pleads specific acts of concealment, specific reliance, and a reasonable explanation for the delay in discovery, the tolling question must be resolved at summary judgment or trial, not on a motion to dismiss. Nastasi & Assocs., Inc. v. Bloomberg, L.P., No. 20-CV-5428 (JMF), 2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022) (a court will not resolve a dispute over fraudulent-concealment tolling on a motion to dismiss when the underlying arguments turn on factual issues that require discovery to resolve.  The running of a statute of limitations will be tolled if a plaintiff can establish that the defendant fraudulently concealed its wrongdoing or the existence of the cause of action.  Because the resolution of a fraudulent-concealment claim is intimately bound up with the facts of the case, it is generally premature and improper to decide the issue at the motion to dismiss stage where the factual record necessary for that determination has not been developed). The FAC provides far more than the minimum required to survive Rule 12 on the concealment-tolling issue: it identifies specific acts of concealment, specific assurances, specific dates, specific documents, and specific reasons why Dixon lacked earlier discovery. FAC ¶¶ 33–34, 39, 47–49, 87–88, 164–171. That is sufficient.

D.  Response to Moreira's Attorney-Duty Argument

Moreira argues that any duty she owed ran only to Cartagena as his lawyer. The FAC alleges Moreira's non-legal operational roles: officer/director of Sneaker and Slate, business manager, payroll controller, Paychex record creator/supervisor, and financial-structure administrator. FAC ¶¶ 18, 33–34, 98–99, 166, 191–194, 200–204. The duty asserted against Moreira arises from those operational and statutory functions, not from an attorney-client relationship with Dixon. FAC ¶¶ 18, 121, 165–166, 200–204. Moreira cannot defeat the claim by substituting her preferred characterization for the pleaded facts.

V.    UNJUST ENRICHMENT (Count VII) SURVIVES AS ALTERNATIVE PLEADING

A.    Rule 8(d) Alternative Pleading

Defendants argue that unjust enrichment is barred because Dixon pleads a contract. Rule 8(d) permits alternative pleading, especially where Defendants deny the existence, enforceability, scope, and terms of the alleged $3,000 per-show agreement. Fed. R. Civ. P. 8(d)(2)– (3). Dixon pleads unjust enrichment only to the extent no enforceable contract governs a particular aspect of the relationship. FAC ¶¶ 172–173, 186–188. Defendants cannot deny the contract and simultaneously insist that the denied contract bars quasi-contract relief. New York law and federal pleading rules both permit unjust enrichment claims in the alternative while the validity or enforceability of any agreement remains contested. Beck v. Manhattan College, 537 F. Supp. 3d 584 (S.D.N.Y. 2021) (unjust enrichment dismissed only where a valid, enforceable contract covers the same subject matter).

The alternative-pleading principle is particularly well-established in the context where defendants deny the agreement but seek to use the alleged agreement as a defensive tool. If Defendants deny that any enforceable per-show agreement existed, they cannot simultaneously invoke a contract to defeat quasi-contract relief. The doctrine of unjust enrichment exists precisely to address situations where one party benefits from another's services and the law implies an obligation to pay in the absence of an enforceable contract. Here, Defendants have received the benefits of more than 200 performances by Dixon—sold-out arenas, touring revenue, management commissions, and commercial catalog exploitation—and Dixon received substantially less than the agreed compensation. FAC ¶¶ 29–30, 35–40, 89–96, 153–155, 172–188. Whether the precise terms of the compensation agreement are enforceable as a formal contract, or whether equity requires compensation under a quantum meruit or unjust enrichment theory, cannot be resolved at the pleading stage without discovery. The elements of unjust enrichment are (1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) it would be unjust to permit the defendant to retain the enrichment without compensation. All three elements are plainly pleaded. FAC ¶¶ 172–188.

B.    Non-Copyright Benefits Are Not Preempted

Copyright preemption does not bar the entire unjust-enrichment claim because the FAC pleads non-copyright benefits: live performance labor, touring services, security/logistics support, promoter payments, per diems, performance fees, Paychex payroll manipulation, and non-royalty tour revenue. FAC ¶¶ 37–40, 172–188. The Copyright Act does not preempt a claim for the

reasonable value of live services, performance labor, withheld show fees, or non-copyright tour proceeds. FAC ¶¶ 174–179, 183–187.

Copyright preemption under 17 U.S.C. § 301 applies only to claims that are equivalent to the exclusive rights within the scope of the Copyright Act. A claim is not preempted if it contains an extra element beyond mere reproduction, distribution, or display of a copyrighted work. The unjust enrichment claim here contains multiple extra elements: the live performance labor, the touring services, the security and logistics functions, and the promoter payments are not within the scope of copyright protection. They are distinct services rendered under a separate compensation agreement, and the enrichment at issue is distinct from any copyright exploitation. FAC ¶¶ 37–40, 174–188. Courts in this circuit have consistently held that unjust enrichment claims based on live-performance services, personal services, and non-copyright touring revenue are not preempted by the Copyright Act, because those services fall outside copyright's scope. The appropriate response to a preemption argument that applies to some, but not all aspects of the unjust enrichment claim are to narrow the claim to non-preempted benefits—not to dismiss the entire claim with prejudice. FAC ¶¶ 172–188.

To the extent unjust enrichment overlaps with copyright-based royalties or catalog proceeds, Dixon preserves the theory as an accounting and constructive-trust remedy tied to co-ownership, not as a substitute copyright infringement claim. FAC ¶¶ 145–155, 180–188, 277–278. The Court can narrow the claim to non-preempted benefits rather than dismiss it wholesale. As a co-owner of the copyrighted works, Dixon has an independent equitable right to an accounting of profits derived from the jointly owned property—a right that exists under copyright law itself, not merely as a substitute for it. That accounting right is not preempted because it arises from co-ownership, not from a claim equivalent to the exclusive rights enumerated in § 106.

C. Constructive Trust / Accounting Preserved

The FAC seeks restitution, disgorgement, accounting, and constructive trust over assets traceable to Dixon's labor and creative contributions. FAC ¶¶ 187–188, 277–278. Those equitable remedies are particularly appropriate where Defendants allegedly controlled records and proceeds, omitted Dixon from registrations and payroll records, routed money through entities, and retained benefits while denying compensation. FAC ¶¶ 33–40, 45–49, 172–188, 269–278. If the Court determines that any part of Count VII is duplicative, it should preserve the equitable remedies as

ancillary to the copyright, fraudulent concealment, wage, and constructive-trust claims. FAC ¶¶ 145–188, 269–278.

Defendants' limitations argument against unjust enrichment is likewise overbroad. Dixon alleges benefits retained through at least 2019–2020 for touring work, and continued exploitation of catalog, royalty, publishing, and catalog-sale proceeds through 2023–2025. FAC ¶¶ 30, 37–40, 45–46, 88(d), 174–188, 272–278. To the extent a three-year limitations period applies to purely legal restitution, it cannot extinguish equitable accounting and constructive-trust remedies tied to continuing retention of identifiable proceeds and assets. FAC ¶¶ 187–188, 277–278. To the extent a six-year limitations period applies, at least 2019–2020 performance benefits and later catalog-related proceeds remain within or subject to tolling. FAC ¶¶ 33–40, 86–88, 174–188. The appropriate remedy, if any, is narrowing by category and date after discovery, not wholesale dismissal.

## VI.    AIDING AND ABETTING CLAIMS (Counts VIII, IX)
### A.  Aiding and Abetting Fraud Against Moreira and Jospitre (Count VIII)

- To plead aiding and abetting fraud, a plaintiff must allege an underlying fraud, actual knowledge, and substantial assistance. Krys v. Pigott, 749 F.3d 117 (2d Cir. 2014) at 127; Lerner, 459 F.3d at 292. The FAC pleads all three. The underlying fraud consists of Cartagena's false assurances that Dixon would receive percentages and credits, the omission of Dixon from registrations and split sheets, the diversion of tour and publishing revenues, and falsified wage records. FAC ¶¶ 164–171, 190. Moreira's knowledge is pleaded through her payroll, entity, wage-statement, and financial-record roles, including the June 2019 Paychex statement and control over records. FAC ¶¶ 18, 166, 191, 193. Jospitre's knowledge is pleaded through his role negotiating and relaying performance terms, receiving show payments, hearing Dixon's complaints, acknowledging the April–May 2023 WhatsApp messages, asking what songs Dixon felt he should be paid for, and directing Dixon to Moreira. FAC ¶¶ 47–49, 166(3), 192, 194.

The Krys framework requires that the aider and abettor have actual knowledge of the underlying fraud—recklessness or constructive knowledge is insufficient. Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014). The FAC meets that standard. Moreira personally caused the Paychex wage statement, controlled the corporate entities through which underpayment was routed, and served as the designated point of contact for financial inquiries. FAC ¶¶ 18, 98–99, 166, 191–194. She is not alleged to have been an innocent bystander who happened to process payroll. She is

alleged to have been the architect of the payroll and corporate structure that made the scheme possible. FAC ¶¶ 18, 38, 166, 200–204. That is actual knowledge, not imputed or constructive knowledge. Jospitre's April–May 2023 communications independently confirm actual knowledge: asking Dixon which songs he felt he should be paid for is not the response of someone who did not know about the fraud; it is the response of someone who knows the fraud exists and is trying to limit the scope of any disclosure or remedy. FAC ¶¶ 47–49, 192.

The Kaufman v. Cohen standard for substantial assistance further confirms adequacy. Kaufman v. Cohen, 307 A.D.2d 113, 125–26 (1st Dep't 2003) (substantial assistance requires more than mere presence but is satisfied where the defendant's conduct affirmatively advances, facilitates, or enables the primary fraud, including by structuring transactions, maintaining records, or making communications that support the fraudulent purpose). Moreira's payroll management, wage-statement generation, and financial-structure administration affirmatively advanced and concealed Cartagena's scheme. Jospitre's payment routing, oral assurances, and communications delayed Dixon's ability to discover and assert his claims. FAC ¶¶ 191–207. These are textbook examples of substantial assistance under Kaufman. FAC ¶¶ 189–196.

Substantial assistance is also pleaded. Moreira allegedly structured and maintained the payroll and corporate architecture, generated and approved wage statements and ledgers that understated compensation, concealed tour receipts, and failed to correct or disclose registrations, splits, and income flows despite inquiries. FAC ¶¶ 18, 99, 166, 191–194. Jospitre allegedly accepted and routed promoter payments tendered nominal payments, reassured Dixon that financial issues would be fixed, concealed documents, and participated in retaliatory planning. FAC ¶¶ 47–49, 166(3), 192–194, 205–207. These are not allegations of mere awareness; they are allegations that Moreira and Jospitre performed functions that advanced and concealed the fraud. FAC ¶¶ 189–196. The aiding-and-abetting fraud claim rises or falls with the underlying fraud allegations; where the fraud claims survive, Count VIII survives with them.

### B. Aiding and Abetting Wage Theft (Count IX)

#### 1. Common-law aiding-and-abetting framework

Defendants argue that the NYLL contains no aiding-and-abetting cause of action. Count IX is pleaded as common-law aiding and abetting of wage theft and, alternatively, as employer/agent/officer liability for actors who substantially assisted the primary wage violations. FAC ¶¶ 197–217. The common-law framework requires a primary violation, knowledge, and substantial assistance. Abu Dhabi Commercial Bank, 651 F. Supp. 2d at 173–74. The FAC pleads

primary wage violations by Cartagena, Sneaker Addict, and Slate; knowledge by Moreira, Jospitre, and Roc Nation; and assistance through payroll systems, diverted payments, false wage statements, concealed records, and tour approvals without proper payment. FAC ¶¶ 197–217.

### 2. Alternative recasting as employer/agent/officer liability

If the Court concludes that New York does not recognize a standalone aiding-and-abetting wage-theft claim, Count IX should be dismissed only as a standalone label and without prejudice to recast the allegations as direct employer, agent, officer, or joint-employer liability. Moreira's payroll role supports direct or agent liability. FAC ¶¶ 18, 98–99, 166, 200–204. Jospitre's payment and intermediary role support agent liability tied to wage diversions. FAC ¶¶ 17, 35, 39–40, 205–207. Roc Nation's functional control supports joint-employer liability. FAC ¶¶ 76–85, 77–80. Rule 8(d) permits that alternative framing.

### 3. Roc Nation via complaints to Castillo and access to settlement sheets

Roc Nation argues that the FAC pleads, at most, constructive knowledge and ordinary management services. The FAC pleads direct complaints to Castillo during Roc Nation's management tenure concerning chronic underpayment, missing per diems, lack of backend compensation, pressure to continue performing, and fear of retaliation. FAC ¶¶ 77–80. It pleads that Roc Nation had access to tour settlement sheets, budgets, and contracts showing what promoters paid and whether Dixon's agreed fee was protected. FAC ¶¶ 77–80, 83, 88(b), 95. It pleads that Roc Nation continued approving tours and budgets that used Dixon's labor without ensuring payment. FAC ¶¶ 80, 83, 88(b), 95. These facts plead knowledge and substantial assistance, or at minimum joint-employer liability, sufficient to survive Rule 12. FAC ¶¶ 197–217, 218–233.

## VII. CIVIL ASSAULT (Count XI) IS TIMELY AS TO TORRES

### A. Recent Torres Threats — Present Ability and Imminence

, civil assault is intentional conduct placing another in reasonable apprehension of imminent harmful or offensive contact. Defendants argue that remote threats can never suffice. The FAC pleads circumstances making the threats immediate and credible: Torres had a known network of associates in New York and Florida, used an account showing his face and nickname, demonstrated knowledge of Dixon's location including Wesley Chapel, gave Dixon a 48 hrs. deadline, threatened that he was going to give it to Dixon, referenced buck 50 facial slashing, stated that his hood would bring it right over there, and caused Dixon to alter daily routines and restrict family movement. FAC ¶¶ 67–75, 238–248. These allegations plead more than abstract

future harm; they plead present ability through associates, location knowledge, specific methods of violence, and a short deadline. FAC ¶¶ 67–75, 236–251.

The present ability requirement for civil assault does not require the defendant to be physically present at the plaintiff's location or to personally carry out the threatened harm. It requires only that the defendant had the ability to carry out the threat—either personally or through associates—at the relevant time. People v. Guerrero, 2017 NY Slip Op 03772, 150 A.D.3d 883, 55 N.Y.S.3d 67 (App. Div.), People v. Bowes, 2022 NY Slip Op 03940, 206 A.D.3d 1260, 170 N.Y.S.3d 334 (App. Div.), N.Y. Penal Law Sec. 20.00. (a defendant can be held criminally liable for threats made by an associate or agent on their behalf under the doctrine of accessorial liability, provided the defendant acted with the required mental culpability and solicited, requested, commanded, importuned, or intentionally aided the associate in making the threat). Here, Torres allegedly demonstrated that capacity through his network of associates, his knowledge of Dixon's specific location, and his explicit 48 hrs. deadline. FAC ¶¶ 67–75, 238–248. Whether Torres had the present ability to follow through on his threats through associates in Wesley Chapel and the Bronx is a factual question that the Court must resolve in Dixon's favor at the pleading stage. The reasonable-apprehension standard does not require certainty that harm will occur; it requires only that a reasonable person in Dixon's position would have experienced apprehension of imminent harmful contact. That standard is plainly met by threats giving a 48-hour deadline and referencing known associates who can bring violence right over there. FAC ¶¶ 67–75, 238–248.

B.  Older Conduct as Context, Not Independent Torts

Dixon does not need every older threat to be independently actionable to preserve Count XI as to Torres. The June 2019 threat and other older threats provide context explaining why the 2023–2025 threats created reasonable apprehension. FAC ¶¶ 55, 67–75, 236–251. If the Court finds older threats time-barred under C.P.L.R. § 215(3), it should treat them as background and allow the recent Torres threats to proceed. FAC ¶¶ 67–75, 238–251. The older threats are not harmless background in any ordinary sense: they are affirmative evidence that Torres's threats had been carried out, or were credibly capable of being carried out, in the past, which makes his 2023–2025 threats plausibly capable of inducing reasonable apprehension in Dixon rather than being dismissed as posturing. FAC ¶¶ 55, 67–75. A person who has already been threatened with physical violence and stranding by the same actor has vastly more reason to apprehend imminent harm from renewed threats than someone experiencing first-time bluster.

C.  Continuing Course of Conduct

The FAC also pleads a continuing course of threat conduct that escalated through 2025 and renewed Dixon's apprehension each time a new threat was issued. FAC ¶¶ 67–75, 236–251, 267. When an alleged offense is part of an ongoing pattern, the continuing tort doctrine permits a plaintiff to rely on conduct occurring more than one year prior to commencement, provided the final actionable event occurred within one year of filing suit. Robles v. Cox and Co., Inc., 841 F. Supp. 2d 615 (E.D.N.Y. 2012). Torres's most recent threats of facial laceration and violence made between 2023 and 2025 fall within the one-year limitations period and anchor the entire pattern of threatening conduct. Defendants may argue that assault cannot be a continuing tort, but even if each assault accrues separately, the recent threats independently fall within the limitations period and state a claim. FAC ¶¶ 67–75, 238–251. At minimum, dismissal with prejudice of Count XI in its entirety is unwarranted. Each new threat renews Dixon's reasonable apprehension; the May 2025 recorded statement about bringing violence right over there is the most recent act in the pattern and was made less than two months before Dixon filed suit. FAC ¶¶ 67–75, 251. That single act, standing alone, is sufficient to state a timely civil assault claim.

VIII.  FRAUDULENT CONVEYANCE / CONSTRUCTIVE TRUST (Count XII)
A.  Preservation of Constructive Trust and Accounting Remedies

Count XII pleads fraudulent conveyance and constructive trust over royalty streams, publishing rights, catalog-sale proceeds, touring revenue, PPP proceeds, and substitute assets traceable to Dixon's labor and creative contributions. FAC ¶¶ 269–278. Even if the Court finds the former-DCL statutory allegations technically deficient, the equitable remedies should be preserved. The FAC alleges that Cartagena and Slate transferred or encumbered assets after Dixon asserted rights; that insider entities and shells were used; that consideration was lacking or inadequate; that transfers were timed around Dixon's demands; and that assets traceable to Dixon's work should be accounted for and held in constructive trust. FAC ¶¶ 269–278.

Defendants' arguments about lack of judgment, insolvency details, fair consideration, and particular transfer dates may warrant a more definite pleading or amendment, not dismissal of equitable tracing and constructive-trust remedies. FAC ¶¶ 272–278. The information concerning exact transfer dates, amounts, transferees, consideration, and retained control is principally within Defendants' possession. FAC ¶¶ 269–278. Where details of the fraudulent scheme are in the exclusive possession of the defendant, Rule 9(b)'s heightened pleading standard is applied with flexibility. The FAC provides ample factual context: it identifies the entities involved (Slate,

BELEEEDAT, WOOO, R4 SO VALID), the approximate years of the transfers (2019 and 2025), the nature of the assets (royalty streams, touring revenue, PPP proceeds, catalog sale), and the badges of fraud (insider transferees, lack of fair consideration, timing near demands, and knowledge of Dixon's claims). FAC ¶¶ 272–278. Moreover, a fraudulent conveyance claim may be brought by a creditor whose claim has not yet been reduced to judgment—the requirement for an existing judgment is premature at the pleading stage.

The constructive trust theory deserves independent analysis. Even if the Court were to find the DCL statutory avoidance claims technically deficient due to the pre-/post-April 2020 transition issue, constructive trust is an equitable remedy that does not depend on the DCL and is available wherever a defendant has unjustly retained identifiable assets traceable to the plaintiff's contributions. Kaufman v. Cohen, 307 A.D.2d 113, 127 (1st Dep't 2003) (constructive trust is imposed where a party holds property under such circumstances that in equity and good conscience it should not retain the property). The FAC alleges that royalty streams, publishing proceeds, touring revenues, and catalog-sale proceeds traceable to works in which Dixon holds a co-ownership interest or to performances in which he provided labor have been transferred to or retained in entities controlled by Cartagena. FAC ¶¶ 269–278. Those circumstances support imposition of a constructive trust over identifiable assets and proceeds, wholly independent of any DCL statutory theory. The Court should preserve the constructive-trust and accounting remedies even if it determines that the current statutory framing requires amendment.

B. Conditional Request for Leave to Plead Current NY UVTA / DCL for Post-April 2020 Transfers

Dixon acknowledges that the current pleading invokes former DCL provisions while some alleged transfers occurred after April 4, 2020. FAC ¶¶ 272, 274. If the Court agrees with Defendants that the former statute does not govern post-April 2020 transfers, Dixon requests leave to amend Count XII under the current New York Uniform Voidable Transactions Act/current DCL provisions and to add additional particulars concerning transfer dates, amounts, transferees, consideration, insolvency, badges of fraud, catalog purchasers, and successor entities. FAC ¶¶ 269–278. Such amendment would be targeted, non-prejudicial, and based on the same asset-transfer and constructive-trust facts already pleaded.

Defendants' Rule 9(b) argument under former DCL § 276 also does not justify dismissal of all equitable relief. The FAC identifies the approximate year and amount of the 2019 Slate-to-BELEEEDAT touring-revenue transfer; the approximate 2025 transfer or assignment of royalty

streams through Slate and/or WOOO to a catalog purchaser; and diversion of PPP loan proceeds obtained by Sneaker Addict based on payroll records that included Dixon. FAC ¶ 274. It also pleads badges of fraud: insider transferees, lack of fair consideration, knowledge of Dixon's claims, and timing near demands and anticipated litigation. FAC ¶¶ 272–276. Defendants may argue that more precision is required for statutory avoidance; that is exactly why leave to amend is requested for dates, transferees, amounts, consideration, insolvency, and retained-control allegations that discovery or investigation can specify further. FAC ¶¶ 269–278.

IX.    LEAVE TO AMEND IS APPROPRIATE IF ANY CLAIM IS DISMISSED

If the Court dismisses any claim or portion of a claim, leave to amend should be granted under Rule 15(a)(2). The requested amendments would be targeted and claim-specific, not an attempt to relitigate dismissed theories wholesale.

Rule 15(a)(2) provides that courts should freely give leave [to amend] when justice so requires. Fed. R. Civ. P. 15(a)(2). The Supreme Court has held that absent a showing of undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment, the leave sought should be granted. Foman v. Davis, 371 U.S. 178, 182 (1962). In the Second Circuit, that instruction means that leave to amend is the presumptive result and that denial requires an affirmative showing of at least one Foman factor. None of the Foman factors is present here. Dixon has not engaged in undue delay: the FAC was filed in response to a motion to dismiss the original complaint, and the current motions are the first opportunity for judicial resolution of the amended claims. Dixon has not acted in bad faith: the FAC is a focused and detailed pleading that drops the RICO claim and other theories, demonstrating good-faith efforts to narrow and clarify the dispute. Defendants cannot show undue prejudice: no discovery schedule has been set, no depositions taken, no trial date fixed. And futility is not established by Defendants' briefing, which asks the Court to draw inferences against Dixon and resolve disputed facts—that is not a futility showing.

For the NYLL claims, Dixon can amend to add further facts concerning 2019–2020 performance dates, paycheck dates, Paychex records, Sneaker Addict and Slate employer functions, Moreira's payroll authority, Roc Nation's budgets and communications, and the precise wage-statement injuries. FAC ¶¶ 33–40, 76–85, 89–101, 200–204, 218–233. For Count X, Dixon can replead joint-employer allegations as a theory incorporated into Counts I, II, V, and IX rather than as a standalone count. FAC ¶¶ 218–233. For Count IX, Dixon can recast aiding-and-abetting

wage theft as direct employer, agent, officer, or joint-employer liability if the Court rejects a standalone aiding claim. FAC ¶¶ 197–217.

For the TVPA claim, Dixon can add further facts concerning the timing of specific threats, the connection between threats and performances, Moreira's and Roc Nation's benefits, and additional complaints to Castillo or other management personnel. FAC ¶¶ 53–85, 102–144. These additional facts would include tour-specific threat incidents, the chronology of threat-and-performance sequences that demonstrate the causal nexus between coercion and labor, and additional details regarding Castillo's actual knowledge and Roc Nation's decision to continue approving tours after complaints. FAC ¶¶ 53–85, 102–144, 77–80. For the copyright claim, Dixon can add registration, beneficial-ownership, supplementary-registration, chain-of-title, co-owner, accounting, and infringement-standing allegations, and can join additional registered owners or transferees if required. FAC ¶¶ 41–49, 145–155. Dixon can also identify the precise contribution he made to each of the twelve works, the approximate dates of those contributions, and any communications in which Defendants acknowledged his creative role. FAC ¶¶ 41–45, 145–152.

For fraudulent concealment and aiding-and-abetting fraud, Dixon can add the exact communications, dates, locations, documents, Paychex metadata, WhatsApp messages, and particular records concealed. FAC ¶¶ 47–49, 164–196. For unjust enrichment, Dixon can separate non-copyright performance-labor benefits from copyright accounting remedies. FAC ¶¶ 172–188. For civil assault, Dixon can identify the dates of recent Torres messages and the circumstances establishing present ability and imminence. FAC ¶¶ 67–75, 236–251. For Count XII, Dixon can plead current DCL/UVTA provisions and additional transfer particulars including specific transfer dates, amounts, transferees, and consideration. FAC ¶¶ 269–278.

Defendants' request for dismissal with prejudice rests on rhetoric about reputational harm, not futility. The FAC already gives notice of the claims and the transactions at issue. Where a more precise statutory label or factual detail could cure any defect, leave should be granted. The Second Circuit has consistently held that pro-plaintiff amendments are presumed appropriate, that courts should not deny leave mechanically, and that where additional facts exist that could cure deficiencies, amendment serves the interest of justice. Here, Dixon has specifically identified the additional facts available for each claim and the precise deficiencies, if any, that amendment would address. That specificity forecloses any argument of futility.

Defendants also ask the Court to reiterate dismissal of Doe and ABC defendants under Rule 4(m). The Doe allegations do not affect the sufficiency of the claims against the served defendants, and any Rule 4(m) issue should be handled administratively or without prejudice to substitution if discovery identifies unknown transferees, payroll actors, publishers, touring personnel, or corporate recipients. FAC ¶¶ 22–28, 269–278. Because the named defendants' control much of the identifying information, dismissal with prejudice of unknown actors before discovery would be premature. FAC ¶¶ 22–28, 87–88, 269–278.

Finally, the Court should reject Defendants' request to deny any amendment based on asserted reputational prejudice. Rule 15 focuses on undue delay, bad faith, repeated failure to cure, undue prejudice, and futility. Fed. R. Civ. P. 15(a)(2). The targeted amendments identified above would not multiply proceedings unnecessarily; they would clarify the exact theories Defendants challenge, align statutory labels with pleaded facts, and allow the case to proceed on a clean record. FAC ¶¶ 29–278. Defendants' disagreement with the allegations, and their insistence that the allegations are harmful to reputation, do not establish futility or justify a pleading-stage adjudication of disputed facts.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in their entirety. The FAC pleads plausible and adequately particularized claims on every count, and the pleading-stage standard requires acceptance of those facts and all reasonable inferences drawn from them.

In the alternative, if the Court dismisses any claim or portion of any claim, Plaintiff requests dismissal without prejudice and leave to amend under Rule 15(a)(2), with the Court identifying the specific deficiencies to be cured. Plaintiff further requests denial of any request to dismiss Doe or ABC defendants with prejudice before discovery identifies the relevant unknown actors.

Dated: New York, New York
July 2, 2026

Respectfully submitted,

/s/ Tyrone A. Blackburn, Esq.
Tyrone A. Blackburn, Esq.